UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MELVIN KIMBROUGH,

                              Plaintiff,
                                                      9:13-CV-0100
v.                                                    (FJS/TWD)

BRIAN FISCHER, ALBERT PRACK,
T. FAUSS, ABATE, H. HAI, MCCARTHY,

                              Defendants.
_____

APPEARANCES:                                  OF COUNSEL:

MELVIN KIMBROUGH, 00-A-2134
Plaintiff pro se
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN                      TIFFINAY M. RUTNIK, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

        This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr.,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Melvin Kimbrough claims that Defendants violated his constitutional rights when they

punished him for passing Black Nationalist literature to another inmate.  (Dkt. No. 1.)  Currently

pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule

of Civil Procedure 56.[1] (Dkt. Nos. 47.) For the reasons discussed below, I recommend that Defendants' motion be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL SUMMARY

Plaintiff alleges that in July 2003, when he was housed at Upstate Correctional Facility ("Upstate"), he ordered and received a pamphlet titled "Black Nationalism." (Dkt. No. 1 at 5.[2]) Officials at Upstate allowed him to possess the pamphlet. *Id.* at 5-6.

In August 2003, Plaintiff was transferred to Auburn Correctional Facility ("Auburn"). (Dkt. No. 1 at 6.) Plaintiff remained there until June 2010. *Id.* On June 6, 2010, Plaintiff was informed that he would be transferring to a medium security facility. *Id.* On June 7, 2010, Plaintiff passed "an abundance of papers" to another inmate to throw away. *Id.* These papers included Black Nationalist literature. *Id.* Defendant Correction Officer J. Hai intervened and confiscated the papers from the other inmate. *Id.*

Plaintiff arrived at Mohawk Correctional Facility ("Mohawk") on June 8, 2010, and was immediately placed in solitary confinement without any explanation. (Dkt. No. 1 at 6.) On June 9, 2010, Plaintiff was issued a misbehavior report that charged him with violating 105.13 (Unauthorized Organizations), 105.14 (Unauthorized Organizational Activities), 113.22 (Possessing Prohibited Articles), and 114.10 (Smuggling). *Id.*

On June 11, 2010, Defendant T. Fauss began the Tier III disciplinary hearing regarding the June 9, 2010, misbehavior report. (Dkt. No. 1 at 7.) He adjourned the hearing to allow

_____

[1]    Plaintiff has also filed a motion for summary judgment. (Dkt. No. 49.) That motion will be discussed in a separate Report-Recommendation.

[2]    Citations to page numbers in the complaint refer to the page numbers assigned by the Court's electronic filing system.

Plaintiff to receive assistance, a rule book, and his personal property from Auburn. *Id.* This personal property included Plaintiff's receipts for the allegedly unauthorized materials. *Id.* at 6. Plaintiff was provided with an outdated rule book. *Id.* at 7. His "efforts to retrieve his receipts for Black Nationalist literature were thwarted by prison officials." *Id.*

Plaintiff asked his assigned assistant to obtain copies of his disbursement receipts from prison business office records. (Dkt. No. 1 at 7.) The assistant was unsuccessful because facility records only went back three years. *Id.* He advised Plaintiff to obtain a monthly statement from DOCCS' central office. *Id.*

Defendant Fauss restarted the disciplinary hearing on June 14, 2010. (Dkt. No. 1 at 7.) Plaintiff pleaded not guilty to all of the charged violations. *Id.* Plaintiff also moved to dismiss the charges for violating Rules 105.13 and 105.14 because those rules were not listed in the copy of the rule book that had been given to him. *Id.* Plaintiff also argued that he should not be charged with violating Rule 105.13 because it pertained to gangs rather than unauthorized organizations. *Id.* Plaintiff argued that Defendant Hai had "attempted to enhance the magnitude of [the] alleged violation" by charging Plaintiff with violating both Rule 105.13 and 105.14. *Id.* Plaintiff testified that the Black Nationalist literature had been "reviewed, permitted and delivered to him" at Upstate and that it posed no threat to the safety and security of the institution. *Id.*

The hearing continued on June 15, 2010, with testimony from the inmate to whom Plaintiff handed the materials and from Defendant Hai. (Dkt. No. 1 at 8.)

Defendant Fauss found Plaintiff guilty of all four rule violations. (Dkt. No. 1 at 8.) He imposed sanctions of 120 days' solitary confinement, 120 days' loss of good time credits, and

loss of phone, commissary, and package privileges. *Id.*

Plaintiff alleges that after finding him guilty, Defendant Fauss turned off the tape recorder and said "You know what this is about, Mr. Hai told me about you. That Black Nationalist bullshit is not tolerated!" (Dkt. No. 1 at 8.)

Plaintiff appealed Defendant Fauss' determination to Defendant Brian Fischer, the Commissioner of DOCCS. (Dkt. No. 1 at 8.) On July 20, 2010, Defendant Albert Prack, Acting Director of Special Housing/Inmate Disciplinary Program, modified Defendant Fauss' decision by dismissing the Rule 105.13 charge. *Id.* at 8, 25. Defendant Prack affirmed the other sanctions. *Id.*

On August 16, 2010, Plaintiff submitted a four-page grievance. (Dkt. No. 51-6 at 17-20.) The third paragraph of the grievance stated that Plaintiff's "complaint is 1st, 5th, 8th, and 14th amendment violations in regards to a ticket written on me . . . on 6/7/10." *Id.* at 17. Plaintiff described the circumstances leading to Defendant Hai's issuance of the misbehavior report. *Id.* at 17-18. He stated that Defendant Hai "failed to substantiate how me possessing the said material constitutes a violation under the . . . rules." *Id.* at 18. Plaintiff complained, in particular, that both Rule 105.13 and Rule 105.14 stated that the rules "exclude[] published materials," and the materials that he passed to the other inmate were published. *Id.* Plaintiff alleged that the misbehavior report "was malicious and he intended to cause me an (sic) deprived indifference by writing an insufficient ticket based on nonlegitimate (sic) charges." *Id.* Plaintiff stated that the fact that neither his rule book nor Defendant Fauss' rule book contained Rules 105.13 and 105.14 violated his "1st, 5th, 8th & 14th amendment rights." *Id.* at 19. He complained that his punishment had not been modified when Defendant Prack dismissed the Rule 105.13

charge.  *Id.* at 19-20.

Plaintiff declares that the Inmate Grievance Program immediately answered his August 16, 2010, grievance by stating that the issue was non-grievable and that he should pursue the matter in the courts.  (Dkt. No. 51-3 at 33.)

On August 17, 2010, Plaintiff filed another grievance.  (Dkt. No. 47-7 at 12.)  Plaintiff stated that:

> I received a response on my Appeal that it was reviewed and modified by Albert Prack, Acting Director for Special Housing.  Charge 105.13 was dismissed.  On 7/25/10, I wrote a letter to the Superintendent in pursuit of NYCRR Title 7, Section 254.9 (2004), which gives the superintendent the authority to reduce a penalty even if the Commissioner decides not to.  On 7/27/10, Captain Rockwood, acting on behalf of the Superintendent, refused to modify my penalty which was imposed by a charge that was dismissed!

*Id.*  Plaintiff requested that "all penalties upon me for being guilty of 105.13 be lifted."  *Id.*  The Inmate Grievance Resolution Committee ("IGRC") responded on August 24, 2010.  *Id.*  The IGRC stated that it did "not have the authority to grant [the] requested action.  The Grievant has exhausted his Administrative Remedies relative to his disciplinary issues and may proceed to the Courts to address the issues contained in this complaint."  *Id.*  The Superintendent responded on September 9, 2010, affirming the findings of the IGRC.  *Id.*  Plaintiff appealed to the Central Office Review Committee ("CORC").  *Id.*  Plaintiff stated that the Superintendent's decision was "evasive" because "[h]e failed to specifically address why he [can't] modify my penalties."  *Id.*  CORC responded on December 1, 2010.  *Id.* at 10.  CORC upheld the Superintendent's decision.  *Id.*  CORC noted that because Plaintiff challenged a disposition resulting from a disciplinary proceeding, the issue was non-grievable.  *Id.*

On September 23, 2010, Plaintiff was transferred back to Auburn. (Dkt. No. 1 at 9.) He was met by a sergeant, who "with the intent to har[]ass" him, stated "Mr. Hai told me to tell you welcome back, and he hope you enjoyed your summer!" *Id.* From September 24 through September 28, 2010, Defendant Hai continued to send similar messages to Plaintiff through other correction officers. *Id.*

Sometime between September 24 and September 28, 2010, Plaintiff spoke with the inmate to whom he had passed his papers. (Dkt. No. 1 at 9.) The inmate informed Plaintiff that he had been allowed to serve his sentence for the June 7, 2010, incident on keeplock status in his general population cell. *Id.*

On September 30, 2010, Plaintiff was informed that he had been placed on "immediate draft status." (Dkt. No. 1 at 9.) The escort officers informed Plaintiff that Defendant McCarthy, the Acting Deputy Superintendent of Security, did not want Plaintiff in his facility. *Id.*

Plaintiff arrived at Five Points Correctional Facility ("Five Points") on September 30, 2010. (Dkt. No. 1 at 9.) There, he was "made aware" that Defendant Hai had trained and worked under Defendant McCarthy. *Id.*

Plaintiff alleges that he was constantly harassed at Five Points. (Dkt. No. 1 at 9-10.) He alleges that as he was being initially processed at the facility he saw his escort officers whispering with Five Points officers while pointing at Plaintiff. *Id.* at 9. He alleges that he was "treated with overt hostility" and told that "you won't be here long asshole." *Id.* Plaintiff alleges that his cell was searched weekly, he was required to submit to weekly urinalysis testing, and his girlfriend was verbally and sexually harassed. *Id.* Two weeks after arriving at Five Points, Plaintiff was placed on mail watch. *Id.*

Plaintiff alleges that on October 28, 2010, he was falsely accused of violating Rule 105.13 (gang affiliation).  (Dkt. No. 1 at 9.)  On November 8, 2010, Plaintiff was found guilty and sentenced to five months of solitary confinement, two months' lost good time credits, and five months of lost privileges.  *Id.* at 10.  Plaintiff challenged the finding both administratively and through a state court Article 78 proceeding.  *Id.*  The initial determination was affirmed.  *Id.*

Plaintiff alleges that on November 18, 2010, he was again falsely charged with violating Rule 105.13.  (Dkt. No. 1 at 10.)  He was found guilty and sentenced to twelve months of solitary confinement, six months' lost good time credits, and twelve months of lost privileges.  *Id.* Plaintiff challenged the finding both administratively and through a state court Article 78 proceeding.  *Id.*  The initial determination was affirmed.  *Id.*

Plaintiff alleges that while he was housed in solitary confinement, he was locked down for twenty-four hours a day in a sixty-foot double bunk cell.  (Dkt. No. 1 at 10.)  The light was kept on all night.  *Id.*  He had no privacy, was not allowed to participate in sports or social gatherings, was unable to attend religious services, was not allowed to have contact visits, received the "bare minimum personal property and food rations."  *Id.*  Plaintiff was released from solitary confinement on April 21, 2012.  *Id.*  He alleges that the time he served in solitary confinement was all "a compound result of prejudice and harassment, set in motion by [D]efendant J. Hai's initial misbehavior report."  *Id.*

Plaintiff filed an Article 78 proceeding in state court challenging his disciplinary conviction.  (Dkt. No. 1 at 8.)  On June 21, 2012, the appellate division ruled in Plaintiff's favor and ordered DOCCS to expunge the disciplinary conviction, restore all of Plaintiff's privileges, and restore Plaintiff's good time credits.  *Id.*; *Kimbrough v. Fischer*, 946 N.Y.S.2d 714 (N.Y.

App. Div. 3d Dep't 2012).  The court stated that:

> On the record before us, we cannot conclude that substantial evidence supports the determination finding petitioner guilty of possessing unauthorized organizational material.  The disciplinary rule at issue provides, in pertinent part, that '[a]n inmate shall not . . . possess printed or handwritten material relating to an unauthorized organization where such material advocates either expressly or by clear implication, violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization.'  Significantly, the documents that petitioner possessed did not refer to any particular organization nor did they advocate violence or acts of disobedience.  Further, as no evidence was presented in the misbehavior report, the hearing testimony, or elsewhere to sustain the remaining charges on a basis independent of a finding that the materials petitioner possessed were unauthorized, those charges must also be annulled.

*Id.* at 714-15.

Plaintiff filed this action on January 28, 2013.  (Dkt. No. 1.)  The complaint asserts the following causes of action: (1) a First Amendment claim against Defendant Hai for confiscating Plaintiff's papers and issuing the misbehavior report and against Defendant Abate[3] for failing to dismiss the misbehavior report (*id.* at 10-11); (2) a due process claim against Defendant Fauss for his conduct during the disciplinary hearing, against Defendant Prack for affirming the majority of the hearing results, and against Defendant Fischer for failing to reverse the disciplinary decision (*id.* at 11, 13); (3) an equal protection claim against Defendants Hai, McCarthy, and Fauss (*id.* at 12-13); and (4) an Eighth Amendment claim against Defendants Hai, Abate, Fauss, Prack, and Fischer (*id.* at 14-15).

---

[3]     The complaint does not make any reference to Defendant Abate other than asserting that he had the authority to dismiss the misbehavior report.

Defendants now move for summary judgment. (Dkt. No. 47.) Plaintiff has opposed the motion and filed a cross-motion for summary judgment. (Dkt. Nos. 49, 51.) Defendants have opposed the cross-motion and replied to Plaintiff's opposition. (Dkt. Nos. 51-52.) Plaintiff has replied to Defendants' opposition. (Dkt. No. 53.)

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id*. at 273. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 & n.11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material[4] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

---

[4]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

9

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

**B.      Legal Standard Governing Motions to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *accord Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").  Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged    but it has not shown    that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III.    ANALYSIS

### A.    Exhaustion of Administrative Remedies

Defendants argue that all of Plaintiff's claims except his due process claim must be dismissed because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (Dkt. No. 47-1 at 2-5.[5]) For the reasons discussed below, I recommend that the Court deny the motion for summary judgment on this ground.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

---

[5]    Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* at

701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at 701.5(d)(3)(ii).

DOCCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. In fact, the regulations specifically state that the results of disciplinary hearings are "non-grievable." N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(e)(1)-(2) (2010). For Tier III disciplinary hearings, the appeal is to the Commissioner of DOCCS. N.Y. Comp. Codes R. & Regs. tit. 7, § 254.8 (2010). An inmate's appeal of a disciplinary hearing decision "constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court." *Davis v. Barrett*, 576 F.3d 129, 132 (2d Cir. 2009).

Where an inmate claims both that there was official misconduct in the events leading to the disciplinary hearing and that the hearing itself was constitutionally flowed, he must follow both DOCCS procedures. *See Rosales v. Bennett*, 297 F. Supp. 2d 637, 639 (W.D.N.Y. 2004). The inmate:

> cannot satisfy the PLRA's exhaustion requirement as to grievable matters that do not directly relate to the *conduct* of a hearing simply by alluding to them in his administrative appeal of the hearing decision. For example, if at the hearing the inmate asserts, or attempts to assert, allegations of misconduct by the correction officers involved in the underlying events, the inmate cannot adequately exhaust his remedies for PLRA purposes through his administrative appeal of the hearing decision; he must separately grieve the alleged misconduct of the officers.

*Id.* (collecting cases) (emphasis in original).

If a prisoner has failed to properly follow each of the applicable steps prior to

commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S.

at 93.

Here, Plaintiff properly exhausted his due process claim regarding Defendant Fauss'

conduct of the disciplinary hearing by pursuing an appeal of the disciplinary conviction and

receiving a final decision from Defendant Prack, the Commissioner's designee. (Dkt. No. 1 at

8.) However, Plaintiff did not exhaust any of his other claims because the only decision he

received from CORC involved solely the issue of whether his punishment should have been

reduced when the Rule 105.13 charge was dismissed. (Dkt. No. 47-7 at 10.) Therefore, Plaintiff

failed to exhaust his administrative remedies as to his First Amendment, equal protection, and

Eighth Amendment claims.

Plaintiff's failure to exhaust, however, does not end the review. The Second Circuit has

held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available

administrative remedies. *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).[6]

First, "the court must ask whether [the] administrative remedies [not pursued by the

prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted).

Here, as discussed above, the grievance process was available to Plaintiff.

Second, if those remedies were available:

> the court should . . . inquire as to whether [some or all of] the
> defendants may have forfeited the affirmative defense of non-
> exhaustion by failing to raise or preserve it . . . or whether the

---

[6] The Second Circuit has not yet decided whether the *Hemphill* rule has survived
the Supreme Court's decision in *Woodford*, 548 U.S. 81. *Amador v. Andrews*, 655 F.3d 89, 102
(2d Cir. 2011).

> defendants' own actions inhibiting the [prisoner's] exhaustion of
> remedies may estop one or more of the defendants from raising the
> plaintiff's failure to exhaust as a defense.

*Hemphill*, 380 F.3d at 686 (citations omitted).  Here, Defendants preserved the exhaustion

defense by asserting it in their answer.  (Dkt. No. 26 ¶15; *Jones*, 549 U.S. at 216; *Alster v.

Goord*, 745 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).)  Defendants are not estopped from asserting

the exhaustion defense because Plaintiff has not alleged that any of the individual Defendants

inhibited him from filing grievances.

Third, if the remedies were available and some of the defendants did not forfeit, and were

not estopped from raising, the non-exhaustion defense, "the court should consider whether

'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply

with the administrative procedural requirements."  *Hemphill*, 380 F.3d at 686 (citations and

internal quotations omitted).  Justification "must be determined by looking at the circumstances

which might understandably lead . . . uncounselled prisoners to fail to grieve in the normally

required way."  *Giano v. Goord*, 380 F.3d 670, 678 (2d Cir. 2004).  Here, prison officials

rejected the grievance that Plaintiff filed complaining about some of the issues underlying his

disciplinary convictions as "non-grievable" and instructed him to pursue his issues in the courts.

(Dkt. No. 51-3 at 33.)  Under these circumstances, Plaintiff has raised a triable issue of fact that

his failure to properly exhaust his administrative remedies was justified.  Therefore, I recommend

that the Court deny Defendants' motion for summary judgment on this ground.

Generally, where a plaintiff has raised a triable issue of fact as to an excuse under

*Hemphill* for failing to exhaust, I would recommend that the Court set the matter for an

evidentiary hearing on the issue of exhaustion.  Here, however, as discussed below, Defendants

are entitled to summary judgment on the merits as to each of Plaintiff's unexhausted claims. Thus, even if Plaintiff demonstrated at a hearing that his failure to exhaust was justified, Defendants would still be entitled to judgment in their favor on the unexhausted claims. As discussed further below, Defendants are not entitled to summary judgment in their favor on the due process claims. If there were an issue as to the exhaustion of those claims, I would recommend that the Court conduct an evidentiary hearing regarding exhaustion. However, Defendants concede that Plaintiff properly exhausted his administrative remedies as to his due process claims against Defendants Fauss and Prack. Therefore, no evidentiary hearing is necessary.

### B.    Personal Involvement by Defendant Fischer

Defendants argue that Defendant Fischer is entitled to summary judgment because there is no evidence that he was personally involved in any of the alleged constitutional violations. (Dkt. No. 47-1 at 19-22.) Defendants are correct.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431,

435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210

(2d Cir. 1985) (per curiam).  In other words, supervisory officials may not be held liable merely

because they held positions of authority.  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)

(citations omitted).  Rather, supervisory personnel may be considered personally involved if they:

(1) directly participated in the violation; (2) failed to remedy that violation after learning of it

through a report or appeal; (3) created, or allowed to continue, a policy or custom under which

the violation occurred; (4) had been grossly negligent in managing subordinates who caused the

violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on

information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d

Cir. 1995) (citations omitted).[7]

Here, there is no evidence that Defendant Fischer was personally involved in any of the

incidents of which Plaintiff complains.  Therefore, I recommend that the Court grant

Defendants' motion for summary judgment and dismiss the claims against Defendant Fischer.

## C.    Due Process

Plaintiff asserts due process claims against Defendants Fauss and Prack.  (Dkt. No. 1 at

---

[7]       In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies.  The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories.  Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories.  *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases).  The Second Circuit itself has noted that "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*."  *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012).  The Second Circuit declined to address the issue in *Reynolds*, however, and has not addressed it since that time.  I will assume for the purposes of this motion that *Colon* remains good law.

11.)  Defendants, who concede that Plaintiff exhausted his administrative remedies regarding these claims, move for summary judgment of these claims.  (Dkt. No. 47-1 at 10-13.)  For the reasons discussed below, I recommend that the Court deny the motion for summary judgment of these claims.

### 1.    Defendant Fauss

In order to prove that procedural due process rights were violated, a plaintiff must show that he was deprived of a cognizable liberty or property interest without due process of law. *McKithen v. Brown*, 626 F.3d 143, 151 (2d Cir. 2010).  An inmate has a liberty interest in remaining free from a confinement or restraint where the confinement or restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).

Defendants concede for the purposes of this motion "that the penalty imposed here, four months in special housing, implicated a liberty interest."  (Dkt. No. 47-1 at 10.)  Defendants, however, "dispute whether plaintiff was deprived of that interest as a result of insufficient process."  *Id.*

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.  *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).  In some circumstances, such as where the inmate is illiterate or

where the complexity of an issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, an inmate may also be entitled to assistance from another inmate or from prison staff in preparing his defense. *Wolff*, 418 U.S. at 570.

Here, Plaintiff does not challenge the sufficiency of the written notice he received, allege that he was not given a reasonable opportunity to call witnesses and present evidence, or challenge the sufficiency of the written statement of the disposition. (Dkt. No. 51-5 at 11-15.[8]) Rather, he argues that Defendant Fauss was not a fair and impartial hearing officer and that Defendant Prack should not have affirmed the hearing decision. *Id.*

It is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y.2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). In contrast to this "extremely tolerant" federal standard, "New York law requires prison disciplinary rulings to be supported by sufficiently relevant and probative information to constitute *substantial* evidence. This requirement is sterner than the 'some evidence' standard

---

[8]     Citations to page numbers in Plaintiff's opposition refer to the page numbers in original document rather than to the page numbers assigned by the Court's electronic filing system.

necessary to afford due process." *Sira*, 380 F.3d at 76 n.9 (emphasis added) (internal citations omitted).

Here, there was not "some evidence" that Plaintiff violated Rule 105.13. That rule states that an inmate:

> shall not engage in or encourage others to engage in gang activities or meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten gang or gang related material. Note: For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign, symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion, or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation, but excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2 (2013). There was no evidence presented at the disciplinary hearing that Plaintiff distributed gang materials. Defendant Fauss' guilty finding on this charge was subsequently reversed. (Dkt. No. 1 at 8, 25.) This reversal does not protect Defendant Fauss from liability because it is well established in the Second Circuit that subsequent administrative reversals do not cure procedural defects in disciplinary hearings. *Walker v. Bates*, 23 F.3d 652, 657 (2d Cir. 1994).

There was also not "some evidence" that Plaintiff violated Rule 105.14. That rule states that an inmate:

> shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or possess printed or handwritten material relating to an unauthorized organization where

> such material advocates either expressly or by clear implication, violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization . . . . This rule excludes possession of published material that the inmate has obtained through the facility library or that has been approved for the inmate to posses through the media review process.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2 (2013).

The rule clearly states that inmates who possess published material that has been approved through the media review process cannot be found guilty of violating the rule. Plaintiff raised this issue at his disciplinary hearing, noting that the publications were from an approved vendor and that "I shouldn't be penalized or punished just by having this." (Dkt. No. 47-11 at 50.) Defendant Fauss stated that:

> I have had numerous hearings where guys have been . . . charged with having possession of things that they shouldn't have whether it be gang related or things that they purchased . . . and . . . the staff at the facilities do their best to review things and if it is stuff that is not allowed in they stop it. They don't allow it to come in, but the reality is that they can't review every little thing that comes into the facility, so the responsibility is placed on the person receiving it, the inmate receiving the material. If you are in possession of something that you are not supposed to have that is on you because that is in your possession and that is the way it is looked at . . . . Just to let you know.

*Id.* at 51.

Defendants argue that Defendant "Fauss correctly explained to [Plaintiff] that it is the responsibility of the inmate to ensure that his possessions ultimately conform with DOCCS rules, not the officials who screen materials coming into the prison." (Dkt. No. 47-1 at 11-12.) Defendants, however, cite no authority for the proposition that this was a "correct" statement of the rules. On the record before the Court, in fact, Defendant Fauss' statement appears to directly

contradict the plain language of Rule 105.14.

Defendants have not shown that they are entitled to judgment as a matter of law that Defendant Fauss' decision was supported by "some evidence." Therefore, I recommend that the Court deny Defendants' motion for summary judgment on this ground.

## 2. Defendant Prack

Plaintiff's due process claim against Defendant Prack is premised on the fact that he affirmed the majority of Defendant Fauss' decision. (Dkt. No. 1 at 8, 11.) Defendants appear to argue that this allegation is insufficient to implicate Defendant Prack's personal involvement. (Dkt. No. 47-1 at 13.) For the reasons discussed below, I recommend that the Court deny Defendants' motion for summary judgment on this ground.

Defendants correctly note that "[d]istrict courts are split in the Second Circuit on the issue of whether simply affirming an allegedly unconstitutional disciplinary decision will implicate the requisite personal involvement for § 1983 liability." (Dkt. No. 47-1 at 13 n.3.) Courts declining to find personal involvement conclude that there is no "ongoing" violation for the supervisory official to "remedy" in such a situation. *See Jamison v. Fischer*, No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, at *14-15, 2012 WL 4767173, at *5 (S.D.N.Y. Sept. 27, 2012) ("Despite the fact that Plaintiff continued to be housed in the SHU, Bezio's involvement and review of the matter was distinct from whatever took place at the hearing, and he cannot be held liable . . . for violations that occurred at the hearing and were not ongoing.").[9] *See also Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009); *Chavis v. vonHagn*, No. 02-CV-

---

[9]     The Court will provide Plaintiff with a copy of all of unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

0119, 2009 U.S. Dist. LEXIS 6871, at *198-99, 2009 WL 236060, at *68 (W.D.N.Y. Jan. 30, 2009); *Odom v. Calero*, No. 06 Civ. 15527, 2008 U.S. Dist. LEXIS 52408, at *16-20, 2008 WL 2735868, at *6-7 (S.D.N.Y. July 10, 2008); *Ramsey v. Goord*, No. 05-CV-47A, 2005 U.S. Dist. LEXIS 42953, at *18-20, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005).

Other district courts in this circuit have found personal involvement where a supervisory official affirms an allegedly constitutionally infirm hearing decision. *See Thomas v. Calero*, 824 F. Supp. 2d 488, 509-10 (S.D.N.Y. 2011); *Holmes v. Fischer*, 764 F. Supp. 2d 523, 539-40 (W.D.N.Y. 2011); *Rodriguez v. Selsky*, No. 9:07-CV-0432, 2010 U.S. Dist. LEXIS 23811, at *14-20, 2010 WL 980273, at *6 (N.D.N.Y. Mar. 15, 2010[10]); *Baez v. Harris*, No. 9:01-CV-807, 2007 U.S. Dist. LEXIS 8728, at *6, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007); *Johnson v. Coombe*, 156 F. Supp. 2d 273, 278 (S.D.N.Y. 2001)  These courts find that there is an "ongoing" violation because having the power to vacate an allegedly unconstitutional decision, refusing to do so, and allowing an inmate to remain in the SHU  "knowingly continu[es] a deprivation of liberty without due process of law."  *Delgado v. Bezio*, No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917, at *27, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011).

I agree with Magistrate Judge David E. Peebles that the cases finding personal involvement in such situations  "appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement."  *Bennett v. Fischer*, No. 9:09-CV-1236, 2010 U.S. Dist. LEXIS 139587, at *38-39, 2010 WL 5525368, at *12 (N.D.N.Y. Aug. 17, 2010).  Therefore, I recommend that the Court find that Defendant Prack was personally involved

---

[10]     Lexis and Westlaw list different dates for this decision.  The Court has used the date listed by Westlaw, which represents the date on which the district court judge adopted the magistrate judge's report-recommendation.

in the alleged constitutional violation and deny Defendants' motion for summary judgment on this ground.

### D. First Amendment

Plaintiff alleges that Defendants Hai and Abate violated his First Amendment rights by confiscating his materials and by retaliating against him. (Dkt. No. 1 at 10-11.) In addition to arguing that these claims are barred because Plaintiff failed to exhaust his administrative remedies, Defendants move for summary judgment on the merits of these claims. (Dkt. No. 47-1 at 6-10.) For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment as to these claims.

#### 1. Confiscation

Defendants argue that they are entitled to summary judgment of Plaintiff's First Amendment claim regarding the confiscation of his materials. (Dkt. No. 47-1 at 6-10.)

Prison restrictions on inmates' receipt and possession of publications are governed by the test set out in *Turner v. Safley*, 482 U.S. 78 (1987). *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989). In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The Court articulated the following factors to consider when determining whether a prison regulation is reasonable: (1) whether the action[11] has a "valid,

---

[11] Although *Turner* involved prison regulations, the Second Circuit has applied the the same analysis to individual decisions that allegedly impinge an inmate's constitutional rights. *See, e.g.*, *Young v. Coughlin*, 866 F.2d 567 (2d Cir. 1989).

rational connection" to a legitimate governmental objective[12]; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id.* at 89-91.

Regarding the first factor, Defendants argue that Defendant Hai's confiscation of the materials was validly and rationally connected to the legitimate governmental objective of maintaining order in the facility. (Dkt. No. 47-1 at 7.) Preservation of security and discipline do, indeed, constitute legitimate penological interests. *Giano v. Senkowski*, 54 F.3d 1050, 1055 (2d Cir. 1995). Plaintiff argues that Defendant Hai's confiscation of his materials, however, was not validly and rationally related to that legitimate governmental objective because the materials themselves did not violate Rule 105.14. (Dkt. No. 51-5 at 8-9.) Defendant Hai declares that, to his eye, the materials "appear[ed] to advocate civil disobedience inside prisons." (Dkt. No. 47-6 ¶ 11.) Because Defendant Hai confiscated the materials as Plaintiff was being transferred, Plaintiff could not inform him that he had been given permission to possess the materials before Defendant Hai wrote the misbehavior report. Defendant Hai's conclusion was rational and connected to the legitimate objective of maintaining order in the facility. Plaintiff has not introduced any evidence raising a triable issue of fact otherwise.

Defendants argue that the remainder of the *Turner* factors weigh in their favor. (Dkt. No.

---

[12]     Courts applying *Turner*, including the Second Circuit, have noted that the first factor "is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006); *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007).

47-1 at 8-10.) Defendants are correct. Plaintiff does not dispute any of these factors in his opposition, in which he argues entirely about the first factor. (Dkt. No. 51-5 at 8-9.) Therefore, I recommend that the Court grant Defendants' motion for summary judgment of the First Amendment claim against Defendants Hai and Agate.

### 2. Retaliation

Plaintiff claims that Defendant Hai "wrote plaintiff a misbehavior report out of a personal prejudice against the political material of 'Black Nationalism,' thus retaliated for engaging in constitutionally protected conduct, with the intent to cause plaintiff an actual injury (confinement)." (Dkt. No. 1 at 10.) Defendants argue that Plaintiff has not raised a triable issue that he was engaged in protected conduct or that there was a causal connection between any protected conduct and Defendant Hai's actions. (Dkt. No. 47-1 at 9-10.) Defendants are correct.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill*, 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official    even those otherwise not rising to the level of a constitutional violation    can be characterized as a constitutionally proscribed retaliatory act.

26

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001)).

As Defendants note, Plaintiff testified at his deposition that his intent in passing the materials to the other inmate was for the other inmate to either throw the materials away or keep them for himself. (Dkt. No. 47-1 at 8.) Plaintiff has not cited, and the Court cannot find, any authority suggesting that this type of conduct is protected.

Even if the conduct was protected, Plaintiff has not raised a triable issue of fact that there was a causal connection between his conduct and Defendant Hai's adverse action. Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*,

58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* Here, there is no evidence that Defendant Hai was motivated by anything other than his job duty to enforce disciplinary rules. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of the retaliation claim.

### E.    Equal Protection

Plaintiff alleges that Defendants Hai, McCarthy, and Fauss violated his right to equal protection. (Dkt. No. 1 at 12-13.) In addition to arguing that this claim is barred because Plaintiff failed to exhaust his administrative remedies, Defendants move for summary judgment on the merits of this claim, arguing that Plaintiff has not raised a triable issue of fact that he was treated differently from any similarly situated individual. (Dkt. No. 47-1 at 14-17.) Defendants are correct.

The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)) (emphasis omitted). Governmental action may also violate the Equal Protection Clause where the defendants

intentionally treat the plaintiff "differently from others similarly situated with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

Here, Plaintiff has not raised a triable issue of fact that he was treated differently from any similarly situated individual. Plaintiff alleges that the inmate to whom he passed the materials served a less onerous disciplinary sentence than Plaintiff did. (Dkt. No. 1 at 9.) However, that inmate was not similarly situated to Plaintiff because his conduct was different: he merely received the materials that Plaintiff handed to him, whereas Plaintiff was charged with distributing the materials. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of the equal protection claim.

### F.    Eighth Amendment

Plaintiff alleges that Defendants Hai, Abate, Fauss, Prack, and Fischer violated his Eighth Amendment rights. (Dkt. No. 1 at 14-15.) In addition to arguing that this claim is barred because Plaintiff failed to exhaust his administrative remedies, Defendants move for summary judgment on the merits of this claim. (Dkt. No. 47-1 at 17-19.) For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this

duty, prison officials "must 'take reasonable measures to guarantee the safety of the inmates.'" *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

To establish an Eighth Amendment conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, a prisoner must show that the defendant's "act or omission . . . result[ed] in the denial of the 'minimal civilized measure of life's necessities.'" *Id*. (citations omitted). Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

To satisfy the subjective component, the plaintiff must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Here, Plaintiff has not alleged or raised a triable issue of fact that he was denied the minimal civilized measure of life's necessities. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED IN PART AND DENIED IN PART**. Specifically, it is recommended that the Court dismiss (1) the First Amendment claims against Defendants Hai and Abate; (2) the equal

protection claims against Hai, McCarthy, and Fauss; and (3) the Eighth Amendment claims against Defendants Hai, Abate, Fauss, Prack, and Fischer and that the Clerk terminate Defendants Hai, Abate, McCarthy, and Fischer from the docket. It is recommended that the due process claims against Defendants Fauss and Prack survive the motion for summary judgment; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Jamison v. Fischer*, No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, 2012 WL 4767173 (S.D.N.Y. Sept. 27, 2012); *Chavis v. vonHagn*, No. 02-CV-0119, 2009 U.S. Dist. LEXIS 6871, 2009 WL 236060 (W.D.N.Y. Jan. 30, 2009); *Odom v. Calero*, No. 06 Civ. 15527, 2008 U.S. Dist. LEXIS 52408, 2008 WL 2735868 (S.D.N.Y. July 10, 2008); *Ramsey v. Goord*, No. 05-CV-47A, 2005 U.S. Dist. LEXIS 42953, 2005 WL 2000144 (W.D.N.Y. Aug. 13, 2005); *Rodriguez v. Selsky*, No. 9:07-CV-0432, 2010 U.S. Dist. LEXIS 23811, 2010 WL 980273 (N.D.N.Y. Mar. 15, 2010); *Baez v. Harris*, No. 9:01-CV-807, 2007 U.S. Dist. LEXIS 8728, 2007 WL 446015 (N.D.N.Y. Feb. 7, 2007); *Delgado v. Bezio*, No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917, 2011 WL 1842294 (S.D.N.Y. May 9, 2011); and *Bennett v. Fischer*, No. 9:09-CV-1236, 2010 U.S. Dist. LEXIS 139587, 2010 WL 5525368 (N.D.N.Y. Aug. 17, 2010).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam));

28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: September 29, 2014
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Candido BAEZ, Plaintiff,
v.
J. HARRIS, Deputy Superintendent, Shawangunk
Correctional Facility; Donald Selsky, Director Special
Housing Unit Program; and Quartarone, Nurse,
Shawangunk Correctional Facility, Defendants.

No. 9:01-CV-807.
Feb. 7, 2007.

Candido Baez, Ossining, NY, Plaintiff Pro Se.

Andrew M. Cuomo, Attorney General for the State of
New York, Maria Moran, Esq., Assistant Attorney
General, Syracuse, NY, Attorney for Defendants.

### MEMORANDUM-DECISION AND ORDER
NORMAN A. MORDUE, Chief U.S. District Judge.
### INTRODUCTION
**\*1** Plaintiff, an inmate in the custody of the New
York State Department of Correctional Services,
brought this action under 42 U.S.C. § 1983. The
amended complaint (Dkt. No. 49) claims that de-
fendants violated his constitutional rights under the
Eighth and Fourteenth Amendments.

Defendants' motion for summary judgment (Dkt.
No. 75) was referred to United States Magistrate
Judge David R. Homer for a report and recommenda-
tion pursuant to 28 U.S.C. § 636(b)(1)(B) and Local
Rule 72.3(c). Magistrate Judge Homer's Report and
Recommendation (Dkt. No. 81) recommends that
defendants' motion be granted in part and denied in

part.

Plaintiff has submitted an objection (Dkt. No. 82)
to the Report and Recommendation. Pursuant to 28
U.S.C. § 636(b)(1)(C), this Court conducts a *de novo*
review of those parts of a magistrate judge's report and
recommendation to which a party specifically objects.
Where only general objections are filed, the Court
reviews for clear error. *See Brown v. Peters,* 1997 WL
599355, \*2-\*3 (N.D .N.Y.), *af'd without op.,* 175 F.3d
1007 (2d Cir.1999). Failure to object to any portion of
a report and recommendation waives further judicial
review of the matters therein. *See Roldan v. Racette,*
984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION
Plaintiff objects to Magistrate Judge Homer's
Report and Recommendation insofar as it recom-
mends: (1) that all claims against Selsky be dismissed;
and (2) that all Eighth Amendment claims be dis-
missed.

### (1) Claims against Selsky
Plaintiff asserts Eighth and Fourteenth Amend-
ment claims against Selsky. Plaintiff objects to Mag-
istrate Judge Homer's recommendation that they be
dismissed.

The Court first addresses plaintiff's Eighth
Amendment claims against Selsky. Plaintiff's
amended complaint may be read to assert a claim
against Selsky based on the allegedly premature re-
moval of plaintiff's bandages after hernia surgery. In a
Memorandum-Decision and Order entered on Sep-
tember 29, 2003 (Dkt. No. 29) the Court adopted
Magistrate Judge Homer's recommendation (Dkt. No.
27) to dismiss without prejudice plaintiff's claims
based on premature removal of the bandages because
plaintiff had failed to exhaust this claim. Plaintiff then
filed a grievance raising this issue. The grievance was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

rejected as untimely, and that rejection was affirmed on administrative appeal. Accordingly, the claim remains unexhausted. Plaintiff objects to dismissal of this claim, arguing that he attempted to exhaust it. The fact that plaintiff was foreclosed from exhausting the claim due to the passage of time does not, without more, excuse him from the administrative exhaustion requirement. *See Williams v. Comstock,* 425 F.3d 175, 176 (2d Cir .2005); *Baez v. Kahanowicz,* 2007 WL 102871, *7 (S.D.N.Y.).* Thus, the Court agrees with Magistrate Judge Homer that plaintiff's Eighth Amendment claim based on removal of his bandages must be dismissed for failure to exhaust his administrative remedies. Further, the Court agrees with Magistrate Judge Homer that, in any event, the claim lacks merit. Accordingly, to the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

**\*2** Plaintiff also appears to assert an Eighth Amendment claim against Selsky stemming from plaintiff's allegedly premature removal from the hospital and subjection to a lengthy bus trip when he needed immediate medical attention. However, there is no basis to find that Selsky was personally involved in these events. To the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

To the extent that plaintiff bases an Eighth Amendment claim on the conditions he experienced in SHU, this Court agrees with Magistrate Judge Homer that as a matter of law plaintiff's allegations fail to state such a claim. *See generally Branch v. Goord,* 2006 WL 2807168, *5 (S.D.N.Y.).* Thus, all Eighth Amendment claims against Selsky are dismissed.

With respect to plaintiff's Fourteenth Amendment claims against Selsky, plaintiff's objections state: "Defendant Selsky could have release[d] plaintiff sooner from SHU, but instead waited until I submitted a C.P.L.R. Article 78 [petition] to change his decision and release me. Defendant Selsky was put on notice

sooner with my administration *[sic]* appeal to release me from SHU but chose not to." Essentially, plaintiff asserts Fourteenth Amendment liability against Selsky stemming from the disciplinary hearing conducted by defendant Harris and Selsky's handling of plaintiff's appeal from Harris' determination. [FN1]

> FN1. In his objection, plaintiff also states: "My father addressed a letter to Mr. Selsky documenting the violations of my rights. Therefore, [Selsky] is personally involve[d] because he was aware of the violation and never release[d] me from SHU[.]" The receipt of a letter does not, however, constitute sufficient personal involvement to generate supervisory liability. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Garvin v. Goord,* 212 F .Supp.2d 123, 126 (S.D.N.Y.2002).

Selsky's affidavit in support of summary judgment states that he is the Director of the Special Housing/Inmate Disciplinary Program, and that he personally responds, as the Commissioner's authorized designee, to all Tier III appeals taken by inmates. Under the circumstances of this case, the record is sufficient to withstand summary judgment on the issue of personal involvement. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through a report or an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."). Likewise, defendants are not entitled to dismissal of plaintiff's claim against Selsky based on plaintiff's confinement in SHU for one year. *See generally Sandin v. Connor,* 515 U.S. 472, 483-84 (1995).

**(2) Claims against Quartarone**

Plaintiff objects to Magistrate Judge Homer's recommendation that the Court dismiss plaintiff's Eighth Amendment claim against defendant Quartarone. Insofar as this claim is based on Quartarone's allegedly premature removal of plaintiff's bandages

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

after his hernia repair surgery, it is unexhausted as discussed above.

Plaintiff's other Eighth Amendment claims, based on his allegedly premature removal from the hospital and bus transfer, do not allege any involvement on the part of Quartarone. The sole named defendant allegedly involved in these events is Forte; however, all claims against him have been dismissed (Dkt. No. 79). Accordingly, all claims against Quartarone are dismissed.

## CONCLUSION

**\*3** It is therefore

ORDERED the Court accepts and adopts the Report and Recommendation (Dkt. No. 81) of United States Magistrate Judge David R. Homer, except insofar as it recommends dismissal of the Fourteenth Amendment claims as against Selsky; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 75) is granted in part and denied in part; and it is further

ORDERED that dismissal of all claims against defendant Quartarone is granted; and it is further

ORDERED that dismissal of plaintiff's Eighth Amendment claims against defendant Donald Selsky is granted; and it is further

ORDERED that dismissal of plaintiff's Fourteenth Amendment claims against Donald Selsky is denied; and it is further

ORDERED that dismissal of plaintiff's claims against J. Harris is denied.

IT IS SO ORDERED.

## REPORT-RECOMMENDATION AND ORDER[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Candido Baez ("Baez"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] three DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. Am. Compl. (Docket No. 49) at ¶¶ 50-53. Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 75. Baez opposes the motion. Docket No. 76. For the reasons which follow, it is recommended that defendants' motion be granted in part and denied in part.

FN2. Harris, Selsky, and Quartarone. Defs. Mem. of Law (Docket No. 75) at 2. The remaining defendant, Doctor Forte, was dismissed following his death in 2004. Docket No. 79.

## I. Background

The facts are set forth in the light most favorable to Baez as the non-movant. See Section II(A) *infra.*

## A. Disciplinary Hearing

At all relevant times, Baez was incarcerated at Shawangunk Correctional Facility ("Shawangunk"). Am. Compl. at ¶ 1. On November 8, 1999, while in the A yard, Baez swung a five-pound weight and hit inmate Garbez on the left side of his head. Moran Aff. (Docket No. 75), Ex. A at 1. Another inmate, Valdez, began to fight with Baez and both ignored orders from corrections officer Riopelle to stop. *Id.* A response

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

team was able to separate Valdez and Baez, removed them from the yard, and brought both inmates to the infirmary. *Id.* Baez was issued a misbehavior report for assault on an inmate, fighting, refusing a direct order, and having a weapon. *Id.* On the same day, corrections officers searched Baez's cell and confiscated a bottle of expired medication, a broken ruler, and a hard plastic plate. *Id.* at 2. Baez received another misbehavior report for possessing unauthorized medication, contraband, property in unauthorized area, and an altered item. *Id.*

On November 10, 1999, the commencement of Baez's Tier III disciplinary hearing [FN3] was adjourned to November 16, 1999 because the hearing officer, Deputy Superintendent of Programs J. Harris, was unavailable. Docket No. 24, Ex. C; Hrg. Tr. at 1. Baez's assistant for the hearing, Boyham,[FN4] first met with Baez on November 10, 1999 and completed his assistance on November 12, 1999. Hrg. Tr. at 2. On November 16, 1999, Baez's disciplinary hearing commenced. Hrg. Tr. at 1. On November 23, 1999, Harris found Baez guilty of assault, fighting, possessing a weapon, refusing a direct order, and having an altered item and found him not guilty of unauthorized medication, having property in an unauthorized area, and possessing contraband. Moran Aff., Ex. A at 3-4. Baez was sentenced to twenty-four months in the Special Housing Unit ("SHU"),[FN5] loss of packages, commissary, and telephone privileges, and the recommended loss of twenty-four months of good time credit. *Id.* Additionally, Baez lost his inmate grade-pay and program assignment. Compl. (Docket No. 1) at ¶ 17.

FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendents' hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2006).

FN4. Boyham, an original defendant in this matter, was dismissed from the case on a motion for summary judgment on September 29, 2003. Docket No. 29.

FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**\*4** Baez appealed Harris's determination. Docket No. 24, Ex. H. On March 21, 2000, Baez filed a petition pursuant to N.Y. C.P.L.R. Art. 78.[FN6] Moran Aff., Ex. C. The defendants received three extensions of time to answer Baez's petition. Am. Compl. at ¶ 10. On May 17, 2000, Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, modified Baez's punishment from twenty-four months to twelve months. Moran Aff., Ex. B at 1-2. On October 26, 2000, Baez's petition was transferred from Ulster County Supreme Court to the Appellate Division, Third Department. Moran Aff., Ex. C at 3. On March 12, 2001, Selsky administratively reversed the disciplinary determination because the hearing officer considered medical evidence not on the record. Moran Aff., Ex. B at 4. On June 14, 2001, Baez's Article 78 petition was denied as moot. Moran Aff., Ex. C at 3-4.

FN6. N.Y. C.P.L.R. Art. 78 (McKinney 1994 & Supp.2006) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

**B. Medical Treatment**

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

On December 14, 1999, Baez had hernia repair surgery at Albany Medical Center. Am. Compl. at ¶ 33. Baez was to remain on bed rest in the hospital for three days. *Id.* On December 16, 1999, Baez was discharged from the hospital. *Id.* Baez was instructed to keep the dressing dry and intact for two days and then remove the outer dressing and resume showering. Davidson Decl. (Docket No. 75), Ex. 1. Baez was not allowed to engage in lifting, strenuous work, straining or reaching for six weeks and was allowed to return to work or school. *Id.* A follow-up examination at the prison clinic was also required. *Id.* Quartarone removed Baez's bandages and padding from the incision area against doctor's orders. Am. Compl. at ¶ 33.

On the day of Baez's discharge, he was ordered to board a bus for transfer to Downstate Correctional Facility. *Id.* Baez was taken on a bus trip which included stops at Shawangunk and Wallkill Correctional Facility where Baez began to vomit and experience severe pain. Am. Compl. at ¶ 34. Baez's requests to be taken to the infirmary were ignored. *Id.* This action followed.

### C. Procedural History

Baez commenced this action by filing a complaint on May 25, 2001. *See* Compl. Defendants filed a motion for summary judgment on December 13, 2002. Docket Nos. 21-23. As a result of that motion, several claims and defendants were dismissed. Docket No. 27. That motion was modified on November 18, 2004 and required Baez to file an amended complaint within thirty days of the order. Docket No. 47. Baez complied and filed his amended complaint on December 17, 2004. Docket No. 49. This motion for summary judgment of the remaining defendants followed. Docket No. 75.

### II. Discussion

Baez asserts three causes of action in his amended complaint. The first alleges that defendant Selsky failed to correct behavior that violated Baez's Eighth and Fourteenth Amendment rights. The second alleges

that defendants Harris and Selsky deprived him of his due process rights in connection with a prison disciplinary hearing. The third alleges that defendant Quartarone was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[FN7] Am. Compl. at ¶¶ 50-53. Defendants seek judgment on all claims.

> FN7. Any claims against Dr. Forte have been dismissed and are not being considered on this motion. *See* note 2 *supra.*

### A. Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the nonmovant special solicitude.[FN8] *Id.; Triestman v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

*Fed. Bureau of Prisons,* 470 F.3d 471, 2006 WL 3499975, at *5 (2d Cir. Dec. 5, 2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

> FN8. Baez has, however, filed at least seven other actions in the federal courts of New York since 1990. *U.S. Party/Case Index* (visited Jan. 8, 2007) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

### B. Eighth Amendment
### 1. Defendant Quartarone

In his third cause of action, Baez contends that "less than forty (40) hours after the [hernia] surgery, defendant Quartarone ... removed the bandages and padding from the incision area of [his] operation," thereby acting with deliberate indifference to his medical needs. Am. Compl. at ¶ 33. Defendants contend that Baez has failed to exhaust his administrative remedies on this claim and, in the alternative, the claim is without merit.

### a. Failure to Exhaust

Defendants contend that Baez has not exhausted his administrative remedies with regard to the claim that his Eighth Amendment rights were violated by defendant Quartarone. This assertion is based on the fact that Baez did not raise the issue of his surgery dressings being removed prematurely in his Grievance No. UST-2681-00. Defs. Mem. of Law at 10; *see also* Moran Aff., Ex. E.

Issues that have previously been determined become the law of the case. *In re Lynch,* 430 F.3d 600, 604 (2d Cir.2005) (citing *Quern v. Jordan,* 440 U.S. 332, 348 n. 18 (1979)). A district court may reconsider its own decision if the law has since changed, new evidence becomes available, to correct an error, or if a

"manifest injustice would otherwise ensue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber,* 407 F.3d 34, 44 (2d Cir.2005).

**\*6** Here, this Court has already decided that Baez did not exhaust his claim regarding removal of the bandages because he never filed a grievance regarding it. Docket No. 27. The Report-Recommendation and Order containing that finding was adopted in full by the district court on September 29, 2003. Docket No. 29. In response to this Court's decisions, Baez filed a grievance on October 3, 2003 where he raised the issue of the early bandage removal. Am. Compl., Ex. A. That grievance was rejected as untimely in the absence of any reason provided for the delay. *Id.* Baez appealed the decision to reject his late grievance, but that decision was affirmed. *Id.* Although Baez attempted to remedy his failure to exhaust, filing an untimely grievance does not amount to an exhaustion of remedies. *Williams v. Comstock,* 425 F.3d 175, 176 (2d Cir.2005). Further, since this Court finds no reason to reconsider its previous decisions, Baez has not exhausted his claim for removal of the bandages.

### b. Medical Treatment

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

risk, even if the harm ultimately was not averted."
*Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

A serious medical need is " 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (quoting *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *Chance,* 143 F.3d at 702-03.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Id.* at 702. Mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate. *Id.* at 703. Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

*7 Even assuming that hernia repair surgery is a serious medical need, Baez failed to raise a question of material fact with regard to the alleged deliberate indifference of Quartarone in removing his bandages. The bandages were removed on the second post-operative day, which was within the instructed time period recommended by Baez's surgeon. Davidson Decl. at ¶¶ 3-4. Therefore, it is recommended in the alternative that defendants' motion for summary judgment on this ground be granted.

**2. Defendant Selsky**
Baez alleges that Selsky "contributed to and proximately caused the ... violation of [his] Eighth and Fourteenth Amendment Rights." Am. Compl. at ¶ 50. Summary judgment in favor of all defendants, including Selsky, with regard to Baez's Eighth Amendment claim resulting from his disciplinary hearing has already been granted. Docket No. 27 at 16. As such, Baez's claim against Selsky for a violation of his Fourteenth Amendment due process rights in connection with his prison disciplinary hearing is dismissed. Baez's claim against Selsky for his alleged involvement in Baez's Eighth Amendment claims relative to his medical care remain at issue.

**a. Personal Involvement**
Defendants contend that Baez cannot demonstrate the personal involvement of Selsky in any Eighth Amendment violation.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). The doctrine of respondeat superior is not a substitute for personal involvement. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved," however, if they participated in the conspiracy, learned of the violation but failed to remedy the wrong, created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue, or were grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted).

In his amended complaint, Baez's only allegation as to the personal involvement of Selsky is that he and his father wrote Selsky a letter documenting the violations of Baez's rights. Am. Compl. at ¶ 42. However, "receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervi-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

sory liability." *Petty v. Goord,* No. Civ. 00-803(MBM), 2002 WL 31458240, at *8 (S.D.N.Y. Nov. 4, 2002). Further, there is no evidence that Selsky participated here in the alleged violations or created a policy which allowed constitutional violations to continue.

Therefore, it is recommended that defendants' motion for summary judgment as to Selsky be granted on this ground.

### C. Fourteenth Amendment

**\*8** Defendants Harris and Selsky contend that Baez's due process claim should be dismissed and that qualified immunity bars Baez's claim.

### 1. Liberty Interest

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, this Court has already decided that Baez has raised a question of fact as to whether twelve months spent in SHU establishes a protected liberty interest. Docket Nos. 27, 29, & 47; *see also Colon v. Howard,* 215 F.3d 227 (2d Cir.2000) (holding that 305 days spent in normal SHU conditions was sufficient to raise a question of significant hardship). Defendants' motion on this ground should, therefore, be denied.

### 2. Process Provided

At a prison disciplinary proceeding, an inmate is entitled to (1) advance written notice of the charges,

(2) an opportunity to call witnesses if it conforms with prison security, (3) a statement of evidence and reasons for the disposition, and (4) a fair and impartial hearing officer. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974)). Additionally, the finding of guilt must be supported by some evidence in the record to comport with due process. *Massachusetts Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985); *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001).

Again, this Court has already determined that there is a question of fact as to the fourth prong of Wolff. Docket No. 27 at *12;.see also In re Lynch,* 430 F.3d at 604 (quoting *Quern,* 440 U.S. at 348 n. 18)). As such, it is recommended that defendants' motion for summary judgment on this ground be denied.

### C. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the issue of defendants entitlement to qualified immunity has already been decided in Baez's favor. Docket Nos. 27, 29, & 47.

**\*9** Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
**(Cite as: 2007 WL 446015 (N.D.N.Y.))**

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Docket No. 75)

1. **GRANTED** as to Quartarone and Selsky in all respects; and

2. **DENIED** as to Harris as to the due process claim.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE AP-PELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Baez v. Harris
Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Delville BENNETT, Plaintiff,
v.
Brian FISCHER, Dale Artus, and H. Martin, Defendants.

Civil Action No. 9:09–CV–1236 (FJS/DEP).
Aug. 17, 2010.

Delville Bennett, Stormville, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Adam W. Silverman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Delville Bennett, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against the Commissioner of the New York State Department of Correctional Services ("DOCS") and two other DOCS employees, alleging violation of his constitutional rights. In his complaint, plaintiff alleges that as a result of his participation in a congregate religious service he was issued a false misbehavior report accusing him of creating a disturbance, engaging in an unauthorized demonstration, and refusing a direct order, leading to a

disciplinary hearing and a finding of guilt on two of the three charges. Plaintiff maintains that defendants' actions violated his First Amendment right to freely exercise his chosen religion, and additionally asserts violations of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. As relief, plaintiff seeks recovery of compensatory and punitive damages in the amount of $500,000 each.

Currently pending before the court is defendants' pre-answer motion for summary judgment dismissing plaintiff's claim based upon his failure to exhaust available administrative remedies and additionally, as against two of the named defendants, on the ground that they were not personally involved in the violations alleged. Having carefully reviewed the record in light of defendants' motion, which plaintiff has opposed, I recommend that it be granted in part.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a New York State prison inmate entrusted to the care and custody of DOCS. *See generally* Complaint (Dkt. No. 1). At the times relevant to the claims set forth in his complaint, Bennett was designated to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.*

Plaintiff's claims grow out of his September 21, 2008 attendance at a Pentecostal Christian service held at Clinton, during which he served as a member of the choir and participated in dancing and singing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

associated with the event.[FN2] *Id.* at ¶¶ 6–7. Plaintiff alleges that after the conclusion of the service he continued "singing and dancing like 'KING DAVID' did ... approximately 6 to 7 feet from the alter in the isles as the Spirit of the Lord led him", Bennett Aff. (Dkt. No. 16) ¶ 4, and that as he exited the chapel area following the service he was confronted by defendant H. Martin, a corrections officer, and asked to produce his identification card, which the officer then confiscated. Complaint (Dkt. No. 1) ¶¶ 8–9. Plaintiff further alleges that he was then placed in keeplock confinement, and that defendant Martin later issued a misbehavior report accusing Bennett of creating a disturbance, participating in an unauthorized demonstration, and refusing to obey direct order.[FN3] *Id.* at ¶ 10; Bennett Aff. (Dkt. No. 16) ¶ 6.

> FN2. Plaintiff's complaint is equivocal as to whether the relevant occurrences giving rise to his claims occurred in September of 2008, or instead one year later. *See, e.g.* Complaint (Dkt. No. 1) ¶ 6 (alleging that the relevant events were set in motion on September 21, 2009) and ¶ 11 (alleging that the resulting disciplinary hearing occurred on September 25, 2008). Plaintiff's prison records reflect that he was designated to the Clinton Correctional Facility, where the relevant events took place, from January of 2008 through April of 2009. *See* Brousseau Aff. (Dkt. No. 14–2) ¶ 12. Accordingly, it appears that the incidents upon which plaintiff's claims are based occurred in September of 2008.

> FN3. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens); Tinsley v.. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2

(N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

A Tier II I disciplinary hearing was conducted on September 25, 2008 to address the charges set forth in the misbehavior report.[FN4] Complaint (Dkt. No. 1) ¶ 11; *see also* Bennett Aff. (Dkt. No. 16) Exhs. D and E. At the conclusion of that hearing plaintiff was found guilty of creating a disturbance and refusing to obey a direct order, but was acquitted of the demonstration charge.[FN5] Complaint (Dkt. No. 1) ¶ 11; Bennett Aff. (Dkt. No. 16) ¶ 10.

> FN4. The DOCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments, such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

FN5. The record now before the court does not disclose the penalty imposed by the hearing officer based upon his finding of guilt.

## II. *PROCEDURAL HISTORY*

**\*2** Plaintiff commenced this action on November 4, 2009. Complaint (Dkt. No. 1). As defendants, plaintiff's complaint names DOCS Commissioner Brian Fischer; Dale Artus, the Superintendent at Clinton; and Corrections Officer H. Martin. *Id.* The causes of action asserted by the plaintiff include violations of the First, Eighth, and Fourteenth Amendments of the United States Constitution. *See generally id.*

Following some initial procedural activity, including the granting of plaintiff's request for leave to proceed *in forma pauperis* and approval of plaintiff's complaint for filing, Dkt. Nos. 4, 8, but prior to answering the complaint, on February 25, 2010 the defendants moved for summary judgment dismissing plaintiff's complaint.[FN6] Dkt. No. 14. In their motion, defendants assert that plaintiff's claims are subject to dismissal on the procedural ground that he failed to satisfy his obligation to exhaust available administrative remedies before commencing the action. *See* Dkt. No. 14, at pp. 4–9. In addition, defendants Fischer and Artus maintain that plaintiff's claims against them are subject to dismissal based upon their lack of personal involvement in the constitutional violations alleged. *Id.* On March 22, 2010, plaintiff's submission in opposition to defendants' motion was received and filed by the court. Dkt. No. 16. Defendants have since replied in response to that submission and in further support of their summary judgment motion. Dkt. No. 17.

FN6. Unlike its Rule 12(b) dismissal motion

counterpart, a summary judgment motion does not have the effect of automatically staying the requirement of answering a plaintiff's complaint. *Compare* Fed.R.Civ.P. 12(b)(6) *with* Fed.R.Civ.P. 56. Despite the lack of a specific rule recognizing such a stay, some courts have deemed the interposition of a pre-answer summary judgment motion as an act of defending in the case, negating a finding of default, while others have not. *Compare Rashidi v. Albright,* 818 F.Supp. 1354, 1355–56 (D.Nev.1993) *with Poe v. Christina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D.Del.1953). In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty days after a final determination is issued with respect to defendants' motion, in the event that the action survives summary judgment. *See Snyder v. Goord,* 9:05–CV01284, 2007 WL 957530 at \*5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, S.J. and Peebles, M.J.).

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*3** When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998).

Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

**B.** *Failure to Comply with Local Rule 7.1(a)(3)*

In support of their motion, defendants have submitted a statement of four material facts alleged by them not to be in dispute, as required under Rule 7.1(a)(3) of this court's local rules.[FN7] Dkt. No. 53–7. While plaintiff has filed papers in opposition to defendants' motion, he did not include among them a response to defendants' Local Rule 7.1(a)(3) Statement.

> FN7. That rule provides, in pertinent part, that "[a]ny motion for summary judgment shall contain a Statement of Material Facts [which] shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established...." N.D.N.Y.L.R. 7.1(a)(3).

This court's local rules require that any party opposing a motion for summary judgment must file a response to the moving party's statement of material facts, mirroring the statement and specifically admitting or denying each of the numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). The rule goes on to provide that "any facts set forth in the Statement Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *Id.* (emphasis omitted). Plaintiff was reminded of the requirements of Local Rule 7.1(a)(3) in a form notice pursuant to Local Rule 56.2 that accompanied defendants' notice of motion. *See* Dkt. No. 14.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

Plaintiff's papers in opposition to the defendants' summary judgment motion fail to comply with this meaningful requirement. Courts in this district have uniformly enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts set forth in a moving party's statement to have been admitted in similar circumstances, where the party opposing the motion has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases) [FN8]; *see also Monahan v. New York City Dep't. Of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In light of plaintiff's demurrer in connection with defendants' Local Rule 7.1(a)(3) Statement, I recommend that the court consider each of the facts asserted in it to have been deemed admitted by the plaintiff for purposes of the instant motion.

FN8. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

## C. *Failure to Exhaust Administrative Remedies*

**\*4** In their motion, defendants allege that a search of grievance records at Clinton has revealed that although plaintiff filed nine grievances while at that facility, none involved the September, 2008 incident now forming the basis for his claims.[FN9] As a threshold procedural matter, defendants contend that plaintiff is therefore precluded from judicial pursuit of his claims based upon his failure to comply with the exhaustion requirement of 42 U.S.C. § 1997e(a).

FN9. In support of their motion, defendants have submitted an affidavit from Tara Brousseau, the Inmate Grievance Supervisor at Clinton, disclosing that nine grievances were filed by the plaintiff while incarcerated at Clinton from January 2008 through April 2009, addressing various subjects, including

(1) deadline access (6/11/08), (2) outgoing mail delay (6/18/08), (3) denture repair (7/2/08), (4) missing property (12/23/08), (5) being singled out by a C.O. (1/5/09), (6) being told to quiet down (1/8/09), (7) headcove ring/d reads (1/8/09), (8) adequate medical treatment (2/17/09), and (9) retaliation by a C.O. (3/16/09). Brousseau Aff. (Dkt. No. 14–2) ¶ 13 and Exh. B.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits," *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 914–15 (2007) (citations omitted); *see also Woodford,* 548 U.S. at 91–92, 126 S .Ct. at 2386; *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

S.Ct. at 992 (citation omitted).

In the event a defendant named in a prisoner action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford*). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697–98) (emphasis omitted).

**\*5** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN10] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The

third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

> FN10. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

In the face of defendants' submissions, plaintiff offers an affidavit in which he claims to have filed a grievance with the IGRC at Clinton regarding the matters alleged in the complaint. *See* Bennett Aff. (Dkt. No. 16) ¶ 7 and Exh. D and E. This allegation is squarely in conflict with the defendants' submissions, and in particular with that portion of the Brousseau affidavit reflecting that grievances filed with the IGRC are logged in and electronically stored, and a search of those records has failed to substantiate plaintiff's claim. Brousseau Aff. (Dkt. No. 14–2) ¶¶ 8–11.

It is unclear from plaintiff's submission whether what plaintiff has referred to as a grievance may actually have been an appeal to the superintendent from his Tier III hearing and its results, or if he claims to have pursued both. The exhibits attached to plaintiff's affidavit in opposition to defendants' motion include a form document entitled "Appeal Form to the Commissioner from Superintendent's Hearing" (the "Appeal Form"), which is signed by Bennett and dated October 20, 2008, and which refers to a hearing date of September 25 and 26, 2008, Bennett Aff. (Dkt. No. 16) Exh. D. Under the specific grounds for the appeal, the form states "please see attached." Attached to

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

Appeal Form is a typewritten document labeled "grievance", dated October 9, 2008, and signed by Bennett as "grievant"; the document is not addressed to any specific individual or entity within the facility. *Id.* Exhs. D–1 and D–2. In essence, the stated basis for the grievance relates to the manner in which the hearing officer conducted the hearing as well as his ultimate determination.

**\*6** The second document attached to the Appeal Form is a separate typewritten document, also labeled "Appeal Form to Commissioner Superintendent's Hearing".[FN11] *Id.* at Exhs. E1 and E2. This document, which is dated October 20, 2008, does not appear to be written in a standard DOCS form, but instead is seemingly a document typewritten by or for the plaintiff setting forth in a narrative fashion the basis for his appeal. *See id.* This second document expressly states that Bennett is appealing from the decision made by Hearing Officer Barton, and in it plaintiff specifically requests that the DOCS Commissioner reverse the hearing officer's determination and dismiss the charges and expunge them from his record. *Id.* at E2.

> FN11. There is no information in the record now before the court as to the outcome of any such appeal.

1. *Plaintiff's First and Eighth Amendment Claims*

To the extent plaintiff contends that he exhausted his administrative remedies with respect to his First and Eighth Amendment claims by pursuing his disciplinary appeal, the argument is unavailing. It is well-established that while placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson,* 380 F.3d at 697–98 (emphasis omitted). "An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance." *LaBounty v. Johnson,* 253 F.Supp.2d 496, 501–502 (W.D.N.Y.2003) (citing *McNair v. Sgt. Jones,* No. 01 Civ. 3253, 2002 WL 31082948, \*7 (S.D.N.Y. Sept. 18, 2002) (dismissing § 1983 where plaintiff failed to exhaust administrative remedies despite having appealed from disciplinary hearing on the same facts alleged in support of his excessive force claim).

While referencing his First Amendment Rights, plaintiff's disciplinary appeal does not mention any claim of cruel and unusual punishment. Moreover, while plaintiff's articulation of his religious exercise claim during his disciplinary proceedings may have represented substantive exhaustion of his First Amendment claim, by raising it in defense of the misbehavior report at issue plaintiff did not fulfill his obligation to procedurally exhaust available remedies with regard to this claim. The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials. *Hairston v. LaMarche,* No. 05 Civ. 6642, 2006 WL 2309592, at \*10 (S.D.N.Y. Aug. 10, 2006). Here, Bennett did not fulfill his procedural exhaustion requirement that by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *Macias,* 495 F.3d at 43; *see also Johnson,* 380 F.3d at 697–98. The mere utterance of his claims during the course of a disciplinary hearing does not obviate the requirement that he file a grievance setting forth a claim which is based upon the same or closely related facts. *Reynoso v. Swezey,* 423 F.Supp.2d 73, 74–75 (W.D.N.Y.2006).[FN12] For these reasons, plaintiff's argument that he exhausted his First and Eighth Amendment claims by way of his disciplinary appeal must fail.

> FN12. In this regard the circumstances of this case are materially distinguishable from other instances where the raising of constitutional claims during a disciplinary hearing

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

has resulted in thorough investigation of the matter by prison officials. *See, e.g., Hairston,* 2006 WL 2309592, at *8–11. In this case, there is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights were in any way investigated by prison officials.

**\*7** Turning to the separate question of whether plaintiff adequately exhausted his administrative remedies through the grievance process, insofar plaintiff claims the grievance attached to his affidavit was filed with the IGRC, there is a factual dispute since defendants' deny this contention. Ordinarily such a conflict would preclude summary judgment. In this instance, however, though plaintiff makes reference to a response from the superintendent, *see* Plf.'s Memorandum (Dkt. No. 16) ¶ 12, there is no indication that the alleged grievance concerning the matter was pursued by the plaintiff to the CORC, a requirement in order to properly exhaust administrative remedies and thereby satisfy the PLRA's exhaustion requirements. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). As a result, I have concluded that plaintiff has failed to exhaust administrative remedies with regard to his First and Eight Amendment claims.

In his opposition papers, plaintiff has raised another matter which gives room for pause. Plaintiff's submission alleges that, upon being relocated on December 9, 2008 from Clinton to the Clinton Correctional Facility Annex, certain of his personal property, which included grievance files, was misplaced. Bennett Aff. (Dkt. No. 16) ¶ 8. Under ordinary situations this could plausibly serve to satisfy the "special circumstances" test for excusing the applicable PLRA exhaustion requirement. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004).[FN13] When examining the third, catch-all factor of the three-part exhaustion rubric announced by the Second Circuit in a series of decisions rendered in 2004, a court should consider whether special circumstances have been plausibly

alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676–77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10.

> **FN13.** The question of whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* No. 04–CV–395, 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.)

The relevant chronology in this case fails to support plaintiff's claim that through special circumstances, principally due to his lost files, he was precluded from pursuing his grievance to completion to the CORC. Plaintiff claims that he exhausted his grievance up to the superintendent's level. Plaintiff's Memorandum (Dkt. No. 16) ¶ 5. Assuming the grievance submitted by the plaintiff in fact constitutes a grievance that was submitted to but denied by the IGRC, while his appeal to the superintendent is not date stamped, as ordinarily would be the case upon receipt of an inmate's appeal of the IGRC determination, *see* 7 N.Y.C.R.R. § 701.5(c)(3), the documents are dated October 9, 2008; presumably, it was submitted to Superintendent Artus on or about that date. Under the New York IGP in a matter such as this, which does not involve creation or revision of a department policy or directive, the superintendent is required to answer the appeal within twenty calendar days of its receipt, *see* 7 N.Y.C.R.R. § 701.5(c)(3) (i), and any appeal from such a determination must be taken within seven calendar days after receipt of the superintendent's response. *Id.* § 701.5(d)(1)(i). Accordingly, under this time frame both the superintendent's response and plaintiff's appeal to the CORC would have been completed prior to December 9, 2008, when, plaintiff maintains, his grievance papers were lost or stolen.[FN14] Accordingly, plaintiff's circumstances do not qualify as "special" under

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

Hemphill.

> FN14. Even if the Appeal Form, the second document attached to plaintiff's affidavit, was actually intended as an appeal of the grievance denial to the superintendent, and not a disciplinary appeal to the Commissioner, the chronology still would not support plaintiff's position because the Appeal Form is dated October 20, 2008; once again, any response by the superintendent would have been received by plaintiff on or about November 9, 2008 and the deadline for an appeal to the CORC would have been November 16, 2008, at least three weeks before plaintiff's transfer and the loss of his property.

**\*8** Because in the face of defendants' submissions, plaintiff has failed to establish that he filed and pursued to completion a grievance pursuant to the New York IGP relating to his religious exercise and cruel and unusual punishment claims, I recommend that these claims be dismissed on this procedural basis.

### 2. *Plaintiff's Due Process Claim*

Although plaintiff's complaint makes only passing reference to the Fourteenth Amendment and provides no allegations of fact that might support a procedural due process claim, when it is construed liberally in light of his motion response, it appears that plaintiff may also be making a claim for violation of his right to due process with respect to the disciplinary hearing. This claim, in contrast to plaintiff's First and Eighth Amendment claims, cannot so easily be dispensed with on exhaustion grounds.

Under the special circumstances exception to exhaustion, "under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding." [FN15]

*Murray v. Palmer,* No. 9:03–CV–1010, 2010 WL 1235591, at \*3 (Mar. 31, 2010) (Suddaby, D.J.) (emphasis omitted) (citing *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697). An appeal from a disciplinary hearing that raises the precise procedural infirmities raised in the section 1983 action, for example, may be sufficient to exhaust administrative remedies. *LaBounty,* 253 F.Supp.2d at 502 n. 5 (citing and quoting *Flanagan v. Maly,* 99 Civ. 12336, 2002 WL 122921, \*2 (S.D.N.Y. Jan. 29, 2002)). In *Flanagan,* the court declined to dismiss the plaintiff's due process claim for failure to exhaust, reasoning that

> FN15. Notably, " 'an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable.' " *Murray,* 2010 WL 1235591, at \* 3 (quoting 7 N.Y.C.R.R. § 701.(3)(e)(2)).

[t]o require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

*Flanagan,* 2002 WL 122921, at \* 2. Although the Second Circuit has not squarely addressed the issue, at least one court within this Circuit has endorsed the court's reasoning in *Flanagan* and refused to require exhaustion where an inmate has pursued his disciplinary appeals to the highest levels without

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

success and then claimed due process violations with respect to the disciplinary hearing in the context of a section 1983 action. *Khalid v. Reda,* No. 00 Civ. 7691, 2003 WL 42145, at * 4 (S.D.N.Y. Jan. 23, 2003) (citing *Samuels v. Selsky,* No. 01 CIV.8235, 2002 WL 31040370, at *8 (S.D.N.Y. Sept. 12, 2002)).

**\*9** Here, as discussed above, in opposition to defendant's motion plaintiff has submitted what appears to be an appeal of his disciplinary determination. For Tier I II superintendent hearings, the appeal is to the Commissioner, or his designee, Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program. *Murra* y, 2010 WL 1235591, at *2 (citing 8 N.Y.C.R.R. § 254.8). The document attached to plaintiff's affidavit in opposition to defendant's motion, Dkt. No. 16, the Appeal Form, appears to be an appeal to the Commissioner of the determination after the superintendent's disciplinary hearing, and it thus seems at least plausible that plaintiff appealed to the highest level available within the DOCS. [FN16] In that document, as grounds for his appeal plaintiff asserts objections to the hearing officer's conduct of the hearing as well as his ultimate determination, claims a violation of his First Amendment rights, and requests reversal of the hearing officer's determination and expungement of the proceeding from his disciplinary record.

> [FN16]. Defendants make much of the fact that although this document is dated October 20, 2008, it was notarized on March 17, 2010, implying that the disciplinary appeal was not filed until March 17, 2010. Notably, however, defendants have not submitted anything in evidentiary form refuting plaintiff's claim that he timely pursued this appeal. Plaintiff's affidavit in opposition to defendants' motion, to which the disciplinary appeal is attached, is dated March 12, 2010, but was notarized on March 17, 2010. Thus, it seems clear that in addition to notarizing the plaintiff's affi-

davit on that date, the notary also inadvertently notarized the attachment thereto.

Unfortunately, the record is not fully developed with respect to the procedures followed with regard to plaintiff's disciplinary hearing and the ultimate disposition of the charges or the appeal, and defendants have completely failed to address the merits of plaintiff's apparent assertion that he exhausted his administrative remedies via the disciplinary appeal. Instead, relying upon their Rule 7.1(a)(3) Statement, defendants contend that plaintiff did not dispute their statement that he failed to file a grievance regarding the constitutional claims made in this lawsuit. In their Rule 7.1(a)(3) Statement, however, defendants merely state that "[p]rior to filing the Complaint, the plaintiff chose not to file a grievance regarding what he now describes as violations of his First, Eighth, and Fourteenth Amendment rights." Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 15) ¶ 1.[FN17] Defendants' Rule 7.1(a)(3) Statement does not allege that plaintiff failed to pursue a disciplinary appeal on due process grounds. When affording plaintiff every favorable inference, defendants' reliance upon their Rule 7.1(a)(3) Statement is misplaced.

> [FN17]. Defendants' Rule 7.1(a)(3) Statement appears to be incorrectly numbered; this statement is actually the last and should be numbered "4" instead of 1.

As was previously noted, the basis for plaintiff's due process claim in this lawsuit is not well-defined. It is also not clear whether any of the named defendants participated in the conduct giving rise to the deprivation. Plaintiff's submission on this motion nonetheless raises unresolved questions of fact as to whether plaintiff fully exhausted his administrative remedies by way of the disciplinary appeal with regard to the due process claims alleged in this judicial proceeding.

D. *Personal Involvement*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

In their motion defendants Fischer and Artus assert their lack of personal involvement in the relevant events giving rise to plaintiff's claims as an alternative basis for dismissal of plaintiff's claims against them.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*10** Neither Commissioner Fischer nor Superintendent Artus is alleged to have been directly involved in the events giving rise to plaintiff's claims. Instead, it appears that they are named as defendants based upon their supervisory positions and plaintiff's allegation that they were "grossly negligent in training and supervising their subordinates." *See* Complaint (Dkt. No. 1) ¶ 14. It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisor for a civil rights violation can be established only if one of five circumstances exist, including when that individual (1) has directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, has failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v.*

*Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom.; Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

In this instance, the evidence in the modest record now before the court regarding the actions of defendants Fischer and Artus is scant. Neither has submitted an affidavit in support of defendants' summary judgment motion reflecting their lack of involvement and to the extent to which, if at all, they have been participants in the supervision and training of corrections officers such as defendant H. Martin at Clinton. For his part, plaintiff has provided nothing other than his raw allegation that the two were grossly negligent in their training and supervision of subordinates.

Clearly, neither Fischer nor Artus was a direct participant in the challenged conduct. It may be, however, that defendant Artus, who presumably learned of the misbehavior report and resulting disciplinary hearing based upon plaintiff's appeal, could be deemed to have failed to remedy the alleged wrong once learning of the violation. I therefore recommend against summary dismissal of plaintiff's claims against defendant Artus based upon lack of personal involvement.

With regard to Commissioner Fischer, there is no indication in the record now before the court that defendant Fischer had any awareness of the specific events giving rise to plaintiff's First and Eighth Amendment claims. Nor has plaintiff alleged the existence of a policy or custom within the DOCS leading to the unconstitutional practices that occurred.[FN18,FN19] Plaintiff's only allegation concerning defendant Fischer's role is that he was grossly negligent in managing subordinates. Neither plaintiff's complaint, however, nor his motion submissions articulate specific facts suggesting Commissioner Fischer's negligence in training and supervising his subordinates.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

FN18. Indeed, DOCS has enacted and implemented a policy specifically recognizing the right of inmates to a limited exercise of their First Amendment religious rights, consistent with legitimate penological and security concerns. *See* DOCS Directive No. 4202.

FN19. It is well established that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy," sufficient to establish supervisor liability. *Ricciuti v. NYC Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

**\*11** It is well settled that vague and conclusory allegations that a supervisor has failed to properly manage a subordinate do not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Having provided no factual basis for holding Commissioner Fischer personally responsible for the alleged violations of his First and Eighth Amendment rights, plaintiff has failed to allege a sufficient basis for holding him responsible for such alleged conduct.

Plaintiff's due process claim, however, is another matter. Plaintiff has produced documents indicating that he appealed the disciplinary determination to the Commissioner. Commissioner Fischer's participation in the relevant events, if any, including his review on appeal of the disciplinary hearing and determination, would seem to bring him squarely within the second of the five above-stated potential grounds for establishing personal involvement on the part of a supervisory

employee.[FN20]

FN20. As previously referenced, ordinarily such appeals are referred to Donald Selsky. On this record, however, there is no indication as to whether such referral was made in this case, thus leaving lingering material questions of fact as to the Commissioner's involvement.

Notably, with regard to the Commissioner's customary designee for review of disciplinary appeals, Donald Selsky, some courts have found that the mere allegation that Selsky has reviewed and affirmed a hearing officer's disciplinary determination is insufficient to show the requisite personal involvement in the alleged underlying constitutional violation. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05–CV47A, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part."); *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at \*7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like defendant Fischer. *See, e.g., Baez v. Harris,* No. 9:01–CV–807, 2007 WL 446015, at \*2

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

(N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation.").

**\*12** In my view, those cases in which courts have concluded that a plaintiff's allegations that the Commissioner, or Director Selsky, reviewed and upheld an alleged constitutionally infirm disciplinary determination are enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement).

Based upon plaintiff's submission, it appears that Commissioner Fischer may have been involved in review of Bennett's disciplinary appeal. On the record before the court it therefore appears that there are material questions of fact with regard to Commissioner Fischer's personal involvement which preclude the entry of summary judgment. *See Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N .Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02–CV–0915, Report–Recommendation, 2005 WL 3531464, at \*16 (N.D.N.Y. Mar. 14, 2004) (Sharpe, D.J. and Peebles,

M.J.) (Selsky's motion for summary judgment for lack of personal involvement denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations.").

In sum, although it may well be that this defendant was not in any way involved in the alleged due process violations, I have determined that at this juncture defendants have failed to establish that there are no material questions of fact as to Commissioner Fischer's personal involvement in the disciplinary appeal, and therefore recommend denial of defendants' motion is this respect. On the other hand, in light of plaintiff's failure to offer facts to support his bald and conclusory allegation regarding negligent supervision and training by Commissioner Fischer, I recommend that plaintiff's First and Eighth Amendment claims against Commissioner Fischer be dismissed on this additional, alternative basis of lack of personal involvement.

IV. *SUMMARY AND RECOMMENDATION*

Because it is clear from the record now before the court that plaintiff has failed to satisfy his PLRA obligation to exhaust available administrative remedies with regard to his free exercise and cruel and unusual punishment claims before commencing this action, his claims in this regard are subject to dismissal on this procedural basis. As to plaintiff's due process claim, the record before the court is equivocal as to whether plaintiff fully exhausted the claims made in this lawsuit by way of his appeal of the disciplinary determination, and material questions of fact regarding this issue preclude entry of judgment as a matter of law. Turning to the remaining portion of defendants' motion, I conclude that a reasonable fact finder could determine that Superintendent Artus was sufficiently involved in the offending conduct to support a finding of liability against him and that while questions of fact remain as to Commissioner Fischer's personal in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)
**(Cite as: 2010 WL 5525368 (N.D.N.Y.))**

volvement, if any, in the alleged due process violations, the record fails to disclose any basis on which a reasonable fact finder could determine that Commissioner Fischer should also be held accountable for the for the First and Eighth Amendment violations alleged in plaintiff's complaint. It is therefore hereby respectfully RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 14) be DENIED solely as to plaintiff's due process claim as against all three defendants, but that defendants' motion otherwise be GRANTED and that plaintiff's claims under the First and Eighth Amendments against all three defendants be DISMISSED.

**\*13** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Bennett v. Fischer
Not Reported in F.Supp.2d, 2010 WL 5525368 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
George M. CHAVIS, Plaintiff,
v.
S. VONHAGN, et al., Defendants.

No. 02–CV–0119(Sr).
Jan. 30, 2009.

West KeySummary**Prisons 310** 🔑**192**

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases
    (Formerly 310k17(2))

**Sentencing and Punishment 350H** 🔑**1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
      350Hk1546 k. Medical care and treatment. Most Cited Cases

No genuine issue of material fact existed regarding whether prison medical staff violated a prisoner's Eighth Amendment rights by being deliberately indifferent to the prisoner's medical needs to preclude summary judgment. The evidence indicated that the prisoner was seen on eighteen occasions during December 1999 because the prisoner complained of ear problems. The prison medical staff examined the prisoner on those occasions, noted that it was not an ear infection, and advised the prisoner to stop putting foreign objects into his ears. The evidence further indicated that the prison medical staff administered Advil, ear drops, ear wash, and over-the-counter medication, such as skin cream, lip balm, and Sudafed, to the prisoner as he requested and needed it. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

George M. Chavis, Dannemora, NY, pro se.

Delia Dianna Cadle, New York State Attorney General's Office, Buffalo, NY, for Defendants.

*DECISION AND ORDER*

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct any and all further proceedings in this case, including entry of final judgment. Dkt. # 42.

Plaintiff filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt.1 and 9. Plaintiff alleges that while an inmate at the Southport Correctional Facility, his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 79. For the following reasons, defendants' motion for summary judgment is granted in its entirety.

*BACKGROUND*

Plaintiff, proceeding *pro se,* filed this action on or about February 11, 2002, seeking "dismissal" (expungement) of each "disciplinary ticket" (hereinafter referred to as "Misbehavior Report") addressed in the amended complaint, termination of each defendant's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

employment with the New York Department of Correctional Services, and compensatory and punitive damages for violations of his rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.[FN1] *Id.* The following claims remain and are presently before this Court on defendants' motion for summary judgment: (1) in or about December 1999, defendants Brandt and vonHagn denied plaintiff emergency medical care and defendant Brandt denied plaintiff medication in or about January 2001; (2) defendants Brandt and vonHagn retaliated against plaintiff because plaintiff had filed grievances against defendants Brandt and vonHagn; (3) defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Selsky, Sheahan and Wilcox violated plaintiff's due process rights under the Fourteenth Amendment in connection with disciplinary hearings and appeals handled by each of the defendants; (4) defendant Gardner interfered with plaintiff's legal mail and denied plaintiff permission to take a religious correspondence course in violation of the First Amendment; and (5) defendants Corcoran and Weingartner violated plaintiff's First Amendment right of access to the New York Court of Claims.

> **FN1.** Plaintiff filed his original complaint together with a motion to proceed *in forma pauperis* on or about February 11, 2002. Dkt.1 and 2. By Order filed March 7, 2002, United States District Judge Charles J. Siragusa granted plaintiff permission to proceed *in forma pauperis* and dismissed all but two of plaintiff's original claims. Dkt. # 3. Plaintiff was granted leave to amend his complaint with respect to certain of his dismissed claims. *Id.* Plaintiff filed an amended complaint on or about May 31, 2002. Dkt. # 9. Thereafter, by Order filed July 1, 2002, United States District Judge David G. Larimer dismissed certain of plaintiff's claims and terminated certain of the defendants. Dkt. # 10. Specifically, Judge Larimer dismissed plaintiff's official capacity claims

against all defendants, plaintiff's interference with non-legal mail claim against defendant Gardner and all claims against defendant Hazelton. *Id.*

## A. Deliberate Indifference Claim

At all times relevant to the allegations in the amended complaint, defendants Sabrina vonHagn, R.N. and Robert Brandt, R.N. were employed by the New York State Department of Correctional Services ("DOCS") at the Southport Correctional Facility ("Southport"). Dkt. # 82, ¶ 1; Dkt. # 83, ¶ 1. Plaintiff's deliberate indifference claim against defendant vonHagn states, in part:

> On the date [sic] of 12–16–99 to 12–22–99, S. VonHagan [sic], inside of this Southport Prison, while acting under State color [sic], in her individual and official [FN2] capacities, had [sic] knowingly, intentionally, and wilfully denied me 'emergency' medical care for a serious—extremely painful ear infection resulting in my total loss of hearing ability in my ear for a time period of two weeks.

> > **FN2.** As noted in footnote 1 *supra,* Judge Larimer dismissed plaintiff's official capacity claims against all defendants.

**\*2** Dkt. # 9, p. 5. Similarly, plaintiff's deliberate indifference claim against defendant Brandt states, in part:

> Additionally, on the date [sic] of 12–16–99 to 12–22–99, this same defendant [Brandt], who is the medical staff co-worker and morning partner of defendant S. VonHagan [sic] (para # 1), had done [sic] SHU–AM cell visits on these dates above and knowingly, wilfully, and intentionally 'aided' in the *denial* of my receiving [sic] 'emergency' medical care for my ear infection resulting in extreme pain and loss in hearing ability for a two week time period.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

*Id.* at p. 5–B (emphasis in original). Plaintiff also alleges (as part of his retaliation claim) that defendant Brandt "violated my right to proper medication" in January 2001. Dkt. # 9, p. 5–A.

In or about December 2004, defendant vonHagn had been a licensed registered nurse for approximately 28 years and had been employed as a registered nurse at Southport since 1994. Dkt. # 83, ¶ 1. Also in or about December 2004, Defendant Brandt had been a licensed registered nurse for approximately 25 years and had been employed as a registered nurse at Southport since 1992. Dkt. # 82, ¶ 1. At all times relevant to the claims alleged in the amended complaint, John Alves, M.D. was the Facility Health Services Director of the Medical Services Unit at Southport and held that position since 1995. Dkt. # 81, ¶ 1. As of December 2004, Dr. Alves had been licensed to practice medicine for approximately 25 years. *Id.*

**1. December 1999**

Plaintiff was transferred to Southport on or about March 24, 1999. Dkt. # 81, ¶ 6. During December 1999, plaintiff's ambulatory health records reveal that he had eighteen encounters with medical staff. Dkt. # 81, ¶ 7. Indeed, prior to December 16, 1999, plaintiff was seen by medical staff on the following nine occasions, December 2 (Brandt), December 3 (vonHagn), December 4 (vonHagn), December 7 (vonHagn—twice), December 10 (vonHagn), December 13 (Brandt), and December 14 (Brandt and Hearn). Dkt. # 81, ¶¶ 7–11; Dkt. # 82, ¶ 9; Dkt. # 83, ¶¶ 8–9. On December 16, 1999, plaintiff was seen by defendant Brandt during morning sick call. Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. During this sick call, plaintiff requested an ear check and stated that he could not hear. *Id.* On or about December 16, 1999, defendant Brandt made the following notations in plaintiff's medical records, "ear / some wax noted drum visible canal mildly irritated from inmate using pen cap paper [sic] for cleaning ear." *Id.;* Dkt. # 70, p. 0843. De-

fendant Brandt advised plaintiff of his findings and plaintiff demanded ear drops. *Id.* Defendant Brandt further advised plaintiff that ear drops were not indicated and defendant Brandt noted that plaintiff was "very verbal, screaming, banging on cell bars." *Id.* Defendant Brandt again saw plaintiff on December 17, 1999, wherein plaintiff again demanded ear drops and complained of a headache. *Id.* Defendant Brandt again advised plaintiff against cleaning his ears with foreign objects and provided plaintiff with Advil. *Id.*

*3 Plaintiff was seen by defendant vonHagn on December 18, 1999, during morning sick call. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. At that time, plaintiff demanded a second ear check and stated that he could not hear out of both ears. *Id.* Defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves, if possible, and noted in plaintiff's medical records for plaintiff to follow up with the block RN. *Id.* Defendant vonHagn further noted that, despite complaints that he could not hear, plaintiff heard her statements. *Id.* Plaintiff began demanding an ear examination immediately. *Id.* Defendant vonHagn also saw plaintiff during morning sick call on December 19 and 20, 1999. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 14; Dkt. # 83, ¶ 11. On December 19, 1999, plaintiff requested Advil, however, defendant vonHagn noted that plaintiff had received Advil on December 17, 1999 and it could not be refilled until December 20, 1999. *Id.* Notwithstanding the foregoing, defendant vonHagn provided plaintiff with Advil and as reflected in plaintiff's medical records, advised plaintiff that he was on the MD list for an ear examination. *Id.*

On December 20, 1999, plaintiff continued to complain of ear blockage and an infection. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12. In plaintiff's medical records, defendant vonHagn noted that plaintiff's ear examination was rescheduled, and that an ear examination was conducted in the office. *Id.* Defendant vonHagn also made the following notes in plaintiff's medical records: "ear / in office left ear

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

cereum [sic] impaction seen, right ear some impaction seen, no visualization of tm (tampanic [FN3] [sic] membrane) seen in either ear." *Id.* According to both Dr. Alves and defendant vonHagn, "visualization" is a sign of an ear infection and as noted, defendant vonHagn did not observe any visualization. Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12. Defendant vonHagn further noted that she provided plaintiff with debrox (ear drops) daily for seven days and ear wash and noted to schedule a follow up. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12.

> FN3. Tympanic membrane.

It was not until December 23, 1999, that plaintiff again requested morning sick call. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 16; Dkt. # 82, ¶ 11. Plaintiff was seen by defendant Brandt and requested over-the-counter medication for general use and defendant Brandt provided him with skin cream, lip balm and Sudafed. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 16; Dkt. # 82, ¶ 11. Notably, plaintiff made no complaint of ear pain on December 23, 1999. *Id.* Plaintiff next requested a morning sick call on December 27, 1999, at which time he was seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 17; Dkt. # 82, ¶ 12. Defendant Brandt noted in plaintiff's medical records that plaintiff wrote the following on his sick call request, "c/o [complains of] ears and ear drops." *Id.* Defendant Brandt further noted that he stopped at plaintiff's cell to do an ear check and plaintiff refused an ear examination, was extremely verbal, nasty and confrontational and stated, "get the fuck away from me white boy you fucking piece of racist homo shit. Leave me alone and stick those [ear drops] up your white homo asshole." *Id.* Thereafter, defendant Brandt terminated plaintiff's sick call, provided ear drops to plaintiff and made a note in plaintiff's medical records to follow up by afternoon sick call, if plaintiff was more compliant and less confrontational. *Id.*

**\*4** Two days later on December 29, 1999, plaintiff again requested morning sick call and plaintiff was seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 18; Dkt. # 82, ¶ 13. Plaintiff complained of his ears and requested over-the-counter medications. *Id.* Defendant Brandt attempted to check plaintiff's ears but plaintiff refused, stating, "fuck you white homoboy." *Id.* Defendant Brandt made the following additional notations in plaintiff's medical records, "balm, AF, MD callout." *Id.* Nurse vonHagn next saw plaintiff on December 31, 1999, during morning sick call. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 19; Dkt. # 83, ¶ 13. At that time, plaintiff requested Eucerin cream and when asked to show defendant vonHagn his dry skin, plaintiff refused and became verbally abusive. *Id.* In addition, plaintiff requested and was provided with Sudafed. *Id.* On January 4, 2000, plaintiff refused to see Dr. Alves during the MD callout and Dr. Alves noted plaintiff's refusal in plaintiff's medical records. Dkt. # 70, p. 0840; Dkt. # 81, ¶ 20. Defendant Brandt also noted plaintiff's refusal to see Dr. Alves in plaintiff's medical records and further noted that when he tried to speak to plaintiff, plaintiff stated "F you + your Dr to check my ear assholes." Dkt. # 70, p. 0840; Dkt. # 81, ¶ 21; Dkt. # 82, ¶ 15.

## 2. January and February 2000[FN4]

> FN4. As noted elsewhere, although plaintiff's deliberate indifference claims against defendants vonHagn and Brandt allege wrongdoing in December 1999 and January 2001, plaintiff's amended complaint also alleges retaliation claims against these same defendants. Accordingly, a further discussion of plaintiff's medical care for the period January 2000 through February 2001 is appropriate for the purpose of demonstrating that at no time relevant to the allegations in the amended complaint were defendants vonHagn and Brandt deliberately indifferent to plaintiff's medical needs and to address plaintiff's claims that defendants refused or failed to provide plaintiff with medical care.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

Plaintiff was next seen at morning sick call on January 8, 2000 by Nurse Whedon who noted that plaintiff requested refills of certain medications, however, Nurse Whedon noted that plaintiff did not have any symptoms of a cold, cough or congestion. Dkt. # 70, p. 0840; Dkt. # 81, ¶ 22. Plaintiff made no complaint on January 8, 2000 about his ears. *Id.* On January 12, 2000, plaintiff was seen during morning sick call by defendant Brandt wherein plaintiff complained of a cold and a sore throat. Dkt. # 70, p. 0839; Dkt. # 81, ¶ 23; Dkt. # 82, ¶ 16. Plaintiff requested hydrocortisone cream and Eucerin, but plaintiff refused to show a need for the cream and became verbally abusive. *Id.* Plaintiff did not make any complaints about his ears on January 12, 2000. *Id.*

Defendant vonHagn next saw plaintiff on January 14, 2000 during morning sick call, wherein plaintiff signed for his eyeglasses and became verbally abusive to defendant vonHagn.[FN5] Dkt. # 70, p. 0839; Dkt. # 81, ¶ 24; Dkt. # 83, ¶ 15. Plaintiff did not make any complaints about his ears on January 14, 2000. *Id.* On January 18, 2000, plaintiff requested morning sick call and was seen by defendant Brandt. Dkt. # 70, p. 0839; Dkt. # 81, ¶ 25; Dkt. # 82, ¶ 17. At that time, plaintiff refused his tuberculosis test and became verbally abusive; plaintiff did not, however, complain about his ears. *Id.* According to plaintiff's medical records, plaintiff requested morning sick call on January 24, 25, and 29, 2000 and February 6, 2000. Dkt. # 70, pp. 0838–0837. Plaintiff was not seen by either defendant Brandt or defendant vonHagn on the three remaining dates in January 2000 or on February 6, 2000 and according to plaintiff's medical records, plaintiff did not complain about his ears during any of those visits. *Id.;* Dkt. # 81, ¶ 26. Thereafter, plaintiff was transferred from Southport to Coxsackie Correctional Facility ("Coxsackie") on or about February 7, 2000. Dkt. # 81, ¶ 27. Plaintiff remained at Coxsackie until in or about May 2000 at which time he was returned to Southport. *Id.*

[FN5]. A discussion of the verbal abuse endured by defendant vonHagn on January 14, 2000 and the resulting Misbehavior Report issued by defendant vonHagn against plaintiff is discussed in detail in the section entitled Retaliation Claim. *See* pp. 19–21 *infra.*

### 3. May–December 2000

*5 For the period May 2000 through December 2000, plaintiff had thirty-eight encounters with medical staff.[FN6] Dkt. # 70, pp. 0754–0763 and pp. 0815–0817; Dkt. # 81, ¶¶ 28–49. Plaintiff was seen by defendant Brandt on May 25, 2000, at which time plaintiff demanded Eucerin cream. Dkt. # 70, p. 0817; Dkt. # 81, ¶ 28. Because no need for the cream was demonstrated, defendant Brandt denied plaintiff's request. *Id.* Plaintiff was seen by defendant vonHagn on July 6, 2000, at which time plaintiff requested a plastic basin and Epsom salts to soak his feet because his toes were bothering him. Dkt. # 70, p. 0763; Dkt. # 81, ¶ 30. Plaintiff did not show defendant vonHagn his toe nails and defendant vonHagn noted in plaintiff's medical records that there should be follow up with the block nurse to cut plaintiff's toe nails. *Id.* When plaintiff was seen by defendant vonHagn on September 29, 2000, he again requested Epsom salts, Sudafed and athlete's foot cream. Dkt. # 70, p. 0760; Dkt. # 81, ¶ 32. Defendant vonHagn noted that because there was no order from the doctor for a foot soak, she only provided plaintiff with Sudafed and athlete's foot cream. *Id.* On October 10, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested over-the-counter skin cream and he was provided with athlete's foot cream and Eucerin. Dkt. # 70, p. 0760; Dkt. # 81, ¶ 34. Plaintiff was also seen by defendant Brandt on October 23, 2000, wherein plaintiff requested a laxative; defendant Brandt provided plaintiff with Fleet enemas. Dkt. # 70, p. 0759; Dkt. # 81, ¶ 36. During November 2000, plaintiff was seen by both defendant vonHagn and defendant Brandt. Dkt. # 70, p. 0758; Dkt. # 81, ¶ 38–39. On November 3, 2000, plaintiff was seen by defendant vonHagn and requested Epsom salt, Sudafed and Eucerin cream. *Id.* Defendant vonHagn provided

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

plaintiff with Sudafed. *Id.* Thereafter, plaintiff was seen by defendant Brandt on November 29, 2000 and requested Eucerin cream. *Id.* Defendant Brandt noted that plaintiff was provided with Eucerin cream on October 10, 2000 and was not due for a refill until January 10, 2001. *Id.* Defendant Brandt provided plaintiff with balm and Sudafed. *Id.*

> FN6. Only those instances where plaintiff was seen by either defendant Brandt or defendant vonHagn are described in greater detail below.

Plaintiff was seen by defendant vonHagn on December 13, 20, 24 and 26, 2000. Dkt. # 70, pp. 0755–0757; Dkt. # 81, ¶¶ 42–45. On December 13, 2000, plaintiff again requested Eucerin and athlete's foot cream. Dkt. # 70, p. 0757; Dkt. # 81, ¶ 42. Plaintiff was provided with athlete's foot cream and balm and it was noted again in plaintiff's medical records that plaintiff was not due for more Eucerin until January 10, 2001. *Id.* On December 20, 2000, plaintiff requested and was provided with Sudafed. Dkt. # 70, p. 0756; Dkt. # 81, ¶ 43. Plaintiff requested Advil, a laxative and to have a toe nail removed on December 24, 2000 when he was seen by defendant vonHagn. Dkt. # 71, p. 0756; Dkt. # 81, ¶ 44. Defendant vonHagn provided plaintiff with Advil and Fleet enemas. *Id.* Again on December 26, 2000, plaintiff requested Advil and laxative and defendant vonHagn provided both to plaintiff. Dkt. # 70, p. 0755; Dkt. # 81, ¶ 45. Defendant Brandt saw plaintiff on December 27 and 28, 2000. Dkt. # 70, p. 0755; Dkt. # 81, ¶¶ 46–47. On December 27, 2000, plaintiff requested and was provided with Advil. *Id.* On December 28, 2000, plaintiff complained of a rash and was provided with hydrocortisone cream. *Id.* Plaintiff requested sick call on December 29, 2000 and when defendant vonHagn went to plaintiff's cell, plaintiff did not respond to defendant vonHagn's inquiries. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 48. Finally, on December 30, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested and was provided with laxative and

Advil. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 49.

### 4. January 2001

**\*6** Plaintiff had twelve encounters with medical staff during January 2001. Dkt. # 70, pp. 0750–0754; Dkt. # 81, ¶ 50. Plaintiff was seen by defendant Brandt on January 2, 9, 10, 22, 23 and 24, 2001. Dkt. # 70, pp. 0752–0754; Dkt. # 81, ¶¶ 51–56. On January 2, 2001, plaintiff complained of his sinuses and requested band-aids for his toes. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 51. Defendant Brandt provided plaintiff with Sudafed and band-aids. *Id.* On January 9, 2001, plaintiff complained of a sore throat and of his toes; defendant Brandt provided plaintiff with throat lozenges and band-aids. Dkt. # 70, p. 0753; Dkt. # 81, ¶ 52. Plaintiff complained of a headache and a sore throat on January 10, 2001 and defendant Brandt provided him with Advil and throat lozenges. Dkt. # 70, p. 0753; Dkt. # 81, ¶ 53.

On January 14, 2001, plaintiff was seen by Nurse Whedon during morning sick call and requested Sudafed for sinus congestion, hydrocortisone cream and "mom." Dkt. # 70, p. 0753. On January 22, 2001, plaintiff complained of a rash and defendant Brandt provided him with athlete's foot cream and hydrocortisone cream. Dkt. # 70, p .0752; Dkt. # 81, ¶ 54. Plaintiff was seen by defendant Brandt on January 23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw hydrocortisone cream at defendant Brandt and stated, "next time I'll spit + shit on you." Dkt. # 70, p. 0752; Dkt. # 81, ¶ 55. The sick call was terminated and defendant Brandt issued a Misbehavior Report.[FN7] *Id.* The following day, on January 24, 2001, plaintiff was again seen by defendant Brandt and plaintiff requested over-the-counter medication for general use. Dkt. # 70, p. 0752; Dkt. # 81, ¶ 56. Defendant Brandt provided plaintiff with throat lozenges and Motrin. *Id.* On January 26, 2001, plaintiff was seen by defendant vonHagn and plaintiff requested hydrocortisone cream and Sudafed. Dkt. # 70, p. 0751; Dkt. # 81, ¶ 57. Defendant vonHagn noted in plaintiff's medical rec-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ords, "no ointment while on level 1" and further noted that plaintiff had received hydrocortisone cream on January 23, 2001 .[FN8] *Id.* Accordingly, defendant vonHagn provided plaintiff with Sudafed. *Id.*

> FN7. The circumstances surrounding the issuance of the Misbehavior Report and plaintiff's claim of retaliation are discussed in greater detail below at pp. 27–28 *infra.*

> FN8. New York State Department of Correctional Services Division of Health Services Policy 3.03 provides that registered nurses may distribute non-prescription medication under an established protocol to allow for distribution of limited supplies of non-prescription or over-the-counter medications by nurses at sick call. A list of the medications for distribution is attached to the policy as Exhibit A and hydrocortisone cream is not among the over-the-counter medications that may be distributed without prescription authorization. Dkt. # 81, ¶ 58 and Exhibit A.

Plaintiff was again seen by Nurse Whedon on January 27 and 28, 2001. Dkt. # 71, p. 0751; Dkt. # 81, ¶¶ 59–60. On January 27, 2001, plaintiff requested hydrocortisone ointment and laxative. *Id.* Nurse Whedon noted in plaintiff's medical records "no ointment on level 1" and provided plaintiff with a laxative. *Id.* On January 28, 2001, plaintiff requested analgesic balm for sore muscles and hydrocortisone ointment. *Id.* Nurse Whedon provided plaintiff with analgesic balm. *Id.* Plaintiff requested sick call on January 29 and 31, 2001 and defendant Brandt attempted to see plaintiff on both days, however on January 29, 2001, plaintiff refused to get out of bed and refused to answer defendant Brandt. *Id.* Similarly, on January 31, 2001, plaintiff refused to acknowledge defendant Brandt. *Id.*

**5. February 2001**

*7 During February 2001, plaintiff had fifteen encounters with medical staff. Dkt. # 70, pp. 0745–0750; Dkt. # 81, ¶ 63. Plaintiff was seen by defendant vonHagn on February 1, 4, 8, 9, and 13, 2001. Dkt. # 70, pp. 0748–0750; Dkt. # 81, ¶¶ 64 and 66–68. On February 1, 2001, plaintiff requested hydrocortisone ointment on the call slip, however, plaintiff refused to answer defendant vonHagn and refused to get out of bed. Dkt. # 70, p. 0750; Dkt. # 81, ¶ 64. On February 3, 2001, plaintiff was seen by Nurse Whedon and requested hydrocortisone ointment and throat lozenges, plaintiff was provided with only throat lozenges. Dkt. # 70, p. 0749; Dkt. # 81, ¶ 65. Plaintiff requested hydrocortisone ointment for his scalp from defendant vonHagn on February 4, 2001. Dkt. # 70, p. 0749; Dkt. # 81, ¶ 66. Plaintiff's medical records reveal that plaintiff refused to answer defendant vonHagn and refused to show any medical need (by examination) for the ointment. *Id.* Plaintiff was again seen by defendant vonHagn on February 8, 2001 and plaintiff refused to answer when he was called for sick call. Dkt. # 70, p. 0749; Dkt. # 80, ¶ 67. According to the sick call request, plaintiff requested Eucerin, Sudafed and hydrocortisone cream. *Id.* Defendant vonHagn provided plaintiff with Sudafed and hydrocortisone cream. *Id.* According to plaintiff's medical records plaintiff was not eligible to receive additional Eucerin until March 13, 2001. *Id.* Finally, plaintiff was seen by defendant vonHagn on February 9, 2001 and requested hydrocortisone ointment and Eucerin. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 68. Defendant vonHagn once again noted that plaintiff was not due for Eucerin until March 13, 2001 and that plaintiff failed to respond to her requests to demonstrate a medical need for hydrocortisone ointment. *Id.*

On February 11, 2001, plaintiff was seen by Nurse Whedon who noted that plaintiff submitted a sick call slip threatening to sue Nurse Whedon if he wasn't provided with hydrocortisone ointment. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 69. Nurse Whedon noted in plaintiff's medical records that there was no medical

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

need shown for hydrocortisone ointment and that plaintiff would not acknowledge the sick call and remained in bed. *Id.* Plaintiff was seen by defendant vonHagn on February 13, 2001 and he requested balm, hydrocortisone ointment and Motrin. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 70. Defendant vonHagn noted in plaintiff's medical records that no tubes or envelopes were returned. FN9 Plaintiff requested morning sick call on February 14, 2001, however, defendant Brandt noted in plaintiff's medical records that plaintiff refused to get up for sick call. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 71.

> FN9. "Inmates are required to return to medical staff [sic] tube or envelope in which Motrin was originally provided to verify that inmate has completed [sic] dose of Motrin previously provided." Dkt. # 81, ¶ 70.

Plaintiff was seen on February 18, 2001 by Nurse Brink at which time he requested and was provided with athlete's foot cream and analgesic balm for sore muscles. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 72. Plaintiff was seen by Nurse Whedon on February 19, 2001 and complained of chronic constipation and requested a high fiber diet; Nurse Whedon recommended a fiber laxative, plaintiff refused stating that they don't work. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 73. Nurse Whedon also noted in plaintiff's medical records that plaintiff continues to request hydrocortisone ointment and plaintiff showed Nurse Whedon scaly patches on his scalp. *Id.* On February 22, 2001, plaintiff was seen by Nurse DeMeritt and requested minor surgery for his right toenail and noted that plaintiff had a left toenail removed in December 2000. Dkt. # 70, p. 0746; Dkt. # 81, ¶ 74. Nurse DeMeritt submitted a request for right toenail surgery. *Id.*

**\*8** Plaintiff was seen by Nurse Whedon on February 24, 2001, wherein plaintiff requested hydrocortisone ointment, Sudafed for congestion and a natural laxative. Dkt. # 70, p. 0746; Dkt. # 81, ¶ 75. Nurse Whedon noted in plaintiff's medical records that his

request for hydrocortisone ointment was denied, plaintiff refused a fiber laxative and plaintiff was provided with Sudafed. *Id.* Plaintiff was seen again by Nurse DeMeritt on February 26 and 28, 2001. Dkt. # 70, p. 0745; Dkt. # 81, ¶¶ 76–77. On February 26, 2001, plaintiff requested foot cream and hydrocortisone cream and Nurse DeMeritt noted that plaintiff returned the empty tubes and also noted "tinea pedis/uticaria" (athlete's foot) to be treated with over-the-counter medication. *Id.* Plaintiff was provided with mycelex and hydrocortisone cream. *Id.* Plaintiff requested a laxative "to clean his system out" on February 28, 2001, however, Nurse DeMeritt did not note any distress and recommended treatment with over-the-counter medication and fluids and provided plaintiff with Fleet enemas. *Id.*

Dr. Alves, as the Facility Health Services Director of the Medical Services Unit at Southport, reviewed plaintiff's medical records and based upon his review, Dr. Alves concluded that defendants Brandt and vonHagn were not deliberately indifferent to plaintiff's medical complaints about ear pain in December 1999. Dkt. # 81, ¶ 78. Moreover, Dr. Alves concluded that neither defendant Brandt nor defendant vonHagn refused to treat plaintiff's complaints of ear pain. *Id.* Indeed, Dr. Alves further concluded that defendants Brandt and vonHagn treated plaintiff's complaints of ear pain, provided him with debrox, scheduled and performed ear examinations and referred plaintiff to the MD callout as necessary. *Id.* Although plaintiff at times refused the debrox, Dr. Alves found that plaintiff did not require any treatment other than debrox and that debrox was the appropriate medication to treat his complaints of ear pain. *Id.* at ¶ 80. Dr. Alves further opined that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to his treatment of ear pain during December 1999. *Id.* at ¶ 79. Notably, Dr. Alves stated that plaintiff did not complain of ear pain at any time after January 2000. *Id.* at ¶ 84. Finally, Dr. Alves determined that nothing in plaintiff's medical records indicated that either defendant vonHagn or defendant Brandt, either prior

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

to or after issuing a Misbehavior Report regarding plaintiff, refused or failed to provide plaintiff with medical care for the period December 1999 through February 2001. *Id.* at ¶¶ 82–83.

**B. Retaliation Claim**

The amended complaint alleges that on or about January 25, 2000 and on or about December 13, 2000, defendant vonHagn issued Misbehavior Reports against plaintiff in retaliation for his complaints about her. Dkt. # 9, pp. 5 to 5–A. Similarly, plaintiff further alleges in the amended complaint that on or about January 23, 2001, defendant Brandt issued a Misbehavior Report against plaintiff in retaliation for plaintiff's complaints about him. *Id* . at pp. 5–A to 5–B. With respect to the hearings held on the allegedly retaliatory Misbehavior Reports issued by defendants vonHagn and Brandt, plaintiff separately alleges that his due process rights were violated by the hearing officers who presided over the hearings. Dkt. # 9. Those claims of due process violations will be separately addressed below. *See generally* pp. 30–65 *infra*. Specifically, as against defendant vonHagn, plaintiff alleges:

> **\*9** Additionally, on the date of 1–25–00, this defendant [vonHagn] 'retaliated' against me with a ticket after my *prior* inmate grievances against her on 'numerous' occasions for denying me proper medical care for many illness'es [sic] I suffered with/from. Furthermore, on the date of 1–13–00 (hearing date of 12–29–00), this same defendant [vonHagn] again retaliated upon [sic] me with a ticket *after* my inmate grievances against her.

Dkt. # 9, pp. 5–5A (emphasis in original). As against defendant Brandt, the amended complaint states:

> This defendant [Brandt] on the date on 1–23–01, inside of this Southport Prison, while acting under state color, in his individual and official [FN10] capacities, had knowingly, wilfully, and intentionally retaliated against me with a ticket after my inmate

grievance against him on date of 1–22–01, after his violation of my right to proper medication.

[FN10.] *See* footnote 2 *supra.*

Dkt. # 9, p. 5A.

**1. "January 25, 2000" Misbehavior Report—Defendant vonHagn**

Defendant vonHagn did not file a Misbehavior Report against plaintiff on January 25, 2000. Dkt. # 83, ¶ 19. Defendant vonHagn did, however, issue a Misbehavior Report against plaintiff on January 14, 2000 (Dkt.# 44, p. 0029) and the hearing with respect to the January 14, 2000 Misbehavior Report was held on January 25, 2000 (Dkt.# 44, p. 0026).[FN11] The January 14, 2000 Misbehavior Report charging violations of rules 107.10 (verbal interference) and 107.11 (verbal harassment) states:

> [FN11.] A review of defendant vonHagn's motion for summary judgment and supporting documentation submitted therewith, reveals that for purposes of the motion for summary judgment, defendant vonHagn has assumed that the Misbehavior Report to which plaintiff is endeavoring to refer in the amended complaint is in fact the January 14, 2000 Misbehavior Report for which the hearing was held on January 25, 2000. Nothing in plaintiff's opposition to defendants' motion for summary judgment suggests that defendants' assumption was incorrect. Accordingly, for purposes of deciding defendant vonHagn's motion for summary judgment, this Court will make the same assumption and treat plaintiff's allegation concerning a "January 25, 2000" Misbehavior Report as a reference to the January 14, 2000 Misbehavior Report.

At approx 7:35/am the writer of this report [de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendant vonHagn] stopped at B–10–20 cell to de-liver inmate Chavis, G 91A3261 glasses [sic] Be-fore the writer of this report could say anything inmate Chavis G told the writer to move on. The writer of this report was able to convince inmate Chavis to sign for glasses so they could be deliv-ered. He was asked not to tear copy away [sic] both needed to be returned to eye glass clinic coord. Pa-tient asked if he wished a copy he could write the nurse adm. Inmate Chavis 91A3261 B–10–20 then said, "you are a stupid asshole." "You want 25¢ to give me a fucking copy of my glasses receipt." "I'll take your fucking money in court. I'll tear you apart in court" [sic] "I'm not as fucking stupid as you are." "You stupid fucking asshole." "Get the fuck away from my cell you asshole." This continued abuse made continuing [sic] sick call on B–10 gallery difficult to hear B–10–17 cell for sick call.

Dkt. # 44, p. 0029. The Tier 2 [FN12] disciplinary hearing was held on January 25, 2000 and con-ducted by defendant Lieutenant ("Lt.") Ryan.[FN13] During the disciplinary hearing, plaintiff advised Lt. Ryan that he believed that the January 14, 2000 Misbehavior Report was written by defendant vonHagn in retaliation for complaints plaintiff had previously filed against defendant vonHagn. Dkt. # 44, pp. 0032–0038; Dkt. # 83, ¶ 23. Specifically, plaintiff stated, "I'm objecting to the ticket and I'm objecting to the hearing. That ticket is retaliatory and uh let the record also reflect that uh this here uh write up [sic], who happens to be a medical female staff aid, uh has been violating my natural rights since I've entered this here facility." Dkt. # 44, pp. 0032–0038. In the amended complaint, plaintiff al-leges that the January 14, 2000 Misbehavior Report issued by defendant vonHagn was in retaliation for the prior grievances filed by plaintiff against de-fendant vonHagn. Dkt. # 9, pp. 5–5A. On or about December 30, 1999, plaintiff filed a grievance against unspecified persons, Grievance No. SPT–17707–99. Dkt. # 65, pp. 0433–0444; Dkt. # 83, ¶ 36. Grievance No. SPT–17707–99 is discussed in greater detail below. *See* pp. 21–23 *infra*. Cor-

rection Officer R. Martino testified at the hearing that he was present on January 14, 2000 when de-fendant vonHagn attempted to give plaintiff his eyeglasses and when plaintiff was verbally abusive toward defendant vonHagn. Dkt. # 44, pp. 0032–0038. Notwithstanding plaintiff's claim of retaliation and relying upon the testimony of Officer Martino, Lt. Ryan found plaintiff guilty of verbal interference and verbal harassment. *Id.*

FN12. New York conducts three types of disciplinary hearings for its inmates. Tier 1 hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation. Tier 2 hear-ings address more serious infractions and may result in 30 days of confinement in a Special Housing Unit ("SHU"). Tier 3 hear-ings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and rec-ommended loss of "good time" its. *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

FN13. Lt. Ryan is a named defendant in this action and how Lt. Ryan conducted the Jan-uary 25, 2000 disciplinary hearing is the subject of a separate due process claim. The claims against defendant Ryan and defendant Ryan's motion for summary judgment will be separately discussed in greater detail below. *See* pp. 59–62 *infra*.

**a. Grievance No. SPT–17707–99**

*10 In Grievance No. SPT–17707–99, plaintiff asserts that:

(1) On this date above [Dec. 27, 1999] (after sub-mitting a sick call slip last night (12–26–99), the same old white ill-minded white fool who denied

me emergency ear examination and ear drops for infection (12–14–99) had [sic] done nothing for my continual inability to hear when he visited my cell, and after I requested outside expert medical attention, he put (wrote) down "refusal" on his sick call log instead of provid [sic] me with proper medical help outside of this place!! (2) On that date of 12–25–99, the officer (KKK racist), in the control room had deliberately turned off the T.V. hole after that 10–g (illegible) had asked for NBA sports station!

Dkt. # 65, p. 0438. In support of defendants' motion for summary judgment, defendant vonHagn, in her affidavit, summarized the assertions in Grievance No. SPT–17707–99 as follows,

In Grievance No. SPT–17707–99, plaintiff asserted that on or about December 26, 1999, Nurse Brandt denied his request for outside medical treatment for his complaints of ear pain; that Nurse Brandt indicated that plaintiff refused treatment; that on December 14, 1999, Nurse Brandt denied him an emergency ear examination and ear drops; and that from December 14, 1999 to December 21, 1999, Nurse Brandt and I [defendant vonHagn] denied him medical treatment for an ear infection.

Dkt. # 83, ¶ 37.[FN14]

FN14. For purposes of deciding defendants' motion for summary judgment on plaintiff's retaliation claim, as it relates to grievances filed prior to the January 14, 2000 Misbehavior Report, the Court will rely on defendant vonHagn's summary of plaintiff's December 30, 1999 grievance, Grievance No. SPT–17707–99.

On December 13 and 14, 1999, plaintiff was seen by defendant Brandt during morning sick call. Dkt. # 70, p. 0844; Dkt. # 80, ¶ 12. Defendant Brandt noted in plaintiff's medical records that plaintiff requested a

refill of hydrocortisone cream for a rash and lip balm and further that plaintiff complained about his sinuses and refused a PPD test. Id. Defendant Brandt provided plaintiff with hydrocortisone cream and Sudafed. Id. For a complete discussion of the medical treatment provided to plaintiff by defendants Brandt and vonHagn for the period December 16–31, 1999, please refer to pp. 4–8 supra, which is incorporated by reference herein.

In response to Grievance No. SPT–17707–99, Nurse Felker and defendant Brandt advised the Inmate Grievance Review Committee ("IGRC") that defendant Brant delivered ear medication to the plaintiff; that plaintiff began verbally harassing defendant Brandt and refused to accept the medication. Dkt. # 65, p. 0444. Accordingly, the Superintendent dismissed plaintiff's grievance, finding that the medical staff had stated that medication was delivered to plaintiff for ear pain, however, plaintiff began to verbally harass the nurse [defendant Brandt] and refused the medication. The Central Office Review Committee ("CORC") upheld the Superintendent's determination. Dkt. # 65, pp. 0433–0434. CORC advised plaintiff to follow the treatment plan outlined by health services staff and noted that there was no medical need for an outside consultant at that time. Id.

Thus, defendant vonHagn submits that she did not file the January 14, 2000 Misbehavior Report in retaliation for Grievance No. SPT–17707–99 filed by plaintiff on or about December 30, 1999, or any other grievance filed by plaintiff. Dkt. # 83, ¶ 42. Rather, defendant vonHagn submits she filed the January 14, 2000 Misbehavior Report because of plaintiff's harassing language on that date. Dkt. # 83, ¶ 43; see pp. 19–21 supra. Moreover, as discussed above, defendant vonHagn contends that notwithstanding plaintiff's claim of retaliation, which Lt. Ryan received, Lt. Ryan found plaintiff guilty of the violations (verbal interference and verbal harassment) based on the testimony of Officer Martino who was present during the January 14, 2000 incident.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

**2. December 13, 2000 Misbehavior Report—Defendant vonHagn**

**\*11** Plaintiff further alleges in the amended complaint against defendant vonHagn that, "on the date of 12–13–00 (hearing date of 12–29–00), this defendant [vonHagn] again retaliated upon [sic] me with a ticket *after* my inmate grievances against her." Dkt. # 9, pp. 5–5A (emphasis in original).

**a. Grievance No. SPT–20137–00**

Plaintiff filed a grievance, Grievance No. SPT–20137–00, against both defendant Brandt and defendant vonHagn on or about December 11, 2000 alleging that defendants Brandt and vonHagn failed to provide plaintiff with a refill of skin cream and that defendants Brandt and vonHagn were racist and biased toward him. Dkt. # 44, pp. 0228–0239; Dkt. # 83, ¶¶ 50–51. Specifically, plaintiff alleged in Grievance No. SPT–20137–00 that:

> On the prior date of 12–6–00 I submitted a sick call slip, and on the next am morning no [sic] medical staff PA visited my cell (S.VonHagn), to inquire about my illnesses! This continual violation in total disregard by most medical staff of character vindictiveness [sic] and KKK corruption for forcing severe suffering on black SHU prisoner is still being allowed by Michael McGinnis, Dr. Alves, O'Bremski [sic], and you James Meck—and Sgt Decker in yourselves [sic] concealing inmate grievances of theft by officers/racism by medical staff (S. VonHagn [sic] Brandt and Ms. Peter).

> Dkt. # 44, p. 0233.

In response to Grievance No. SPT–20137–00, Nurse Administrator Obremski advised the IGRC that plaintiff's medical records do not indicate that a sick call request was ever submitted by plaintiff on December 6, 2000. Dkt. # 83, ¶ 52. Plaintiff's medical records do indicate, however, that on December 13,

2000, plaintiff requested a skin cream refill but plaintiff was not due for a refill until January 1, 2001 and that plaintiff was advised of that fact. *Id.* Finally, Nurse Administrator Obremski stated that, absent any evidence, plaintiff's allegations of racism and corruption were unfounded. *Id.;* Dkt. # 44, p. 0237. The Superintendent denied plaintiff's grievance, and the CORC upheld the Superintendent's determination that the Nurse Administrator indicated that plaintiff received medication refills on the appropriate dates and received proper medical care. Dkt. # 44, pp. 0228–0229; Dkt. # 83, ¶ 53.

After the filing of the aforementioned grievance, defendant vonHagn next saw plaintiff on December 13, 2000, at which time she noted that plaintiff had received a 90 day supply of Eucerin on October 10, 2000 which was not to be refilled until after January 10, 2001. Moreover, on December 13, 2000, defendant vonHagn provided plaintiff with athlete's foot cream and balm. Dkt. # 83, ¶ 54. On that same date, defendant vonHagn issued a Misbehavior Report based on plaintiff's threats to her and to the male assists. Dkt. # 83, ¶ 29. The December 13, 2000 Misbehavior Report states,

> While making rounds on B Block 3 Gallery this nurse [defendant vonHagn] stopped to see Inmate Chavis, G. 91A3261 B–3–19 for sick call. He requested refills. He was asked about old containers. He immediately got an attitude and said, 'He wasn't every other inmate and just get him what he wanted.' As this nurse walked away from his cell, inmate Chavis, G. says [sic] 'I'm going to hit that white bitch in her head with a baseball bat.' C.O. Stamp told inmate Chavis, G 91A3261 that statement was not necessary. Inmate Chavis, G. then said, shut up you fuck ass white mother fucker, I'll kill you too after I kill her. Inmate Chavis, G. continued to threaten this nurse and Correctional Officer until we left gallery area.

> **\*12** Dkt. # 44, p. 0104; Dkt. # 83, ¶ 31.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

A Tier 3 disciplinary hearing was held on December 26, 2000 (and continued on December 29, 2000) by Lt. Sheahan in relation to the December 13, 2000 Misbehavior Report.[FN15] Dkt. # 44, pp. 0160–0199. During the hearing, plaintiff advised Lt. Sheahan that defendant vonHagn wrote the December 13, 2000 Misbehavior Report in retaliation for grievances filed by plaintiff. Dkt. # 83, ¶ 32. Lt. Sheahan received plaintiff's evidence of complaints against defendant vonHagn, but nevertheless found plaintiff guilty of making threats against defendant vonHagn and other staff. *Id.* Indeed, Lt Sheahan found that the evidence submitted by plaintiff of past grievances against defendant vonHagn and other medical staff did not establish that the December 13, 2000 Misbehavior Report was retaliatory. *Id.* at ¶ 33. Moreover, Lt. Sheahan indicated that the disposition was given to plaintiff to impress upon him that threats to staff will not be tolerated. Dkt. # 44, p. 0102; Dkt. # 83, ¶ 33.

> **FN15.** Lt. Sheahan is a named defendant in this action and how Lt. Sheahan conducted the December 26, 2000 (December 29, 2000) disciplinary hearing is the subject of a separate due process claim and will be separately discussed below. *See* pp. 62–65 *infra.*

Following the December 13, 2000 Misbehavior Report, and during the balance of December 2000, January and February 2001, defendant vonHagn saw plaintiff a total of ten times, December 20, 24, 26, and 29, 2000, January 26, 2001, February 1, 4, 8, 9, and 13, 2001. Dkt. # 81, ¶¶ 43–77. For a complete discussion of the medical treatment provided to plaintiff by defendant vonHagn on the preceding dates, *see* pp. 10–17 *supra.* At each time after the December 13, 2000 Misbehavior Report, defendant vonHagn continued to provide plaintiff with appropriate care and treatment. Dkt. # 81, ¶ 82; Dkt. # 83, ¶ 35.

**3. January 23, 2001 Misbehavior Report—Defendant Brandt**

In the amended complaint, plaintiff alleges that defendant Brandt, in retaliation for the grievances filed against him by plaintiff, issued a retaliatory Misbehavior Report on January 23, 2001. Dkt. # 9, p. 5–A. During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, December 30, 1999 (Grievance No. SPT–17707–99), May 24, 2000 (Grievance No. SPT–18746–00) and December 11, 2000 (Grievance No. SPT–20137–00). Plaintiff was seen by defendant Brandt on January 23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw hydrocortisone cream at defendant Brandt and stated, "next time I'll spit + shit on you." Dkt. # 70, p. 0752; Dkt. # 81, ¶ 55. The sick call was terminated and defendant Brandt issued a Misbehavior Report. *Id.*

The Misbehavior Report charged plaintiff with violating rule 102.10 (threats) and states, "[w]hile conducting sick call rounds this writer [defendant Brandt] stopped at Inmate Chavis 91A3261 cell to deliver medication. He asked what it was I told him hydrocortisone cream. He got up slid it back under the door and stated 'I want ointment and the next time you do this I'll spit on you + then throw shit on you.' " Dkt. # 44, p. 0115. A Tier 2 disciplinary hearing was held on January 29, 2001 and was conduced by Lt. Donahue.[FN16]

> **FN16.** Lt. Donahue is a named defendant in this action and the claims against defendant Donahue, including a due process claim relating to the January 29, 2001 disciplinary hearing, will be discussed in greater detail below. *See* pp. 30–44 *infra.*

**\*13** During plaintiff's Tier 2 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the January 23, 2001 Misbehavior Report was written by defendant Brandt in retaliation for complaints which plaintiff filed against defendant Brandt and/or the

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

medical staff at Southport. Dkt. # 44, pp. 0124–0128; Dkt. # 82, ¶ 27. Lt. Donahue received plaintiff's testimony and notwithstanding plaintiff's claim of retaliation, found plaintiff guilty of making threatening statements to defendant Brandt. *Id.*

### a. Grievance No. SPT–17707–99

A thorough discussion of Grievance No. SPT–17707–99 is set forth in the preceding section at pp. 21–23 and is incorporated by referenced herein.

### b. Grievance No. SPT–18746–00

With respect to Grievance No. SPT–18746–00 filed on or about May 24, 2000, plaintiff claimed that on or about May 21, 2000:(1) defendant Brandt refused to provide him with medical care; (2) defendants vonHagn and Brandt were racist; (3) defendant Brandt told other members of the nursing staff not to treat plaintiff; (4) plaintiff had previously grieved defendant Brandt's and defendant vonHagn's failure to treat his ear infection in December 1999; and, (5) defendant Brandt refused to provide plaintiff with skin cream. Dkt. # 82, ¶ 36; Dkt. # 83, ¶ 46.

With respect to Grievance No. SPT–18746–00, Nurse Felker advised the IGRC that plaintiff had been seen several times for his skin condition, that plaintiff does not have a skin condition that required the skin cream requested and that the medical staff advised that plaintiff is verbally abusive on a regular basis, *to wit,* whenever he is seen by the medical staff. Dkt. # 65, p. 0419; Dkt. # 83, ¶ 47. On or about May 26, 2000, the IGRC recommended that plaintiff's grievance be dismissed and on or about June 12, 2000, the Superintendent agreed. Dkt. # 65, p. 0414 and 0417; Dkt. # 83; ¶ 48. Upon the recommendation of the Division of Health, on or about August 2, 2000, CORC upheld the Superintendent's determination. Dkt. # 65, p. 0409; Dkt. # 83, ¶ 48. In so finding, CORC noted that plaintiff had been issued skin cream on June 5, 2000 and that his allegations against the staff had not been substantiated. *Id.*

### c. Grievance No. SPT–20137–00

The third grievance filed by plaintiff against defendant Brandt during the time period relevant to the allegations in the amended complaint was filed on or about December 11, 2000 (Grievance No. SPT–20137–00). A thorough discussion of Grievance No. SPT–20137–00 is set forth in the preceding section at pp. 24–26 and is incorporated by reference herein.

### C. Due Process Claims—Hearing Officers

The amended complaint alleges several causes of action against defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan premised on the theory that the defendants denied plaintiff his due process rights during ten disciplinary hearings under the Eighth and Fourteenth Amendments to the United States Constitution.

### 1. Defendant Lieutenant Donahue

**\*14** During the relevant time period alleged in the amended complaint, plaintiff claims that defendant Lt. Donahue conducted six Tier 2 disciplinary hearings concerning plaintiff: January 11, 2000 (December 31, 1999 Misbehavior Report); January 25, 2000 (this disciplinary hearing was in fact conducted by defendant Ryan, see pp .59–62 *infra.*); November 20, 2000 (November 12, 2000 Misbehavior Report); December 21, 2000 (December 12, 2000 Misbehavior Report); January 29, 2001 (January 23, 2001 Misbehavior Report); and, March 7, 2001 (February 29, 2001 Misbehavior Report). Dkt. # 9.

As against defendant Donahue, the amended complaint states as follows:

> This defendant [Donahue], on the dates of 3–7–01, 1–29–01, 12–21–00, 11–29–00, 1–25–00, and 1–21–00, inside of this Southport Prison, while acting under state color [sic], in his individual and official [FN17] capacities, had *violated* my 'due pro-

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

cess' rights *in each one* of these separate tier hearing [sic] by 'denying' me *all* witnesses in each hearing stated above. Additionally, my 'requested' need for 'assistance' during and prior to these separate hearings, had been *denied* by this defendant, *and each* separate *disposition* had [sic] sentenced me to 30–days cell confinement (30 x 6 = 180 days cell confinement), after knowingly and intentionally [sic]

FN17. *See* footnote 2 *supra.*

* * *

I suffered more 'extended' SHU-punative [sic] segregation time (see para # 5), for ticket, I *never* received but [sic] a hearing I attended with my right to due process *violated* due to deliberate indifference, and racism. Finally, I had appealed each disposition (stated), in bias—partiality, however, *each one* of my appeals were 'ignored' and these 'retaliatory' dispositions affirmed (by defendant W. Wilcox—see para # 9).
Dkt. # 9, pp. 6–D to 6–E (emphasis in original).

Additionally, plaintiff alleges that at the conclusion of the December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue issued a retaliatory Misbehavior Report for conduct that occurred as plaintiff was being transported back to his cell after the hearing. Dkt. # 9. Defendant Donahue contends that the December 21, 2000 Misbehavior Report was not issued for retaliatory reasons. Specifically, plaintiff alleges:

Furthermore, on the date of 12–21–00, immediately after conducting a tier hearing against me, after violating my due process rights knowingly and vindictively, this defendant had verbally discriminated against me this date after hearing completion [sic], and proceeded to retaliate against me with another misbehavior ticket on this 12–21–00 date, for al-

leged verbal threats I had [sic] *not* been guilty of; as this retaliatory ticket against me, by this defendant had resulted after my contacts in numerous official complaints against this defendant (after his direct orders to SHU escort officers to physically assault me, while I be [sic] in full restraints *un* able to protect myself and further his referring to me during several separate hearings as a 'piece of shit' and a 'boy') resulting in a *nine month* Albany investigation by the top DOCS officials *and* the Inspector Generals [sic] office!. I have valid official exhibits from Albanys [sic] DOCS top officials to prove this claim.

**\*15** Dkt. # 9, pp. 6–D to 6–E (emphasis in original)

Defendant Donahue, a Lieutenant at Southport, has held that position since 1998 and has been an employee of DOCS since 1984. Dkt. # 84, ¶ 1. From time to time, defendant Donahue's duties include conducting inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. *Id.* at ¶ 3.

**a. January 11, 2000 Tier 2 Disciplinary Hearing**

The January 11, 2000 Tier 2 disciplinary hearing was conducted following the issuance of a Misbehavior Report on December 31, 1999 by Sergeant Kerbein charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats). Dkt. # 84, ¶ 9. The Misbehavior Report states:

DSS Morse received a letter from you dated 12–29–99 and addressed to Supt. McGinnis or Deputy Superintendent in which you called them/state 'and the vindictiveness of your racist, bias and extremely prejudice/rotton [sic] character!!'. [sic] Another statement you state 'well, DOCS employee of redneck and corrupted character are you satisfied now!". [sic] Your final statement was 'I sincerely hope you're just as strong after you

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

do [sic] receive your New Years [sic] present from me, as I believe it'll be a suitable gift for you and you will receive [sic] it in soon [sic] time arriving [sic].'

Dkt. # 44, p. 0013; Dkt. # 84, ¶ 9. According to defendant Donahue, the regulations (7 N.Y.C.R.R. §§ 251–2.2(2); 251–4.1(a) and (b); 253.4) provide that where, as here, an inmate is charged with a violation warranting a Tier 2 disciplinary hearing, the inmate is not entitled to an employee assistant for purposes of that hearing. Dkt. # 84, ¶ 10. Rather, the hearing officer, in his discretion, may offer an inmate the opportunity to select an inmate assistant, where such assistance would enable the inmate to comprehend the case in order to respond to the charges. Id. at ¶ 11.

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the December 31, 1999 Misbehavior Report and on January 2, 2000, plaintiff requested and received a copy of DOCS Directive No. 4932, Chapter V, Standards, Behavior & Allowances (7 N .Y.C. R.R. Part 251 C). Dkt. # 44, p. 0016; Dkt. # 84, ¶ 13. The Tier Assistance Selection Form also indicates that no assistance is required for the hearing and further that plaintiff refused to sign the form. Id. At the outset of the hearing, plaintiff objected stating that he had not been served with a copy of the Misbehavior Report. Dkt. # 44, pp. 0002–0007; Dkt. # 84, ¶ 14. After defendant Donahue read the Misbehavior Report, defendant Donahue asked plaintiff to enter his plea to the charges; plaintiff refused, stating, "I told you I never received the ticket. I don't have anymore to say here." Dkt. # 44, p. 0003. Accordingly, defendant Donahue entered a plea of not guilty on plaintiff's behalf and proceeded with the hearing. Dkt. # 44, p. 0003; Dkt. # 84, ¶ 14.

**\*16** In response to plaintiff's objection, defendant Donahue indicated that he was going to attempt to locate Officer Comfort who served plaintiff with a copy of the Misbehavior Report. Dkt. # 44, p. 0003. Plaintiff objected to Officer Comfort's anticipated

testimony. Id. Due to Officer Comfort's unavailability, the disciplinary hearing was adjourned and continued on January 21, 2000. Id. Over plaintiff's objections, Officer Comfort did in fact testify that he served plaintiff with a copy of the Misbehavior Report. Id. at p. 0005; Dkt. # 84, ¶ 16. Thereafter, plaintiff indicated that he did not have any questions for Officer Comfort. Dkt. # 44, p. 0005; Dkt. # 84, ¶ 17. Defendant Donahue explained to plaintiff that pursuant to the applicable regulations, plaintiff was not entitled to any assistance on a Tier 2 disciplinary hearing. Id. Plaintiff continued to object to the hearing, insisting that he did not receive the Misbehavior Report and further, that defendant Donahue had previously threatened his life and health. Dkt. # 44, p. 0006; Dkt. # 84, ¶ 19. Specifically, plaintiff stated, "Let the record reflect that at, that at uh, uh at a previous time my life and health was threatened by this Lt. Donahue here. After he had flipper [sic] off the cassette he ordered the escort officer to uh escort this piece of shit back to his cell and bounce him on his head." Dkt. # 44, p. 0006.

Thereafter, defendant Donahue asked whether plaintiff had any evidence to present related to the Misbehavior Report and plaintiff responded, "I don't know what you are talking about." Dkt. # 44, p .0006. Stating that plaintiff was being uncooperative, defendant Donahue concluded the hearing to consider his decision. Id. Defendant Donahue based his decision on the Misbehavior Report which he found to be credible and on plaintiff's December 28, 1999 letter (the basis for the December 31, 1999 Misbehavior Report). Dkt. # 44, p. 0014; Dkt. # 84, ¶ 20. As reflected on the Disciplinary Hearing Disposition Rendered form, defendant Donahue relied upon "[t]he written report of Sgt Kerbein which I find to be credible. Also the threatening letter written by inmate Chavis which I have examined. This inmate makes harassing and threatening statements in a letter sent to the Supt or DSS." Dkt. # 44, pp. 0008–0009; Dkt. # 84, ¶ 21. In addition, defendant Donahue noted that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

the reasons for his disposition were to serve as a deterrent of future misconduct by plaintiff and others and further, defendant Donahue noted that this type of conduct will not be tolerated at Southport. *Id.* Defendant Donahue imposed a penalty of 30 days keeplock confinement (7/18/00–8/17/00) which was modified to run from January 21, 2000 through February 20, 2000. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 84, ¶ 23; Dkt. # 86, Exhibit A.

**b. November 29, 2000 Tier 2 Disciplinary Hearing**

**\*17** Defendant Donahue conducted a Tier 2 disciplinary hearing on November 29, 2000 in relation to a Misbehavior Report issued on November 12, 2000. Dkt. # 84, ¶ 26. The November 12, 2000 Misbehavior Report charged plaintiff with violating Rule 107.10 (interference with employee) and Rule 102.10 (threats). Dkt. # 44, p. 0072. The Misbehavior Report prepared by Sergeant ("Sgt.") Cleveland states:

On the above date and time [11/12/00 6:45 a.m.], I received a copy of a letter that was authored by the above inmate (Chavis 91A3261 D–5–21) from Lt. Sheehan [sic]. Upon my review of this letter I identified that it had been sent from inmate Chavis to Dep. Commissioner L. LeClaire on 10/3/00. The content of this letter was harassing in nature and contained insolent and abusive language directed towards Mr. LeClaire and Commissioner Goord. Inmate Chavis also stated in his letter, "you respect me, and I'll respect you, because after release *you and whoever else WILL* be respecting me". [sic] I interpreted this comment to be an implied threat to Mr. LeClaire. A copy of this letter was placed in the Captains [sic] office contraband file as evidence.

Dkt. # 44, p. 0072; Dkt. # 84, ¶ 27. At the outset of the hearing, plaintiff was advised by defendant Donahue that he had the right to present witnesses on his own behalf and that he should present any oral or documentary evidence he wished to be considered during the hearing. Dkt. # 44, p. 0064–0068. Plaintiff

responded that he understood his rights. *Id.* With respect to the service of the charges, plaintiff stated that he didn't know if he was served with a copy because he was asleep and when he woke up there was a Misbehavior Report on his gate. *Id.* Thereafter, defendant Donahue noted that there had been an extension granted to complete the hearing because plaintiff had been out to court and the extension was granted to complete the hearing within twelve days of plaintiff's return from court and plaintiff returned from court on November 27, 2000. *Id.*

In response to defendant Donahue's inquiry as to how he intended to plead to the charges, plaintiff stated "[a]t this particular time I'm going to object to the hearing." Dkt. # 44, p. 0066. Plaintiff objected on the following grounds, "[t]he fact that on the date of September 8th I had sent the letter to uh Commissioner Gord [sic] with a complaint against you and uh Lt. Ryan, for your misconduct during the tier hearing process while I been in the facility here." *Id.* Accordingly, defendant Donahue entered a plea of not guilty to the charges on plaintiff's behalf. *Id.* Plaintiff also voiced an objection to the entry of a plea of not guilty and requested that the hearing be adjourned and another hearing officer be assigned. *Id.* at pp. 0066–0067. Plaintiff's objections to the hearing and the hearing officer were noted on the record and plaintiff did not offer any evidence or any statement with respect to the Misbehavior Report. *Id.*

**\*18** Thereafter, defendant Donahue concluded the hearing and contemplated his decision. The plaintiff chose to return to his cell before defendant Donahue read his decision. *Id.* Defendant Donahue found plaintiff guilty of charge 107.10 (interference) and guilty of 102.10 (threats). *Id.* at p. 0068. Defendant Donahue imposed a penalty of 30 days keeplock confinement to run from September 5, 2001 to October 5, 2001. *Id.* In his statement of evidence relied upon, defendant Donahue stated that he relied upon the written report of Sgt. Cleveland and his examination of the letter in evidence and further that he found Sgt.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

Cleveland's report to be credible. Dkt. # 44, p. 0070. Defendant Donahue stated that the reasons for his disposition were to serve as a deterrent for future misconduct by the plaintiff and that "threats towards employees of this department will not be tolerated." *Id.* On or about December 11, 2000, Captain Wilcox affirmed defendant Donahue's determination. Dkt. # 86, Exhibit A.

**c. December 21, 2000 Tier 2 Disciplinary Hearing**

Defendant Donahue conducted a Tier 2 disciplinary hearing involving plaintiff on December 21, 2000. Dkt. # 44, pp. 0081–0100; Dkt. # 84, ¶ 41. The December 21, 2000 disciplinary hearing related to a Misbehavior Report issued on December 12, 2000 by Correction Officer Gary Morse and charged plaintiff with a violation of Rule 102.10 (threats). Dkt. # 44, p. 0090; Dkt. # 84, ¶ 42. The December 12, 2000 Misbehavior Report states:

> On the above date [12–12–00], inmate Chavis, George 91A3261 sent a grievance to the Inmate Grievance office. This grievance contained a number of threatening statements. These statements include: 'However, if he attempts to disregard my handicap again, I'll exit my cell and compel him to regard me the next shower time so he had better be prepared next shower. Sgt. Mulvern had been informed of this and P. Jayne needs to seriously beware.' Chavis goes on to state, 'Emergency ambulance after P. Jayne disregards my handicap again on scheduled shower day. The ambulance will be for him not me'. [sic] 'I have surgical scars on my right wrist, and P. Jayne better realize it or suffer a penalty.' These threats are aimed at C.O. P. Jayne who is a shower officer.

> Dkt. # 44, pp. 0090 and 0092.

At the outset of the hearing, defendant Donahue advised plaintiff that he had the right to have witnesses testify on his behalf, that plaintiff should present any oral or documentary evidence that he wishes to have considered at the hearing and that plaintiff should raise any procedural objections during the hearing. Dkt. # 44, pp. 0081–0086. Thereafter, plaintiff indicated that he understood his rights and that he had received a copy of the charges. *Id.* After defendant Donahue read the charges and asked plaintiff how he plead to the charges, plaintiff objected to defendant Donahue serving as the hearing officer on the grounds that there was a pending investigation into defendant Donahue's conduct as it related to plaintiff.[FN18] *Id.;* Dkt. # 44, ¶ 43. Moreover, plaintiff objected stating, "[l]et the record also reflect that uh that's a grievance. And uh Section uh 6 Letter B states that no inmate shall, shall suffer deprivals [sic] because of a grievance." Dkt. # 44, p. 0083; Dkt. # 84, ¶ 45.

> **FN18.** With the exception of plaintiff's self-serving statements made throughout plaintiff's opposition to defendants' motion for summary judgment concerning "an investigation" into defendant Donahue, plaintiff offers no independent evidence (e.g. grievances or letters) to corroborate this assertion. Accordingly, this Court will not separately address these assertions.

**\*19** Defendant Donahue entered a plea of not guilty on plaintiff's behalf and asked whether plaintiff had any testimony or evidence to present. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 46. Plaintiff indicated that he wished to call Thomas C. Egan, CORC Director and Commissioner "Gordon" [Goord] as witnesses. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 47. On the grounds that neither Director Egan nor Commissioner Goord had any knowledge of the Misbehavior Report or of plaintiff's grievance, defendant Donahue denied plaintiff's request to call them as witnesses during the disciplinary hearing. Dkt. # 44, pp. 0084–0085; Dkt. # 84, ¶ 48. In response to this denial, plaintiff objected stating that defendant Donahue's denial illustrated that he is biased and racist. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 43.

Page 19

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

Defendant Donahue noted that plaintiff was returned to his cell because he was being disruptive and for making threats. Dkt. # 44, p .0085; Dkt. # 84, ¶ 52. Thereafter, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed 30 days keeplock confinement as the penalty to run from October 5, 2001 to November 4, 2001. Dkt. # 44, p. 0085; Dkt. # 84, ¶ 53. According to the transcript of the hearing and the disposition record, in reaching his determination, defendant Donahue relied on the written report of Correction Officer Morse which he found to be credible and his examination of the threatening letter written by plaintiff to the Inmate Grievance Office. Dkt. # 44, pp. 0085 and 0088; Dkt. # 84, ¶ 53. Defendant Donahue stated the following as his reasons for the disposition, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Threats toward staff will not be tolerated at the facility, including in the form of written grievances." Dkt. # 44, p. 0088; Dkt. # 84, ¶ 53.

**d. December 21, 2000 Misbehavior Report**

Following the December 21, 2000 disciplinary hearing (*see* pp. 37–40 *supra* ), defendant Donahue issued a Misbehavior Report based on plaintiff's threatening and harassing language as he was being escorted back to his cell after the hearing. Dkt. # 84, ¶ 89. As discussed above, plaintiff was returned to his cell prior to hearing defendant Donahue's determination because he was being disruptive and was making threats. *Id.* at ¶ 90. A Tier 3 disciplinary hearing was held on January 4, 2001 concerning the December 21, 2000 Misbehavior Report and was conducted by defendant Irizarry. *Id.* at ¶ 91. A complete discussion of plaintiff's claims against defendant Irizarry concerning the January 4, 2001 disciplinary hearing, including a discussion of the charges, is set forth below. *See* pp. 49–53 *infra.*

**e. January 29, 2001 Tier 2 Disciplinary Hearing**

On January 29, 2001, defendant Donahue conducted a Tier 2 disciplinary hearing arising from a Misbehavior Report dated January 23, 2001. Dkt. # 84, ¶ 61. In the January 23, 2001 Misbehavior Report, Nurse Brandt charged plaintiff with violating Rule 102.10 (threats) stating, "[w]hile conducting sick call rounds this writer stopped at Inmate Chavis 91A3261 cell to deliver medication. He asked what it was I told him hydrocortisone cream. He got up slid it back under the door stated [sic] 'I want ointment and the next time you do this I'll spit on you + then throw shit on you.' " Dkt. # 44, p. 0115; Dkt. # 84, ¶ 62. Plaintiff refused to sign the Tier Assistance Selection Form, however, as discussed above, because this was a Tier 2 disciplinary hearing, plaintiff was not entitled to any assistance. Dkt. # 44, p. 0116; Dkt. # 84, ¶ 63. In addition, a review of the hearing transcript reveals that plaintiff did not request any assistance during the hearing. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 64.

**\*20** As reflected in the hearing transcript, defendant Donahue advised plaintiff that he was entitled to have witnesses testify on his behalf, that he should present any oral or documentary evidence that he wished to be considered during the hearing and that he should raise any procedural questions during the hearing so that they may be considered. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 65. Thereafter, plaintiff indicated that he understood his rights and plaintiff entered a plea of not guilty to the charges. *Id.* During the hearing, plaintiff did not request to have any witnesses testify on his behalf. Dkt. # 84, ¶ 66. Plaintiff testified during the hearing that the incident did not occur as recited in the Misbehavior Report. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 67. Specifically, plaintiff stated,

Uh everything is totally uh different from what he has on the ticket. Uh I [sic] been down [sic] for thirteen years already and I've never done anything hy, unhygienic to anybody, whether officer or inmate, so he is basically lying there. I wrote up a grievance against him on um the 22nd. And on three prior separate occasions that grievance [sic], that recent grievance, I had uh written to Albany in complaint [sic] about the, the type of improper

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

medical care that I'm receiving here. And uh D. [sic] Brandt came to my cell and he brought me the wrong medication. I suffer with uh, a severe uh psoriasis skin condition from my stem to uh my body. The reason why you don't see it too clear is because I have uh creams all over my head and all over my body and stuff like that. And uh this guy is just, is constantly not giving me what, what I need you know.... So this is a thing where they constantly [sic] not giving me what I need and, and my skin is just messing up. It it's just one ticket after another.

Dkt. # 44, p. 0126, Dkt. # 84, ¶ 67. Plaintiff further stated that he took the medication and shoved it through the door and that "he [Nurse Brandt] had me active a little bit but rather than take it and throw [sic] out to react this time, I just took it and shoved it under the door. I didn't want him to uh talk about [sic] I tried to attack him and stuff like that, so I just took it and slid it underneath the door." Dkt. # 44, p. 0126; Dkt. # 84, ¶ 68. In addition, plaintiff stated that he had copies of the complaint letter that he had sent to Albany in his cell, defendant Donahue stated that he would accept plaintiff's testimony that he had filed several complaints against Nurse Brandt. Dkt. # 84, ¶ 69.

Plaintiff chose to return to his cell before defendant Donahue read his determination. Dkt. # 84, ¶ 70. Thereafter, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed the penalty of 30 days keeplock confinement to begin February 4, 2003 through March 6, 2003. Dkt. # 44, p. 0127. As set forth in the hearing transcript and the Hearing Disposition Sheet, defendant Donahue relied on the Misbehavior Report of Nurse Brandt which he found to be credible. Dkt. # 44, pp. 0113, 0125–0128; Dkt. # 84, ¶ 71. Defendant Donahue noted that the penalty imposed, 30 days keeplock confinement, was imposed to serve as a deterrent for future misconduct by plaintiff and other inmates. *Id.* Finally, defendant Donahue noted that plaintiff had been found guilty of threats on many previous occasions. *Id.*

**f. March 7, 2001 Tier 2 Disciplinary Hearing**

**\*21** On March 7, 2001, defendant Donahue conducted a Tier 2 disciplinary hearing in relation to a February 28, 2001 Misbehavior Report. Dkt. # 44, pp. 0129–0131; Dkt. # 84, ¶ 78. The February 28, 2001 Misbehavior Report charged plaintiff with violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) stating:

> On the above date and approximate time [2–28–01 7:15 p.m.] while making rounds I observed water on B–1 Gallery. As I continued the rounds I observed Chavis # 91A3261 repeatedly flushing his toilet. I ordered Chavis to stop and he refused by continuing to flush his toilet. I then left the gallery and went to the pipe chase to turn his water off. I then contact [sic] the area sergeant.

Dkt. # 44, pp. 0129–0131. Defendant Chavis refused to attend the March 7, 2001 disciplinary hearing and refused to sign the Waiver Form. Accordingly, the disciplinary hearing was conducted in his absence and at the outset of the hearing, defendant Donahue entered a plea of not guilty on plaintiff's behalf. *Id.;* Dkt. # 84, ¶¶ 80 and 83. According to the hearing transcript, when Sgt. Gagliardi went to plaintiff's cell to bring him to the hearing, plaintiff was sleeping and when Sgt. Gagliardi woke him and informed him that he had a disciplinary hearing and that defendant Donahue was conducting the hearing, plaintiff said "I'm not going, I'm not going to attend the hearing with him [defendant Donahue]." Dkt. # 44, pp. 0129–0131. Defendant Donahue conducted the hearing, considered the evidence (the Misbehavior Report of Correction Officer Kamas) and determined that plaintiff had indeed violated Rules 118.33 (flooding) and 106.10 (refusing a direct order). Dkt. # 44, pp. 0129–0131; Dkt. # 84, ¶ 84. Defendant Donahue imposed a penalty of 30 days keeplock confinement as a deterrent of future misconduct on the part of plaintiff and other inmates. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

**2. Defendant Lieutenant Gilmore**

Plaintiff claims that defendant Lt. Gilmore conducted a Tier 2 disciplinary hearing on July 18, 2000 with respect to a July 9, 2000 Misbehavior Report and during the course of that hearing, Lt. Gilmore denied plaintiff due process. Dkt. # 9. Specifically, in the amended complaint, plaintiff alleges against defendant Gilmore:

This defendant [Gilmore], on the date of 7–18–00, inside of this Southport Prison, while acting under state color in his individual and official [FN19] capacities, had conducted a hearing, and in his doing so had intentionally, knowingly, and wilfully *violated* my due process rights by finding me guilty [sic] for a violation that I had not been charged with on the retaliatory ticket. Additionally, no other officer had endorsed the retaliatory ticket nor had any testified against me of the several SHU-officers present at the incident of which I had not been the aggressor (my two eye witness'es [sic] had confirmed my defense however, this defendant had found me guilty anyway, than [sic] sentenced me to a 10–day sentenced [sic]. Soon after, I did appeal on 7–18–00. However, the defendant W. Wilcox (para—# 9), had affirmed the sentence in bias against me.

FN19. *See* footnote 2 *supra.*

**\*22** Dkt. # 9, pp. 6–F to 6–G. During the time period alleged in the amended complaint, defendant Gilmore was a Lieutenant at Southport and had held that position from June 1999 to June 2001. Dkt. # 86, ¶ 1. As part of his duties, defendant Gilmore conducted inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. Dkt. # 85, ¶ 3.

The July 9, 2000 Misbehavior Report, authored by Correction Officer Burgett and endorsed by Sgt. Parish, charged plaintiff with violating Rule 107.10 (interference), Rule 107.11 (harassment) and Rule

106.10 (refusal to obey a direct order). Dkt. # 85, ¶ 6. In the Misbehavior Report, Officer Burgett described that plaintiff aggressively questioned the duration of his shower at the two minute warning and again at the termination of his shower. Dkt. # 44, p. 0042; Dkt. # 85, ¶ 6. Officer Burgett further stated that he informed plaintiff that his shower was the required duration, plus one minute and that plaintiff accused Officer Burgett of lying. *Id.* As Officer Burgett began to counsel plaintiff about harassing employees, plaintiff became extremely loud and verbally aggressive, stating "you aint [sic] telling me nothing [sic] because youre [sic] an asshole, I'll have you in a penitentiary wearing handcuffs in a week, bet that, you aint [sic] scaring nobody with your ticket." *Id.* Thereafter, Officer Burgett stated that he issued a direct order for wrist restraints to be applied in order to escort plaintiff and plaintiff refused to come out of the shower. *Id.* Officer Burgett then issued two more orders for plaintiff to put out his hands for wrist restraints and plaintiff again refused and stated he would not come out of the shower. *Id.* After Sgt. Parish responded to the scene, plaintiff complied with the wrist restraints and was escorted to his cell. *Id.*

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on July 10, 2000 and did not request a copy of DOCS Directive No. 4932, Chapter V, Standards, Behavior & Allowances and that plaintiff refused to sign the form. Dkt. # 44, p. 0043; Dkt. # 85, ¶ 7. Notwithstanding the foregoing, at the disciplinary hearing, plaintiff claimed that he had requested and never received a copy of DOCS Directive No. 4932, Chapter V. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 8. Defendant Gilmore immediately gave plaintiff a copy of DOCS Directive No. 4932, Chapter V. However, plaintiff declined defendant Gilmore's offer of a few minutes to review the document. *Id.* Plaintiff was advised at the outset of the hearing that he may have witnesses testify on his behalf, that nothing said by plaintiff would be used against him in a criminal proceeding, that plaintiff should present any oral or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

documentary evidence he wished defendant Gilmore to consider during the hearing and that any procedural objection or claims should be made during the hearing. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 9. Plaintiff indicated that he understood his rights. *Id.* Thereafter, plaintiff plead not guilty to the charges and requested to have inmates Lopez and Wilson testify as witnesses. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 10.

**\*23** As a threshold matter, plaintiff objected to the Misbehavior Report on the grounds that the copy he had received had not been endorsed by Sgt. Parish. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 11. Defendant Gilmore showed plaintiff the original July 9, 2000 Misbehavior Report which contained the endorsement by Sgt. Parish and noted plaintiff's objection for the record. *Id.* Thereafter, plaintiff further objected to the Misbehavior Report on the grounds that it was fabricated by Officer Burgett. Dkt. # 44, pp. 0045–0063; Dkt. 85, ¶ 12. Plaintiff denied calling Officer Burgett an asshole and stated that it was Officer Burgett who called him an asshole. *Id.* Plaintiff further asserted that he had requested the presence of Sgt. Parish because Officer Burgett threatened him and that he had refused to come out of the shower because of Officer Burgett's threatening behavior, including brandishing a night stick. *Id.* Plaintiff admitted that he told Officer Burgett that if he hit him with a baton, plaintiff would have Officer Burgett arrested. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 13. Plaintiff further admitted to calling Officer Burgett a scumbag. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 14. Finally, plaintiff stated that after Sgt. Parish came to the shower, he cooperated with the wrist restraints and was escorted back to his cell. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 15.

Since plaintiff's requested witnesses Lopez and Wilson were confined to SHU, they could not be in the same room as plaintiff. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 16. Accordingly, defendant Gilmore advised plaintiff that plaintiff could instruct defendant Gilmore as to what questions to ask each witness and that he, Gilmore, would question the witnesses and then

play the testimony back for plaintiff. *Id.* Plaintiff requested that defendant Gilmore ask inmates Lopez and Wilson whether plaintiff called Officer Burgett an asshole?, how long plaintiff was in the shower?, and why plaintiff requested Sgt. Parish to come to the shower area?. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 17. Thereafter, both inmates Lopez and Wilson testified outside the presence of plaintiff, stating, in part, that Officer Burgett had called plaintiff an asshole, that the shower had lasted less than ten minutes and that plaintiff had requested the Sergeant because the officers were brandishing their night sticks/holding their batons in their hands. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶¶ 19–26. Following the testimony of inmates Lopez and Wilson, the recorded testimony was played for plaintiff and plaintiff stated that he was satisfied with their testimony and that he could hear and understand their testimony. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 28.

Plaintiff then presented a copy of a grievance he filed against Officer Burgett and stated that there were numerous other grievances that had been filed by other inmates against Officer Burgett. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 29. Defendant Gilmore reviewed the consolidated grievance written on July 9, 2000 by plaintiff and filed on July 10, 2000 listing problems with the shower officer. At plaintiff's request, defendant Gilmore read the grievance into the record. *Id.* Thereafter, plaintiff reiterated his objection to the Misbehavior Report and stated that he had nothing further to offer in response to the charges. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 30. Defendant Gilmore, relying on the Misbehavior Report authored by Officer Burgett, as well as plaintiff's testimony, found plaintiff not guilty of violating Rule 107.10 (interference) and not guilty of violating Rule 106.10 (refusing a direct order). Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 31. Defendant Gilmore did, however, find plaintiff guilty of violating Rule 107.11 (harassment) because he concluded that the plaintiff had participated in a verbal confrontation with Officer Burgett (plaintiff admitted to calling Officer Burgett a scum-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

bag) and imposed a penalty of 10 days keeplock confinement. *Id.* Plaintiff appealed defendant Gilmore's determination and Captain Wilcox affirmed the determination on or about July 30, 2000. Dkt. # 85, ¶ 33; Dkt. # 86, Exhibit A.

### 3. Defendant Hearing Officer Irizarry

**\*24** Defendant Hearing Officer Irizarry conducted a Tier 3 disciplinary hearing on January 4, 2001 with respect to a December 21, 2000 Misbehavior Report issued by defendant Donahue following a Tier 2 disciplinary hearing conducted by defendant Donahue on December 21, 2000. Dkt. # 9. Plaintiff claims that defendant Irizarry denied him due process by denying him assistance prior to the hearing, denying plaintiff his right to call expert witnesses during the hearing, denying plaintiff the right to present evidence during the hearing and threatening to reprimand plaintiff during the hearing for making objections. Dkt. # 9, pp. 6–B to 6–D. Moreover, plaintiff claims that because defendant Selsky modified the hearing determination, that his due process rights were violated.[20] *Id.* In addition, plaintiff claims that he never received a copy of the December 21, 2000 Misbehavior Report. *Id.* Specifically, as against defendant Irizarry, the amended complaint states, in part,

> FN20. Director Selsky is a named defendant in this action and the claims against defendant Selsky will be separately discussed in greater detail below. *See* pp. 66–74 *infra.*

This defendant [Irizarry], on the date of 12–21–00 (note: this defendant had *personally dated* his hearing disposition 1–4–00), inside of this Southport Prison, while acting under state color, in his individual and official [21] capacities, had knowingly, wilfully, and intentionally *violated* my right to due process, by denying me 'assistance' prior to himself conducting the hearing, by also denying my right to call expert witness'es [sic] of which I had only two, and verbally threatening to reprimand me, due to my *un* ceasing 'objections' to this defendants

[sic] misconduct durring [sic] this hearing, and *no* threat to institutional safety or correctional goals, had been stated in this defendants [sic] disposition of 1–4–00. I 'suffered' a finding in [sic] guilt, and sentenced to nine (9) months extended SHU-punitive [sic] segregation ...

> FN21. *See* footnote 2 *supra.*

Dkt. # 9, pp. 6–B to 6–C (emphasis in original). Defendant Irizarry (incorrectly identified as Irrizarry in the amended complaint) is the Food Service Administrator at Southport and has held that position since 1990. Dkt. # 86, ¶ 1. From time to time, defendant Irizarry's duties included conducting inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.

On December 21, 2000, following a Tier 2 disciplinary hearing, defendant Donahue issued a Misbehavior Report charging plaintiff with violating Rules 102.10 (threats) and 107.11 (harassment). Dkt. # 65, p. 0664; Dkt. # 86, ¶ 6. The Misbehavior Report states:

> While exiting B-block first floor hearing room from a Tier 2 hearing on the above date and time, inmate Chavis, 91A3261 became verbally abusive. Chavis stated, 'you're a bitch Lt. Donahue. I'll have you in handcuffs and leg irons and I'll fuck you up, you bitch.' Inmate Chavis continued to yell obscenities and make threats as he was escorted back to his cell. These threats included Chavis stating, 'I'll murder your ass, you punk ass mother fucker.' Inmate Chavis was secured in his cell without further incident.

**\*25** Dkt. # 65, p. 0664. As a threshold matter, plaintiff claims that defendant Irizarry denied him an assistant to prepare for the hearing. Dkt. # 9. On December 23, 2000, plaintiff was served with a copy of the Misbehavior Report and indicated on the Tier Assistance Selection Form that he waived his right to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

an assistant and plaintiff refused to sign the Tier Assistance Selection Form. Dkt. # 65, p. 0667; Dkt. # 98, pp. 5–18. During the hearing, plaintiff claimed that despite what is reflected on the Tier Assistance Selection Form, he did not refuse an assistant. Rather, plaintiff stated during the hearing that he was sleeping when the Misbehavior Report was delivered to him. Dkt. # 98, pp. 5–18. Defendant Irizarry found plaintiff's claim not to be true because the officer who served plaintiff with a copy of the Misbehavior Report, Officer McIntosh, testified that plaintiff was awake when he was served and simply refused to sign or pick an assistant. *Id;* Dkt. # 86, ¶ 12.

Plaintiff further alleges that defendant Irizarry refused to allow him to call witnesses to testify during the hearing. Dkt. # 9. During the hearing, plaintiff requested that DOCS' Commissioner Goord and Associate Commissioner W. Chapman testify as witnesses on his behalf. Dkt. # 65, p. 0666; Dkt. # 98, pp. 5–18. In response to defendant Irizarry's question concerning why plaintiff requested Commissioner Goord and Associate Commissioner Chapman as witnesses, plaintiff stated, "[b]ecause they have everything to do with this ticket. And they have everything to do with the conduct of that [sic] hearing." Dkt. # 98, p. 16. Plaintiff's request was denied by defendant Irizarry on the grounds that their testimony was not relevant to the hearing as neither Commissioner Goord nor Associate Commissioner W. Chapman were present or in the facility at the time of the alleged incident. Dkt. # 65, p. 0666; Dkt. # 86, ¶ 15; Dkt. # 98, p. 16. Defendant Irizarry maintains that according to policy, an inmate's request for administrative, supervisory or staff personnel to testify does not mean that the staff member is automatically called to testify. Dkt. # 86, ¶ 16. If, according to defendant Irizarry, every inmate was granted the right to call every staff member selected, it would be extremely disruptive of facility operations, especially where, as here, an inmate requests Commissioner Goord and Associate Commissioner Chapman to testify. *Id.* In addition, 7 N.Y.C.R.R. § 254.5(a) provides that where

the testimony of a requested witness would be immaterial, duplicative or unnecessary, as defendant Irizarry determined Commissioner Goord's and Associate Commissioner Chapman's testimony would be, the hearing officer may exercise his/her discretion to deny the request. *Id.*

After hearing the testimony and based on the Misbehavior Report, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment). Dkt. # 65, pp. 0661–0662; Dkt. # 86, ¶ 19. Defendant Irizarry imposed a penalty of nine months confinement in SHU commencing June 27, 2001 through March 23, 2002. *Id.* In reaching the determination, defendant Irizarry noted on the Hearing Disposition Sheet that he had relied upon the written Misbehavior Report of Lt. Donahue and the testimony of Officer Bennett who was present at the time of the incident. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 20. Defendant Irizarry further noted that a review of plaintiff's disciplinary record revealed that plaintiff had been charged and found guilty of sixteen charges of threats and twelve charges of harassment. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 22. In addition, defendant Irizarry noted that none of the previous sanctions imposed upon plaintiff as a result of those determinations had helped to modify plaintiff's behavior. *Id.* Thus, defendant Irizarry noted that the penalty of nine months confinement in SHU was a just disposition. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 23. Thereafter, defendant Selsky modified the penalty to six months SHU confinement. Dkt. # 86, ¶ 24 and Exhibit A. As will be discussed in greater detail below, plaintiff contends that because defendant Selsky modified the penalty imposed, defendant Irizarry denied plaintiff due process. Dkt. # 86, ¶ 18.

**4. Defendant Lieutenant Quinn**

**\*26** In the amended complaint, plaintiff alleges that on February 5, 2001, defendant Lt. Donald Quinn violated his due process rights by denying him assistance prior to a Tier 3 disciplinary hearing, denied him the right to have witnesses testify on his behalf and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

denied plaintiff the right to attend the hearing to its conclusion. Dkt. # 9. Specifically, plaintiff's claim against defendant Quinn states, in part:

> This defendant—Quinn, on the date of February 5, 2001, while acting under state color, inside of this Southport Prison, in his individual and official [FN22] capacities, had knowingly violated my right to due process, intentionally and wilfully by denying me assistance prior to this hearing, and furthermore my witness'es [sic]. Also, I was denied my right to attend this hearing upon [sic] it's [sic] conclusion, and the right to [sic] disposition. I was found guilty, sentenced to 12–months SHU punative [sic] segregation suffering [sic] ...

> FN22. *See* footnote 2 *supra*.

Dkt. # 9, p. 6. At all times relevant to the allegations in the amended complaint, defendant Quinn was a Lieutenant at Southport and held that position from December 14, 2000 to February 8, 2001. Dkt. # 87, ¶ 1. From time to time, defendant Quinn's responsibilities included conducting disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.

Defendant Quinn conducted a disciplinary hearing beginning on January 31, 2001 and continuing on February 5, 2001, arising from a January 27, 2001 Misbehavior Report charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats). Dkt. # 87, ¶ 6. The Misbehavior Report, authored by Officer Hodge stated,

> I was given a letter by Lt. Sheahan, the watch commander to review. This letter, dated January 8, 2001, was written to Mr. Anthony Annucci, Deputy Commissioner, by Inmate George Chavis 91A3261. In this letter, Inmate Chavis uses several obscene words and phrases, calling several staff members, including but not limited to Supt. McGinniss [sic],

> Lt. Donahue, and RN S. VonHagn, 'KKK bitches.'' He also takes Mr. Annucci to task for 'believing all the lying bullshit your prison staff feeds you.' He also complains that Mr. McGinnis 'doesn't do a gatdamn (sic) things,' and promises to 'sue all you KKK asses.' He closes with a statement that he is 'tired of the KKK bullshit, and sooner or later I'll terminate all of it.' Inmate Chavis also states that 'then, the personal retaliation occurs ... no one is getting away with violating me in life (?) and assume I'll be your good ole nigger. I'll teach a lot of the KKK in uniform here respect.'

Dkt. # 68, p. 0710. According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on January 17, 2001 and indicated on the form that he requested an employee assistant for the Tier 3 disciplinary hearing. Dkt. # 68, p .0712; Dkt. # 87, ¶ 7. The form reveals that plaintiff identified G. Powers as his first choice for an assistant and J. Morton and P. Nardi as his second and third choices respectively. Dkt. # 68, p. 0712. It appears, however, that plaintiff refused to sign the form. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 8.

**\*27** The disciplinary hearing began on January 31, 2001 at which time plaintiff objected to the hearing claiming that he had not received assistance. Dkt. # 87, ¶ 9. At the outset of the hearing, plaintiff stated that he had chosen G. Powers as his assistant and that despite the fact that G. Powers was available, Sgt. Morton was assigned to serve as his assistant. Dkt. # 98, pp. 20–33. During the hearing, plaintiff insisted that notwithstanding what is indicated on the Tier Assistance Selection Form, he did not select J. Morton and P. Nardi as his second and third choices for an assistant, plaintiff claimed that he chose *only* G. Powers. Dkt. # 68, p. 0712; Dkt. # 98, pp. 20–33. Indeed, plaintiff stated during the hearing that he had witnesses who would testify concerning G. Powers' availability to serve as his assistant. Dkt. # 98, pp. 20–33. Defendant Quinn advised plaintiff during the hearing that G. Powers was not available to serve as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

his assistant. *Id.* In fact, there is a notation on the Tier Assistance Selection Form next to G. Powers' name stating, "off list". Dkt. # 68, p. 0712. Thereafter, plaintiff and defendant Quinn discussed at length whether plaintiff had in fact refused J. Morton's assistance to prepare for the hearing. Dkt. # 98, pp. 20–33.

Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci called as witnesses. *Id.* Plaintiff continuously objected to the hearing because he claimed he had not received assistance. Dkt. # 98, pp. 20–33. Thereafter, defendant Quinn adjourned the hearing so that he could verify with Sgt. Morton that plaintiff had been offered assistance and that plaintiff had refused that assistance. *Id.* The hearing was reconvened on February 5, 2001 and plaintiff refused to attend the hearing.[FN23] Dkt. # 87, ¶ 10. The hearing was conducted outside of plaintiff's presence. Dkt. # 98, pp. 20–33. Moreover, Sgt. Morton testified telephonically that plaintiff had waived his assistance. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 15. Defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding that Deputy Commissioner Annucci's testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 11. As with previous administrative, supervisory or staff personnel witnesses identified by plaintiff to testify at other disciplinary hearings, Deputy Commissioner Annucci is located in Albany, New York and to have Deputy Commissioner Annucci testify in every hearing as requested would be extremely disruptive. Dkt. # 87, ¶ 12. Moreover, because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner Annucci during the hearing, he was able to make a determination as to the threatening, obscene and abusive language therein. *Id.* at ¶ 14. Based on the foregoing, defendant Quinn determined that Deputy Commissioner Annucci's testimony was not necessary. *Id.* Accordingly, defendant Quinn maintains that it was in the exercise of his discretion that he denied plaintiff's request to have Deputy Commissioner Annucci testify at the hearing. *Id.* at ¶

13. Notwithstanding the fact that plaintiff refused to attend the hearing and did not avail himself of the opportunity to present a defense at the hearing, plaintiff claims that Deputy Commissioner Annucci would have testified that "no such letter of alleged threat existed" and further, that no letter was physically produced during the hearing. Dkt. # 96, p. 8. It should be noted that at no time when plaintiff was present at the January 31, 2001 commencement of the disciplinary hearing did he deny that he wrote the January 8, 2001 letter to Deputy Commissioner Annucci. Dkt. # 98, pp. 20–33.

> FN23. In opposition to defendants' motion for summary judgment, plaintiff claims that he did not refuse to attend the hearing, rather, plaintiff claims that no one came to escort him to the hearing. Dkt. # 96, p. 9. The hearing transcript, Dkt. # 98, pp. 20–33, reflects the testimony of Sgt. Mulhearn and Correction Officer Manzo who testified that they attempted to escort plaintiff to the February 5, 2001 continuation of his disciplinary hearing and plaintiff refused. Moreover, Sgt. Mulhearn testified that he requested plaintiff to sign the Waiver of Right to Attend Disciplinary Hearing advising plaintiff that a disposition of the charges would be made in his absence and plaintiff refused. Dkt. # 68, p. 0713; Dkt. # 87, ¶ 10; Dkt. # 98, pp. 20–33.

**\*28** At the conclusion of the hearing, defendant Quinn rendered his determination and found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months keeplock confinement in SHU beginning September 27, 2002 and continuing through September 27, 2003. *Id.* at ¶ 16. In reaching this determination, defendant Quinn noted that he relied on the Misbehavior Report and the handwritten letter from plaintiff, wherein plaintiff made harassing statements to Deputy Commissioner Annucci. *Id.* at ¶ 17. Defendant Quinn further noted that the penalty was im-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

posed to serve as a deterrent to plaintiff and others and to reinforce that threatening and harassing employees will not be tolerated. *Id.*

Thereafter, plaintiff alleged that he never received a copy of the hearing disposition and he commenced an Article 78 proceeding in New York State Supreme Court, Chemung County challenging the February 5, 2001 disposition. Dkt. # 87, ¶ 18. In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but maintained that he did not refuse to attend the hearing. *Id.* Plaintiff further claimed that he did not learn of the disposition until June 26, 2001 when he reviewed a copy of the SHU readout sheet. *Id.* On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id.* at ¶ 19.

By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id.* at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant, denied him the right to attend the hearing and refused to call Deputy Commissioner Annucci as a witness. *Id.* Plaintiff further alleged that defendant Quinn was biased, refused to let plaintiff see the January 8, 2001 correspondence (the letter authored by plaintiff that formed the basis for the January 27, 2001 Misbehavior Report) and that because he never received a copy of the disposition, he was unaware of the penalty imposed. *Id.* On April 26, 2002, defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because defendant Quinn failed to interview a requested witness who may have provided relevant testimony. *Id.* at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination several months before plaintiff was ordered to serve his penalty. *Id.* at ¶ 22. As discussed above, the penalty of twelve months confinement in SHU was to commence

on September 27, 2002 and continue through September 27, 2003. *Id.* at ¶ 23.

**5. Defendant Lieutenant Ryan**

Plaintiff alleges that defendant Lieutenant Ryan denied him due process during a Tier 2 disciplinary hearing held on January 25, 2000 with respect to a January 14, 2000 Misbehavior Report. Specifically, plaintiff alleges that:

**\*29** This defendant [Ryan], on the date of 1–25–00, inside of this Southport State Prison, while acting under state color, in his individual and official [FN24] capacities, had knowingly, wilfully, and intentionally *violated* my due process, while his [sic] conducting a hearing. This defendant had personally used his own ink pen (*prior* to turn on the recorder), for 'signing' (endorsing), the retaliatory ticket against me (forgery), on behalf of the medical escort officer who showed 'reluctance' to sign the ticket himself, and further had *never* cared to appear at the hearing personally—*no* assistance [sic] been issued [sic] me prior to the hearing though I stated the ticket was *not* understood by me on several occasions. Furthermore, a voice phone had been used, over my *un* ceasing 'objections'. I had been forced from the partial hearing and than [sic] found guilty, and sentenced to 30–days keeplock cell confinement. Soon after, I did appeal on 1–25–00, however, the defendant W. Wilcox (para—# 9), had affirmed the due process violation against me, of a charge *not* even part of the incident and clearly *not* written in the retaliatory ticket!

[FN24.] *See* footnote 2 *supra.*

Dkt. # 9, pp. 6–G to 6–H (emphasis in original). At all times relevant to the allegations in the amended complaint, defendant Ryan was a Lieutenant at Southport and held that position from 1987 to 2000. Dkt. # 93, ¶ 1. From time to time, defendant Ryan's duties included conducting disciplinary hearings as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. *Id.* at ¶ 3.

The Tier 2 disciplinary hearing conducted by defendant Ryan was held on January 25, 2000 and was in relation to a January 14, 2000 Misbehavior Report which charged plaintiff with violating Rules 107.10 (verbal interference) and 107.11 (verbal harassment). Dkt. # 44, p. 0026. The Misbehavior Report was written by defendant Nurse vonHagn for an incident that took place when she attempted to deliver eyeglasses to plaintiff. A complete discussion of the incident that gave rise to the Misbehavior Report is set forth at pp .19–21 *supra.*

At the outset of the hearing, defendant Ryan advised plaintiff that he may have witnesses testify on his behalf and that nothing he said during the course of the hearing could be used against him in a criminal proceeding. Dkt. # 44, pp. 0032–0038; Dkt. # 93, ¶ 11. Plaintiff indicated that he understood his rights. *Id.* Thereafter, plaintiff objected to the Misbehavior Report as retaliatory and noted for the record that he had, at that time, approximately fifteen grievances filed against defendant vonHagn, as well as an Article 78 pending against her. Dkt. # 44, pp. 0032–0038; Dkt. # 93, ¶ 17. Plaintiff did not, however, contrary to the claims made in the amended complaint, claim during the hearing that defendant Ryan denied him an assistant or denied him the ability to have witnesses testify on his behalf. *Id.;* Dkt. # 93, ¶ 7. Moreover, as is reflected in the hearing transcript, over plaintiff's objection, Officer Martino, who endorsed the Misbehavior Report, testified by telephone at the hearing and unequivocally stated that he had witnessed the incident involving defendant vonHagn and plaintiff. Dkt. # 44, pp. 0032–0038.

**\*30** Just prior to Officer Martino's testimony, plaintiff became increasingly disruptive, objecting to the hearing because it was "bias and partial." *Id.* Accordingly, plaintiff requested to return to his cell for the balance of the hearing and was, therefore, not present for the remainder of the hearing. *Id.* Following Officer Martino's testimony, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30 days keeplock confinement beginning July 18, 2000 and continuing until August 17, 2000. *Id.* In reaching his determination, defendant Ryan relied on the January 14, 2000 Misbehavior Report and the testimony of Officer Martino who witnessed the incident. Dkt. # 93, ¶ 29. Defendant Ryan further stated that he imposed the penalty to serve as a reminder that the type of behavior exhibited towards defendant vonHagn will not be tolerated. *Id.* Plaintiff appealed defendant Ryan's determination and Captain Wilcox affirmed defendant Ryan's determination finding that there was no evidence of retaliatory acts committed by defendant vonHagn, that defendant Ryan properly called Officer Martino to testify, that plaintiff was not confined pending the hearing, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan and that a witness may testify by telephone. Dkt. # 44, p. 0024; Dkt. # 92, ¶ 31. Following plaintiff' appeal, defendant Ryan's determination was affirmed by defendant Wilcox on or about January 28, 2000. Dkt. # 86, Exhibit A.

**6. Defendant Captain Sheahan**

Finally, plaintiff alleges in the amended complaint that defendant Captain Sheahan denied plaintiff due process in connection with a Tier 3 disciplinary hearing that began on December 26, 2000 and was continued on December 29, 2000 concerning a December 13, 2000 Misbehavior Report. Dkt. # 9. In short, plaintiff alleges that defendant Sheahan denied plaintiff his right to witnesses, improperly found him guilty at the conclusion of the hearing, and was biased against plaintiff. *Id.* As against defendant Sheahan, plaintiff specifically alleges:

This defendant [Sheahan], on the date of 12–29–00, inside of this Southport prison, while acting under state color in his individual and official [FN25] capaci-

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

ties, had conducted a hearing, and knowingly, intentionally, and wilfully violated my due process rights repeatedly by 'denying' my right [sic] witness'es [sic] (only one expert witness having a full indepth [sic] and personal knowledge of my situations [sic] in [sic] suffering with the defendant—author of the retaliatory ticket—para # 1), over my repeated 'objections'. [sic] Additionally, this defendant (Shehan [sic] ), had stated no valid reason on [sic] disposition, in [sic] respect to the threat of any institutional or correctional goals as is necessary to deny witness'es [sic]. I suffered a finding in [sic] guilt, and sentenced to six (6) months further SHU-punative [sic] segregation, an [sic] I appealed on 12–31–00, however, the defendant (D. Selskey [sic] ), affirmed the bias, partial disposition against me, in further violation of my due process rights.

FN25. *See* footnote 2 *supra.*

**\*31** Dkt. # 9, pp. 6–A to 6–B (emphasis in original). During the time period relevant to the allegations in the amended complaint, defendant Michael Sheahan was a Captain at Southport and has held that position since June 2003. Dkt. # 88, ¶ 1. As with the other hearing officers named as defendants, defendant Sheahan's duties included conducting inmate disciplinary hearings as the Superintendent's designee. Dkt. # 88, ¶ 3. The underlying facts relating to the December 13, 2000 Misbehavior Report issued by defendant vonHagn are discussed at length above. *See* pp. 23–27 *supra.*

Plaintiff was advised at the outset of the hearing that he had the right to have witnesses testify on his behalf, that nothing plaintiff said would be used against him in a criminal proceeding, that plaintiff should present any oral or documentary evidence during the hearing and that any procedural objections or claims should be made promptly during the hearing. Dkt. # 44, pp. 00160–0199; Dkt. # 88, ¶ 7. Plaintiff responded that he understood his rights. *Id.* Plaintiff objected that he did not receive the employee assistant

that he had requested and had not received copies of the grievances he requested to support his claim that defendant vonHagn issued the December 13, 2000 Misbehavior Report in retaliation for complaints plaintiff filed against her. Dkt. # 88, ¶ 8. After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the hearing to further investigate plaintiff's assertions. *Id.* at ¶ 9. The Tier 3 disciplinary hearing reconvened on December 29, 2000. *Id.* During the continuation of the hearing, plaintiff agreed that he had been provided with an assistant, Officer Carpenter, that Officer Carpenter had met with plaintiff on December 26, 2000 and further, that the assistance he had received was acceptable. *Id.* Although plaintiff testified that he had not received all of the grievances that he had requested, plaintiff stated that the data he had received was satisfactory for the hearing. *Id.* at ¶ 10. Finally, although plaintiff agreed that when he met with Officer Carpenter he had not requested any witnesses, plaintiff advised defendant Sheahan that he did want Thomas Egan, Director of CORC to testify with respect to "certain verifications concerning the grievances." *Id.* at ¶ 11.

Plaintiff plead not guilty to the charges in the Misbehavior Report and objected to the Misbehavior Report on the grounds that: it was retaliatory; he had written at least twenty to twenty-five complaints against defendant vonHagn; he had one witness who would testify that plaintiff never threatened defendant vonHagn; Officer Stamp threatened plaintiff; defendant vonHagn had been violating plaintiff's right to medical care since March 1999; defendant vonHagn is racist, biased and unprofessional; and defendant vonHagn had written retaliatory Misbehavior Reports against plaintiff on prior occasions. *Id.* at ¶ 12. In support of some of his objections, plaintiff submitted copies of the grievances for defendant Sheahan's consideration. *Id.* Defendant Sheahan advised plaintiff that he accepted the grievances as evidence of his claim that defendant vonHagn had submitted the December 13, 2000 Misbehavior Report in retaliation for

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

plaintiff's grievances. *Id.* at ¶ 13.

**\*32** As noted above, plaintiff requested that Director Egan testify that the grievances submitted by plaintiff were "exhausted." *Id* . at ¶ 14. Defendant Sheahan denied plaintiff's request to have Director Egan testify because, as noted above, he accepted the grievances submitted by plaintiff and determined that any testimony by Director Egan would have been redundant. *Id.* Following defendant Sheahan's denial of plaintiff's request to have Director Egan testify, plaintiff's objection was noted for the record and plaintiff indicated that he had nothing further to submit with respect to the Misbehavior Report. *Id.* at ¶ 17. Thereafter, defendant Sheahan rendered his determination. *Id.*

Defendant Sheahan found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of six months confinement in SHU. *Id.* at ¶ 18. In reaching this determination, defendant Sheahan relied upon the December 13, 2000 Misbehavior Report and stated that in his opinion, the evidence of past grievances submitted by plaintiff did not establish that the Misbehavior Report issued by defendant vonHagn was retaliatory in nature. *Id.* Further, defendant Sheahan stated that the disposition was rendered to impress upon plaintiff that threats to staff would not be tolerated. *Id.* Plaintiff appealed defendant Sheahan's determination and defendant Selsky affirmed the determination on or about February 9, 2001. *Id.* at ¶ 20.

**D. Due Process Claims—Appeals**

The amended complaint alleges a cause of action against defendants Selsky and Wilcox premised on the theory that the defendants denied plaintiff his due process rights in connection with plaintiff's appeals of certain disciplinary hearing determinations. Dkt. # 9. According to plaintiff, because the hearing officers violated plaintiff's constitutional rights, defendants Wilcox and Selsky must also be liable for violating plaintiff's constitutional rights because they affirmed

the determinations of the hearing officers. Dkt. # 9, pp. 6–H to 6–I. Similarly, plaintiff claims that where defendant Selsky modified a hearing officer's determination, such modification also constituted a violation of plaintiff's constitutional rights. *Id.* at p. 6–I.

Against defendant Wilcox, plaintiff alleges, "on the separate date's [sic] of 1–21–00, 1–25–00, 7–18–00, 7–30–00, 11–29–00, 12–31–00, 12–22–00, 3–8–01, 1–30–01 [FN26], inside of this Southport State Prison, while acting under state color in his individual and official [FN27] capacities, had intentionally, knowingly, and wilfully *violated* my right to 'due process' ..." Dkt. # 9, p. 6–H (emphasis in original). Based on a review of plaintiff's disciplinary history, a copy of which is attached as Exhibit A to defendant Irizarry's affidavit (Dkt.# 86), defendant Wilcox decided appeals involving plaintiff on the following dates: January 28, 2000 (January 25, 2000 determination); July 30, 2000 (July 18, 2000 determination); December 11, 2000 (November 29, 2000 determination); December 28, 2000 (December 21, 2000 determination) and February 5, 2001 (January 29, 2001 determination). Dkt. # 86, Exhibit A.

> [FN26]. It is unclear from the language in the amended complaint whether the dates alleged are the dates when plaintiff's appeals were decided, the dates of the hearing determinations, or some other unknown date. Notwithstanding the dates enumerated in plaintiff's amended complaint, in support of their motion for summary judgment, defendants addressed the following determination/appeal dates: January 11, 2000 determination (December 29, 1999 Misbehavior Report); November 20, 2000 determination; December 21, 2000 determination; January 29, 2001 determination; March 7, 2001 determination; July 18, 2000 determination; January 4, 2001 determination; February 5, 2001 determination; January 25, 2000 determination; and December 29, 2000 deter-

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

mination. In those instances where the dates alleged in the amended complaint do not match with either the hearing date, the appeal date, or the date addressed by defendants, the Court will note the discrepancy and identify the approximate date.

FN27. *See* footnote 2 *supra.*

**\*33** Similarly, as against defendant Selsky, plaintiff claims on February 21, 2001, defendant Selsky "knowingly, intentionally, and wilfully *violated* my right under [sic] 'due process' by "modifying a disposition dated 1–4–00 (not 1–4–01), and I suffered a 6–month SHU-punitive [sic] segregation sentence ..." Dkt. # 9, p. 6–I (emphasis in original). Additionally, plaintiff claims that on February 9, 2001, defendant Selsky violated his due process rights by "affirming a bias [sic] disposition, where I suffered *no* witnesses, *nor* had all of my evidence been allowed at the partial *un* fair hearing. I suffered *another* 6–months SHU-punitive [sic] segregation sentence." Dkt. # 9, p. 6–I (emphasis in original). At all times relevant to the allegation in the amended complaint, Donald Selsky was the Director of the Special Housing/Inmate Disciplinary Program (Dkt.# 80, ¶ 123) and defendant Wilcox was a Captain at Southport.

**1. "1–21–00"—Defendant Wilcox**

As discussed at length above, a disciplinary hearing was held on January 11, 2000 concerning an incident that occurred on December 31, 1999. *See* pp. 32–35 *supra.* Defendant Lt. Donahue presided over the January 21, 2000 Tier 2 disciplinary hearing wherein he found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of 30 days keeplock confinement. *Id.* Contrary to plaintiff's allegations, plaintiff did not appeal defendant Lt. Donahue's January 21, 2000 determination. Dkt. # 86, Exhibit A.

**2. "1–25–00"—Defendant Wilcox**

On January 25, 2000, defendant Lt. Ryan presided over a Tier 2 disciplinary hearing concerning a January 14, 2000 Misbehavior Report by defendant vonHagn alleging that plaintiff violated Rules 107.10 (interference) and 107.11 (harassment). As discussed above, defendant Ryan found plaintiff guilty and imposed a penalty of 30 days keeplock confinement and 30 days loss of packages, commissary and phone privileges. *See* pp. 59–62 *supra.* Plaintiff appealed Lt. Ryan's determination alleging that: the Misbehavior Report was retaliatory in nature; defendant Ryan "manipulated" the Misbehavior Report by endorsing it; plaintiff was improperly confined in connection with the Misbehavior Report for eleven days without an extension; defendant Ryan exhibited "partiality, bias, racism, vindictiveness and Klu [sic] Klux Klan mentality" in the conduct of the disciplinary hearing; and, defendant Ryan improperly received testimony over the telephone. Dkt. # 44, p. 0025. On January 28, 2000, defendant Wilcox affirmed defendant Ryan's determination stating,

1. There is no evidence of any retaliatory acts committed by RN VonHagn [sic]. 2. Hearing Officer properly called the Escort Officer to the Hearing as a witness. 3. You were not confined pending this Hearing. 4. There is no evidence of any partiality, biasness [sic], racism, vindictiveness, threats, or official misconduct by the Hearing Officer at this Hearing. The Hearing Officer may receive testimony from a witness via speaker phone when that person cannot report to the Hearing to testify in person.

**\*34** Dkt. # 44, p. 0024.

**3. "7–18–00"—Defendant Wilcox**

According to plaintiff's disciplinary history, on July 30, 2000, defendant Wilcox affirmed defendant Gilmore's July 18, 2000 determination. Dkt. # 86, Exhibit A. As discussed above, on July 18, 2000, defendant Lt. Gilmore found plaintiff not guilty of violating Rules 107.10 (interference with employee)

and 106.10 (refusing direct order) and guilty of violating Rule 107.11 (harassment) and imposed a penalty of 10 days keeplock confinement. *See* pp. 44–49 *supra.*

### 3. "7–30–00"—Defendant Wilcox

A review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not reveal a separate disciplinary hearing that occurred on July 30, 2000, except for the appeal of the July 18, 2000 determination that was decided on July 30, 2000, as discussed above. Accordingly, for purposes of deciding defendants' motion for summary judgment, the Court will treat plaintiff's allegations concerning a July 30, 2000 disciplinary hearing as a second, duplicative reference to the July 18, 2000 hearing determination.

### 5. "11–29–00"—Defendant Wilcox

A Tier 2 disciplinary hearing was conducted by defendant Donahue on November 29, 2000. Dkt. # 44, p. 0069; Dkt. # 86, Exhibit A. Following the hearing, defendant Donahue found plaintiff guilty of violating Rules 107.10 (interference) and 102.10 (threats) and imposed a penalty of 30 days keeplock confinement. *Id.* Plaintiff filed an appeal of defendant Donahue's determination on November 29, 2000 stating that, (1) he had objected to the hearing being conducted by "this discriminiata [sic]/bias officer due to his previous verbal threats upon me back in January, and also, due to a prior grievance exhaustion [sic] against him for both these valid reasons" and (2) defendant Donahue was the subject of an official complaint by plaintiff to the DOCS Commissioner. Dkt. # 44, pp. 0378–0379. On December 11, 2000, defendant Wilcox affirmed defendant Donahue's determination stating, "No evidence Hearing Officer was bias [sic]. Hearing Officer was appropriately assigned to conduct Hearing." Dkt. # 44, p. 0377.

### 6. "12–31–00"—Defendant Wilcox

A review of plaintiff's disciplinary history (Dkt. #

86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing or appeal that was held, filed or decided on or about December 31, 2000. As will be discussed below, the record before the Court does, however, reveal that plaintiff appealed a December 29, 2000 determination of a Tier 3 disciplinary hearing and that determination was affirmed by defendant Selsky on February 9, 2001.

### 7. "12–22–00"—Defendant Wilcox

On December 22, 2000, plaintiff appealed a December 21, 2000 determination by defendant Donahue. Dkt. # 44, pp. 0365–0366. In his December 22, 2000 appeal, plaintiff stated that: (1) he objected to defendant Donahue as the hearing officer because of plaintiff's prior grievances filed against defendant Donahue; (2) he objected to defendant Donahue's "misconduct" by entering a plea on plaintiff's behalf over plaintiff's objections; (3) plaintiff objected to the Misbehavior Report as being retaliatory in nature; and, (4) defendant Donahue erroneously denied plaintiff's request for two expert witnesses ("Mr. Glen Goord/Thomas G. Eagen [sic]"). *Id.* Thereafter, on December 28, 2000, defendant Wilcox affirmed defendant Donahue's December 21, 2000 determination stating, "Hearing Officer was appropriate. No evidence Misbehavior Report was retaliatory in nature. Witnesses appropriately denied and reasons documented. No evidence Hearing Officer acted improperly ." Dkt. # 44, p. 0364.

### 8. "3–8–01"—Defendant Wilcox

**\*35** Plaintiff alleges that defendant Wilcox violated his due process rights on March 8, 2001. However, a review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing or appeal that was held, filed or decided on or about March 8, 2001. To the contrary, plaintiff's disciplinary history reveals that a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

Tier 2 disciplinary hearing was conducted on March 7, 2001 by defendant Donahue with respect to a Misbehavior Report issued by Correction Officer Kamas on February 28, 2001. Dkt. # 86, Exhibit A. Plaintiff did not appeal this determination.

### 9. "1–30–01"—Defendant Wilcox

On January 30, 2001, plaintiff appealed the determination of a Tier 2 disciplinary hearing held on January 29, 2001. The January 29, 2001 disciplinary hearing was conducted by defendant Donahue and at the conclusion of the hearing, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed a penalty of 30 days keeplock. Dkt. # 44, p. 0112. In his appeal, plaintiff stated that: (1) the Misbehavior Report was retaliatory in nature because it was written by defendant Brandt against whom plaintiff had filed a grievance; (2) "the hearing officers [sic] disposition in [sic] bias/partiality, due to *no* evidence *nor* endorsement ..."; (3) defendant Donahue had been "under investigation" by DOCS officials; and, (4) defendant Donahue's actions were retaliatory in nature. Dkt. # 44, pp. 0121–0123 (emphasis in original). Defendant Wilcox reviewed the January 29, 2001 determination and affirmed it stating, in part, "HO [Hearing Officer] was appropriate and not biased. No evidence Misbehavior Report was retaliatory." Dkt. # 44, p. 0120.

### 10. "2–21–01"—Defendant Selsky

On or about February 21, 2001, defendant Selsky modified the penalty imposed by defendant Irizarry following a Tier 3 disciplinary hearing conducted on January 4, 2001. Dkt. # 86, Exhibit A. Following the January 4, 2001 disciplinary hearing, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU. Dkt. # 65, p. 0661. Defendant Selsky modified the penalty to six months SHU confinement. Dkt. # 86, Exhibit A. Defendant Selsky did not, however, overturn defendant Irizarry's determination nor did defendant Selsky find that the hearing was procedurally improper. Dkt. # 80, ¶¶ 246 and 304–306.

### 11. "2–9–01"—Defendant Selsky

Following the disciplinary hearing which commenced on December 26, 2000 and concluded on December 29, 2000, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (interference) and 102.10 (threats) and imposed a penalty of six months SHU confinement. Dkt. # 44, p. 101. On February 9, 2001, defendant Selsky affirmed the December 29, 2000 hearing determination of defendant Lt. Sheahan.[FN28] Dkt. # 44, p. 100; Dkt. # 86, Exhibit A.

> FN28. Plaintiff's disciplinary record (Dkt. # 86, Exhibit A) erroneously indicates that the hearing officer who presided over the hearing was defendant Donahue. According to all other documents relating to the December 26 and 29, 2000 hearing, it was defendant Sheahan who presided over the Tier 3 disciplinary hearing.

### E. Denial of Religious Correspondence Course Claim

**\*36** In his amended complaint, plaintiff alleges that in or about November and December 1999, defendant, Deane M. Gardner, "knowingly and intentionally *violated* my legal right to study religeon [sic] from a Christian order in my own Catholic faith. However, after deliberately violating my right, soon after, this very same bible study course in [sic] correspondence is now implemented here in Southport prison, and still I have been denied a right to take this correspondence course in Christian belief." Dkt. # 9, p. 5–C (emphasis in original). At all times relevant to the allegations in the amended complaint, defendant Gardner was employed as the Senior Mail and Supply Clerk at Southport. Dkt. # 94, ¶ 1.

In connection with his claim that defendant Gardner denied him his right to take a religious correspondence course, plaintiff filed Grievance No.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

SPT–17423–99 on or about November 16, 1999. Dkt. # 44, p. 0250. In this grievance, plaintiff states in part, "on the date of Nov. 2nd, I received an information packet concerning religeous [sic] training or studies, however, the senior mailroom clerk—D. Gardner, informed me that I could not take any correspondences [sic] courses either religeous [sic] or college!" Dkt. # 44, p. 0250. Moreover, plaintiff alleges that an item paid for by plaintiff and sent to plaintiff by an outside vendor had been stolen by the mail room staff. *Id.* Finally, plaintiff claims that he had been denied level 3 phone call privileges. *Id.* In response to the grievance, the IGRC recommended,

> [p]er recent CORC decisions, the grievant may not participate in any correspondance [sic] courses/programs while at Southport. Grievant is advised to contact the educational supervisor once he is transferred to a general confinement facility. Regarding the item from an outside vendor which the grievant alleges was stolen by mailroom staff, no facts have been submitted. The grievant needs to provide proof of this claim. Finally regarding his telephone call, he is advised to address this issue with his area supervisor.

Dkt. # 44, p. 0251. As noted above, Southport is an all SHU facility and all inmates housed at Southport are assigned to SHU confinement. Dkt. # 94, ¶ 9.

On December 1, 1999, the Superintendent concurred with the recommendation of the IGRC and stated, in part, "[t]here are no provisions in either the facility policy or departmental directive # 4933 that allows SHU inmates to participate in any correspondence courses. Any desire to learn more about religious practices should be directed to staff in religious services." Dkt. # 44, p. 0254. Thereafter, plaintiff appealed to CORC on December 6, 1999 stating that he has a constitutional right to study religion in prison. Dkt. # 44, p. 0255. CORC issued its determination on or about January 19, 2000 wherein it concurred with the Superintendent's determination. Dkt. #

44, p. 0246. In support of its determination, CORC cited to its prior decision in SPT–14519–98 dated August 26, 1998 wherein CORC stated, in part, "[t]here are no outside correspondence courses allowed in this facility." *Id.* Moreover, CORC further cited its decision in SPT–7594–94 rendered on September 15, 1994, which states, in part, "CORC concurs with the Superintendent in that the grievant may not participate in any correspondence course due to the logistical problems related to housing in Southport C.F." *Id.*

***37** With respect to plaintiff's claim of stolen property, CORC indicated that it had not been presented with sufficient evidence to support his allegation that staff stole his property. *Id.* CORC advised that plaintiff nevertheless retained his right to pursue such a claim through the inmate claims mechanism as set forth in Departmental Directive # 2733, Inmate Personal Property Claim. *Id.* Finally, with respect to plaintiff's appeal, CORC advised plaintiff to address his concerns regarding religious study to the facility chaplain. *Id.*

In support of her motion for summary judgment, defendant Gardner claims that in her position as Senior Mail and Supply Clerk, she had no authority to set any policy for DOCS or Southport and further, had no authority to determine whether an inmate may take a correspondence course or otherwise engage in educational or religious activities. Dkt. # 94, ¶ 16. Defendant Gardner further states that she made no determination with regard to plaintiff's desire to take a religious correspondence course. *Id.* at ¶ 17. Moreover, defendant Gardner states that she did not interfere with any of plaintiff's constitutional rights or deny plaintiff the right to exercise any constitutional right. *Id.*

**F. Interference with Legal Mail Claim**

In addition to his claim that defendant Gardner denied him the right to take a religious correspondence course, plaintiff further claims that defendant Gardner interfered with his legal mail. Dkt. # 9, p. 5–B. Spe-

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

cifically, plaintiff alleges: "[t]his defendant [Gardner], in the months of November and December of 1999, inside of this Southport Prison, while acting under state color, in her individual and official [FN29] capacities, had knowingly, wilfully, and intentionally violated my incoming legal mail ... (my legal mail had been opened, examined and censored out of my presence and had arrived to my SHU-punative [sic] segregation cell opened ..." Dkt. # 9, p. 5–B to 5–C.

FN29. *See* footnote 2 *supra.*

On or about October 28, 1999, plaintiff filed Grievance No. SPT–17276–99 alleging that his incoming legal mail had been opened by the mail room clerk and censored, despite the fact that, according to plaintiff, the envelope was clearly marked "Legal Mail ." Dkt. # 44, p. 0262. In the grievance, plaintiff requested that the following action be taken, "the request is clearly obvious (no employee of D.O.C.S. is supposed to violate federal law by opening a prisoners [sic] incoming legal mail!), and a legal retaliation [sic] will be activated soon enough." Dkt. # 44, p. 0262. On or about October 29, 1999, K. Washburn, Mailroom Clerk, submitted a response to Grievance No. SPT–17276–99 to the IGRC stating,

> Grievant is only partially correct by stating that legal mail which is clearly marked as such, and is from an attorney, is not to be opened by the mailroom. However, this was not the case. The letter in question arrived in an envelope which was completely handwritten, unlike normal mail from attorneys. The senders [sic] name was also illegible. Since the senders [sic] name could not be verified as a legitimate, legal entity, the mail was opened. Mailroom staff have also stated that whenever legal mail is opened in error, the enveloped is stamped by the mailroom to let the addressee know it was opened in error.

**\*38** Dkt. # 44, p. 0268. Thereafter, the IGRC ad-

vised plaintiff of the results of the investigation by reiterating K. Washburn's response. *Id.* at p. 0263. The Superintendent concurred with the IGRC recommendation and advised plaintiff that despite his allegations, facility staff acted within Department policy. *Id.* at p. 0266. CORC sustained the Superintendent's determination and concurred with the IGRC recommendation, stating that facility staff acted within department policy and "[c]ontrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employees referenced in this instant complaint." *Id.* at p. 0259.

As set forth in Grievance No. SPT–17276–99 and as provided in 7 N .Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2), legal mail which is clearly marked as such and is from an attorney is not to be opened by the mailroom outside the presence of the inmate. If privileged correspondence is opened in error outside the presence of the inmate, documentation of such error should be maintained. Dkt. # 94, ¶ 26; 7 N.Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2). General correspondence, however, between an inmate and someone other than a person approved for legal correspondence, will be opened, outside the presence of the inmate, and inspected for cash, checks, money orders, printed or photocopied materials or contraband. Dkt. # 94, ¶ 27; 7 N.Y.C.R.R. 720.2(b) and 720.4(a). Here, because, as described above, plaintiff's correspondence was not readily identified as legal mail, it was opened and thereafter stamped as opened in error. Dkt. # 94, ¶ 28.

**G. Access to the Courts Claims**

Plaintiff claims that on or about September 13, 2000, Superintendent Corcoran violated his constitutional right of access to the courts when he denied plaintiff access to vouchers and certified mailed receipts contained in plaintiff's sealed property bags. Dkt. # 9, p. 5–D. As a result, plaintiff further alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

about December 20, 2000. *Id.* During the time period alleged in the amended complaint, Michael P. Corcoran was the Deputy Superintendent for Administrative Services at Southport. Dkt. # 90, ¶ 1.

Plaintiff also claims that on or about June 12, 2001, Deputy Superintendent Weingartner violated his constitutional right of access to the courts when he denied plaintiff's "advanced certified mailing request" for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims. Dkt. # 9, p. 5–E. In addition, plaintiff further claims that the manilla envelope containing the material had been kept from him "until the expiration of my time to respond by certified mail—return receipt—requested to the Attorney General." *Id.* As a result, plaintiff alleges that his claim was dismissed. *Id.* During the time period alleged in the amended complaint, defendant Lawrence W. Weingartner was the Assistant Deputy Superintendent for Program Services at Southport. Dkt. # 91, ¶ 1.

### 1. Defendant Michael P. Corcoran

**\*39** As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags. Dkt. # 90, ¶ 7. With respect to plaintiff's claim against defendant Corcoran, plaintiff was transferred from Southport to Coxsackie in or about February 2000 and plaintiff remained at Coxsackie until in or about May 2000, at which time he was transferred back to Southport. Dkt. # 90, ¶ 9. A Personal Property Transferred Form was completed on or about May 16, 2000 listing plaintiff's personal property transferred from Coxsackie to Southport. Dkt. # 90, ¶ 12 and Exhibit A. As set forth on the Personal Property Transferred Form (which plaintiff refused to sign), plaintiff was advised not to leave active legal case material behind and was instructed to include all active legal material in his 4–bag limit. *Id.* Upon transfer to Southport, the property bags of SHU inmates are

reviewed with the incoming inmate. *Id.* at ¶ 17. The incoming inmate is advised that if he has any active legal matters, he should take all active legal material with him to his cell. *Id.* "Due to the restrictions on the amount of property which SHU inmates are allowed to have in their cells, any personal property of SHU inmates that exceeds the SHU cell property limits are placed in storage, to be returned to the inmate upon his release from SHU confinement. *Id.*

On or about May 25, 2000, plaintiff completed an Inmate Claim Form concerning certain property that plaintiff alleged had been stolen. Dkt. # 90, ¶ 10 and Exhibit A. Notably, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing. *Id.* at ¶ 11. On or about June 16, 2000, defendant Corcoran advised plaintiff that he had received his claim, that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that a failure to establish proof of ownership may result in denial of his claim. *Id.* at ¶ 13. Moreover, defendant Corcoran advised plaintiff that his claim would be sent to Security staff for investigation and that he would be notified of a decision upon completion of the investigation. *Id.* at ¶ 14. On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected. Dkt. # 90, ¶ 16 and Exhibit A.

Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000. Dkt. # 90, ¶ 19 and Exhibit B. Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated in pertinent part, "I have again received another demeaning and insolent note from you. This is the last time that I will respond to [sic]. I will not authorize you access to your property bags, since you've already determined that we have broken

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

into your bags to destroy your receipts." *Id.*

**\*40** As described above, plaintiff claims that as a result of defendant Corcoran's conduct, Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. Dkt. # 9, p. 5–D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001.[FN30] Dkt. # 90, ¶ 21 and Exhibit B. As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility. *Id.* The Judgment further noted that the matter came on to be heard by Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs [sic] and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim," Claim No. 98329 was dismissed. *Id.* Thus, in support of his motion for summary judgment, defendant Corcoran argues that "to the extent plaintiff's Claim No. 98329 was dismissed, as established by the Judgment in Claim No. 98329, such dismissal was had after the Court heard the proofs and allegations of the parties, and not, as plaintiff claims, because I prevented him access to receipts or vouchers or otherwise prevented him from accessing the Court of Claims." Dkt. # 90, ¶ 22.

> FN30. In opposition to defendants' motion for summary judgment, plaintiff concurs that his claim was dismissed on January 2, 2001. Dkt. # 96, p. 63.

**2. Defendant Lawrence W. Weingartner**

As a threshold matter, defendant Weingartner states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims. Dkt. # 91, ¶ 6. Defendant Weingartner states that counsel for defendants received a packet of documents from plaintiff in connection with discovery in this matter and that included in those documents was a copy of a

letter from Mark C. Davison, Court Clerk Specialist, New York State Supreme Court, Appellate Division, Fourth Department to plaintiff dated July 27, 2001. *Id.* at ¶ 7. In his July 27, 2001 letter, Mr. Davison advised plaintiff that in response to plaintiff's July 2, 2001 letter, there was nothing that Mr. Davison could do with respect to the alleged failure of Southport to forward papers to the Attorney General in connection with Claim No. 99509. *Id.* at ¶ 8. Mr. Davison advised plaintiff that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion under CPLR 5520. *Id.*

Also included in the documents supplied by plaintiff was a Notice dated June 18, 2001 to plaintiff from the Southport mailroom. *Id.* at ¶ 9. In that Notice, plaintiff was advised that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program and that plaintiff should see the item checked on the Notice and where applicable, correct and resubmit the item for processing. *Id.* at ¶ 10. In the box designated "other," plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the guidelines for special handling as outlined in DOCS Directive No. 4421. *Id.* at ¶ 11. DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence. *Id.* at ¶ 12. DOCS Directive No. 4421 provides that advances for "special handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order. *Id.* at ¶ 13. Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling "may not be used to pay for any special handling charges such as for certified, return-receipt, express mail, etc., unless such mail services are required by statute or court order. Advances for special handling for filing a Claim or Notice of Intention on the Attorney General [sic] Office must be specified on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

the approved Advance Request form for postage. You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421)." *Id.* at ¶ 14.

**\*41** According to defendant Weingartner, because plaintiff's request for special handling did not meet the guidelines for special handling, his request was denied. *Id.* at ¶ 15. Indeed, defendant Weingartner further stated that plaintiff's request for special handling for mailing a notice of appeal to the Attorney General did not meet the guidelines for special handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office. *Id.* There is nothing in the record to suggest that after plaintiff received the June 18, 2001 Notice, he submitted to the mailroom staff any court order or statute showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested. *Id.* at ¶ 16. Lastly, in further support of his motion for summary judgment, defendant Weingartner states that to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by Mr. Davison that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely notice pursuant to CPLR 5520. *Id.* at ¶ 17. There is nothing in the record to suggest that plaintiff submitted any such motion pursuant to CPLR 5520. *Id.* at ¶ 18.

### DISCUSSION AND ANALYSIS

Defendants argue that they are entitled to summary judgment because plaintiff has failed to establish violations of the First, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, with respect to his deliberate indifference claim, plaintiff failed to establish that he suffered from a sufficiently serious medical condition and that defendants Brandt and vonHagn were deliberately indifferent to his medical needs. With respect to plaintiff's retaliation claim against defendants Brandt and vonHagn, plaintiff is unable to establish retaliatory

motive. Even if plaintiff could establish such retaliatory motive, the record before the Court clearly establishes that there were proper, non-retaliatory reasons for the punishment imposed on plaintiff.

Plaintiff's claims of deprivation of due process against defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky fail as a matter of law because plaintiff received all the process he was due during the course of each disciplinary hearing and appeal. With respect to plaintiff's denial of right to take a religious correspondence course claim against defendant Gardner, that claim must fail because contrary to plaintiff's assertions, defendant Gardner was not personally involved in the decision. Plaintiff's second claim against defendant Gardner, interference with legal mail, also fails as a matter of law because plaintiff cannot under any circumstances demonstrate that he suffered actual injury. Finally, plaintiff's claims of interference with access to the Courts claims against defendants Corcoran and Weingartner fail as a matter of law because with respect to defendant Corcoran, plaintiff cannot demonstrate that he suffered any injury and with respect to defendant Weingartner, plaintiff cannot establish that any conduct on the part of defendant Weingartner caused the dismissal of Claim No. 99509 pending before the Court of Claims. Because, for the reasons set forth below, the Court agrees that defendants are entitled to judgment as a matter of law, the Court need not reach the issue of whether defendants are entitled to qualified immunity.

### Summary Judgment

**\*42** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable infer-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

ences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

### Deliberate Indifference to Serious Medical Needs Claims Against Defendants vonHagn and Brandt

In *Estelle v. Gamble,* the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by

the Eighth Amendment" to the United States Constitution. 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish an unconstitutional denial of medical care that rises to the level of an Eighth Amendment violation, a plaintiff (prisoner) must prove, beyond mere conclusory allegations, that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle,* 429 U.S. at 104. More specifically, the prisoner must demonstrate both that the alleged deprivation is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Both the objective and subjective components must be satisfied in order for a plaintiff to prevail on his claim. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### Objective Component

**\*43** Under the objective component, in assessing whether a medical condition is "sufficiently serious," the Court considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and, the severity and persistence of pain. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id.* Indeed, the Second Circuit has held that the alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

The types of conditions which have been held to meet the constitutional standard of serious medical need include: the failure to treat a painful and disfiguring facial keloid, *Brock v. Wright,* 315 F.3d 158, 160 (2d Cir.2003); refusal to treat a cavity at risk of "acute infection [ ], debilitating pain and tooth loss" unless prisoner consented to extraction of another diseased tooth, *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000); untreated dental problems that resulted in chronic pain for a period of six months resulting in tooth degeneration, *Chance,* 143 F.3d. at 702; failure to treat a ruptured Achilles tendon which resulted in swelling and pain, *Hemmings,* 134 F.3d at 106–07; confiscation of prescription eyeglasses necessary to correct serious vision problem and subsequent denial of medical treatment resulting in loss of vision in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87–88 (2d Cir.1996); failure to remove broken hip pins from prisoner's hip for over three years despite prisoner's complaint of persistent pain, *Hathaway,* 37 F.3d at 64–65; and, loss of an ear where doctor threw away prisoner's ear and stitched up the stump, *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir.1974).

Here, plaintiff's chief complaint, that he suffered from an "extremely painful ear infection resulting in my total loss of hearing ability in my ear for a time period of two weeks" is far from resembling the foregoing serious medical problems. Dkt. # 9, p. 5. In opposition to defendants' motion for summary judgment on his deliberate indifference claim, plaintiff offers nothing more than bald, conclusory allegations that he suffered from an extremely painful ear infection and further, that the ear infection resulted in a temporary (two week) loss of hearing. Dkt. # 96. Plaintiff's claims are belied by the medical records which unmistakably demonstrate that plaintiff was repeatedly seen by defendants Brandt and vonHagn, as well as others on the medical staff and further, that plaintiff received proper and adequate medical treatment. Moreover, there is nothing whatsoever in plaintiff's medical records that supports plaintiff's claim of hearing loss.

**\*44** Beginning on December 16 and continuing through December 31, 1999, plaintiff was seen by the medical staff at Southport nine times. Plaintiff was seen by defendant Brandt on December 16, 17, 23, 27 and 29, 1999. Plaintiff was seen by defendant vonHagn on December 18, 19, 20 and 31, 1999. On December 16, 1999, defendant Brandt noted some wax in ear and some mild irritation of the canal due to plaintiff inserting foreign objects into his ear. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. Plaintiff was also seen by defendant Brandt on December 17, 1999, wherein plaintiff again demanded ear drops and defendant Brandt again advised plaintiff against cleaning his ears with foreign objects. Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. Plaintiff was seen by defendant vonHagn on December 18, 1999 during morning sick call and plaintiff demanded a second ear check and claimed he could not hear out of both ears. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. At that time, defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves. *Id.* Although plaintiff was seen by defendant vonHagn on December 19, 1999, he did not complain of ear pain at that time. *Id.*

On December 20, 1999, defendant vonHagn examined plaintiff's left ear and noted "left ear cereum impaction seen, right ear some impaction seen, no visualization of tampanic [sic] membrane seen in either ear." Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12 Thus, defendant vonHagn saw no signs of infection and provided plaintiff with debrox (ear drops) and ear wash to be used for seven days. *Id.* Plaintiff's next complaint concerning his ears was not until December 27, 1999, when he requested sick call and he was to be seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 17; Dkt. # 82, ¶ 12. When defendant Brandt went to see plaintiff, plaintiff refused and was extremely verbal, nasty and confrontational. *Id.* As a result, defendant Brandt terminated the sick call. *Id.* Plaintiff again complained of his ears on December 29, 1999 and plaintiff was to be seen by de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

fendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 18; Dkt. # 82, ¶ 13. Plaintiff refused to have defendant Brandt check his ears, stating, "fuck you white homoboy." *Id.* Thereafter, despite his complaints, plaintiff repeatedly refused to allow anyone, including Dr. Alves, to check his ears. After January 4, 2000 (when plaintiff refused to see Dr. Alves on an MD callout) and continuing until his transfer to Coxsackie in May 2000, plaintiff made no complaints whatsoever about his ears. Dkt. # 81, ¶¶ 21–26.

At most, plaintiff asserts that he suffered from "extreme pain." However, plaintiff's amended complaint and opposition to defendants' motion for summary judgment fail to offer any specificity with respect to the "extreme pain" that he claims he suffered. Moreover, the record before the Court is utterly devoid of any mention by plaintiff of any impact on his daily activities, or the severity or persistence of pain. Indeed, neither plaintiff nor defendants make any mention that plaintiff's alleged hearing loss affected his ability to communicate with the medical staff. Conversely, defendant vonHagn noted on December 18, 1999 that plaintiff heard her statements. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. Upon his review of plaintiff's medical records, Dr. Alves concluded that there was nothing to support plaintiff's assertion that he suffered hearing loss. Dkt. # 81, ¶ 79. Absent any evidence to support a conclusion that plaintiff suffered a serious medical condition as a result of defendant Brandt's and defendant vonHagn's alleged failure to provide medical care and treatment in December 1999, other than plaintiff's allegations that he suffered from extreme pain, plaintiff fails to satisfy the objective element of his deliberate indifference claim.

### Subjective Component

**\*45** The subjective component for the establishment of a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the defendant acted with a "sufficiently culpable state of mind" so as to violate the Eighth Amendment's cruel and unusual punishment clause. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Hathaway,* 37 F.3d at 66, *quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In *Estelle,* the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment. *Estelle,* 429 U.S. at 104–05.

"The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553, *citing Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005). The Supreme Court further stated in *Estelle* that, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind .' " *Estelle,* 429 U.S. at 105–06. Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

*Id.* at 106; *see also Chance,* 143 F.3d at 703 (stating "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").

Where, as here, the prisoner has received some (extensive) medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment. Rather, "[p]rison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates [and] courts have repeatedly held that a prisoner does not have the right to the treatment of his choice." *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (internal citations omitted).

**\*46** In their motion for summary judgment, defendants Brandt and vonHagn assert that, "[p]laintiff's allegations ... is [sic] at most negligence or malpractice and does [sic] not rise to the level of a constitutional violation." Dkt. # 92, p. 15. Nevertheless, defendants Brandt and vonHagn maintain that the record establishes that they were neither negligent nor that their conduct could be characterized as medical malpractice. *Id.* Accordingly, they ask this Court to find, as a matter of law, that plaintiff is unable to establish that, (1) he suffered from a serious medical condition and (2) that defendants Brandt and vonHagn were deliberately indifferent to plaintiff's medical needs. The Court agrees with the defendants that the record is devoid of any evidence to support a finding that plaintiff suffered from a serious medical condition as a result of the care and treatment he received in or about December 1999. Moreover, the Court agrees with the defendants that plaintiff also fails to satisfy the subjective component of the deliberate indifference standard.

Plaintiff claims that defendant vonHagn "know-

ingly, intentionally, and wilfully denied [plaintiff] 'emergency' medical care ..." and that defendant Brandt "knowingly, wilfully and intentionally 'aided' in the denial of [plaintiff's] 'emergency' medical care...." Dkt. # 9. However, there is nothing in the record to establish any intent on the part of either defendant vonHagn or defendant Brandt. To the contrary, the undisputed record unequivocally establishes that defendant vonHagn and Brandt made every effort to comply with plaintiff's requests and to provide plaintiff with appropriate treatment, medications and examinations. Moreover, Dr. Alves, the Facility Health Services Director of the Medical Services Unit at Southport, concluded that defendants properly treated plaintiff's complaints with the appropriate medication and referred plaintiff to Dr. Alves for examination and further, that defendant vonHagn appropriately scheduled and performed ear examinations on plaintiff. In addition, Dr. Alves' review of plaintiff's medical records indicates that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to the treatment of his complaints of ear pain during December 1999. Finally, Dr. Alves calculates that during the period, December 1999 through January 2001, plaintiff had approximately 92 encounters with medical staff concerning a multitude of complaints, including, ear pain. Notably, however, plaintiff made no complaints of ear pain after January 2000.

The record clearly establishes that defendants vonHagn and Brandt made every effort to treat plaintiff's complaints of ear pain with an appropriate course of treatment and medication, and that despite their efforts, plaintiff refused several of their attempts to examine his ears and refused to be seen by Dr. Alves. Additionally, there is nothing in the record to support plaintiff's claim that he suffered from a total loss of hearing for a period of two weeks or that the care and treatment provided to plaintiff by defendants was in any way related to plaintiff's claim of hearing loss. Finally, the Court agrees with the defendants that plaintiff's allegations are, at most, claims of negli-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

gence or medical malpractice and thus, do not create a cause of action that rises to the level of a constitutional violation. Therefore, the Court finds that plaintiff's claim of deliberate indifference by the defendants is without merit.

### Retaliation Claims Against Defendants vonHagn and Brandt

**\*47** In support of their motion for judgment as a matter of law on plaintiff's retaliation claim, defendants vonHagn and Brandt argue that plaintiff cannot satisfy his burden and establish that the actions of defendants vonHagn and Brandt were the result of a retaliatory motive. Dkt. # 92, p. 18. In response to defendants' motion, plaintiff summarily states, without elaboration, that "defense counsel continually makes claims of *un* disputed facts pge # 6, no. # 22, however, plaintiff notes that *no* undisputed facts, can be evident by counsel when what [sic] no truth is in them such as the case here in 90 to 95% of counsels [sic] compilation." Dkt. # 96, p. 75 (emphasis in original). Moreover, plaintiff asserts in conclusory fashion that defendants vonHagn and Brandt retaliated against him by issuing Misbehavior Reports following the filing of plaintiff's grievances against them. Plaintiff's conclusory allegations, without more, are insufficient to create a material issue of fact.

An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (internal quotations and citations omitted). For the reasons set forth below, plaintiff cannot meet his heavy burden of establishing retaliatory motive on the part of defendants vonHagn and Brandt. However, even assuming retaliatory motive, defendants vonHagn and Brandt are entitled to summary judgment because there are "proper, non-retaliatory reasons for his punishment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

Here, plaintiff alleges that defendants vonHagn and Brandt wrote Misbehavior Reports against him in retaliation for his complaints (grievances) about them.

### January 23, 2001 Misbehavior Report

Plaintiff alleges that defendant Brandt, in retaliation for plaintiff's filing of grievances, issued a retaliatory Misbehavior Report on January 23, 2001. Dkt. # 9, p. 5–A. As the undisputed record before the Court demonstrates, defendant Brandt saw plaintiff at sick call on January 23, 2001, at which time plaintiff refused hydrocortisone cream and told defendant Brandt, "next time I'll spit + shit on you." Thereafter, defendant Brandt issued a Misbehavior Report. Dkt. # 82, ¶¶ 23–25. A Tier 2 disciplinary hearing was conducted by Lt. Donahue on January 29, 2001. *See generally,* Dkt. # 44, pp. 0112–0128. During the January 29, 2001 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the Misbehavior Report was written by defendant Brandt in retaliation for complaints plaintiff filed and defendant Brandt and/or the medical staff at Southport. *Id.* Notwithstanding plaintiff's claims of retaliation, Lt. Donahue found plaintiff guilty of making threatening statements directed to defendant Brandt. *Id.*

**\*48** During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, Grievance No.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

SPT–17707–99 (December 30, 1999), Grievance No. SPT–18746–00 (May 24, 2000) and Grievance No. SPT–20137–00 (December 11, 2000). Thus, the first grievance filed by plaintiff against defendant Brandt was filed over thirteen months *before* the alleged retaliatory Misbehavior Report was issued on January 23, 2001. Although, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation," the significant passage of time between the last grievance filed by plaintiff against Brandt and the allegedly retaliatory Misbehavior Report stretches even the most liberal construction of the applicable case law beyond its limits. *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002), *citing Colon,* 58 F.3d at 872.

In Grievance No. SPT–17707–99, filed on or about December 30, 1999, plaintiff asserted that, (1) on or about December 26, 1999, defendant Brandt denied his request for outside medical treatment for his complaints of ear pain, (2) defendant Brandt indicated that plaintiff refused treatment, (3) on December 14, 1999, defendant Brandt denied him an emergency ear examination and ear drops and (4) from December 14–21, 1999, defendants Brandt and vonHagn denied him medical treatment for an ear infection. Dkt. # 65, p. 438; Dkt. # 82, ¶ 30; Dkt. # 83, ¶ 37. The Superintendent dismissed plaintiff's grievance finding that medication was delivered to plaintiff for ear pain, but plaintiff began to verbally harass the nurse and thereafter, refused the medication. Dkt. # 65, p. 0434; Dkt. # 82, ¶ 32; Dkt. # 83, ¶ 39. CORC upheld the Superintendent's determination on or about March 8, 2000 and advised plaintiff to follow the treatment plan outlined by health services staff and noted there was no medical need for an outside consultant at that time. Dkt. # 65, p. 0433; Dkt. # 82, ¶ 32; Dkt. # 83, ¶ 39.

In Grievance No. SPT–18746–00, filed on or about May 24, 2000, plaintiff asserted that, (1) on or about May 21, 2000, defendant Brandt refused to provide him with medical care, (2) defendants Brandt and vonHagn were racist, (3) defendant Brandt told other nursing staff not to treat plaintiff, (4) plaintiff had previously grieved defendant Brandt's and vonHagn's alleged failure to treat his ear infection in December 1999 and (5) defendant Brandt refused to provide plaintiff with skin cream. Dkt. # 65, p. 0415; Dkt. # 82, ¶ 36; Dkt. # 83, ¶ 46. The IGRC recommended dismissal of plaintiff's grievance and the Superintendent concurred. Dkt. # 65, pp. 0416–0417; Dkt. # 82, ¶ 38; Dkt. # 83, ¶ 48. On or about August 2, 2000, based upon the recommendation of Division of Health Services, the Superintendent's determination was upheld by CORC. Dkt. # 65, p. 0409; Dkt. # 82, ¶ 38; Dkt. # 83, ¶ 48. Indeed, CORC noted that plaintiff was issued skin cream on June 5, 2000 and that his allegations against staff had not been substantiated. *Id.*

**\*49** Finally, in Grievance No. SPT–20137–00 filed on or about December 11, 2000, plaintiff asserted that defendants vonHagn and Brandt failed to provide him with a refill of skin cream and were racist and biased towards him. Dkt. # 44, p. 0225, Dkt. # 82, ¶ 41; Dkt. # 83, ¶ 51. The Superintendent denied plaintiff's grievance and CORC upheld the Superintendent's determination on or about February 14, 2001, finding that the Nurse Administrator indicated that plaintiff had received medication refills on the appropriate dates and had received proper medical care. Dkt. # 44, p. 0228–0229; Dkt. # 82, ¶ 43; Dkt. # 83, ¶ 53.

**"January 25, 2000" Misbehavior Report and December 13, 2000 Misbehavior Report**

Specifically, plaintiff alleges that defendant vonHagn issued a retaliatory Misbehavior Report on January 25, 2000 because of the grievances plaintiff had filed against her. Defendant vonHagn did not issue a Misbehavior Report on January 25, 2000, rather, she issued one on January 14, 2000. Defendant vonHagn maintains, however, that the January 14, 2000 Misbehavior Report was issued as a result of plaintiff's threatening and harassing language. The

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

Misbehavior Report states in pertinent part, "[p]atient asked if he wished a copy [receipt for glasses] he could write the Nurse Adm. Inmate Chavis 91A3261 B–10–20 then said 'you are a stupid asshole.' 'You want 25¢ to give me a fucking copy of my glasses receipt.' 'I'll take your fucking money in court. I'll tear you apart in Court.' 'I'm not as fucking stupid as you are.' "You stupid fucking asshole.' 'Get the fuck away from my cell you asshole.' " Dkt. # 44, p. 0029.

A Tier 2 disciplinary hearing was conducted by Lt. Ryan on January 25, 2000. Dkt. # 44, pp. 0024–0038; Dkt. # 83, ¶ 22. Plaintiff advised Lt. Ryan during the hearing that he believed the January 14, 2000 Misbehavior Report was written by defendant vonHagn in retaliation for complaints filed by plaintiff. Dkt. # 44, pp. 0032–0038; Dkt. # 83, ¶ 23. Following the hearing, Lt. Ryan found plaintiff guilty of using harassing language against defendant vonHagn. Dkt. # 44, pp. 0024–0038; Dkt. # 83, ¶ 24. On January 28, 2000, the guilty determination was affirmed by Captain Wilcox. Dkt. # 44, p. 0024.

On December 13, 2000, defendant vonHagn issued a Misbehavior Report stating,

While making rounds on B Block Gallery this nurse [defendant vonHagn] stopped to see Inmate Chavis, G. 91A3261 B–3–19 for sick call. He requested refills. He was asked about old containers. He immediately got an attitude and said, 'He wasn't every other inmate and just get him what he wanted.' As this nurse walked away from his cell, inmate Chavis, G. says 'I'm going to hit that white bitch in her head with a baseball bat.' C.O. Stamp told inmate Chavis, G 91A3261 that statement was not necessary. Inmate Chavis, G. Then said, Shut up you fuck ass white mother fucker, I'll kill you too after I kill her. Inmate Chavis, G. continued to threaten this nurse and correctional officer until we left gallery area.

**\*50** Dkt. # 44, p. 0104; Dkt. # 83, ¶ 31. A Tier 3 disciplinary hearing was conducted on December 26, 2000 by Lt. Sheahan. During the hearing, plaintiff advised Lt. Sheahan that defendant vonHagn had written the December 13, 2000 Misbehavior Report in retaliation for complaints filed by plaintiff against defendant vonHagn. Dkt. # 83, ¶ 32. Thereafter, Lt. Sheahan found plaintiff guilty of using threatening and harassing language towards defendant vonHagn and Lt. Sheahan's determination was affirmed by defendant Donald Selsky, Director, Special Housing/Inmate Disciplinary Program. Dkt. # 44, pp. 0100–0111 and 0160–0199. Indeed, Lt. Sheahan found that the evidence submitted by plaintiff of past grievances against defendant vonHagn and other medical staff did not establish that the December 13, 2000 Misbehavior Report was retaliatory. Moreover, Lt. Sheahan indicated that the disposition was given to plaintiff to impress upon him that threats will not be tolerated. Dkt. # 44, p. 0102.

With respect to the "January 25" (January 14), 2000 and December 13, 2000 Misbehavior Reports, during the time period relevant to the allegations in the amended complaint (December 1999 through January 2001), plaintiff filed three grievances against defendant vonHagn, Grievance No. SPT–17707–99 (filed December 30, 1999), Grievance No. SPT–18746–00 (filed May 24, 2000) and Grievance No. SPT–20137–00 (filed December 11, 2000). Each of the aforementioned grievances were filed against defendants Brandt and vonHagn and have been discussed above in connection with the January 23, 2001 Misbehavior Report. See pp. 21–29 supra.

The January 23, 2001 Misbehavior Report issued by defendant Brandt allegedly in retaliation for the grievances (Grievance Nos. SPT–17707–99, SPT–18746–00 and SPT–20137–00) filed by plaintiff was issued as a result of plaintiff's threatening language, "next time I'll spit + shit on you," and not in retaliation for any grievance filed by plaintiff. Significantly, plaintiff was found guilty of the violation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

charged in the Misbehavior Report. Moreover, plaintiff's medical record unequivocally establishes that defendant Brandt properly treated all of plaintiff's medical complaints and provided plaintiff with the appropriate care.

The January 14, 2000 and December 13, 2000 Misbehavior Reports issued by defendant vonHagn were likewise issued as a result of plaintiff's harassing and threatening language and not in retaliation for any grievance submitted by plaintiff. As with the January 23, 2001 Misbehavior Report, plaintiff was found guilty of the violations enumerated in the January 14, 2000 and December 13, 2000 Misbehavior Reports. Moreover, plaintiff's medical records establish that at no time did defendant vonHagn refuse to treat plaintiff, in fact, the records reveal that defendant vonHagn treated plaintiff's medical complaints and provided him with proper care and treatment.

Thus, the Court agrees with defendants Brandt and vonHagn that plaintiff cannot meet his heavy burden of establishing retaliatory motive on the part of defendants vonHagn and Brandt. Additionally, even if plaintiff could establish a retaliatory motive, there is nothing in the record before this Court to suggest that there was anything improper about the Misbehavior Reports generated by defendants Brandt and vonHagn. With respect to each of the Misbehavior Reports, the hearing officer found that plaintiff engaged in harassing and threatening behavior and each such determination was later upheld. Accordingly, there were "proper, non-retaliatory reasons for his punishment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

### Deprivation of Due Process Claims Against Defendants Donahue, Gilmore, Trizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky

**\*51** To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya*

*v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996). Each of the defendants assert that plaintiff received all the process he was due during the course of each of the ten disciplinary hearings addressed in the amended complaint. Dkt. # 92, pp. 25–48.

### Liberty Interest

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004), *quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id., quoting Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.* at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 WL 22327110, at \* 6 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer v. Richards,* 364 F.3d 60 (2d Cir.2004); *Smith v. Taylor,* No. 03–0202, 2005 WL 2019547 (2d Cir. Aug.23, 2005) (determining that 45 days disciplinary

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

confinement in SHU, absent evidence of conditions more onerous than those generally present in the SHU, was insufficient to establish a protected property interest); *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4 1/2 month period, Sims was sentenced to SHU for a total of nearly 3 1/2 years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003), *quoting, Tookes v. Artuz,* No. 00CIV4969, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"); *cf. Prince v. Edwards,* No. 99CIV8650, 2000 WL 633382 (S.D.N.Y. May 17, 2000) (suggesting that any period of segregation of one year or less affords no protected liberty interest).

***Procedural Safeguards***

**\*52** In *Wolff v. McDonnell,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety. *Id.* at 563–66. Moreover, although not specifically required by *Wolff,* plaintiff was provided with an opportunity to appeal each determination and he did in fact exercise that right to appeal on several occasions and with respect to each appeal taken,

enumerated specific grounds for his appeal.

Plaintiff claims that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan violated his Fourteenth Amendment right to due process during the disciplinary hearings each conducted with respect to Misbehavior Reports issued against plaintiff. For each defendant, plaintiff alleges a multitude of reasons why the defendants violated his due process rights. Plaintiff claims that in connection with the five Tier 2 disciplinary hearings conducted by defendant Donahue, he was: denied assistance to prepare for the hearings; denied production of certain witnesses to testify at those hearings; erroneously found guilty of the charges; improperly subject to a sentence of 30 days cell confinement at the conclusion of those hearings; and was prejudiced by defendant's bias and issuance of a retaliatory Misbehavior Report following one of the disciplinary hearings. Dkt. # 9, pp. 6–D to 6–F.

As against defendant Gilmore, plaintiff claims that at his July 18, 2000 Tier 2 disciplinary hearing, defendant Gilmore improperly found him guilty of a violation for which he had not been charged, the Misbehavior Report was not endorsed by a witness; there was no testimony against plaintiff during the hearing and plaintiff's witnesses confirmed plaintiff's defense. Dkt. # 9, pp. 6–F to 6–G. Plaintiff claims that at his Tier 3 disciplinary hearing conducted on January 4, 2001 by defendant Irizarry, defendant Irizarry denied him assistance to prepare for the hearing, denied his request to have certain witnesses testify at the hearing, and improperly found him guilty of the charges since defendant Selsky later modified the hearing determination. Dkt. # 9, pp. 6–B to 6–C. Plaintiff alleges that defendant Quinn denied him due process at his Tier 3 disciplinary hearing conducted on February 5, 2001 by denying: his request for assistance to prepare for the hearing; his request to have Deputy Commissioner Annucci testify at the hearing; his right to attend the hearing; and by failing to provide plaintiff with a copy of the hearing disposition,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

and improperly finding him guilty of the charges following the hearing. Dkt. # 9, pp. 6 to 6–A.

**\*53** Plaintiff claims that defendant Ryan denied him due process at his January 25, 2000 Tier 2 disciplinary hearing because he improperly endorsed the Misbehavior Report; denied plaintiff an assistant to prepare for the hearing; allowed a witness to testify telephonically; and forced plaintiff to leave the hearing. Dkt. # 9, pp. 6–G to 6–H. Finally, plaintiff claims that defendant Sheahan denied him due process at his December 26, 2000 (December 29, 2000) Tier 3 disciplinary hearing because he denied plaintiff his right to witnesses; incorrectly found him guilty at the conclusion of the hearing; and was biased against plaintiff. Dkt. # 9, pp. 6–A to 6–B.

**Employee Assistance—The Tier 2 and 3 Disciplinary Hearings**

As discussed above, *Wolff* requires that an inmate be provided with at least 24 hours advance written notice before the hearing "to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Wolff,* 418 U.S. at 563–64. Institutional concerns have generally operated as a bar to inmates obtaining retained or appointed counsel. *Wolff,* 418 U.S. at 570; *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1999). Inmates do, however, have a "limited" right to assistance. *Silva,* 992 F.2d at 22. Indeed, the Second Circuit has held that "in certain circumstances an inmate will be unable to 'marshal evidence and present a defense' without some assistance." *Id.* (internal citations omitted). "[A] prison inmate facing a disciplinary hearing is only entitled to assistance from a fellow inmate or a prison employee under certain circumstances. For example, when the inmate is illiterate or the issues extremely complex." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988).

7 N.Y.C.R.R. § 251–4.1 provides that an inmate shall be entitled to employee assistance for purposes of a disciplinary hearing if: "(1) the inmate is either illiterate or non-English speaking; (2) the inmate is

sensorially disabled ...; (3) the inmate is charged with drug use as a result of a urinalysis test; or (4) the inmate is confined pending a disciplinary hearing to be conducted pursuant to Part 254 of this Title." Thus, according to DOCS' disciplinary procedure, an inmate charged with a violation for which a Tier 2 disciplinary hearing is warranted is not entitled to an employee assistant. 7 N.Y.C.R.R. § 251–4.1. In addition, DOCS' regulations provide that a hearing officer may, in his or her "absolute discretion," offer an inmate the opportunity to select an assistant where the assistance would enable the inmate to adequately comprehend the case in order to respond to the charges. 7 N.Y.C.R.R. § 251–4.1(b).

As a threshold matter, there is no dispute that plaintiff is neither illiterate nor sensorially disabled. Moreover, none of the disciplinary hearings that are the subject of plaintiff's claims charged plaintiff with drug use as a result of a urinalysis test. Similarly, none of the issues considered at the Tier 2 disciplinary hearings discussed in plaintiff's amended complaint were so complex that plaintiff was unable to "marshal evidence and prepare a defense." To the contrary, the record before the Court establishes that in each of the Tier 2 disciplinary hearings discussed above, plaintiff was indeed able to present evidence (and often did), both oral and documentary, in his own defense. Accordingly, plaintiff's claims that he was denied an employee assistant to prepare for any of the aforementioned Tier 2 disciplinary hearings must fail because such assistance was neither required nor necessary. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**\*54** Both the Second Circuit case law and DOCS' regulations provide for an inmate to receive employee assistance when that inmate is charged with an offense warranting SHU confinement. *Silva,* 992 F.2d at 22; *Eng,* 858 F.2d at 898; 7 N.Y.C.R.R. § 251–4.1(b). In the amended complaint, plaintiff complains that with respect to three Tier 3 disciplinary hearings conducted by defendants Sheahan (December 26 and 29, 2000),

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

Irizarry (January 4, 2001), and Quinn (February 5, 2001) each defendant denied him his right to assistance. For the following reasons, plaintiff's claims that he was denied assistance in connection with the December 26 and 29, 2000, January 4, 2001 and February 5, 2001 Tier 3 disciplinary hearings must fail as a matter of law.

### Defendant Sheahan—December 26, 2000 Tier 3 Hearing

Plaintiff alleges that defendant Sheahan denied him due process at his December 26, 2000 Tier 3 disciplinary hearing because defendant Sheahan, *inter alia,* denied him an employee assistant and because he did not receive copies of the grievances he had requested. Dkt. # 9, pp. 6–A to 6–B. Plaintiff's claims are wholly unsupported by the record before this Court. After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the December 26, 2000 hearing to further investigate plaintiff's assertions of denial of an assistant, and the Tier 3 disciplinary hearing reconvened on December 29, 2000. *Id.* at ¶ 9. During the continuation of the hearing, plaintiff agreed that he had been provided with an assistant, Officer Carpenter; that Officer Carpenter had met with plaintiff on December 26, 2000; and further that the assistance he had received was acceptable. *Id.* Although plaintiff testified that he had not received all of the grievances that he had requested, he stated that the data he had received was satisfactory for the hearing. *Id.* at ¶ 10. Based on plaintiff's statements, defendant Sheahan proceeded with the disciplinary hearing. Thus, the undisputed record before this Court reveals that plaintiff did receive assistance prior to the December 29, 2000 continuation of the Tier 3 disciplinary hearing commenced on December 26, 2000. Moreover, with respect to plaintiff's claim that he did not receive copies of the grievances he requested for the hearing, the record before the Court is clear. Although plaintiff did not receive all of the requested grievances, he unequivocally stated during the hearing that the data he did receive was satisfactory.

### Defendant Irizarry—January 4, 2001 Tier 3 Hearing

As part of his claim against defendant Irizarry, plaintiff alleges that defendant Irizarry denied his request for a staff assistant to help him prepare for the January 4, 2001 Tier 3 disciplinary hearing. Dkt. # 9, pp. 6–B to 6–D. The record before the Court establishes that on December 23, 2000, plaintiff was served with a copy of the Misbehavior Report wherein it was indicated that he waived his right to an assistant and refused to sign the Tier Assistance Selection Form. Dkt. # 65, p. 0667. However, the Superintendent's & Disciplinary Hearings—Witness Interview Sheet dated January 4, 2000 indicates that plaintiff claimed during the hearing that he did not refuse an assistant. Dkt. # 65, p. 0665. Moreover, the hearing transcript reveals that plaintiff claimed that he was sleeping when the Misbehavior Report was served on him and further, that he did not refuse an assistant. Dkt. # 98, pp. 5–18. Defendant Irizarry, found, however, that plaintiff's claims that he was sleeping and that he did not refuse an assistant were not true because the officer who served plaintiff with a copy of the Misbehavior Report (Officer McIntosh) testified during the disciplinary hearing that plaintiff was awake when he was served and simply refused to sign the form or select an assistant. *Id.;* Dkt. # 86, ¶ 12.

### Defendant Quinn—January 31, 2001 Tier 3 Hearing

**\*55** Plaintiff also claims in his amended complaint that defendant Quinn denied him his right to a staff assistant during his Tier 3 disciplinary hearing that began on January 31, 2001 and continued on February 5, 2001. Dkt. # 9, pp. 6 to 6–A. According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on January 27, 2001 and indicated on the form that he requested an employee assistant for the Tier 3 disciplinary hearing. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 7. The form reveals that plaintiff identified G. Powers as his first choice for an assistant and J. Morton and P. Nardi

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

as his second and third choices respectively. Dkt. # 68, p. 0712. It appears, however, that plaintiff refused to sign the form. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 8. Notwithstanding the foregoing, in support of his motion for summary judgment, defendant Quinn maintains that the Tier Assistance Selection Form indicates that plaintiff refused to have Sgt. Morton act as his employee assistant. Dkt. # 87, ¶ 8.

The disciplinary hearing began on January 31, 2001 at which time plaintiff objected to the hearing and plead not guilty to both charges. Dkt. # 87, ¶ 9; Dkt. # 98, pp. 20–33. Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci to be called as witnesses. *Id.* Thereafter, defendant Quinn adjourned the hearing so that the witnesses could be located. *Id.* The hearing was reconvened on February 5, 2001 and plaintiff refused to attend the hearing. Dkt. # 87, ¶ 10; Dkt. # 98, pp. 20–33. Plaintiff also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising plaintiff that a disposition of the charges would be made in his absence. Dkt. # 68, p. 0713; Dkt. # 87, ¶ 10. The hearing was conducted outside of plaintiff's presence and Sgt. Morton testified at the hearing. Dkt. # 87, ¶ 15; Dkt. # 98, pp. 20–33. Defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding that Deputy Commissioner Annucci's testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 11; Dkt. # 98, pp. 20–33. Moreover, because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner Annucci during the hearing and was able to make a determination as to the threatening, obscene and abusive language therein, defendant Quinn determined that Deputy Commissioner Annucci's testimony was not necessary. Dkt. # 87, ¶ 14. Accordingly, defendant Quinn maintains that it was in the exercise of his discretion that he denied plaintiff's request to have Deputy Commissioner testify at the hearing. *Id.* at ¶ 13.

In opposition to defendant Quinn's motion for summary judgment, plaintiff argues that because he was not provided with assistance prior to the Tier 3 disciplinary hearing, he was unable to obtain evidence from two witnesses prior to the hearing and therefore unable to prepare a defense to the charges. Dkt. # 96, p. 6. Plaintiff further insists that he had selected Mr. G. Powers to serve as his assistant, however, according to plaintiff defendant Quinn "repeatedly badger[ed]" him to select another member of the prison staff, for example, Sgt. Morton, to serve as his assistant for purposes of the hearing. *Id.* at p. 7. Plaintiff's arguments in opposition to defendant Quinn's motion for summary judgment are belied by the clear record before the Court. Specifically, plaintiff claims that because he was not provided with assistance, he was unable to obtain evidence from the two witnesses he requested at the outset of the hearing, Sgt. Morton, who he allegedly refused to have serve as his assistant, and Deputy Commissioner Annucci.[FN31] Despite this claim, defendant Quinn adjourned the hearing on January 31, 2001 in order to locate the witnesses. When the hearing reconvened on February 5, 2001, plaintiff refused to attend and as a result was not present when Sgt. Morton testified.

> FN31. As discussed above, defendant Quinn exercised his discretion and denied plaintiff's request to have Deputy Commissioner Annucci testify during the hearing.

***56** Thus, the record before the Court unmistakably establishes that with respect to the Tier 3 disciplinary hearings, plaintiff either received the required assistance, refused the assistance or refused to attend the hearing. With respect to the Tier 2 hearings, plaintiff was not entitled to assistance and the circumstances presented in the hearings were not so complex that plaintiff was not able to marshal evidence and prepare a defense. Accordingly, it was unnecessary for the hearing officers in the Tier 2 disciplinary hearings to exercise their discretion and offer plaintiff the opportunity to select an assistant. For the foregoing reasons, defendants' motion for summary

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

insofar as it relates to plaintiff's claims that he was denied employee assistance during his disciplinary hearings is granted.

**Impartiality of Hearing Officer**

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff v. McDonnell* 418 U.S. 539, 570–71, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is "some evidence in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

**Defendant Donahue**

As alleged in the amended complaint, defendant Donahue conducted disciplinary hearings in connection with Misbehavior Reports issued to plaintiff on the following dates: January 11, 2000; November 29, 2000; December 21, 2000; January 29, 2001 and

March 7, 2001. Dkt. # 9, pp. 6–D to 6–F. The Court's review of the transcripts of each disciplinary hearing conducted by defendant Donahue does not reveal any evidence of bias. Dkt. # 44, pp. 0001–0007 (January 11, 2000); Dkt. # 44, pp. 0064–0068 (November 29, 2000); Dkt. # 44, pp. 0081–0086 (December 21, 2000); Dkt. # 44, pp. 0124–0128 (January 29, 2001); Dkt. # 44, pp. 0129–0131 (March 7, 2001). Specifically, with respect to the disciplinary hearing commenced on January 11, 2000 and continued on January 21, 2000, defendant Donahue permitted plaintiff to voice his objections to the hearing, afforded plaintiff the opportunity to testify or to present evidence in his defense, and set forth sufficient evidence in his disposition to support his determination of guilt, including a copy of the letter to Deputy Superintendent Morse from plaintiff. Dkt. # 44, pp. 0001–0007. Defendant Donahue stated that he relied upon the report of Sgt. Kerbein which he found to be credible and on the threatening letter written by plaintiff. *Id.* Defendant Donahue further stated that his reasons for the disposition were that it was to serve as a deterrent of future misconduct by plaintiff and others and that the conduct exhibited by plaintiff would not be tolerated. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

**\*57** Similarly, during the disciplinary hearing conducted by defendant Donahue on November 29, 2000, defendant Donahue afforded plaintiff the same opportunity to present testimony or evidence and plaintiff repeatedly exercised his right to object to the hearing. Dkt. # 44, pp. 0064–0068. Plaintiff waived his right to testify or to present evidence and returned to his cell before defendant Donahue rendered his determination. *Id.* At the close of the hearing, defendant Donahue set forth the evidence on which he relied to support his determination of guilt. *Id.* Specifically, he relied upon the Misbehavior Report which he found to be credible, as well as the letter written by plaintiff to Deputy Commissioner LeClaire. *Id.* Similar to the January 11, 2000 (continued on January 21, 2000) disciplinary hearing presided over by him, de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

fendant Donahue stated that his reasons for his disposition were that it was to serve as a deterrent of future misconduct by plaintiff and others and to reiterate that threats towards employees would not be tolerated. *Id.*

Defendant Donahue conducted a third disciplinary hearing concerning plaintiff on December 21, 2000. The Misbehavior Report related to a December 11, 2000 grievance authored by plaintiff and received by the Inmate Grievance Office. As set forth in the Misbehavior Report, the grievance contained a number of threatening statements. As with the prior two disciplinary hearings conducted by defendant Donahue, plaintiff was given and did exercise his right to object to the hearing. Dkt. # 44, pp. 0081–0086. Moreover, defendant Donahue provided plaintiff with the opportunity to call witnesses to testify during the hearing, other than CORC Director Egan and DOCS Commissioner Goord. *Id.* Defendant Donahue found that neither Director Egan nor Commissioner Goord would have any information bearing on the allegations in the Misbehavior Report. *Id.* Notably, at no time during the hearing did plaintiff deny that he wrote the December 11, 2000 grievance. *Id.* In reaching his determination, defendant Donahue set forth sufficient evidence in his disposition to support his determination of guilt. *Id.* Specifically, he relied upon the Misbehavior Report by Officer Morse which he found to be credible and his examination of the grievance containing threats by plaintiff and submitted to the Inmate Grievance Office. *Id.* Again, defendant Donahue stated, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Threats towards staff will not be tolerated at this facility, including in the form of written grievances." *Id.*

Defendant Donahue next conducted a disciplinary hearing involving plaintiff on January 29, 2001. Dkt. # 44, pp. 0124–0128. During the hearing, he honored plaintiff's request to testify and accepted plaintiff's testimony that he had filed several complaints against Nurse Brandt. As in previous hearings, plaintiff chose

to return to his cell before defendant Donahue rendered his decision. *Id.* As set forth in the hearing transcript and on the Hearing Disposition Sheet, defendant Donahue relied on the written report of Nurse Brandt which he found to be credible. *Id.* In addition, he noted that during the hearing, plaintiff admitted that he got "active" because Nurse Brandt did not bring him the medication that he wanted. *Id.* Defendant Donahue again noted that "[t]he [d]isposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Inmate Chavis has been found guilty of threats many times previously." *Id.* Defendant Donahue's determination was affirmed by defendant Wilcox on February 5, 2001. Dkt. # 86, Exhibit A.

**\*58** Finally, on March 7, 2001, defendant Donahue conducted a hearing with respect to a Misbehavior Report issued to plaintiff on February 28, 2001. Plaintiff refused to attend the hearing. Thereafter, defendant Donahue noted that plaintiff waived his right to attend the hearing, entered a plea of not guilty on plaintiff's behalf and conducted the hearing in plaintiff's absence. Dkt. # 44, pp. 0129–0131. At the conclusion of the disciplinary hearing, defendant Donahue found plaintiff guilty of violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) and imposed the penalty of 30 days keeplock confinement. *Id.* In reaching his determination, he relied upon the Misbehavior Report of Officer Kamas which he found to be credible and noted that the disposition was given to serve as a deterrent of future misconduct by plaintiff and others. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

**Defendant Gilmore**
Defendant Gilmore conducted one Tier 2 disciplinary hearing involving plaintiff on July 18, 2000. Plaintiff testified at length during the hearing and defendant Gilmore honored plaintiff's request to call two inmate witnesses to testify during the hearing. Dkt. # 44, pp. 0045–0063. In addition, defendant

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

Gilmore honored plaintiff's request and read into the record a grievance filed by plaintiff against the Correction Officer involved in the incident that precipitated the Misbehavior Report. *Id.* At the conclusion of the hearing, defendant Gilmore found plaintiff not guilty of violating Rules 107.10 (interference) and Rule 106.10 (refusing a direct order) and guilty of violating Rule 107.11 (harassment). *Id.* Defendant Gilmore imposed a penalty of 10 days keeplock confinement. *Id.*

Defendant Gilmore noted both on the record and on the Hearing Disposition Sheet that in reaching his determination, he relied upon the written report of Officer Burgett as well as the testimony of plaintiff provided during the hearing. Dkt. # 44, p. 0040 and p. 0062. In addition, defendant Gilmore stated among his reasons for the disposition, that plaintiff deserved credit for "the cooperative spirit he displayed during [the] hearing." Dkt. # 44, pp. 45–63. Moreover, defendant Gilmore explained to plaintiff that he found plaintiff not guilty of the charge of disobeying a direct order because he did not believe that plaintiff disobeyed a direct order without just cause, since plaintiff felt threatened and chose not to come out of the shower. *Id.* Thereafter, defendant Gilmore noted that plaintiff requested a sergeant and once the sergeant was present, plaintiff obeyed the direct order and came out of the shower. *Id.* In addition, defendant Gilmore found plaintiff not guilty of the charge of interference because he felt that plaintiff did what he had to do to protect himself and that he did not interfere with an employee. *Id.* Defendant Gilmore did, however, find plaintiff guilty of harassment because plaintiff admitted during the hearing that he called Officer Burgett "a scum bag." *Id.* at p. 0051.

**\*59** In opposition to defendants' motion for summary judgment, plaintiff argues that defendant Gilmore prejudiced the evidence because he found plaintiff guilty of harassment based on a fact that was not alleged in the Misbehavior Report, rather, defendant Gilmore found plaintiff guilty based on an admission plaintiff made during the hearing. Dkt. # 96, p. 30. Specifically, plaintiff argues that the Misbehavior Report alleges that plaintiff called Officer Burgett "an asshole" whereas during the hearing plaintiff testified that he called Officer Burgett "a scum bag." Dkt. # 44, p. 0042 and p. 0051. Accordingly, plaintiff contends that he should not have been found guilty and that defendant Gilmore's finding of guilt must have been based on "predetermination, bias and undeniably [sic] favoritism for a coworker." Dkt. # 96, p. 30. As reflected in the disciplinary hearing transcript, defendant Gilmore explained at length the evidence he relied upon and the reasons for his disposition and this Court finds that the record is devoid of any evidence of bias or predetermination. Defendant Gilmore's determination was affirmed by defendant Wilcox on July 30, 2000. Dkt. # 86, Exhibit A.

**Defendant Irizarry**

Defendant Irizarry conducted a Tier 3 disciplinary hearing on January 4, 2001 concerning a Misbehavior Report issued to plaintiff following the December 21, 2000 disciplinary hearing conducted by defendant Donahue. Dkt. # 98, pp. 5–18. Defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU. Dkt. # 65, p. 0661; Dkt. # 98, pp. 5–18. In reaching this determination, defendant Irizarry relied on the Misbehavior Report of defendant Donahue and the testimony of Officer Bennett. Dkt. # 65, p. 0662. Defendant Irizarry stated that the reason for the disposition was, "[ ] after finding you guilty, I reviewed your Disciplinary Record and found that you have been charged with, and found guilty, of 16 charges of Threats and 12 charges of Harassment. None of these sanctions helped to modify your behavior. And [ ] feel this to be a just Disposition." Dkt. # 98, pp. 5–18. Thereafter, on or about February 21, 2001, defendant Selsky modified the penalty imposed to six months SHU confinement. Dkt. # 86, Exhibit A. In opposition to defendants' motion for summary judgment, plaintiff

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

states, without elaboration, that defendant Irizarry was not impartial. This Court finds that there is simply nothing in the record before it to support such a conclusion and without more, plaintiff's opposition does not create a material issue of fact for trial.

**Defendant Quinn**

Defendant Quinn commenced a Tier 3 disciplinary hearing on January 31, 2001 involving a Misbehavior Report issued to plaintiff by Officer Hodge. Dkt. # 68, p. 0710; Dkt. # 98, pp. 20–33. The hearing was adjourned and reconvened on February 5, 2001, but plaintiff refused to attend the hearing. Dkt. # 68, p. 0709; Dkt. # 98, pp. 20–33. Plaintiff also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising plaintiff that a disposition of the charges would be made in his absence. Dkt. # 68, p. 0713. Thereafter, the hearing was conducted in plaintiff's absence and as set forth on the Hearing Disposition Sheet, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of 12 months SHU confinement. Dkt. # 68, p. 0708; Dkt. # 98, pp. 20–33. In reaching his determination, defendant Quinn relied on the written report of Officer Hodge and the handwritten letter from plaintiff to Deputy Commissioner Annucci wherein defendant Quinn found that plaintiff made harassing statements. *Id.* As his reasons for the disposition, defendant Quinn stated, "[t]his Disposition is given to serve notice that threatening employees and harassing them will not be tolerated. This Disposition is given to punish this inmate for threatening employees and should also act as a deterrent to others." Dkt. # 98, pp. 20–33. Plaintiff's opposition to defendants' motion for summary judgment states, in conclusory fashion, that defendant Quinn's failure to interview witnesses with relevant information is illustrative of defendant Quinn's undeniable bias, racism and partiality. Dkt. # 96.

**\*60** During the disciplinary hearing, plaintiff requested to have inmate Smith and Deputy Commissioner Anthony J. Annucci testify on his behalf. Dkt. # 98, pp. 20–33. Plaintiff claimed that Inmate Smith would testify concerning his selection of an assistant and that plaintiff did not refuse an assistant, rather, he did not select J. Morton as his assistant. *Id.* Plaintiff also testified on January 31, 2001 that he requested to have Deputy Commissioner Anthony J. Annucci as a witness. Deputy Commissioner Annucci was the intended recipient of the January 8, 2001 letter authored by plaintiff that was the subject of the January 27, 2001 Misbehavior Report. As the hearing transcript reveals, because plaintiff was being uncooperative at the outset of the hearing and was insisting on an assistant despite the fact that he had purportedly refused the assistant prior to the hearing, the hearing was adjourned. Thereafter, plaintiff refused to attend the hearing which resumed on February 5, 2001. During the February 5, 2001 continuation of the hearing, Sgt. Morton testified that he had been assigned to assist plaintiff and plaintiff refused. Because plaintiff refused to attend the hearing, although he had previously indicated he had two witnesses to testify, there were no other witnesses to interview, thus, plaintiff's claim that defendant Quinn's failure to interview witnesses was illustrative of his bias, racism and partiality is wholly without merit.

**Defendant Ryan**

Defendant Ryan conducted a Tier 2 disciplinary hearing on January 25, 2000 in connection with a January 14, 2000 Misbehavior Report issued by defendant vonHagn. Dkt. # 44, p. 0026. At the conclusion of the hearing, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30 days keeplock confinement, 30 days loss of packages, commissary and phone privileges. *Id.* In reaching his determination, defendant Ryan relied on the Misbehavior Report and the testimony of Officer Martino who witnessed the January 14, 2000 incident. *Id.* at p. 0027. Defendant Ryan explained that he had imposed the penalty to serve as a reminder that the type of behavior plaintiff exhibited towards defendant vonHagn would not be tolerated. Dkt. # 44, pp.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

0153–0159. In support of his motion for summary judgment, defendant Ryan notes that plaintiff did not deny that he used abusive language toward defendant vonHagn or that he threatened defendant vonHagn. Dkt. # 44, pp. 0032–0038. Plaintiff argues in opposition to defendants' motion for summary judgment that defendant Ryan endorsed (forged) the name of the officer (Officer Martino) on the Misbehavior Report because, plaintiff alleges, Officer Martino refused to do so. Dkt. # 96, pp. 30–34. In stark contrast to plaintiff's allegation, Officer Martino testified via telephone at the disciplinary hearing that he had indeed witnessed the incident and at no time did Officer Martino state that he had refused to endorse the Misbehavior Report. Dkt. # 44, pp. 0153–0159. Defendant Captain Wilcox affirmed defendant Ryan's determination, finding that there was no evidence of retaliatory acts committed by defendant vonHagn; that defendant Ryan properly called Officer Martino to testify; that plaintiff was not confined pending the hearing; that a witness may testify by telephone; and most notably, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan. Dkt. # 44, p. 0024; Dkt. # 92, ¶ 31. Thus, plaintiff's assertions that defendant Ryan was biased or impartial because he had allowed Officer Martino to testify via telephone and that defendant Ryan endorsed the Misbehavior Report because Officer Martino had refused are unsupported by the record before this Court.

**Defendant Sheahan**

*61 The Tier 3 disciplinary hearing conducted by defendant Sheahan began on December 26, 2000 and continued on December 29, 2000. Dkt. # 44, pp. 0160–0199. At the outset of the hearing, plaintiff plead not guilty and objected to the Misbehavior Report on the ground that it was issued in retaliation for the 20 to 25 grievances he had filed against defendant vonHagn. Id. During the hearing, plaintiff submitted copies of the grievances he filed against defendant vonHagn, as well as copies of correspondence to Superintendent McGinnis, Deputy Commissioner An-

nucci and Commissioner Goord. Id. Defendant Sheahan accepted the grievances as evidence of plaintiff's allegations of retaliation and accordingly, found that the testimony of Director Egan, as requested by plaintiff, would have been redundant. Id. At the conclusion of the hearing, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (harassment) and Rule 102.10 (threats) and imposed a penalty of six months SHU confinement. Dkt. # 44, p. 0101. In reaching this determination, defendant Sheahan relied upon the December 13, 2000 Misbehavior Report and determined that the evidence submitted by plaintiff did not establish that the Misbehavior Report issued by defendant vonHagn was retaliatory. Dkt. # 44, pp. 0160–0199. Defendant Sheahan imposed a penalty of six months confinement in SHU and stated that the penalty was imposed to impress upon plaintiff that threats to staff would not be tolerated. Dkt. # 44, pp. 0160–0199. Thereafter, defendant Selsky affirmed defendant Sheahan's determination. Dkt. # 86, Exhibit A. In support of his motion for summary judgment, defendant Sheahan states that plaintiff did not deny that he used abusive language toward defendant vonHagn. Id. In opposition to defendant's motion for summary judgment, plaintiff claims that defendant Sheahan's denial of his requested witness, CORC Director Egan and defendant Sheahan's finding that the grievances submitted by plaintiff did not establish a retaliatory motive are illustrative of defendant Sheahan's bias. Dkt. # 96, pp. 18–24. As the record before this Court unmistakably demonstrates, defendant Sheahan accepted the grievances submitted by plaintiff as evidence of his claim of retaliation and found that the proposed testimony of Director Egan, that the grievances submitted by plaintiff were "exhausted," would have been redundant. Thus, plaintiff's claim that defendant Sheahan's denial of plaintiff's witness demonstrates defendant Sheahan's bias is wholly without any basis in fact.

Here, plaintiff's bare, conclusory allegations of bias and prejudgment, without more, are insufficient

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

to defeat defendants' motion for summary judgment. As reflected in the Hearing Disposition Sheets and hearing transcripts, each of the hearing officers based their determinations on the Misbehavior Reports, testimony of plaintiff, testimony of witnesses present during the incidents, and the documentary evidence, often including letters written by plaintiff. Additionally, as noted above, the hearing officers' determinations were frequently based on plaintiff's admissions made during the hearing or plaintiff's failure to deny that he had used the abusive, threatening or harassing language charged in the Misbehavior Reports.

**\*62** The record before the Court unequivocally establishes that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were neither biased nor prejudged the evidence. To the contrary, each hearing officer based his finding of guilt on the credible evidence presented during the hearing and each made an objectively reasonable determination based on the evidence. Thus, the Court agrees with defendants that plaintiff has failed to meet his burden of demonstrating that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were so partial so as to violate plaintiff's due process rights. Accordingly, defendants' motion for summary judgment on plaintiff's due process claims based on bias, prejudgment and impartiality is granted.

**Denial of Witness Testimony**

In *Wolff v. McDonnell,* the Supreme Court of the United States determined that,

[an] inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.

418 U.S. at 566. In reaching this conclusion, the Court recognized that,

[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

*Id.* In exercising that discretion, prison officials must be able to,

explain, in a limited manner, the reason why witnesses were not allowed to testify, ... either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a 'liberty' interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.'

*Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). A hearing officer may rationally exclude witnesses or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). The burden is on the prison official to demonstrate "the rationality of his position." *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990).

During several of the disciplinary hearings discussed above, plaintiff claims that he was denied due process because his requests to have certain witnesses testify during the hearings were denied. Specifically, plaintiff claims that: (1) defendant Donahue during the December 21, 2000 disciplinary hearing denied plaintiff's requests to have CORC Director Thomas Egan and DOCS' Commissioner Goord testify; (2) during the December 26, 2000 disciplinary hearing, defendant Sheahan denied plaintiff's request to have CORC Director Egan testify; (3) during the January 4, 2001 disciplinary hearing, defendant Irizarry denied plaintiff's requests to have DOCS' Commissioner Goord and Associate Commissioner Chapman testify;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

and, (4) defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify during a February 5, 2001 disciplinary hearing.

### Defendant Donahue

**\*63** During plaintiff's December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue denied plaintiff's request to call CORC Director Thomas Egan and DOCS' Commissioner Goord as witnesses. The hearing transcript does not provide any insight as to why plaintiff requested to have Director Egan and Commissioner Goord testify, because plaintiff refused to elaborate on his statements that both witnesses had "a lot or everything to do with the ticket." Dkt. # 44, pp. 0081–0086. The gravamen of the Misbehavior Report was statements made in a grievance filed by plaintiff. Neither Director Egan nor Commissioner Goord were mentioned in the grievance; neither were present at Southport when the grievance was received nor had any knowledge of plaintiff's grievance. Dkt. # 92, p. 29. Accordingly, defendant Donahue denied plaintiff's request and properly prepared a Witness Interview Sheet noting the reason for denying the request, "Mr. Egan [and] Commissioner Goord denied as not having material testimony." Dkt. # 44, p. 0091.

### Defendant Sheahan

Defendant Sheahan conducted a Tier 3 disciplinary hearing that began on December 26, 2000 and continued on December 29, 2000. During the hearing, plaintiff requested to have Director Egan testify that the grievances submitted by plaintiff were "exhausted." Dkt. # 44, p. 0105. Defendant Sheahan denied plaintiff's request because he had previously accepted the grievances submitted by plaintiff as evidence and acknowledged that some of the grievances had been exhausted and based on the foregoing, determined that Director Egan's testimony would be redundant. *Id.* Defendant Sheahan properly prepared a Witness Interview Sheet detailing plaintiff's request and the reasons for his denial. *Id.* Specifically, the Witness Interview Sheet states,

T. Eagen [sic] IGRC—Albany—(Requested by Inmate). For verification of past submitted Grievances that he he [sic] has submitted concerning inadequate medical care by the facility and requests to have RN S. VonHagn kept away from [sic]. This hearing officer accepted the inmates [sic] evidence (grievances) that he brought to the hearing as being submitted and determined that Mr. Eagans [sic] testimony would be redundant as I have already accepted what the correlation [sic] that the (illegible) was received in retaliation of these grievances.

Dkt. # 44, p. 0105.

### Defendant Irizarry

During the Tier 3 disciplinary hearing conducted on January 4, 2001, defendant Irizarry denied plaintiff's request to have Commissioner Goord and Associate Commissioner Chapman testify on his behalf. The hearing resulted from a Misbehavior Report issued by defendant Donahue following the December 21, 2000 disciplinary hearing. Dkt. # 65, p. 0664. Defendant Irizarry denied plaintiff's request because neither Commissioner Goord nor Associate Commissioner Chapman were present at Southport at the time of the incident and accordingly, their testimony was not relevant to the hearing. *Id.* at p. 0666. Defendant Irizarry properly prepared a Witness Interview Sheet setting forth his reasons for denying plaintiff's request, "[y]our witnesses, G. Goord Commissioner and W. Chapman Asso. Comm. were denied because their testimony is not relevant to this hearing they were neither present nor in this facility at the time of this [sic] charges was [sci] written or when this incident happened." Dkt. # 65, p. 0666.

### Defendant Quinn

**\*64** Defendant Quinn conducted a Tier 3 disciplinary hearing concerning plaintiff on February 5, 2001. Dkt. # 98, pp. 20–33. During the hearing, plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci testify. *Id.* Sgt. Morton testified telephonically. However, as discussed above,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

plaintiff refused to attend the hearing. *Id.; see also* pp. 55–59 *supra.* With respect to Deputy Commissioner Annucci, defendant Quinn denied plaintiff's request to have him testify because, according to defendant Quinn, his testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711. Prior to rendering his decision, defendant Quinn reviewed the correspondence from plaintiff to Deputy Commissioner Annucci which was the subject of the Misbehavior Report. Dkt. # 68, pp. 0716–0718. After reviewing the letter, defendant Quinn determined that the letter indeed contained threatening, obscene and abusive language and that testimony from Deputy Commissioner Annucci was not necessary to determine whether plaintiff's correspondence contained threats, abusive or harassing language. Dkt. # 87, ¶ 14.

In the instant case, as detailed above, defendants Donahue, Sheahan, Irizarry and Quinn informed plaintiff of their respective decisions for denying plaintiff's requests for testimony. The decisions by defendants Donahue, Sheahan, Irizarry and Quinn to deny the requested testimony were reasonable. With respect to defendant Donahue and defendant Quinn, the issue to be decided at the disciplinary hearing was whether plaintiff wrote the grievance/letter and whether they contained threats, abusive and/or harassing language. Thus, in the case of defendant Donahue, unspecified testimony from Director Egan and Commissioner Goord, who were neither mentioned in the grievance nor present at Southport when the grievance was received, is irrelevant. Similarly, with respect to defendant Quinn, testimony from Deputy Commissioner Annucci, the intended recipient of the letter, is equally irrelevant.

Plaintiff's complaint against defendant Sheahan, that his request to have Director Egan testify that the grievances submitted by plaintiff were exhausted was improperly denied, must also fail. As reflected in the Witness Interview Sheet completed by defendant Sheahan, defendant Sheahan found that such testimony would be redundant because he had accepted the grievances submitted by plaintiff as evidence and acknowledged that some of the grievances had been exhausted. Finally, defendant Irizarry properly denied plaintiff's request to have Commissioner Goord and Associate Commissioner Chapman testify because such testimony would not be relevant. Neither Commissioner Goord nor Associate Commissioner Chapman were at Southport at the time of the incident alleged in the Misbehavior Report. Accordingly, plaintiff's claim that because defendants Donahue, Sheahan, Irizarry and Quinn improperly denied his requests to have certain witnesses testify during the disciplinary hearings, his due process rights were violated must fail as a matter of law.

**Ejection from Hearing**

**\*65** An inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings. *Wolff,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). Thus, "[p]rison inmates do not possess a constitutional right [FN32] to be present during the testimony of witnesses during a disciplinary proceeding." *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989); *Bogle v. Murphy,* No. 98–CV–6473 CJS, 2003 WL 22384792 (W.D.N.Y. Sep.9, 2003) (plaintiff's ejection from his disciplinary hearing was not a due process violation). On more than one occasion as discussed above, plaintiff was removed from a disciplinary hearing, voluntarily requested to leave a disciplinary hearing before its conclusion or refused to attend a disciplinary hearing. To the extent that buried within one of plaintiff's many claims is a claim that his voluntary or involuntary removal from a disciplinary hearing constituted a denial of his due process rights, that claim must fail. On those occasions when plaintiff was involuntarily removed from the disciplinary hearing by the hearing officer because he was being disruptive and uncooperative during the hearing, such a circumstance does not give rise to a due process claim. On the other occasions where plaintiff either refused to attend the disciplinary hearing or elected to

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

leave the hearing before its conclusion that likewise does not give rise to a due process claim. Thus, this Court finds that to the extent plaintiff is claiming that his absence from a disciplinary hearing, whether voluntary or involuntary, violated his right to due process, such a claim must fail as a matter of law.

> FN32. Although N.Y.Comp.Codes R. & Regs. tit. 7, § 254.5 affords inmates the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals," state rules and regulations do not necessarily support viable due process claims under § 1983. *See Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995); *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987); *Dawes v. Leonardo,* 885 F.Supp. 375, 377–78 (N.D.N.Y.), *aff'd* 71 F.3d 406 (1995).

**Reversal of Determination Not Indicative of Due Process Violation**

Plaintiff has alleged that he was denied due process by defendant Quinn at his February 5, 2001 Tier 3 disciplinary hearing because defendant Quinn's determination was later overturned by defendant Selsky. Dkt. # 9, p. 6–I. The February 5, 2001 Tier 3 disciplinary hearing, discussed at length above, *see* pp. 55–59 *supra,* was a continuation of a hearing that commenced on January 31, 2001. Dkt. # 87, ¶ 9. After entering a plea of not guilty to both charges, plaintiff requested to have two witnesses testify and the hearing was adjourned to locate one of the witnesses. *Id.* When the hearing was reconvened on February 5, 2001, plaintiff refused to attend the hearing and refused to sign the Waiver of Right to Attend Disciplinary Hearing Form which advised him that a disposition of the charges would be made in his absence. *Id.* at ¶ 10. Thereafter, the hearing was conducted outside of plaintiff's presence. *Id.* at ¶ 11.

Following the hearing, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months SHU confinement to run from September 27, 2002 to September 27, 2003. *Id.* at ¶ 16. In reaching this determination, defendant Quinn relied on the Misbehavior Report and on the hand-written letter from plaintiff, wherein he made harassing statements to Deputy Commissioner Annucci. *Id.* at ¶ 17. As discussed above, plaintiff alleged that he never received a copy of the hearing disposition and commenced an Article 78 proceeding in New York Supreme Court, Chemung County challenging the February 5, 2001 disposition. *Id.* ¶ 18. In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but stated that he did not refuse to attend the hearing and did not learn of the disposition until June 26, 2001. *Id.* On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id.* at ¶ 19.

**\*66** By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id.* at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant; denied him the right to attend the hearing; and refused to call Deputy Commissioner Annucci as a witness. *Id.* Plaintiff further alleged that defendant Quinn was biased and refused to let plaintiff see the January 8, 2001 correspondence. Since he never received a copy of the disposition, he was unaware of the penalty imposed. *Id.* On April 26, 2002, Defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because of defendant Quinn's failure to interview a requested witness who may have provided relevant testimony. *Id.* at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

several months *before* plaintiff was ordered to begin serving his penalty. *Id.* at ¶ 22. Thus, plaintiff did not serve a single day of the penalty imposed by defendant Quinn.

It is well-settled that where, as here, a disciplinary determination has been reversed and expunged before an inmate begins to serve the penalty imposed, the inmate's due process rights have not been violated. *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992) (*per curiam* ), *cert. denied,* 510 U.S. 837, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993). Following a disciplinary hearing, Young had been found guilty of violating certain prison rules and a penalty of 180 days SHU confinement, suspension of commissary and package privileges was imposed by the hearing officer and the hearing officer further recommended a loss of six months good time. Young appealed the hearing officer's determination and Director Selsky reversed the determination, vacated the penalty and recommended loss of good time and ordered the hearing records be expunged. Thereafter, Young commenced a section 1983 suit against the hearing officer alleging a denial of due process because he was (1) barred from his disciplinary hearing; (2) prevented from calling witnesses on his behalf; and (3) denied an impartial hearing officer. The District Court found that plaintiff had been denied his right to call witnesses at a disciplinary hearing and awarded plaintiff nominal damages of one dollar. In addition, the District Court granted the hearing officer's motion for summary judgment with respect to Young's claims that he was improperly excluded from the hearing and that the charges were not heard by an impartial hearing officer. The Second Circuit reversed finding that the determination rendered at the disciplinary hearing had been reversed and expunged before Young had even begun to serve his penalty. In making this finding, the Second Circuit reasoned that, "on account of the administrative reversal of [the hearing officer's] decision, Young was never penalized on the charges .... Therefore, he suffered no interference with a liberty interest and has no valid claim for relief." *Id.*

**\*67** Accordingly, following the same reasoning set forth in *Young,* because defendant Quinn's determination was reversed and expunged before plaintiff began serving the penalty imposed, plaintiff suffered no interference with a liberty interest and any claim that defendant Quinn denied him due process must fail as a matter of law.

**Administrative Appeal**

In his amended complaint, plaintiff claims that defendants W. Wilcox and D. Selskey [sic], violated his due process rights under the Fourteenth Amendment to the United States Constitution. Dkt. # 9, pp. 6–H to 6–I. Specifically, plaintiff claims that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 22, 2000, December 31, 2000, January 30, 2001 and March 8, 2001, defendant Wilcox violated his due process rights in connection with his appeal of each of the hearing officer's determinations. Plaintiff claims that as a result he suffered 270 days of cell confinement and a loss of $45 ($5 each for each finding of guilt). Similarly, as against defendant Selsky, plaintiff alleges that on February 21, 2001, defendant Selsky violated his due process rights by "modifying a disposition dated 1–4–00 (*not* 1–4–01)" and as a result, plaintiff suffered "a 6–month SHU-punitive [sic] segregation sentence." Dkt. # 9, pp. 6–H to 6–I. In addition, plaintiff alleges that defendant Selsky violated his due process rights on February 9, 2001 because he affirmed a "bias [sic] disposition, where [plaintiff] suffered *no* witnesses, *nor* had all of my evidence been allowed at partial (*un* fair) hearing." *Id.*

In the amended complaint, plaintiff alleges that in connection with his administrative appeals of eleven hearing determinations, defendants Wilcox and Selsky violated his federal constitutional right to due process. Specifically, plaintiff alleges that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 31, 2000, December 22, 2000, March 8, 2001 and January 30, 2001, defendant

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

Wilcox violated his due process rights. As discussed above, a review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not reveal a disciplinary hearing or appeal that was held, filed or decided on July 30, 2000, December 31, 2000, and March 8, 2001 [FN33]. Each of the other dates correspond to either a hearing date or an appeal date, January 21, 2000 (hearing date) (hearing commenced on January 11, 2000), (defendant Donahue); January 25, 2000 (hearing date, defendant Ryan); July 18, 2000 (hearing date, defendant Gilmore); November 29, 2000 (hearing date, defendant Donahue); December 22, 2000 (appeal date), (December 21, 2000 hearing date, defendant Donahue); and January 30, 2001 (appeal date), (January 29, 2001 hearing date, Donahue). Each of the aforementioned hearings was discussed at length above and none of the defendant hearing officers violated plaintiff's constitutionally protected due process rights. Accordingly, because none of the hearing officers violated plaintiff's due process rights in conducting the Tier 2 and Tier 3 disciplinary hearings, the Court agrees with defendants that there can be no basis for concluding that defendant Wilcox violated plaintiff's due process rights by affirming the hearing determinations.

> FN33. As discussed above, a disciplinary hearing did take place on March 7, 2001, however, plaintiff did not appeal that determination.

**\*68** With respect to defendant Selsky, plaintiff claims that on February 9, 2001, defendant Selsky violated his due process rights by affirming a December 29, 2000 determination by defendant Sheahan. Dkt. # 9, p. 6–I. For the reasons stated above concerning plaintiff's claims against defendant Wilcox and because there is nothing in the record to support the conclusion that defendant Sheahan violated plaintiff's due process rights in conducting the December 26 and 29, 2000 disciplinary hearing, plaintiff's claim

against defendant Selsky simply because he affirmed the determination issued by defendant Sheahan fails as a matter of law. Similarly, plaintiff's claim against defendant Selsky because he modified the penalty imposed following a January 4, 2001 disciplinary hearing conducted by defendant Irizarry must also fail. The disciplinary hearings conducted by defendants Sheahan and Irizarry have been discussed at length above. There is nothing in the record before this Court to support the conclusion that either defendant Sheahan or defendant Irizarry violated plaintiff's due process rights. Accordingly, defendant Wilcox's decisions affirming the hearing officers' determinations and defendant Selsky's decisions affirming or modifying the results of the disciplinary hearings do not, standing alone, establish a federal constitutional violation. *See Hameed v. Mann,* 57 F.3d 217, 224 (2d Cir.1995) (Selsky entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing).

**Denial of Right to Take Religious Correspondence Course Claim**

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873, *citing Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

In the instant case, plaintiff alleges that on or about November 2, 1999, he received an information packet concerning religious training and that defendant Gardner informed him that he could not take any correspondence courses. Dkt. # 9, pp. 5–B to 5–C; Dkt. # 94, ¶ 7. As a result, plaintiff filed Grievance No. SPT–17423–99 on or about November 16, 1999. Dkt. # 44, p. 0250. In response to the Grievance, the IGRC advised plaintiff that pursuant to recent decisions by CORC, plaintiff may not participate in any correspondence courses/programs while at Southport and further advised plaintiff to contact the education supervisor once he is transferred to a general confinement facility. Dkt. # 94, ¶ 8; Dkt. # 44, p. 0251. Thereafter, the Superintendent concurred with the IGRC recommendation stating that there are no provisions in either the facility policy or DOCS Directive No. 4933 that allow SHU inmates to participate in any correspondence courses. Dkt. # 44, p. 0254; Dkt. # 94, ¶ 10. Plaintiff appealed to CORC which issued its decision concurring with the Superintendent on or about January 19, 2000. Dkt. # 44, p. 0246; Dkt. # 94, ¶ 11. In its determination, CORC cited its prior decision in SPT–14519–98 dated August 26, 1998 which stated in part, "[t]he present policy will remain [sic] effect. There are no outside correspondence courses allowed in this facility." Dkt. # 44, p. 0254; Dkt. # 94, ¶ 12. CORC also cited its decision in SPT–7594–94 issued September 15, 1994, which states in part, "CORC concurs with the Superintendent in that the grievant may not participate in any correspondence course due to the logistical problems related to housing in Southport C.F." *Id.*

**\*69** Thus, defendant Gardner did not deny plaintiff the right to take a religious correspondence course. Rather, any such denial was the result of DOCS policy as set forth by the Superintendent and CORC. As the Senior Mail and Supply Clerk, defendant Gardner "had no authority to set any policy for DOCS or Southport and no authority to determine whether an inmate may take any correspondence course or otherwise engage in educational or religious activities."

Dkt. # 92, p. 53. Accordingly, because defendant Gardner did not make any policy preventing plaintiff from taking a religious correspondence course, plaintiff's claim against her must fail as a matter of law.

### Interference with Legal Mail Claim

DOCS Directive Nos. 4421 (Privileged Correspondence), 7 N.Y.C.R.R. Part 721 and 4422 (Inmate Correspondence Program), 7 N.Y.C.R.R. Part 720, set forth DOCS' policy regarding inmate mail correspondence. Dkt. # 94, ¶ 25. Legal mail which is clearly marked as such and is from an attorney is not to be opened by the mailroom outside the presence of the inmate. If, however, privileged correspondence is opened in error outside the presence of the inmate, documentation of the error should be maintained. 7 N.Y.C.R.R. §§ 721.2(2), 721.3(b)(1) and (2). Pursuant to 7 N.Y.C.R .R. §§ 720.2(b), 720.4(a), general correspondence between an inmate and someone other than a person approved for legal correspondence will be opened and inspected for cash, checks, money orders, printed or photocopied materials or contraband. An inmate is not required to be present during the inspection of incoming general mail. 7 N.Y.C.R.R. §§ 720.2(b), 720.4(a).

It is accepted that a prisoner must be present when, for whatever reason, legal mail (clearly marked as such) is opened by prison officials ... and th[e] Constitution guarantees a prisoner [ ] 'reasonable access to the courts.' *Standley v. Lyder,* 99 Civ 4711, 2001 WL 225035, at *2 (S.D.N.Y. March 6, 2001) (internal citation omitted) *(citing Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986)) *(citing Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In order '[t]o prevail on a claim of interference with legal mail, a plaintiff must show that a pending or anticipated legal action was prejudiced by the alleged ence.' *Standley,* 2001 WL 225035, at *2 (quoting *Morgan v. Montanye,* 516 F.2d 1367, 372 (2d Cir.1975) and *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993)).

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

*Govan v. Campbell,* 289 F.Supp.2d 289, 297 (N.D.N.Y.2003). Moreover, the Second Circuit has dismissed claims where only sporadic interference with mail was alleged and further, where a plaintiff does not allege actual prejudice to his ability to vindicate his legal claim. *Standley v. Lyder,* 99 Civ 4711, 2001 WL 225035, at *2 (S.D.N.Y. Mar.7, 2001); *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

Plaintiff claims that in or about November 1999 and December 1999, defendant Gardner interfered with and opened his legal mail. Dkt. # 9, pp/5–B to 5–C. Plaintiff filed Grievance No. SPT–17276–99 alleging that his incoming legal mail was censored and opened by the mail room clerk even though the envelope was marked "Legal Mail." Dkt. # 44, p. 0262. In response, K. Washburn, Mailroom Clerk, informed the IGRC that legal mail which is clearly marked and from an attorney, is not to be opened by the mailroom. Dkt. # 44, p. 0268; Dkt. # 94, ¶ 20. As explained by Ms. Washburn, the letter that is the subject of Grievance No. SPT–17276–99 was in an envelope that was completely handwritten (unlike mail from attorneys), the sender's name was illegible and that because the sender's name could not be verified as a legitimate legal entity, the mail was opened. *Id.* Ms. Washburn further stated that whenever legal mail is opened in error, the envelope is stamped by the mailroom to let the inmate know that it was opened in error. *Id.* The Superintendent denied plaintiff's grievance and CORC concurred with the Superintendent's determination, stating that contrary to plaintiff's allegations, facility staff had acted consistent with department policy. Dkt. # 44, p. 0259; Dkt. # 94, ¶ 23.

**\*70** Plaintiff's amended complaint is devoid of any claim that he suffered actual injury as a result of alleged interference with his legal mail. Thus, in the absence of any facts to demonstrate that his access to the courts was impaired or that he was otherwise prejudiced by the opening of a single envelope, plaintiff's claim against defendant Gardner must fail as a matter of law.

***Interference with Access to the Courts Claim***

Although prisoners retain the constitutional right to meaningful access to the courts, prisoners alleging a violation of this right in the context of a section 1983 action must demonstrate actual harm, e.g., that a "nonfrivolous legal claim had been frustrated or was being impeded." *Lewis v. Casey,* 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (footnotes omitted); *see Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Here, plaintiff claims that on September 13, 2000 and June 12, 2001, defendants Corcoran and Weingartner respectively, violated his constitutional right of access to the courts. Dkt. # 9, pp. 5–D to 5–E. Plaintiff alleges that defendant Corcoran denied plaintiff access to vouchers and certified mail receipts contained in plaintiff's sealed property bags. *Id.* at p. 5–D. As a result, plaintiff alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed. *Id.* As against defendant Weingartner, plaintiff alleges that he was denied an "advanced certified mailing request" for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims. *Id.* at p. 5–E. Plaintiff further claims that a "manilla envelope containing the material" had been kept from him "until the expiration of my time to respond by certified mail-return receipt-requested to the Attorney General." Dkt. # 9, p. 5–E.

**Defendant Michael P. Corcoran**

As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags. Dkt. # 90, ¶ 7. In his affidavit in support of his motion for summary judgment, defendant Corcoran recounts an incident where, after plaintiff's transfer to Southport from Coxsackie in May 2000, plaintiff submitted a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
(Cite as: 2009 WL 236060 (W.D.N.Y.))

claim concerning certain property that was missing. Dkt. # 90, ¶¶ 8–19. On or about May 25, 2000, plaintiff submitted a claim that certain property had been stolen. Dkt. # 90, ¶ 10 and Exhibit A. The record before this Court establishes that plaintiff made no claim that any legal papers or receipts were missing from his property bags when plaintiff was transferred to Southport from Coxsackie in or about May 2000. *Id.* at ¶ 11. Notably, however, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing. *Id.* at ¶ 11. Defendant Corcoran advised plaintiff that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that failure to establish proof of ownership may result in denial of his claim. *Id.* at ¶ 13.

**\*71** On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected. *Id.* at ¶ 16. Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000. Dkt. # 90, ¶ 19 and Exhibit B. Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated, in pertinent part, "I have again received another demeaning and insolent note from you. This is the last time that I will respond to [sic]. I will not authorize you access to your property bags, since you've already determined that we have broken into your bags to destroy your receipts." *Id* .

At the time of plaintiff's transfer, plaintiff was advised not to leave active case material behind and plaintiff was further instructed to include all active legal material in his 4–bag limit. Dkt. # 90, ¶ 12 and Exhibit A. Plaintiff refused to sign the Personal Property Transferred Form. *Id.* Plaintiff claims that as a result of defendant Corcoran's conduct, Claim No.

98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. Dkt. # 9, p. 5–D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001. Dkt. # 90, ¶ 21 and Exhibit B. As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility. *Id.* The Judgment further notes that the matter came on to be heard by the Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim", Claim No. 98329 was dismissed. *Id.* Thus, the Judgment dismissing Claim No. 98329 makes clear that the matter was dismissed after the parties had submitted "proofs and allegations" and makes no mention whatsoever of dismissal because of plaintiff's failure to submit certain vouchers or receipts. Accordingly, because plaintiff has failed to establish that he suffered any injury, his claim against defendant Corcoran must fail as a matter of law.

**Defendant Lawrence W. Weingartner**

Similar to defendant Corcoran, defendant Weingartner, in support of his motion for summary judgment, states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims. Dkt. # 91, ¶ 6. Based on a review of the documents produced by plaintiff in connection with this action, defendant Weingartner has concluded that plaintiff's claim relates to a June 18, 2001 Notice advising plaintiff that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program. *Id.* at ¶ 10. The Notice directed plaintiff's attention to the item checked and where applicable, advised plaintiff to correct and resubmit the item for processing. *Id.* In the box designated "other", plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

guidelines for special handling as outlined in DOCS Directive No. 4421. *Id.* at ¶ 11. DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence. *Id.* at ¶ 12. DOCS Directive No. 4421 provides that advances for "special Handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order. 7 N.Y.C.R.R. 3(a)(3)(v). Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling,

> **\*72** may not be used to pay for any special handling charges such as for certified, return-receipt, express mail, etc., unless such mail services are required by statute or court order. Advances for special handling for filing a Claim or Notice of Intention on the Attorney General [sic] Office must be specified on the approved Advance Request form for postage. You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421).

> *Id.* at ¶ 14.

According to defendant Weingartner, because plaintiff's request for special handling did not meet the applicable guidelines, his request was denied. *Id.* at ¶ 15. Indeed, defendant Weingartner further states that a request for special handling for mailing a notice of appeal to the Attorney General does not meet the guidelines for special handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office. *Id* . In addition, there is nothing in the record to suggest that after he received the June 18, 2001 Notice, that plaintiff submitted any court order or statute to the mailroom showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested. *Id.* at ¶ 16. Lastly, in further support of his motion for summary judgment, defendant Weingartner states that

to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by the Court (Mr. Davison) that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely notice pursuant to CPLR 5520. *Id.* at ¶ 17. There is nothing in the record to suggest plaintiff submitted any such motion pursuant to CPLR 5520. *Id.* at ¶ 18. Thus, because plaintiff cannot establish that defendant Weingartner interfered with his right of access to the Court of Claims or that any conduct on the part of defendant Weingartner caused the dismissal of Claim No. 99509 or prevented plaintiff from appealing the dismissal of Claim No. 99509, plaintiff's claim against defendant Weingartner must fail as a matter of law.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment (Dkt.# 79) is in all respects **GRANTED.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

W.D.N.Y.,2009.
Chavis v. vonHagn
Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
**(Cite as: 2011 WL 1842294 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Felix DELGADO, Plaintiff,
v.
Norman R. BEZIO et al., Defendants.

No. 09 Civ. 6899(LTS).
May 9, 2011.

### MEMORANDUM ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff Felix Delgado ("Delgado" or "Plaintiff"), proceeding *pro se*, asserts he was deprived of due process of the law when he was tried and adjudged guilty in a prison disciplinary hearing for attempting to acquire a parole officer's home address. He alleges, among other things, that he was given insufficient notice of the critical facts of the accusation against him, was found guilty without sufficient evidentiary support and was not informed or evidence the hearing officer relied upon in reaching his conclusion. Delgado further alleges tna he was held in special housing unit confinement for 125 days in conditions that constituted a deprivation of liberty and cruel and unusual punishment.

Delgado filed these allegations in an Amended Complaint made pursuant to 42 U.S.C. § 1983 against the Director of Special Housing and Inmate Disciplinary Program for the New York State Department of Correctional Services, Norman R. Bezio ("Bezio"); Acting Director of Special Housing and Inmate Disciplinary Program, Albert Prack ("Prack"); Superintendent of Otisville Correctional Facility, Catherine Cook ("Cook"); Deputy Superintendent of Admin-

istration of Otisville Correctional Facility, Steven Brandow ("Brandow"); Captain for Otisville Correctional Facility, Charles Weeden ("Weeden"); Sergeant at Otisville Correctional Facility, Charles Howerter ("Howerter"); and Inmate Records Coordinator I at Otisville Correctional Facility, Joan M. Pauley ("Pauley" and, collectively, "Defendants") in their official and individual capacities.

Defendants filed the instant motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and the Plaintiff has not opposed the motion. This Court herein reviews the merits of the motion to determine whether the movants have carried their burden. *See McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir.2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal.") The Court has considered carefully the parties' submissions and, for the following reasons, the Defendants' motion is granted in part and denied in part.

### BACKGROUND

The following facts are drawn from the Amended Complaint unless otherwise indicated.[FN1] On October 24, 2007, Delgado was moved from the general prison population into the Special Housing Unit ("SHU") and given notice that he would be tried in a Tier III disciplinary hearing. The Inmate Misbehavior Report, which constituted Delgado's notice of the charge against him, read in pertinent part, as follows:

> FN1. Plaintiff's Amended Complaint references exhibits attached to the original Complaint. All exhibits referenced by the Amended Complaint are considered to be incorporated therein.

2) Location of Incident[:] Bld. 17 Hearing Room.

Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
**(Cite as: 2011 WL 1842294 (S.D.N.Y.))**

Incident Date[:] 10/22/07. Incident Time[:] Approx 6:15 p.m.

3) Rule Violation(s) [:] 113.26 Inmates shall not solicit personal identifying information of department employees.

4) Description of Incident[:] On above date and time I Sgt. Howerter recieved [sic] confidential information that inmate Delgado 93A0549 has been attempting to acquire the home address of SR. Parole Officer Cassel.

**\*2** (Compl.Ex.I.) The date and time written in section 2 as the "Incident Date" and "Incident Time" are the only indications of date and time found in the report. The language in section 4 indicates that the date and time listed refer to the date and time when Howerter interviewed Foley and not, in fact, the date of the alleged misconduct-that is, they do not refer to the date and time when Delgado is alleged to have violated rule 113.26 by attempting to acquire Parole Officer Cassel's home address. The Inmate Misbehavior Report was signed by defendants Howerter and Weeden. (*Id.*)

Delgado's prison disciplinary hearing was held on October 26 and November 2, 2007. Delgado selected Counselor Candelaria "to assist him with gathering evidence and information for his defense" prior to the hearing. (Am.Compl.¶ 29.) At the hearing, Delgado denied the charged behavior, arguing that it would not have been in his interests to jeopardize his parole prospects and that he had no reason to seek his parole officer's home address. Parole officer Cassel testified that Delgado had not spoken with him since approximately June of the prior year. Delgado asked that the attorney who had been handling his parole matters, Cheryl Kates ("Kates"), be permitted to testify, but this request was denied on the grounds that Kates "can provide no relevant testimony related to [the] incident in question." (Compl.Ex. M.) The confidential in-

formant who had accused Plaintiff was an inmate named John Foley. Foley did not testify at the hearing, confidentially or otherwise, and Plaintiff was not informed of Foley's identity until after the hearing. Plaintiff was also not informed that Foley had originally told prison officials that a single, unnamed inmate was trying to acquire parole officer Cassel's address and that, when interviewed by Howerter, Foley said that two inmates, Delgado and someone named Peretti, were both seeking Cassel's address.

Delgado was found guilty and sentenced to six months in SHU with 30 days suspended and "loss of package, loss of commissary, [and] loss of phone" privileges. In rendering this disposition, defendant Brandow, the hearing officer, described the evidence he had relied upon as follows:

> I find you guilty. The reason why I find you guilty, okay, first[ ] let's see, confidential information which was established during the investigation, various documents, listen to me now, related to the confidential investigation, corroborated charges with the misbehavior report. That's why I came to my decision.

(*Id.*) Delgado asked Brandow whether he had "conducted a[n] independent assessment of this confidential source or whoever this person was that provided confidential information." (Compl. Ex. L p14.) Brandow responded that he had "reviewed all the documents and came to a conclusion from [Delgado's] testimony, from the confidential informant's testimony, and the confidential informant's to-froms." (*Id.* p15.) Delgado was given a copy of the hearing disposition on November 2, 2007. Under the heading "Statement of Evidence Relied Upon," it stated in its entirety:

**\*3** [The] evidence relied upon was confidential information which was established during an investigation. Various documents relating to the confidential investigation corroborate charges within the misbehavior report written by Sgt. Howerter.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
**(Cite as: 2011 WL 1842294 (S.D.N.Y.))**

(Compl.Ex.P–1.) Under the heading "Reasons for Disposition," it stated in its entirety:

This disposition is intended to dissuade this inmate for [sic] acting in this manner in the future and to punish him for this unacceptable behavior. This type of behavior will not be tolerated and this disposition should serve as a future deterrent to inmate population.

(*Id.*)

For six weeks following the entry of disposition, Kates attempted to get a copy of the record of the disciplinary hearing and to have Delgado's SHU sentence reversed or reduced. After receiving the hearing record, she submitted a 23–page legal memorandum on Delgado's behalf, citing to the hearing transcript and applicable law, dated December 11, 2007. The sentence was summarily affirmed by defendant Cook on November 23, 2007, by defendant Prack on December 14, 2007, and by defendant Bezio on January 28, 2008. Delgado was released from SHU in February 2008.

*Conditions of Delgado's Confinement*

Delgado served 125 days at the Southport Correctional Facility, a maximum security facility exclusively for SHU inmates. In his Complaint, Delgado alleges he was "stripped of all personal property, including nutritional foods, cosmetics, and clothing, as well as blankets to keep warm." During the "severe winter season," he was deprived of warm clothing and personal blankets; heat in his cell was kept at a minimum, and at night officers would open the windows, which inmates were unable to close. On most days, Delgado was locked in his cell 23 of the 24 hours and was given one hour to exercise in a steel metal cage. He was escorted in metal restraints when moving to and from his cell and the exercise cage. He was allowed only two showers and one visit each week. Once a month, he was allowed to receive cosmetics

and stationery from the commissary but was denied any other commissary privileges. He was not permitted to receive packages except books by mail. These allegations are taken as true for the purposes of this motion practice. Upon release from SHU, Delgado was transferred to the Wende Correctional Facility, also a maximum security facility.

*DISCUSSION*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). In the case of a *pro se* litigant, the Court reads pleadings leniently and construes them to raise "the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). While this guidance applies with particular force when a *pro se* plaintiff's civil rights are at issue, *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), the pleadings still must contain factual allegations that raise a "right to relief above the speculative level." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 603 (S.D.N.Y.2009) (quoting *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 555 (2007)).

*Claims Against Defendants in their Official Capacities*

**\*4** A state official is entitled to Eleventh Amendment sovereign immunity to the extent that state official is sued in his or her official capacity. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989); *see also Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005). "The Eleventh Amendment, through the doctrine of

Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
**(Cite as: 2011 WL 1842294 (S.D.N.Y.))**

sovereign immunity, bars suits in federal court against a state absent a waiver of immunity or congressional legislation specifically overriding immunity." *Robinson v. Fischer,* No. 09 Civ. 8882, 2010 WL 5376204 (S.D.N.Y. Dec. 29, 2010) (citing *Pennhurst State Sch. & Hospital v. Halderman,* 465 U.S. 89, 99 (1984)). New York State has not consented to § 1983 suits in federal court. *Mamot v. Board of Regents,* 367 F. App'x 191, 192 (2d Cir.2010). Plaintiff's claims against Defendants in their official capacities will, accordingly, be dismissed on sovereign immunity grounds.

### Fourteenth Amendment Due Process Claim

Plaintiff asserts he was denied due process because: (1) he did not receive adequate notice of the critical facts of the accusation against him; (2) he was improperly denied the opportunity to call a certain witness; (3) he was founding guilty without a sufficient evidentiary basis and without the facts supporting the finding being disclosed to him; (4) he was denied effective assistance of counsel; and (5) he was denied a copy of his hearing transcript in adequate time to prepare a meaningful appeal.

### Plaintiff's Liberty Interest

To proceed on a due process claim, a plaintiff must plead sufficient facts to show the deprivation of a liberty interest without due process of law. *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009). "Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id* . (citation omitted). When assessing whether confinement constitutes an "atypical and significant hardship," courts take into account the duration and the conditions of the confinement. *Id.* at 606 (citation omitted). There is no bright line rule but, generally, a period of confinement in SHU lasting fewer than 101 days does not by itself amount to atypical and significant hardship, while confinement in SHU for 305 days or more has been found to be "atypical and significant without any further aggravating conditions."

*Id.* at 606 (citation omitted). A confinement lasting 125 to 288 days is "relatively long and thus necessitat[es] specific articulation of factual finding." *Sims v.. Artuz,* 230 F.3d 14, 23 (2d Cir.2000), cited in *Dawkins,* 646 F.Supp.2d at 606. Delgado was confined in SHU for 125 days, and he has alleged additional facts that could support a finding of atypical and significant hardship. He has therefore pleaded sufficiently that he suffered the deprivation of a protected liberty interest.

### Inadequate Notice

**\*5** "Due process requires that, in a prison disciplinary hearing resulting in the imposition of solitary confinement, an inmate must be afforded advance written notice of the charges against him ...." *Dawkins v. Gonyea,* 646 F.Supp.2d at 608. Notice should provide enough information to enable the inmate to prepare a defense. *Id.* Further, "notice should include information about the date, place, and manner of the alleged misconduct" where possible. *Id.* An inmate has "a heightened need for adequate notice" when "the majority of the evidence presented against him [i]s not made available to him." *Id.*

In *Dawkins v. Gonyea,* inmate Dawkins was served a misbehavior report identifying him as "one of two inmates responsible for distributing a large amount of heroin throughout the facility." 646 F.Supp.2d at 602. On the misbehavior report, "the incident date and time recorded [we]re the date and time [a] confidential informant conveyed information to the officers, not the date and time Dawkins actually participated in the alleged violations." *Id.* at 608. The report did not identify any "sites within the facility where Dawkins allegedly engaged in the charged conduct." *Id.* at 609. Furthermore, the report failed to specify the particulars of the incident of misbehavior involved and it failed to identify the other inmate involved in the alleged misconduct. *Id.* The court held that "a report lacking one of the categories of information about the violation ... the date and time, the place the inmate is alleged to have participated, the manner in which it was perpetrated, the identity of any

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
(Cite as: 2011 WL 1842294 (S.D.N.Y.))

other persons involved, and the roles the participants played" might still be sufficient to constitute adequate notice; however, a report lacking all of these details does not provide the accused enough information to defend himself. *Id.*

In the instant case, as in *Dawkins,* the misbehavior report Delgado received disclosed the date, time and place when and where the investigating officer acquired the confidential accusation but lacked the more critical information of the date, time and place of the alleged misconduct. The report provided no indication of the circumstances or nature of Delgado's alleged attempt to obtain the address information, and the report did not indicate that the "confidential information" on which it relied came from an informant, let alone that there was a single informant. The pleadings indicate that the confidential informant was concerned for his safety; this concern may have justified Defendants' withholding some information from the Plaintiff but it does not, on the current record, excuse the complete denial of meaningful information that Delgado could have used to prepare a defense. Therefore, the motion to dismiss the due process claim of inadequate notice will be denied.

*Calling Witnesses*

Due process requires that an inmate in a disciplinary hearing be permitted to call witnesses and present evidence in his defense. *See Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citations omitted). This right, however, is "subject to the mutual accommodation between institutional needs and objectives and the provisions of the Constitution...." *Id.* (citation and internal quotation marks omitted). A prisoner's right to call witnesses may be denied if granting the request would be "unduly hazardous to institutional safety or correctional goals" or the proposed testimony would be irrelevant or unnecessary. *Id.* "The burden is ... upon the official to prove the rationality of the position." *Id.* (citation omitted). Here, Delgado sought to call Kates, the lawyer who had been handling his parole application.

Hearing officer Brandow denied this request because he concluded that Kates could provide "no relevant testimony related to [the] incident in question." Brandow did not explain the basis for this conclusion. At this stage, the Court need not, and does not, make a finding on whether Kates' testimony would have been relevant, but the facts alleged in the Complaint support a plausible inference that the testimony would have been highly relevant to questions of Delgado's motive and the credibility of his accuser, given that the substance of the confidential informant's accusation was that Delgado requested the address in order to obtain a document relevant to his parole effort and Kates was the attorney who was responsible for communicating with that parole officer on Delgado's behalf. The motion to dismiss Delgado's due process claim that he was improperly prohibited from calling Kates as a witness will be denied accordingly.

*The "Some Evidence" Standard and Presentation of Evidence*

**\*6** Due process dictates that a finding of guilt in a prison disciplinary hearing must be supported by "some evidence." *Dawkins v. Gonyea,* 646 F.Supp.2d at 610 (citation omitted). Additionally, "an inmate facing disciplinary proceedings is entitled to know the evidence upon which a disciplinary ruling is based" or, if evidence is withheld, to receive a reasonable explanation as to why it was withheld. *Id.* at 611–12 (citation omitted). "[T]he 'some evidence' standard may be met even if the sole evidence was supplied by a confidential informant, as long as there has been some examination of indicia relevant to the confidential informant's credibility." *Id.* (citation and some internal punctuation omitted). "When sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened." *Id.* (citation omitted).

All of the evidence supporting the charge against Delgado was derived from a single, confidential in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
**(Cite as: 2011 WL 1842294 (S.D.N.Y.))**

formant, and the documentation before the Court on this motion practice is ambiguous as to whether the informant ever actually testified before Brandow, the hearing officer. When asked whether he had conducted an assessment of the informant's credibility, Brandow said that he had "conducted an investigation of all the relevant documents" and "reviewed all the documents and came to a conclusion from [Delgado's] testimony, from the confidential informant's testimony, and the confidential informant's to-froms." However, nowhere in the copy of the hearing record that is annexed to the original complaint is there any testimony attributable to the informant. Rather, Brandow's knowledge as to the informant's accusation appears to have come entirely from the report and hearsay testimony of officer Howerter. Further, Brandow's response that he "conducted an investigation" is ambiguous as to whether it refers to the overall investigation into Delgado's guilt or to an assessment specifically of the informant's credibility.

When Brandow rendered his decision, he did not reveal to Delgado what evidence was relied on, stating only that:

The evidence relied upon was confidential information which was established during an investigation. Various documents relating to the confidential investigation corroborate charges within the misbehavior report written by Sgt. Howerter.

Accordingly, the Court will deny the motion to dismiss Delgado's claim that his due process rights were violated when a decision was rendered against him without a sufficient evidentiary basis and without disclosure of the evidence relied upon.

*Inadequate Assistance of Counsel*

Inmates are not entitled to counsel in prison disciplinary proceedings. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (citation omitted). Delgado's constitutional claim will be dismissed insofar as it is based

on inadequate assistance of counsel.

*Production of Hearing Record in Time for Administrative Appeal*

**\*7** It is well established that an inmate does not have a constitutional due process right to receive a transcript of his disciplinary hearing. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N.Y.2002) (citations omitted). Accordingly, Petitioner's due process claim will be dismissed insofar as it is premised on his lawyer receiving a transcript only after his administrative appeal was filed. Because defendant Pauley's only alleged misconduct is failing to promptly produce the hearing record, she will be dismissed from this suit.

*Eighth Amendment Claim*

"Restraints on an inmate do not violate the [Eighth] amendment unless they are totally without penological justification, grossly disproportionate, or involve the unnecessary and wanton infliction of pain." *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) (citation and internal punctuation omitted). To establish an Eighth Amendment violation, "an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety ." *Id.* at 751.

Delgado alleges he was "stripped of all personal property, including nutritional foods ... and clothing." To the extent this allegation can be understood to mean that Plaintiff had no nutritional food and no clothing for 125 days, the Court finds it implausible without more detailed allegations demonstrating the factual basis of the claim. The Court construes the allegation, instead, to mean that, although the Plaintiff was given *prison-issued* clothing, he could not keep any *personal* clothing, and that although he received *prison-provided* food, he was not allowed to obtain or possess *additional* food that he considered to be more

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
**(Cite as: 2011 WL 1842294 (S.D.N.Y.))**

nutritious. So construed, this allegation does not state a plausible claim that Plaintiff was denied the "minimal civilized measure of life's necessities"—the basic necessities of food and clothing having been provided by the prison.

Plaintiff also alleges that during the winter months, he was made to sleep with the windows open and the heat at a minimum and that he was without his "personal blankets." Again, the Court construes the word "personal" to mean "owned by the inmate" and in contrast to "prison-issued." As such, the Court does not read the Amended Complaint to allege that Plaintiff was completely deprived of bedding but, rather, that he was deprived of additional blankets that he may have purchased or received from outside the prison. Plaintiff concedes that the heat was kept on, albeit at a minimal level. Sleeping with the windows open and heat low during the winter in New York might constitute an atypical and significant hardship, as in *Corselli v. Coughlin,* where an inmate alleged that prison officials had subjected him to cruel and unusual punishment when they forced him to sleep in solitary confinement with the windows open in sub-zero temperatures that caused ice to form in the toilet bowl and the inmate to became ill for over a month with a cold, fever and cramps. 842 F.2d 23, 27 (2d Cir.1988). In light of these allegations, the Second Circuit reversed a district court's grant of summary judgment against the inmate, holding that the inmate had stated a claim sufficiently to be resolved by the trier of fact. *Id.*

**\*8** However, incarceration with bedding of some sort, the heat kept on and no allegation of illness or sub-zero temperatures inside the cell does not constitute a denial of the minimal civilized measure of life's necessities. Petitioner's other allegations of hardship are all less severe than his allegations of being denied sufficient food, clothing and heat during the winter, and they do not rise to the level of depicting cruel and unusual treatment either. Therefore, Petitioner's claim that he was subjected to cruel and unusual punishment

will be dismissed.

*Personal Involvement*

As explained above, the Court will dismiss Delgado's Eighth Amendment claim and his due process claims premised upon ineffective assistance of counsel and untimely issuance of the hearing record, and all claims asserted against the Defendants in their official capacities. Delgado's other personal-capacity claims may proceed against only those Defendants who are alleged to have been personally involved. "Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation." *Prescott v. Riker Island Med. Staff,* No. 09 Civ. 255, 2011 WL 1435218, at *4 (S.D.N.Y. Apr. 12, 2011) (citation omitted). Defendants do not dispute that Howerter, Weeden and Brandow were personally involved in the conduct giving rise to Delgado's claims, so the remaining claims against them will be permitted to go forward.

Defendants Prack, Bezio and Cook are each alleged to have affirmed, or declined to reconsider, the disposition of Delgado's disciplinary hearing. Until recently, it was clear that the personal involvement of a supervisor was to be evaluated in this Circuit by reference to the five-category test articulated in *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). *See Qasem v. Toro,* 737 F.Supp.2d 147, 151 (S.D.N.Y.2010). A supervisor's personal involvement could be demonstrated by evidence that:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information

indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873. The continuing vitality of this test has been called into question in light of the Supreme Court's holding in *Ashcroft v. Iqbal* that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. 1937, 1948 (2009); *see also Qasem,* 737 F.Supp.2d at 151.

**\*9** The Second Circuit has not yet addressed the impact, if any, of *Iqbal* on the *Colon* standard. Courts in this district have reached contrary conclusions, holding in some cases that only the first and third *Colon* categories remain viable bases for liability, *see, e.g., Bellamy v. Mt. Vernon Hosp.,* 07 civ 1801, 2009 WL 1835939, at \*4 (S.D.N.Y. June 26, 2009) and, in other cases, that "the personal involvement required to overcome a 12(b)(6) motion varies depending on the constitutional provision alleged to have been violated" such that the applicability of each Colon category will depend on the nature of the violation alleged, *see Qasem,* 737 F.Supp.2d at 151–52; *see also D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 346–47 (S.D.N.Y.2010).

This Court agrees with the latter line of reasoning. The *Iqbal* Court specifically observed that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," *Iqbal,* 129 S.Ct. at 1948, and that a *Bivens* action is the "federal analog to suits brought against state officials under ... 42 U.S.C. § 1983." *Id.* (citation omitted). "It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected [in *Iqbal* ] the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009). Thus, where the claim does not require a showing of discriminatory

intent, the *Colon* analysis should still apply, insofar as it is "consistent with the particular constitutional provision alleged to have been violated." *Qasem,* 737 F.Supp.2d at 151–52. Here, Plaintiff does not assert an intentional discrimination claim of the sort that was at issue in *Iqbal,* and intent is not an element of his due process claims.

Plaintiff's due process claims against Prack, Bezio and Cook fall into the second *Colon* category of personal involvement—namely, that "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon,* 58 F.3d at 873. The *Iqbal* decision would clearly preclude liability of a supervisor on the basis of mere knowledge that a subordinate had rendered a decision that was intentionally discriminatory, and would likely preclude as well a claim based on affirmance of such a decision (at least absent a proffer that the affirmance was intentionally discriminatory). However, it cannot be said that the *Iqbal* holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of Plaintiff s due process rights, thus continuing a deprivation of liberty without due process of law. Plaintiff claims that he was denied due process by reason of the withholding of information on confidentiality grounds at his disciplinary hearing. He also alleges that he appealed to, or sought reconsideration from, Defendants Prack, Bezio and Cook. In his appeal and reconsideration-request papers, his attorney identified the withholding of information as grounds for the infirmity of the decision and argued that the reliance on confidential information denied Plaintiff the ability to defend himself at the hearing. (Compl. Ex R, Nov. 15, 2007, appeal letter; Compl. Ex. V, Dec. 11, 2007, appeal letter.) Defendants Prack, Bezio and Cook each denied an appeal or request for reconsideration. Read in the light most favorable to Plaintiff his Complaint and supporting documents allege sufficiently the personal involvement of Prack, Bezio and Cook, as they are alleged to have had the power, and to have refused, to vacate a penalty they knew had been

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)
**(Cite as: 2011 WL 1842294 (S.D.N.Y.))**

imposed in violation of Plaintiff's due process rights, thus violating Plaintiff's constitutional rights by knowingly continuing a deprivation of liberty without due process of law. Accordingly, the motion will be denied to the extent it seeks dismissal of Plaintiff s due process claims against Prack, Bezio and Cook.

*Qualified Immunity*

**\*10** Government officials performing discretionary functions generally enjoy qualified immunity from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would know." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 612–13 (S.D.N.Y.2009) (citation omitted). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Johnson v. Goord,* 487 F.Supp.2d 377, 398 (S.D.N.Y.2007) (citation omitted). Furthermore, prison officials, including hearing officers, are "charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989).

The right to adequate notice of a prison disciplinary hearing has been clearly established by both the Supreme Court and the Second Circuit. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 613 (2009) (citing *Wolff v. McDonnell,* 418 U.S. 539, 555–56 (1974), and *Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004)). The right to call witnesses at such a hearing has also been clearly established by both courts, subject to certain safeguards, which are also clearly established. *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). The Second Circuit has also clearly established that "an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information" and that an inmate has a "due process right to

know the evidence upon which a discipline ruling is based." *Id.* at 614 (citing *Sira,* 380 F.3d at 77, 74). Accordingly, there is an insufficient basis for the Court to find at this stage that any Defendants are entitled to qualified immunity. As this matter proceeds, Defendants may, of course, proffer evidence and reassert their qualified immunity defense.

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted with regard to all claims brought against Defendants in their official capacities, the Eighth Amendment claim and the due process claims premised on ineffective assistance of counsel and the untimely issuance of a hearing record. The motion to dismiss is denied in all other respects. This Memorandum Order resolves docket entry number 15. This case remains referred to Magistrate Judge Katz for general pretrial management.

SO ORDERED.

S.D.N.Y.,2011.
Delgado v. Bezio
Not Reported in F.Supp.2d, 2011 WL 1842294 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 4767173 (S.D.N.Y.)
**(Cite as: 2012 WL 4767173 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Randy JAMISON, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 11 Civ. 4697 RJS.
Sept. 27, 2012.

Randy Jamison, pro se.

Eric T. Schneiderman, Attorney General of the State of New York, Julia H. Lee, Of Counsel, Office of the Attorney General of the State of New York, New York, NY, for Defendants.

MEMORANDUM AND ORDER

SULLIVAN, J.

**\*1** Randy Jamison ("Plaintiff"), proceeding *pro se*, brings this action against various prison officials, pursuant to 42 U.S.C. § 1983. Plaintiff asserts that Defendants Lieuten ant Tokarz, Commissioner Brian Fischer, and Director Norman Bezio (collectively, "Defendants") violated his Fourteenth Amendment right to due process by prohibiting him from calling witnesses during a prison disciplinary hearing, which ultimately resulted in Plaintiff being sentenced to spend eighteen months in the Special Housing Unit ("SHU"). Before the Court are Fischer and Bezio's motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), and Plaintiff's motion to strike Tokarz's answer. For the following reasons, the Court grants Defendants' motion to dismiss, grants Plaintiff leave to file an amended complaint, and denies Plaintiff's motion to strike Tokarz's answer.

I. BACKGROUND
A. Facts [FN1]

FN1. The following facts are taken from the Complaint. In consideration of Defendants' motion to dismiss, the Court also considers the Defendants' memorandum of law in support of their motion to dismiss, Plaintiff's memorandum of law in opposition ("Opp'n"), and Defendants' reply. The Court also considers Plaintiff's memorandum in support of his motion to strike Tokarz's answer.

Plaintiff is currently an inmate at the Auburn Correctional Facility in upstate New York. He alleges that his due process rights were violated at a disciplinary hearing conducted by Tokarz when he was at the Green Haven Correctional Facility, which is located in Dutchess County in the Southern District of New York. Plaintiff alleges that Tokarz did not permit certain witnesses to testify during the hearing and that the "employee assistance cler [k] failed to interview witnesses prior to the hearing and/or collect documentary evidence to prepare a defense." (Compl.5.) According to Plaintiff, as a result, he was sanctioned with spending eighteen months in the SHU, subject to harsher conditions than are present in the rest of the prison, as well as the "loss of packages, commissary, phone, [and] goodtime" privileges. (*Id.* at 4.) In the SHU, Plaintiff alleges that he suffered "atypical and significant hardships, loud noise, feces thrown, [and] lack of social stimuli," as well as the "denial of contact visits, family picnics, academic and vocational programs[,] congregate religious services, meals and recreation." (*Id.* at 4–5.)

In addition to his claims against Tokarz, Plaintiff also brings claims against Bezio, Director of the Spe-

Not Reported in F.Supp.2d, 2012 WL 4767173 (S.D.N.Y.)
**(Cite as: 2012 WL 4767173 (S.D.N.Y.))**

cial Housing and Inmate Disciplinary Program for the New York State Department of Correctional Services. Plaintiff asserts that Bezio heard Plaintiff's appeal and, while he modified the sentence to only seventeen months in the SHU, he left the "illegal determination in tact [sic]." (*Id.* at 5.) Plaintiff served all seventeen months of this modified sentence. (*Id.* at 4.) Finally, Plaintiff asserts claims against Fischer, Commissioner of the New York State Department of Corrections, alleging that Fischer's failure to train and supervise employees led to the violation. (*Id.* at 5.)

### B. Procedural History

Plaintiff filed a complaint on April 5, 2011 in the United States District Court for the Northern District of New York. On June 24, 2011, the case was transferred to this district, and it was assigned to my docket on August 11, 2011. By Order dated October 24, 2011, the Court set a briefing schedule for Fischer and Bezio's motion to dismiss, directing Defendants to file their motion by December 2, 2011, Plaintiff to file his opposition by January 31, 2012, and Defendants to file their reply by February 13, 2012.

**\*2** Fischer and Bezio timely filed a joint motion to dismiss. However, Plaintiff failed to timely file his opposition. Thus, the Court issued an Order, dated March 7, 2012, directing Plaintiff to submit a response to Defendants' motion on or before April 4, 2012. Plaintiff submitted a response, dated April 2, 2012.

On December 29, 2011, after Fischer and Bezio filed their motion to dismiss, Tokarz was served. According to Federal Rule of Civil Procedure 12(a)(1)(A)(i), Tokarz was required to respond to the Complaint by January 19, 2012. Tokarz failed to do so, but Plaintiff made no attempt to secure a default against him. Accordingly, on March 7, 2012, as part of the same order granting Plaintiff additional time to file his opposition to Fischer and Bezio's motion, the Court granted Tokarz until April 4, 2012 to file his answer or join in the other Defendants' motion to dismiss.

In compliance with the Court's March 7 Order, Tokarz filed an answer on April 4, 2012. Plaintiff then submitted a motion, dated April 16, 2012, which replies to certain portions of Tokarz's answer, seeks to strike certain defenses that Tokarz asserts, and seeks to strike the entire answer as untimely. (Doc. No. 25.) Tokarz was not ordered to respond to Plaintiff's motion and has not done so.

### II. DEFENDANTS' MOTION TO DISMISS
#### A. Legal Standards

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded allegations contained in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007); *Grandon v. Merrill Lynch & Co.,* 147, F.3d 184, 188 (2d Cir.1998). *Pro se* filings in particular are read liberally and interpreted "to raise the strongest arguments that they suggest." *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006) (internal quotation marks omitted). To state a legally sufficient claim, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). However, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555). If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* 550 U.S. at 570. Although the Court construes the Complaint liberally because Plaintiff is *pro se,* the Complaint must still contain factual allegations that raise a "right to relief above the speculative level" in order to survive a motion to dismiss. *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 603 (S.D.N.Y.2009) (quoting *Twombly,* 550 U.S. at 555)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4767173 (S.D.N.Y.)
**(Cite as: 2012 WL 4767173 (S.D.N.Y.))**

(internal quotation marks omitted).

### B. Claims Against Fischer

**\*3** Plaintiff's Complaint fails to state a claim against Fischer because it does not allege that Fischer was personally involved with the deprivation of rights that Plaintiff claims to have suffered. It is well established that "the doctrine of *respondeat superior* cannot be used to establish liability [of a supervisory official] under § 1983." *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). Rather, liability under § 1983 turns on a defendant's personal involvement in the alleged constitutional deprivations. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Accordingly, to the extent that Plaintiff has named Fischer simply because he is the "Commissioner" of the Department of Corrections, the claims against Fischer must be dismissed.

Although *respondeat superior* is not a basis for liability under § 1983, the Second Circuit has held that supervisory liability may attach where there was:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). However, because *Iqbal* explicitly rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," *Iqbal,* 556 U.S. at 677, courts in this Circuit

are not in agreement as to whether all five *Colon* categories enumerated above continue to be viable, *see, e.g., Barnes v. Pozzi,* No. 10 Civ. 2554(JGK), 2012 WL 3155073, at \*8 (S.D.N.Y. Aug. 3, 2012) (noting that courts are divided over the application of the *Colon* categories in the wake of *Iqbal* ); *compare Martinez v.. Perilli,* No. 09 Civ. 6470(WHP), 2012 WL 75249, at \*4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five *Colon* categories still apply after *Iqbal.*" ), *with Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2009 WL 1835939, at \*4, \*6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal'* s muster.... The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated...."). The Second Circuit has not yet addressed which, if any, of the *Colon* categories survive *Iqbal. See Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012) (noting considerable skepticism as to whether all *Colon* categories survived *Iqbal* but not deciding the issue). However, the Court need not wade into this dispute because Plaintiff fails to state a claim against Fischer under any interpretation.

**\*4** In the Complaint, Plaintiff asserts that Fischer is liable for allowing a policy or custom that resulted in the alleged constitutional violation. However, the Complaint states only that "Fischer ... had a policy and procedure in place that allowed hearing officers to illegally impose disciplinary sanctions on [Plaintiff] and failed to properly train its employees in matters of due process of law." (Compl.5.) Because Plaintiff is proceeding *pro se,* the Court interprets the Complaint liberally. *See, e.g ., Pabon,* 459 F.3d at 248. However, even under the most liberal of readings, Plaintiff has not alleged any facts whatsoever to support this claim. Indeed, even Plaintiff admits that "the original complaint lacks specific facts to prove that Fischer failed in training his employees[ ] and [was] deliberately] indifferent to the need to train subordinates as to their obligation not to violate the constitutional rights at issue." (Opp'n ¶ 39.)

In light of this deficiency, Plaintiff requests per-

Not Reported in F.Supp.2d, 2012 WL 4767173 (S.D.N.Y.)
**(Cite as: 2012 WL 4767173 (S.D.N.Y.))**

mission to submit an amended complaint that would set forth greater factual support for this claim.[FN2] (Opp'n ¶¶ 25, 38–39.) Accordingly, the claims against Fischer are dismissed without prejudice. Plaintiff may file an amended complaint that alleges specific facts concerning the nature of these policies and Fischer's specific involvement in their creation. However, as explained above, Fischer cannot be held liable on a theory of *respondeat superior;* any future complaint must allege with specificity facts regarding Fischer's personal involvement in the constitutional deprivation that Plaintiff allegedly suffered.

> FN2. The opposition requests either that this Court permit Plaintiff to amend the complaint or to accept his attached amended complaint (referred to as an "Amended Petition"). (Opp'n ¶ 25.) However, no such attachment was provided to the Court.

### C. Claims Against Bezio

Bezio argues that the claims against him must be dismissed because the Complaint does not assert that he was personally involved while the alleged constitutional violation was ongoing. As set forth above, there is no *respondeat superior* liability under § 1983, and the Second Circuit has not yet addressed whether all five *Colon* categories of liability continue to be viable. *See Reynolds,* 685 F.3d at 205 n. 14. However, the only *Colon* category that is arguably applicable to Bezio is the second—that Bezio failed to remedy a wrong after being informed through a report or appeal. *See Colon,* 58 F.3d at 873. In particular, Plaintiff alleges that Bezio affirmed the results of the hearing at which Plaintiff was denied the right to call witnesses on his behalf. (Compl.5.)

However, Bezio cannot be held liable under this theory because the alleged constitutional violation had ceased by the time that Bezio was called upon to review Plaintiff's appeal. This Court recently adopted the position taken by other courts in this circuit that a prison official who denies an inmate's administrative appeal from a disciplinary hearing can be held liable under § 1983 only if the violation complained of was still "ongoing" at the time of the appeal, such that he or she could have remedied the violation directly. *Fiore v. Medina,* No. 11 Civ. 2264(RJS), at 15 (S.D.N.Y. Sept. 27, 2012); *see Odom v. Calero,* No. 06 Civ. 15527(LAK)(GWG), 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008); *see also Burton v. Lynch,* 664 F.Supp.2d 349, 360–61 (S.D.N.Y.2009) (applying the same standard for officials who review prison grievances). In this case, the only constitutional violation alleged in the Complaint is that Tokarz denied Plaintiff the ability to call witnesses at the hearing. (Compl.5.) Bezio was not present at the hearing when this violation allegedly occurred, and the violation, if any, was isolated to the hearing itself. *See Koehl v. Bernstein,* No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at *10 (S.D.N.Y. June 17, 2011); *Odom,* 2008 WL 2735868, at *7. Put simply, Bezio could not have corrected the alleged denial of Plaintiff's ability to call witnesses at the hearing because—by definition—the hearing ended before Bezio became involved through Plaintiff's appeal. *See Odom,* 2008 WL 2735868, at *7. Therefore, Bezio was not personally involved because the alleged constitutional violation was not ongoing at the time of Plaintiff's administrative appeal.

**\*5** Plaintiff's continued incarceration in the SHU at the time that Bezio reviewed his appeal does not change the fact that the alleged constitutional violation had concluded before Bezio became involved. To be sure, Plaintiff s continued incarceration in the SHU was arguably a consequence of the deprivation complained of, namely, the inability to call witnesses at the hearing. Additionally, Bezio had the ability to modify the sentence imposed following this disciplinary hearing by virtue of his responsibility to consider Plaintiff's administrative appeal. But unlike a condition of confinement case, in which the alleged constitutional violation continues unabated, the deprivation alleged here—a procedural error isolated to a particular time and place—was not ongoing simply

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4767173 (S.D.N.Y.)
**(Cite as: 2012 WL 4767173 (S.D.N.Y.))**

because Plaintiff's punishment had not yet run its course.

The Court recognizes that other courts in this Circuit have reached the opposite conclusion and have permitted claims to go forward against prison officials who denied inmates' administrative appeals when the inmates were still housed in the SHU as a result of their hearings.[FN3] *See, e.g., Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 WL 1842294, at *8 (S.D.N.Y. May 9, 2011) (denying motion to dismiss claims against officers who heard the plaintiff's appeal from a disciplinary hearing); *Thomas v. Calero,* 824 F.Supp.2d 488, 509 (S.D.N.Y.2011) (denying motion to dismiss because "Bezio's actions, by affirming [the hearing officer's] determination with only a modification of the penalty, are sufficient to demonstrate personal involvement and could lead a trier of fact to impose liability under the second *Colon* factor"); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (denying appeal officer's motion to dismiss because "the prisoner allege[d] a formal appeals process through which both defendants were on notice" that plaintiff had been denied the opportunity to call witnesses at his disciplinary hearing). However, the Court disagrees with these decisions insofar as they focus on the effects of the hearing where the constitutional violation is alleged to have occurred and not on the alleged constitutional violation itself. Instead, the Court concurs with Judge Gorenstein that an official reviewing an appeal of a prison disciplinary hearing can be held liable under § 1983 only if the constitutional violation complained of—in this case, the alleged due process violation during the hearing—is itself ongoing. *See Odom,* 2008 WL 2735868, at *7. Despite the fact that Plaintiff continued to be housed in the SHU, Bezio's involvement and review of the matter was distinct from whatever took place at the hearing, and he cannot be held liable under § 1983 for violations that occurred at the hearing and were not ongoing.

FN3. The Court also recognizes that the

Second Circuit has, on at least one occasion, allowed a due process claim to proceed against a prison official based partly on the allegation that the official had "affirmed [plaintiff's disciplinary] conviction on administrative appeal" after the plaintiff was denied the opportunity to call witnesses during his disciplinary hearing. *Williams,* 781 F.2d at 324. *Williams* is not dispositive, however, because the Second Circuit recognized that, during the relevant period at that particular facility, inmates were regularly denied the right to call witnesses, and the defendant could be alleged to have been involved in a "custom or policy" of allowing unconstitutional practices. *Id.* Additionally, the decision in *Williams* pre-dates the Supreme Court's decision in *Iqbal* and appears to conflict with the Second Circuit's more recent suggestion that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004).

Furthermore, allowing suits to proceed against all of the officers who reviewed an inmate's appeal in such a situation would improperly impose supervisory liability, conflicting with the clear mandate of *Iqbal* and many years of Second Circuit case law. *See Iqbal,* 556 U.S. at 676 (holding that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution"); *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and internal quotation marks omitted)).

**\*6** Accordingly, the Court grants Bezio's motion to dismiss because he was not personally involved

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

with the alleged constitutional violation. Bezio's only involvement occurred after the violation had concluded, which is insufficient to establish liability under § 1983.

### III. PLAINTIFF'S MOTION TO STRIKE

Shortly after filing his opposition to Defendants' motion to dismiss, Plaintiff, without leave of the Court, submitted a motion on April 16, 2012, which (1) replies and objects to certain portions of Tokarz's answer, (2) seeks to strike certain defenses, and (3) seeks to strike the entire answer because it was not timely filed. (Doc. No. 25.) Tokarz did not respond to this motion.

Plaintiff contends that Tokarz's answer should be striken because it was untimely, and suggests that a default judgment should be entered against Tokarz.[FN4] Under the Federal Rules of Civil Procedure, a defendant must respond within twenty one days of being served with the summons and complaint. *See* Fed.R.Civ.P. 12(a)(1)(A)(i). Tokarz was served on December 29, 2011 and, therefore, his answer was due January 19, 2012. (Doc. No. 18.) However, the other defendants—Fischer and Bezio—were served well before Tokarz, and, accordingly, the Court set a briefing schedule for Defendants' motion to dismiss before Plaintiff served Tokarz. (Doc. No. 14.) Fischer and Bezio timely filed their motion to dismiss (Doc. No. 15), but Plaintiff did not respond or seek an extension of the deadline to file his opposition.

> FN4. Although Plaintiff does not specifically request a default judgment in his motion, the relief he seeks is consistent with a default judgment and, thus, the Court construes this *pro se* submission liberally as though it had specifically requested a default judgment.

When the Court did not receive Plaintiff's opposition it also noted that Tokarz had not answered, despite having been served on December 29, 2011.

Accordingly, by Order dated March 7, 2012, the Court directed Plaintiff to file his opposition and Tokarz to answer or respond to the Complaint by April 4, 2012. (Doc. No. 20.) In compliance with the Court's Order, Tokarz filed an answer on April 4, 2012. (Doc. No. 21.)

Courts have inherent authority to set and enforce deadlines for the management of litigation. *See Car–Freshner Co. v. Air Freshners, Inc.,* No. 10 Civ. 1491(GTS), 2012 WL 3294948, at *3 (N .D.N.Y. Aug. 10, 2012).* In this case, because there was no prejudice to Plaintiff—who had not filed his opposition to Bezio and Fischer's motion to dismiss at that point—the Court exercised its discretion and extended the time for Tokarz to answer until April 4, 2012. Because Tokarz timely submitted his answer in accordance with the schedule set by the Court, Plaintiff's motion to strike the answer as untimely is denied.

Relatedly, Plaintiff did not submit this motion or otherwise suggest that Tokarz was in default until after Tokarz had already answered. Because Tokarz has now appeared and answered, there is no basis for entering a default judgment. Moreover, granting a default in this situation would be inconsistent with the Second Circuit's clear policy in favor of resolving cases on the merits. *See State St Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 168 (2d Cir.2004) ("Default judgments are generally disfavored and are reserved for rare occasions." (citations and internal quotation marks omitted)). Therefore, the Court denies Plaintiff's motion for a default judgment.

**\*7** Insofar as Plaintiff attempts to reply to portions of Tokarz's Answer, pursuant to Federal Rule of Civil Procedure 7(a)(7), a reply to an answer is permitted only if ordered by the Court. The Court did not order a reply from Plaintiff. Accordingly, the Court will not consider those portions of Plaintiff's motion that reply to Tokarz's answer. To the extent that Plaintiff disagrees with the assertions that Tokarz makes in his answer, those disputes will be resolved at

Not Reported in F.Supp.2d, 2012 WL 4767173 (S.D.N.Y.)
**(Cite as: 2012 WL 4767173 (S.D.N.Y.))**

a later stage in this litigation.

Similarly, Plaintiff provides absolutely no justification for his assertion that certain defenses raised by Tokarz should be stricken. Federal Rule of Civil Procedure 12(f) permits a court to strike "from any pleading an insufficient defense or any other redundant, immaterial, impertinent, or scandalous matter." *Connell v. City of New York,* 230 F.Supp.2d 432, 438 (S.D.N.Y.2002). However, motions to strike are disfavored. *See, e.g., DDR Constr. Servs., Inc. v. Siemens Indus., Inc.,* 770 F.Supp.2d 627, 664 (S.D.N.Y.2011); *Connell,* 230 F.Supp.2d at 438. Granting a motion to strike is appropriate only if, construing the defendant's pleading liberally, it is clear that the defense could not succeed under any circumstances. *Connell,* 230 F.Supp.2d at 438. To prevail on the motion to strike, the movant must also show that he or she will be prejudiced by the inclusion of the defense. *Id.* Having reviewed Tokarz's answer, the Court finds that the material that Plaintiff seeks to strike is directly related to Plaintiff's claims and that there appears to be a substantial question as to whether the defenses Tokarz asserts will ultimately succeed. Although Plaintiff clearly disagrees with both Tokarz's account of the facts and whether he can prevail under certain affirmative defenses, this is not a basis for striking the answer.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Bezio and Fischer's motion to dismiss all claims against them and denies Plaintiff's motion to strike Tokarz's answer and for a default judgment.

Plaintiff may file an amended complaint that alleges with greater specificity the facts concerning the nature of any policies that led to the due process violation he allegedly suffered as well as what Fischer's involvement with those policies was. If Plaintiff wishes to file an amended complaint, IT IS HEREBY ORDERED THAT he shall do so by October 31, 2012.

The amended complaint will completely replace the original complaint, so Plaintiff must include all the facts and legal information relating to his claims in the amended complaint.

The Clerk of Court is respectfully requested to terminate the motions pending at Doc. Nos. 15 and 24.

SO ORDERED.

S.D.N.Y.,2012.
Jamison v. Fischer
Not Reported in F.Supp.2d, 2012 WL 4767173 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jonathan ODOM, Plaintiff,
v.
Ana E. CALERO, et al., Defendants.

No. 06 Civ. 15527(LAK)(GWG).
July 10, 2008.

*REPORT AND RECOMMENDATION*
GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**\*1** Jonathan Odom, currently an inmate at the Auburn Correctional Facility, brings this suit *pro se* under 42 U.S.C. §§ 1983 and 1985 against employees of the New York State Department of Correctional Services ("DOCS"). After the defendants filed a motion to dismiss, the undersigned issued a Report and Recommendation recommending that the motion be granted. Following objections by plaintiff, the district judge granted the defendants' motion to dismiss some of the claims but sustained Odom's objection to dismissing two of the claims on statute of limitations grounds. Thus, the instant Report and Recommendation addresses the alternative grounds raised in the motion to dismiss with respect to the remaining two claims.

In the remaining causes of action, Odom alleges that, in retaliation for testifying in 2001 regarding the assault of a fellow inmate at the Sing Sing Correctional Facility ("Sing Sing"), Correction Officers W. Perez and Brian McCoy filed false misbehavior reports against him, and that Hearing Officer Ana E. Calero violated his right to due process through her conduct at his disciplinary hearings. Following the hearings, Odom was sentenced to various amounts of time in the Special Housing Unit ("SHU") at Sing Sing. Odom further alleges that Brian Fischer, the Superintendent of Sing Sing, and Donald Selsky, the Director of the Special Housing/Inmate Disciplinary Program, violated his right to due process by affirming the decisions made at those hearings.

Defendants Perez and McCoy have never been served. Defendants Calero, Fischer, and Selsky move to dismiss Odom's claims for failure to state a claim and on qualified immunity and Eleventh Amendment immunity grounds. For the reasons stated below, the defendants' motion should be granted in part and denied in part.

I. *BACKGROUND*

A. *Facts*

On this motion to dismiss, the Court assumes that the facts alleged in Odom's complaint, amended complaint, and affirmation in opposition to the motion are true. *See, e.g., Burgess v. Goord,* 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan. 26, 1999) (" 'the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum' " (quoting *Gadson v. Goord,* 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997))); *accord Torrico v. IBM Corp.,* 213 F.Supp.2d 390, 400 n.4 (S.D.N.Y.2002). In addition, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007).

Odom's allegations stem from an incident on May 27, 2001, in which he alleges that he witnessed Perez

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

and "other[ ] prison officials" assault another inmate. *See* Amended Complaint, filed May 24, 2007 (Docket # 10) ("Am.Compl."), ¶ 12. Odom was issued approximately ten misbehavior reports both before and after he testified at the other inmate's disciplinary hearing. *Id.* ¶ 16; *see id.* ¶¶ 24-25, 43-44. All of the charges against Odom were dismissed at disciplinary hearings or on appeal before Selsky, except for the charges considered at disciplinary hearings held on June 7, 2001 and July 16, 2001. *Id.* ¶ 17. Those charges resulted in Odom being sentenced to 455 days in the SHU. *Id.* ¶ 18. The charges considered at these hearings were ultimately dismissed on June 17, 2005, and December 30, 2005. *Id.* ¶ 17; *see* Exs. A, F to Am. Compl.

**\*2** In his first and second causes of action, Odom alleges violations of his due process rights. *Id.* ¶ 27; *see id.* ¶¶ 38; 56. Two Correction Officers, Perez and McCoy, filed misbehavior reports in retaliation for Odom's testifying about the assault of a fellow inmate in 2001. *See id.* ¶¶ 24-25, 44-45. Fischer caused Odom to be subjected to misbehavior reports and unfair disciplinary hearings, and he also assigned Calero as the hearing officer in order to violate Odom's due process rights. *Id.* ¶¶ 14, 28, 43, 46. Calero undertook "to act as [his] inmate assistant, and then did nothing to help assist [him]," *id.* ¶ 29; *see id.* ¶ 47; asked prison officials leading questions and "then provided most of their answers," *id.* ¶ 30; *see id.* ¶ 48; and "refused to allow [Odom] to call witnesses and precluded [him] from presenting a defense, resulting in him being found guilty with no evidence to support the charges," *id.* ¶ 31; *see id.* ¶ 49; Affirmation in Opposition to Defendants' Motion to Dismiss, filed Sept. 7, 2007 (Docket # 25) ("Pl.Aff."), ¶ 9 (Calero failed "to obtain the testimony of the witnesses requested by the plaintiff during his June 7, 2001 and July 16, 2001 disciplinary hearings"). Following one of the hearings, Calero told plaintiff to "mind his business next time." Am. Compl. ¶ 14.

Odom filed appeals with Fischer and Selsky after

the disciplinary hearings. *Id.* ¶ 15. While neither Fischer nor Selsky "commit[ted] the due process violations," *id.* ¶ 32, 50, Fischer and Selsky "both became responsible for them[ ] when they ... failed to correct them in the course of their supervisory responsibilities," *id.* ¶ 32; *see id.* ¶ 50. They "refus[ed] to overturn [his] disciplinary conviction and expunge it, despite their knowledge of the ... due process violations." *Id.* ¶ 34; *accord id.* ¶¶ 50-52.

**B.** *Procedural History*

The original complaint was received by the Pro Se Office on June 27, 2006, and was filed on December 29, 2006. (Docket # 1). After submitting a "Supplemental Complaint" (filed May 4, 2007 (Docket # 7)), Odom filed the Amended Complaint on May 24, 2007, *see* Am. Compl.

Defendants Calero, Fischer, and Selsky filed their motion to dismiss and supporting papers on August 22, 2007. *See* Notice of Motion, filed Aug. 22, 2007 (Docket # 20) ("Def.Not."); Memorandum of Law in Support of Defendants' Motion to Dismiss, filed Aug. 22, 2007 (Docket # 21) ("Def.Mem."); Declaration of Jeb Harben, filed Aug. 22, 2007 (Docket # 22). Odom responded with an affirmation, *see* Pl. Aff., and the defendants filed a reply brief, *see* Reply Memorandum of Law in Support of Defendants' Motion to Dismiss, filed Sept. 21, 2007 (Docket # 28) ("Def.Reply").

On February 19, 2008, the undersigned issued a Report and Recommendation recommending that all claims be dismissed. *Odom v. Calero,* 2008 WL 449677 (S.D.N.Y. Feb. 19, 2008). The district judge granted the defendants motion to dismiss claims three, four, five and six in the Amended Complaint, sustained Odom's objection to the dismissal of claims one and two on statute of limitations grounds, and referred the motion back to the undersigned to address the alternative grounds in defendants' motion to dismiss. *See* Order, filed Mar. 25, 2008 (Docket # 40). Odom responded to this order, *see* Affirmation in Reply to Judge Lewis A. Kaplan's March 27, 2008 Court Order,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

dated April 14, 2008 (Docket # 51), and defendants filed a motion for reconsideration, *see* Motion for Reconsideration, filed Apr. 9, 2008 (Docket # 42), which was denied, *see* Order, filed Apr. 15, 2008 (Docket # 45).

**\*3** Shortly before the denial of the motion for reconsideration, Odom submitted a motion for summary judgment. *See* Notice of Motion for Summary Judgment, dated April 14, 2008 (Docket # 48) ("S.J.Motion"); Plaintiff's Affirmation in Opposition to Defendants' Motion for Reconsideration and in Support of the Plaintiff's Motion for Summary Judgment, dated April 14, 2008 (Docket # 49); Brief in Support of Plaintiff's Motion for Summary Judgment, dated April 14, 2008 (Docket # 50); Statement of Undisputed Facts, dated April 14, 2008 (Docket # 52). As discussed below, the summary judgment motion should be denied for procedural reasons. Nonetheless, we have considered Odom's submissions in support of the summary judgment motion to the extent they are relevant to his opposition to the defendants' motion to dismiss.

In addition to arguing for dismissal on statute of limitations grounds, Calero, Fischer, and Selsky moved to dismiss the complaint for failure to state a claim or "insufficient pleadings," qualified immunity, failure to allege a conspiracy, and Eleventh Amendment immunity. Def. Mem. at 5-17.

II. *DISCUSSION*

A. *Law Governing a Motion to Dismiss for Failure to State a Claim*

Under Fed.R.Civ.P. 8(a)(2), a pleading is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Thus, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)) (some internal quotation marks and citation omitted). On a motion to dismiss for failure to state a claim, all factual allegations in the complaint are accepted as true. *See Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508 n.1 (2002).

Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do .... Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (internal quotation marks, citations, and brackets omitted); *see also id.* at 1966 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks, citation, and brackets omitted). Thus, "a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007).

For purposes of deciding a motion to dismiss, "[a] document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) (per curiam) (internal quotation marks and citations omitted); *accord Boykin v. Key-Corp,* 521 F.3d 202, 213-14 (2d Cir.2008).

**\*4** Calero, Fischer, and Selsky argue that Odom has failed to "allege sufficient specific facts to support the stated causes of action," Def. Mem. at 7, by which they apparently mean to argue that he has failed to state a claim under Fed.R.Civ.P. 12(b)(6), *see* Def. Mem. at 4-5, 7 (citing *Bell Atl. Corp.*), 9-11; Def. Not. We now consider whether Odom's Amended Complaint states a claim against any of these defendants.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

B. *Section 1983 Claims*

To assert a claim under 42 U.S.C. § 1983, a plaintiff must show that he has been deprived of a right secured by the Constitution or federal law by a defendant acting under the color of state law. 42 U.S.C. § 1983; *see West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 does not grant any substantive rights, but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999) (citations omitted), namely in the Constitution or federal statutes. Here it is undisputed that the defendants were acting under color of law. The only question is whether plaintiff has shown that they committed a violation of plaintiff's federal rights. In this case, the only violations that the complaint may be fairly read to assert are violations of the Due Process clause of the Fourteenth Amendment.

A party asserting a due process claim " 'must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)), *cert. denied,* 543 U.S. 1187 (2005). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

"Segregation of longer than 305 days in standard SHU conditions is sufficiently atypical to require procedural due process protection under *Sandin." Iqbal v. Hasty,* 490 F.3d 143, 161 (2d Cir.2007). Odom alleges that he was sentenced to 455 days in the SHU as a result of the disciplinary hearings on June 7, 2001 and July 16, 2001, Am. Compl. ¶ 18, and defendants do not contest that Odom's confinement implicates a liberty interest. Thus, for the purposes of this motion we assume that Odom's sentence of confinement in the SHU implicates a liberty interest.

**\*5** We next address each defendant's arguments regarding whether Odom was deprived of his liberty through insufficient process.

1. *Calero*

As previously noted, Odom alleges that Calero violated his due process rights by the manner in which she conducted disciplinary hearings with respect to misbehavior reports on June 7, 2001 and July 16, 2001. *See* Am. Compl. ¶¶ 4, 17, 27-31, 46-49. Specifically, he alleges that "Calero ... violated the plaintiff's due process rights by failing (without rational explanation) to obtain the testimony of the witnesses requested by the plaintiff during his June 7, 2001 and July 16, 2001 disciplinary hearings." Pl. Aff. ¶ 9; *see* Am. Compl. ¶ 31 (Calero "refused to allow plaintiff to call witnesses and precluded the plaintiff from presenting a defense"); *accord id.* ¶ 49. Odom asserts that in one of the hearings he requested that Calero call "several inmates as witnesses" for him and "provided their cell locations," Declaration in Support of Plaintiff's Motion for Summary Judgment, dated Apr. 14, 2008 (attached to S.J. Motion), ¶ 3, but that she refused to call them on the ground that "staff reports gave a 'full picture' of the incident," *id.* ¶ 4. "The evidence at the hearing consisted solely of the written report of defendant Perez, inmate Hurt's and my neighbor W16 cell and my testimony" [sic]. *Id.* ¶ 5.

In addition, Odom alleges that he was not afforded "the right to a fair and impartial hearing of-

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

ficer" in his disciplinary hearings. Am. Compl. ¶ 27; *accord id.* ¶ 48. Specifically, he alleges that Calero asked prison officials leading questions and provided "most of their answers." *Id.* ¶ 30; *accord id.* ¶ 48.

According to the Second Circuit:

The due process protections afforded a prison inmate do not equate to "the full panoply of rights" due to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. 2963. Notably, there is no right to counsel or to confrontation at prison disciplinary hearings. *See id.* at 567-70, 94 S.Ct. 2963. Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *See id.* at 563-67, 94 S.Ct. 2963; *accord Luna v. Pico,* 356 F.3d at 487; *Kalwasinski v. Morse,* 201 F.3d at 108.

*Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004).

Construing the complaint in the manner most favorable to plaintiff, Odom's allegations that he was not given a reasonable opportunity to call witnesses and that Calero "provided answers" to questions asked at the hearings are sufficient to state a claim for violation of his due process rights. The defendants' argue that the allegations are infirm because Odom does not give sufficient factual details such as the names of witnesses that he would have called or the evidence he would have presented. Def. Mem. at 7. At this stage of the litigation, however, when only a "short and plain statement" of a claim is required by Fed.R.Civ.P. 8(a)(2), and where the plaintiff is proceeding *pro se,* such factual detail is not required in the complaint.

**\*6** The defendants also argue that Odom has

failed to state a claim because there was some evidence on which Calero could have reasonably relied in making her decisions at the disciplinary hearings. Def. Mem. at 10; Def. Reply at 4. Certainly, a hearing decision will be upheld if there is "any evidence" in the record to support it. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (emphasis omitted). But this argument fails for two reasons. First, it requires the Court to look outside the record on a motion to dismiss. Second, it does not address the question of whether Calero committed a due process violation. By asking the Court to judge the decision based on the record that Calero allowed to be created, the defendants ignore the allegations that Odom was not given a reasonable opportunity to call witnesses in order to create a proper record in the first place.

2. *Fischer and Selsky*

The defendants argue that Odom has failed to allege the personal involvement of Fischer and Selsky in any constitutional violation. Def. Mem. at 9. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ( "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior"* ), *cert. denied,* 543 U.S. 1093 (2005); *accord Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). According to the Second Circuit,

The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the viola-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal,* 490 F.3d at 152-53 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

Odom's central allegation is that Fischer and Selsky violated his rights by not overturning Calero's decisions when he appealed the disciplinary hearing decisions to them. Odom argues that Fischer and Selsky "both became responsible" for the due process violations committed at the hearings "when they ... failed to correct [the violations] in the course of their supervisory responsibilities." Am. Compl. ¶¶ 32, 50. He alleges that they "refus[ed] to overturn [his] disciplinary conviction and expunge it, despite their knowledge of the ... due process violations." *Id.* ¶ 34; *accord id.* ¶¶ 50-52. While the source of that knowledge is not identified, the context of allegations make clear that it could only have been derived from their review of Odom's assertions as part of the appeal process itself. Indeed, in another submission, Odom asserts that he "identified the due process violations in his discretionary appeal and direct appeal letters," and that as a result "Fischer and Selsky both knew just what to look for." Pl. Aff. ¶ 12.

**\*7** These allegations are insufficient to show personal involvement in the due process violation alleged to have been committed by Calero. Odom concedes that neither Fischer nor Selsky "commit[ted] the due process violations" themselves. Am. Compl. ¶¶ 32, 50. Rather, Calero is alleged to have committed the alleged due process violation. Once the hearing was over and her decision was issued, the due process violation was completed. The only opportunity that Fischer or Selsky had to rectify this violation was through the appeal process itself.

The only method outlined by the Second Circuit by which personal involvement may be shown poten-

tially relevant here is that Fischer and Selsky, "after being informed of the violation through [the appeals], failed to remedy the wrong." *Colon,* 58 F.3d at 873. This method does not apply here, however, because-as has been noted in a related context-"affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at \*10 (S.D.N.Y. Jan. 19, 2007) (citing, *inter alia, Foreman v. Goord,* 2004 WL 1886928, at \*7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at \*7 (internal citations omitted). The reference in case law to an official who "fails to remedy" a violation logically applies only to ongoing, and therefore correctable, constitutional violations-not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded. As was held in *Harnett v. Barr,* 538 F.Supp.2d 511 (N.D.N.Y.2008), "[i]f the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Id.* at 524; *accord Thompson,* 2001 WL 636432, at \*7 ("The Second Circuit's reference to the failure by a supervisor to remedy a known wrong seems to have a different focus. As worded, it appears to address cases involving continuing unconstitutional prison conditions that the warden may be proven or assumed to know about, and a refusal by the warden to correct those conditions."). In this case, any constitutional violation allegedly committed by Calero was concluded by the time Fischer and Selsky were called upon to review it. Accordingly, they were not "per-

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

sonally involved" in committing the alleged due process violations.[FN1]

> FN1. Odom has made other allegations against Fischer that are too vague and conclusory to state a claim for a due process violation, such as the assertion that Fischer "subjected" Odom to four of the misbehavior reports after Odom testified at the other inmate's disciplinary hearing. Am. Compl. ¶ 43. Another assertion-that Fischer intentionally assigned Calero as the hearing officer at both hearings in order to violate Odom's due process rights, *id.* ¶¶ 14, 28, 46-is insufficient to show personal involvement inasmuch as it was Calero's responsibility to act as an impartial hearing officer. To fault Fischer, as a supervisory official, for giving her his assignment is tantamount to arguing that he failed in his supervisory responsibilities. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam) (a mere "linkage in the prison chain of command" is not sufficient to demonstrate personal involvement for purposes of section 1983).

## C. *Qualified Immunity*

**\*8** The defendants assert that they are entitled to qualified immunity. Def. Mem. at 11. The doctrine of qualified immunity precludes civil liability where prison officials performing discretionary functions " 'did not violate clearly established rights or if it would have been objectively reasonable for the official[s] to believe [their] conduct did not violate plaintiff's rights.' " *Reuland v. Hynes,* 460 F.3d 409, 419 (2d Cir.2006) (quoting *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003)), *cert. denied,* 128 S.Ct. 119 (2007); *accord Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability, and "[f]or a

constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' " (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987))). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434-35 (2d Cir.2004).

With respect to Calero, the defendants' brief makes no argument that the rights of a prisoner to due process at a disciplinary hearing under the standard set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974), were not clearly established at the time of Odom's hearings. *See* Def. Mem. at 11-12. Instead, they seem to argue that Calero's actions were objectively reasonable. *Id.* But their only support for this argument is material outside the record, *see id.* at 11, and their claim that the decision on the disciplinary hearings must have been justified by the evidence presented at the hearing. As noted previously, however, the issue is whether the complaint alleges that Calero committed a due process violation-not whether the decision was justified by record.

"In analyzing whether the defense of qualified immunity may be successfully invoked on a motion to dismiss, the court need look no further than the complaint's allegations regarding the specific procedural protections allegedly denied the plaintiff. If the entitlement to those protections was 'clearly established' at the time of the administrative hearing ... then the defense is unavailable." *Wright v. Dee,* 54 F.Supp.2d 199, 207 (S.D.N.Y.1999). Calero does not contest that it was clearly established at the time of Odom's hearings that he was entitled to call witnesses on his behalf, *see, e. g., Sira,* 380 F.3d at 69, and that he was entitled to an impartial hearing officer, *see, e.g., Allen v. Cuomo,* 100 F.3d 253, 259 (1996). Odom alleges that these procedural protections were denied him.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

Thus, Calero has not shown that the complaint establishes that she is entitled to qualified immunity for Odom's due process claims.[FN2]

> FN2. While it is clear in the Amended Complaint that Odom is alleging that Perez and McCoy filed the misbehavior reports in retaliation for Odom's testifying at another inmate's disciplinary hearing, Am. Compl. ¶¶ 24-25, 44-45, no retaliation claim has been asserted against Calero. To the extent the complaint could be construed as making such a claim against Calero, it would have to be dismissed because it is not clearly established in this Circuit that a prisoner has a constitutional right to testify in a disciplinary hearing of another inmate. *See Pettus v. McGinnis,* 533 F.Supp.2d 337, 340 (W.D.N.Y.2008) ("This Court has found no authority ... that even today clearly establishes within this circuit whether an inmate's testimony on behalf of another inmate at the other inmate's disciplinary hearing is constitutionally protected.") (dismissing claim of retaliation) (emphasis omitted).

D. *Claims Under 42 U.S.C. § 1985*

**\*9** Odom also purports to assert conspiracy claims under 42 U.S.C. § 1985. *See* Am. Compl. at 1. "To state a conspiracy claim under 42 U.S.C. § 1985, plaintiff must allege (1) some racial or other class-based discriminatory animus underlying the defendants' actions, and (2) that the conspiracy was aimed at interfering with the plaintiff's protected rights." *Porter v. Selsky,* 287 F.Supp.2d 180, 187 (W.D.N.Y.2003) (citing *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268 (1993); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994)), *aff'd on other grounds,* 421 F.3d 141 (2d Cir.2005). There are no explicit allegations of conspiracy in the Amended Complaint, however. When this issue was raised by defendants in their motion, Odom's response, *see* Pl. Aff. ¶ 46, pointed to scattered allega-

tions in the Amended Complaint that particular defendants "acted alone and/or in conjunction with another named defendant." *See, e.g.,* Am. Compl. ¶¶ 28, 31, 32, 46, 50. Nothing in Odom's allegations, however, shows that the elements of a section 1985 claim, quoted above, have been met.

E. *Eleventh Amendment*

The defendants argue that "[i]f claims are being made against defendants in their positions of authority within DOCS, those claims are essentially claims against DOCS or the State of New York and are barred." Def. Mem. at 17. Odom does not address this argument.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While the language of the Eleventh Amendment is not literally applicable to suits brought by citizens of the state being sued, the Supreme Court has long held that it bars such suits as well. *See, e.g., Employees of Dep't of Pub. Health and Welfare v. Dep't of Pub. Health and Welfare,* 411 U .S. 279, 280 (1973). Thus, "[i]t is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) (citations omitted). The Supreme Court has also explicitly held that 42 U.S.C. § 1983 is not a statute that abrogates the States' sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 340-45 (1979).

The bar imposed by the Eleventh Amendment "remains in effect when State officials are sued for damages in their official capacity ." *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Thus, the Eleventh Amendment bars suits against individual employees of the State who are named as defendants in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

their official capacities. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); *Eng v. Coughlin,* 858 F.2d 889, 894 (2d Cir.1988). Accordingly, to the extent that Odom intends to state claims for money damages against Calero or any other defendant in their official capacities, such claims must be dismissed.

E. *Odom's April 14, 2008 Motion for Summary Judgment*

**\*10** Odom recently filed a motion for summary judgment (Docket # 48). This motion should be denied for two reasons. First, its statement of material facts (Docket # 52) violates Local Civil Rule 56.1(d) inasmuch as none of the statements are "followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Second, discovery has not yet begun in this case. Thus, a motion for summary judgment is premature and would merely result in a denial pursuant to Fed.R.Civ.P. 56(f). Odom previously filed a motion for summary judgment and it was denied for precisely this reason. *See* Order, filed Nov. 30, 2007 (Docket # 36) (available at: *Odom v. Calero,* 2007 WL 4191752 (S.D.N.Y. Nov. 28, 2007)).

*Conclusion*

For the foregoing reasons, the defendants' motion to dismiss the first and second causes of action (Docket # 20) should be granted in part and denied in part, with the only claim to proceed being the due process claim against Calero. Odom's motion for summary judgment (Docket # 48) should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street,

New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2008.
Odom v. Calero
Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Michael F. RAMSEY, Plaintiff,
v.
Glenn S. GOORD, Donald Selsky, Mr. Ryerson,
Thomas G. Eagen, John H. Nuttall, Michael McGin-
nis, Paul Chapius, A. Bartlett, M. Sheahan, J. Irizarry,
J. Hale, J. Cieslak, Sgt. Litwilder, J. Ames, C.O.
Clark, C.O. Held, and P. Klatt, Defendants.

No. 05-CV-47A.

Aug. 13, 2005.

Michael F. Ramsey, Clinton Correctional Facility,
Dannemora, NY, pro se.

DECISION and ORDER
SKRETNY, J.

*INTRODUCTION*

**\*1** Plaintiff, an inmate formerly incarcerated at
the Elmira and Southport Correctional Facilities
(hereinafter "Elmira" and "Southport"), has brought
this action pursuant to 42 U.S.C. § 1983, and seeks
permission to proceed *in forma pauperis* pursuant to
28 U.S.C. § 1915. Plaintiff's complaint sets forth five
claims alleging violations of his constitutional and
statutory rights. The first and second claims set forth
in the complaint relate to a July, 2002 administrative
hearing that was conducted on disciplinary charges
brought against him during his sojourn at Elmira, and
principally allege a violation of plaintiff's due process
rights. Plaintiff's third and fourth claims allege viola-
tions of his right to practice his religious beliefs by
correctional employees and supervisory personnel at
Southport between February, 2004 and January, 2005.

Plaintiff's fifth claim asserts that prison officials at
Southport interfered with his First and Fourteenth
Amendment rights when they deprived him of paper
and other materials necessary to his prosecution of
legal actions that he had previously filed. Plaintiff
seeks declaratory and injunctive relief as well as
compensatory and punitive damages with respect to
each claim.

Plaintiff's application to proceed *in forma pau-
peris* is granted. For the reasons set forth below, sev-
eral of plaintiff's claims are now dismissed pursuant to
28 U.S.C. §§ (e)(2)(B) and 1915(A), and service by
the U.S. Marshal is directed with respect to the re-
maining claims.

*DISCUSSION*

Section 1915(e)(2)(B) of 28 U.S.C. provides that
the Court shall dismiss a case in which *in forma
pauperis* status has been granted if the Court deter-
mines that the action: (I) is frivolous or malicious; (ii)
fails to state a claim upon which relief may be granted;
or (iii) seeks monetary relief against a defendant who
is immune from such relief. In addition, 28 U.S.C. §
1915A(a) requires the Court to conduct an initial
screening of "a complaint in a civil action in which a
prisoner seeks redress from a governmental entity or
officer or employee of a governmental entity," *id.,*
regardless of whether or not the inmate has sought *in
forma pauperis* status under 28 U.S.C. § 1915.

In evaluating the complaint, the Court must ac-
cept as true all factual allegations and must draw all
inferences in plaintiff's favor. *See King v. Simpson,*
189 F.3d 284, 287 (2d Cir.1999). Dismissal is not
appropriate "unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." *Conley v.
Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80
(1957). "This rule applies with particular force where

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir.1998).* Based on its evaluation of the amended complaint, the Court finds that several of plaintiff's claims must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b) because they fail to state a claim upon which relief may be granted.

**\*2** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. §§ 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875-76 (2d Cir.1994)). In addition, a prerequisite for liability under § 1983 is "personal involvement" by the defendants in the alleged constitutional deprivation. *Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998).

*1. Claims Relating to July, 2002 Disciplinary Hearing (First and Second Claims)*

*(a) Due Process*

The first claim of plaintiff's complaint alleges that he was deprived of his procedural due process rights during a disciplinary hearing conducted before defendant Ryerson, a hearing officer at Elmira, which resulted on July 24, 2002 in the determination of guilt with respect to the charges brought against plaintiff, and the imposition of six moths punitive confinement with six months loss of good time and privileges. (Compl. pp. 4-5). Specifically, plaintiff claims that he was denied the following due process rights at the hearing: the right to call witnesses; the right to employee assistance; the right to hear and respond to the evidence against him; and the right to have the hearing electronically recorded. (Compl. p. 5). He asserts that

defendants Selsky and Goord further violated his due process rights when they denied his appeal of Ryerson's determination.

Plaintiff's second claim also relates to the July, 2002 disciplinary hearing, and alleges that defendant Goord, Commissioner of the New York State Department of Correctional Services ("DOCS") ordered defendant Selsky, Director of the Special Housing Program for DOCS, to deny plaintiff's appeal of the July 24, 2002 disciplinary determination in retaliation for a complaint plaintiff had sent to Goord with respect to Goord's treatment of him. The complaint further alleges that following the denial of plaintiff's appeal of the July 24, 2002 determination by defendant Selsky, he sent a complaint to defendant Goord repeating the "blatant due process violations" that had allegedly been committed by defendant Ryerson during the disciplinary hearing, and alleging that Goord and Selsky's refusal to reverse Ryerson's determination was done for the purpose of retaliating against him for the complaint he had filed against Goord. Following plaintiff's receipt of a letter from defendant Selsky informing him that no further action would be taken with respect to plaintiff's appeal of the disciplinary determination, plaintiff states that he filed an Article 78 petition in New York State Supreme Court challenging defendant Ryerson's determination. He alleges that after unnecessarily delaying the Article 78 proceeding for the purpose of prolonging plaintiff's stay in punitive confinement, defendant Goord administratively reversed defendant Ryerson's determination and then moved successfully to dismiss plaintiff's petition as moot. (Compl. pp. 3, 6-7).

**\*3** It is well settled that when a litigant makes a constitutional challenge to a determination which affects the overall length of his imprisonment, the "sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Moreover, an inmate cannot use § 1983 to recover damages where "establishing the basis for the damages claim necessarily

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

demonstrates the invalidity of the conviction," *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and a § 1983 cannot lie "unless ... the conviction or sentence has already been invalidated" on direct appeal or by a habeas corpus petition. *Id.* at 487. The Supreme Court further held in *Edwards v. Balisok,* 520 U.S. 641, 646, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), that habeas was the sole mechanism for an inmate's constitutional challenge to a prison disciplinary hearing which led to a revocation of the inmate's accrued good-time credits because the "principal procedural defect complained of," namely deceit and bias on the part of the disciplinary hearing officer, "would, if established, necessarily imply the invalidity of the deprivation [the inmate's] good-time credits."

While the determination that forms the gravamen of plaintiff's complaint in the instant matter did affect the overall length of his imprisonment to the extent that it imposed a loss of six months good time, his complaint is not barred under *Preiser* and *Heck* because plaintiff demonstrates that it was administratively reversed following his commencement of an Article 78 proceeding in New York State Supreme Court.[FN1] *See, e.g., Odom v. Pataki,* 00 Civ. 3727, 2001 U.S. Dist. LEXIS 2790, at *7-8 (S.D.N.Y.2001) ("[A]n inmate may not assert a damages claim under § 1983 that attacks the fact or length of the inmate's confinement without first showing that the conviction has been reversed or otherwise invalidated.").

> FN1. Plaintiff attaches to his complaint documentation from the New York State Department of Correctional Services and the New York State Attorney General's Office which supports his claim that the July 24, 2002 disciplinary hearing determination was reversed, with all references to that determination expunged from plaintiff's record.

In determining whether plaintiff's first and second claims can go forward, the Court must also examine whether plaintiff has alleged the deprivation of a liberty interest that is entitled to constitutional protection. The administrative reversal of the July 24, 2002 disciplinary determination, and the expungement of that determination from plaintiff record, does not render plaintiff's due process claim non-justiciable, for plaintiff alleges that he served 121 days in "punitive confinement" prior to such reversal, during which he was handcuffed, chained and shackled whenever permitted to leave his cell.[FN2] (Compl. p. 5).

> FN2. The Court's determination that plaintiff served 121 days in punitive confinement is based upon the plaintiff's allegation that he was sentenced to six months of such confinement on July 24, 2002, and that his sentence was administratively reversed on November 22, 2002, pursuant to a Memorandum issued on the latter date by the Director of Special Housing/Inmate Discipline of the New York State DOCS, a copy of which is attached to the complaint.

In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300.[FN3] "Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence impose by a court of law," 515 U.S. at 485, 115 S.Ct. at 2301, and it is only where the prisoner's conditions of disciplinary confinement become an atypical and significant hardship based on a liberty interest created by state law that federal due process standards must be met. *See Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997) (holding that, while *Sandin* did not create a per se rule that disciplinary confinement may never implicate a liberty interest, where a prisoner fails to show the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

conditions to which he was subjected were "atypical and significant," summary judgment may nevertheless be granted).

> FN3. *Sandin* compared inmates in the SHU for disciplinary purposes to inmates in both the general inmate population and those in administrative segregation and protective custody. 515 U.S. at 485-86, 115 S.Ct. at 2301. Based on that comparison, the Court held that the plaintiff's 30-day SHU punishment did not "work a major disruption in his environment," *id.* at 486, 115 S.Ct. at 2301, and was "within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 487, 115 S.Ct. at 2302.

**\*4** Thus, in order to allege a cognizable due process claim, a § 1983 plaintiff must show that the "conditions of his [disciplinary] confinement ... were dramatically different from the basic conditions of [his] indeterminate sentence." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). In determining whether a prisoner has a liberty interest in remaining free from segregated confinement, district courts must make factual findings with respect to the alleged conditions of the confinement and the issue of its atypicality. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393-95 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Miller,* 111 F.3d at 8-9; *Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997). Several factors should be considered when assessing whether the particular restrictions imposed on the prisoner are atypical and significant, including: (1) the effect of the segregation on the length of the plaintiff's prison confinement; (2) the extent to which the conditions at issue differ from other routine prison conditions; and (3) the duration of the prisoner's disciplinary confinement compared to the potential duration a prisoner may experience while in discretionary confinement. *Wright,* 132 F.3d at 136.

In terms of the period of the number of days of punitive or other special confinement that will be regarded as sufficient implicate a prisoner's liberty interest, our Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). Instead, the Court of Appeals have established guidelines to be used by district courts in determining whether a prisoner's liberty interest has been infringed. *Id.* Pursuant to these guidelines, the Court has ruled that where a prisoner has been confined for what it has termed an "intermediate duration," defined as between 101 and 305 days, the district court is required to develop a " 'detailed record' of the conditions of confinement relative to ordinary prison conditions." *Id.* at 65 (quoting *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000)). The Court in *Palmer* further instructed that in a case involving an intermediate term of confinement, the district court must examine the "actual circumstances" of SHU confinement "without relying on its familiarity with SHU conditions in previous cases." *Id.* (citing *Kalwasinski v. Morse,* 201 F.3d 103, 106 (2d Cir.1999)).

In the instant case, plaintiff alleges that he was maintained in keeplock for 121 days, during which time he further alleges that he was subject to restraint by handcuffs, chains and shackles whenever he was allowed to leave his cell. It is not possible, based upon the allegations set forth in the complaint, for the Court to determine whether the conditions under which plaintiff was maintained were atypical within the meaning of *Sandin.* In light of the Second Circuit's directive that the district court must develop a detailed record concerning the nature of confinement conditions "where special confinement exceeds 101 days or there is any other indication of atypicality," *Harris v. McGinnis,* No. 02 Civ. 6481, 2004 U.S. Dist. Lexis 19500, at \*14 (S.D.N.Y.2004), the Court concludes that the complaint sufficiently alleges that plaintiff was deprived of a liberty interest.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

**\*5** To state a due process claim, plaintiff must also allege that the defendants "deprived him of [a liberty] interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654. Under the Fourteenth Amendment, the procedural protections required when the length or conditions of confinement implicate due process protections: "advance notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)). In light of the plaintiff's allegations, noted above, concerning how his due process rights were infringed at the July 24, 2002 hearing, and given the Court's duty to construe liberally the pleadings of *pro se* plaintiffs, the Court determines that the plaintiff's first and second claims sufficiently allege that his liberty interest was deprived as a result of insufficient process.[FN4]

> FN4. The Court notes that while plaintiff does specify in his complaint the precise nature of the alleged deprivation of due process that occurred at the July 24, 2002 hearing, the complaint is pretty thin in terms of allegations of specific facts showing precisely how plaintiff's due process rights were interfered with. The Court's decision to allow plaintiff's due process claims to proceed despite the sparseness of his factual allegations stems from the fact that the administrative reversal of the hearing determination is stated to have been based upon error by the hearing officer. (DOCS Memorandum 11/22/02 attached to complaint.)

There remains, however, the question of whether plaintiff has alleged sufficient involvement by defendants Ryerson, Goord and Selsky in the claimed deprivation of his due process rights. A prerequisite for liability under a § 1983 claim is "personal in-volvement" by the defendants in the alleged constitutional deprivation. *Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998). Under this requirement, there may be liability if:

(1) the defendant participated directly in the alleged constitutional violation; or (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which the unconstitutional practices occurred or allowed the continuance of such policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A claim which fails to demonstrate a defendant's personal involvement in the alleged constitutional deprivation is subject to *sua sponte* dismissal. *Montero v. Travis,* 171 F.3d 757, 761-62 (2d. Cir.1999) (citing *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *see Neitzke v. Williams,* 490 U.S. 319, 323 n. 2, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Plaintiff's due process claim against defendant Ryerson stems from Ryerson's role as the hearing officer at the hearing which concluded on July 22, 2002, and the Court finds that Ryerson's alleged role in presiding over the hearing is sufficient to allege personal involvement. Accordingly, plaintiff's first claim, alleging deprivation of due process, will be allowed to go forward against defendant Ryerson.

The Court's determination is different, however, with respect to plaintiff's due process claims against defendants Selsky and Goord. Plaintiff alleges in his first claim that he appealed Ryerson's disciplinary determination to Goord, and that defendant Selsky responded on Goord's behalf, advising him that his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

appeal was denied. In his second claim he further alleges that he sent two letters to defendant Goord complaining about the treatment to which he had been subjected at the disciplinary hearing. Once again responding on behalf of Commissioner Goord, defendant Selsky advised plaintiff that no further action would be taken by Selsky or Goord with respect to plaintiff's complaint about his treatment at the hearing. (Compl. pp. 6-7). Plaintiff's allegations are not sufficient to allege personal involvement by defendants Selsky and Goord with respect to plaintiff's due process claims.[FN5]

> FN5. While plaintiff alleges that defendant Goord ordered defendant Selsky to deny plaintiff's appeal as a means of punishing and retaliating against plaintiff for having complained to Goord, plaintiff alleges no facts that would support this allegation and it is not self-evident how plaintiff would have been in a position to know that Goord "ordered" Selsky to punish and retaliate against plaintiff. Plaintiff similarly alleges no facts to support his claim that Goord requested "lengthy delays and unnecessary extensions" in responding to plaintiff's Article 78 complaint.

**\*6** It is well-established that "mere linkage in the prison chain of command" is not sufficient to support a claim of personal involvement. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1995); *see also Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim."). Moreover, the fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS "chain of command," affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part. *Page v. Breslin,* 02-CV-6030, 2004 U.S. Dist. LEXIS 25056, at \*21-22 (E.D.N.Y.2004); *Foreman v. Goord,* 02 Civ. 7089, 2004 U.S. Dist. LEXIS, at \*21-22

(S.D.N.Y.2004). In addition, the fact that defendant Goord apparently referred plaintiff's appeal and letter-complaints to defendant Selsky for resolution is not enough to establish personal involvement on the part of Goord. *See Lunney v. Brureton,* 04 Civ. 2438, 2005 U.S. Dist. LEXIS 770, at \*45-46 (S.D.N.Y.2005) (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d cir.1997)) ("[S]ubmitting an appeal or complaint to a subordinate for disposition is not sufficient to find personal involvement."). The Court therefore determines that plaintiff's due process claims against defendants Selsky and Goord must be dismissed.

*(b) Malicious Prosecution, First Amendment, Equal Protection*

In addition to his due process arguments, plaintiff's first and second claims set forth additional bases for his challenges to the disciplinary proceeding concluded on July 24, 2002. He alleges that he was the victim of malicious prosecution, and that defendants Selsky and Goord's initial refusal to reverse the disciplinary determination stemmed from their decision to retaliate against plaintiff for complaining about their treatment of him, thereby violating his First Amendment rights. Plaintiff also invokes the equal protection clause.

Plaintiff fails to specifically indicate which actions of the defendants are alleged to constitute "malicious prosecution." However, based upon the factual recitals set forth in his statement of his first and second claims, it would appear that plaintiff is contending that the refusal of defendants Selsky and Goord to reverse defendant Ryerson's determination on appeal until after plaintiff had commenced an Article 78 proceeding with respect to that determination constituted "malicious prosecution."

"To prevail on a malicious prosecution claim under either New York law or § 1983, a plaintiff must show that the defendant maliciously commenced or continued against the plaintiff a criminal proceeding that ended in the plaintiff's favor, and that there was no

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

probable cause for the proceeding." *Marshall v. Sullivan,* 105 F.3d 47, 50 (2d Cir.1996) (citing *Posr v. Doherty,* 944 F.2d 91, 100 (2d Cir.1991)). Further, only those claims of malicious prosecution that implicate Fourth Amendment rights can be appropriate bases for malicious prosecution claims brought under § 1983. *Washington v. County of Rockland,* 373 F.3d 310, 316 (2d Cir.2004) (citing *Albright v. Oliver,* 510 U.S. 266, 274-75, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). A claim for malicious prosecution under § 1983 may not be premised on an administrative disciplinary proceeding, at least in the absence of a claim of a violation of Fourth Amendment rights. *Id.* at 315.

**\*7** The disciplinary proceeding challenged by plaintiff in the instant matter was not a criminal prosecution, *see Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("Prison disciplinary proceedings are not part of a criminal prosecution ...."), and plaintiff alleges no violation of Fourth Amendment rights. Accordingly, to the extent the first and second claims in the complaint are based upon the defendants' alleged malicious prosecution of him, they must be dismissed.

Plaintiff's invocation of his First Amendment rights to free speech and to petition the government as another basis for his second claim is understood to relate to his allegation that defendant Selksy denied plaintiff's appeal from the July 24, 2002 disciplinary determination in retaliation for his sending a letter to defendant Goord criticizing certain statements Goord had made in a DOCS newsletter. (Compl.P. 6).

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e .g., Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To state a retaliation claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of*

*New York,* 210 F.3d 79, 85 (2d Cir.2000) (internal quotation and citation omitted). As to the second prong, a prisoner alleging retaliation must show that the protected conduct was "a substantial or motivating factor" behind the alleged retaliatory conduct. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Evidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. *See Colon,* 58 F.3d at 872-73.

Because claims of retaliation are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care," *Colon,* 58 F.3d at 872, requiring " 'detailed fact pleading ... to withstand a motion to dismiss." ' *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (quoting *Angola v. Civiletti,* 666 F.2d 1, 4 (2d Cir.1981)). To survive a motion to dismiss, such claims must be " 'supported by specific and detailed factual allegations," ' and should not be stated " 'in wholly conclusory terms." ' *Friedl,* 210 F.3d at 85-86 (quoting *Flaherty,* 713 F.2d at 13); *see also Graham,* 89 F.3d at 79 (wholly conclusory claims of retaliation "can be dismissed on the pleadings alone"); *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (same).

Moreover, only those retaliatory acts that are likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment are actionable under § 1983; in other words, allegations of *de minimis* acts of retaliation do not state a claim under § 1983. *Thaddeus-X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999) (cited with approval in *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). *See Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (on remand, district court must consider the "serious question" of "whether the alleged acts of retaliation ... were more than *de minimis*" in deciding summary judgment motion). A *de minimis* retaliatory

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

act is outside the ambit of constitutional protection. *Dawes,* 239 F.3d at 492.

**\*8** There is nothing in plaintiff's complaint to support his claim that his appeal from July 24, 2002 was denied in retaliation for his having sent a complaint to defendant Goord beyond: (1) the temporal proximity between his filing of his complaint and the denial of his appeal and (2) his recital of an accusation of retaliation that he leveled against Goord and Selsky in a second letter that he sent to Goord following the denial of his appeal. Plaintiff fails, however, to point to anything said or otherwise communicated to him by Goord or Selsky or by any other prison official or employee that supports his claim that defendants' denial of his appeal was intended to retaliate against him for exercising his First Amendment rights. The Court therefore finds that plaintiff's claim of retaliation is wholly conclusory and therefore that his First Amendment claims (free speech, right to petition) should be dismissed. Further, the Court finds nothing in plaintiff's statement of his first and second claims that would support his allegation that defendants Goord and Selsky violated his equal protection rights, and those claims must likewise be dismissed.

*2. Claims Alleging Deprivation of Religious Freedom (Third and Fourth Claims)*

Plaintiff's third and fourth claims principally allege that prison officials took actions that had the effect of depriving him of his right to freely exercise his religious beliefs.

Plaintiff's third claim alleges that Jewish inmates like himself were subjected at Southport to certain delays and restrictions on their right to be fed food prepared in accordance with the prescribed kosher rules. Specifically, he asserts that only Jewish inmates were forced to wait ten to twenty days after their arrival at Southport before being provided with a kosher diet, disciplined for giving away food they do not eat or want and denied meat alternatives for meat items on the kosher menu. (Compl. p. 8). Curiously, plaintiff's

complaint does not identify the officials or employees at Southport who were responsible for such alleged discriminatory treatment of Jewish inmates. Instead, his third claim focuses on the alleged failure of supervisory personnel to take favorable action in response to the grievances and letters plaintiff submitted to them in which he complained about the facility's "discriminatory policies and practices." He alleges that in February, 2004 he filed a grievance complaining about religious discrimination, but that acting Superintendent Chappius and Superintendent McGinnis upheld the denial of the grievance, as did defendant Eagan, the director of the DOCS Inmate Grievance Program, to whom plaintiff subsequently appealed.[FN6]

> [FN6]. Plaintiff attaches to his complaint copies of the relevant decisions denying his grievances, which the Court has reviewed.

As previously noted in connection with the Court's assessment of plaintiff's disciplinary hearing claims, personal involvement of a defendant in an alleged Constitutional violation is a prerequisite for liability under § 1983. Here, plaintiff does not allege that defendants Goord, Eagan, McGinnis and Chappius were personally involved in the alleged deprivations of plaintiff's free exercise rights. Instead, plaintiff seeks to sue them because of their refusal to reverse the denial of his grievance. As previously noted, the fact that a prison official in the prison "chain of command" affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official. *Page v. Breslin,* 02-CV-6030, 2004 U.S. Dist. LEXIS 25056, at \*21-22 (E.D.N.Y.2004); *Foreman v. Goord,* 02 Civ. 7089, 2004 U.S. Dist. LEXIS, at \*21-22 (S.D.N.Y.2004); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002); *Villante v. N.Y. State Dep't of Corr. Servs.,* 96-CV-1484, 2001 U.S. Dist. LEXIS 25208, at \*17 (N.D.N.Y.2001). This point was well-stated in *Joyner v. Greiner,* in which the Court dismissed a former inmate's Eighth Amendment claim against the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

Superintendent of the Sing Sing Correctional Facility which was premised upon the Superintendent's denial of a grievance the inmate had filed with respect to the medical treatment he had received:

**\*9** The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant.

195 F.Supp.2d at 506 (internal quotation marks and citation omitted).

This principle applies to superintendents, commissioners, and other prison officials who are in the chain of command with respect to the grievance review process. *See, e.g., Breslin,* 2004 U.S. Dist. LEXIS at \*21-22 (dismissing claim against superintendent based upon "mere affirmation of grievance denial"); *Foreman,* 2004 U.S. Dist. LEXIS at \*21-22 (dismissing claims against Commissioner and prison superintendent).

Accordingly, the Court determines that plaintiff's claims against defendants Goord, Eagen, McGinnis, and Chappius alleging violations of his freedom of religion, due process and equal protection rights, as set forth in the "third claim" of his complaint, must be dismissed in their entirety for failure to allege the requisite personal involvement by the defendants.

Plaintiff's fourth claim also relates to the alleged deprivation by prison officials of kosher food, but other things are added to a create convoluted assortment of allegations. Specifically, plaintiff asserts that his rights to free speech and to petition were interfered with, and that he was subjected to malicious prosecution and discrimination.

Plaintiff's fourth claim alleges that in retaliation for having provided a statement supporting a fellow Jewish inmate who had been involved in a dispute with defendant C.O. Clark, Clark advised plaintiff that he was being removed from the kosher meal program. Plaintiff asserts that this retaliatory denial of kosher food, which began on July 29, 2004, continued for about a month thereafter, ending (on September 4, 2004) after plaintiff had filed grievances with respect to the defendants' actions in connection with plaintiff's exclusion from kosher meals, and related retaliatory actions allegedly undertaken by several of the defendants.[FN7] Plaintiff claims that defendant Held initially ordered him removed from the kosher meal program, and that defendant Irizarry subsequently sent plaintiff a letter advising him that he was being removed from the kosher meal "for allegedly violating a facility rule."

> FN7. Several of the memoranda and grievance decisions by DOCS officials attached to the complaint indicate that plaintiff had been removed from the "Cold Alternative Meal Program" as a result of "program violations" by the plaintiff (specifically, that plaintiff was giving away or trading his food) and not in retaliation for something plaintiff had done.

Plaintiff then chronicles his attempts to appeal defendant Irizarry's determination, initially to defendant McGinnis. He alleges that McGinnis was advised by the facility Rabbi that Irizarry's actions violated plaintiff's religious dietary laws, and that he should immediately be returned to the kosher meal program, but McGinnis disregarded the Rabbi's advice and upheld Irizarry's determination. Thereafter plaintiff appealed McGinnis's affirmation of Irizarry's decision to defendant Goord. However, following the resumption of plaintiff's kosher meals on September 4, 2004, defendant DOCS deputy Commissioner Nuttal, responding on behalf of Goord, informed plaintiff that the issue was "closed," and that no actions would be taken in response to the issues raised in plaintiff's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

complaints and appeals. Two additional grievances subsequently filed by plaintiff were, he claims, likewise ignored.

**\*10** The Court finds that plaintiff's allegations are sufficient to allow his fourth claim asserting violations of his free exercise, right to petition, due process, and equal protection rights to proceed against defendants Klatt, Clark, Held, Irizarry, McGinnis, and Sheahan.[FN8]

> **FN8.** While the allegations in plaintiff's fourth claim against defendants McGinnis and Sheahan would appear to be essentially based upon their denial of plaintiff's appeal of defendant Irizarry's decision to remove plaintiff from the kosher food program, and might therefore be dismissed for failure to allege those defendant's personal involvement in the violation of plaintiff's constitutional rights (see discussion set forth in the Court's dismissal of plaintiff's third claim *supra* ), the Court finds that plaintiff's allegation that the facility Rabbi spoke to defendant McGinnis, but McGinnis disregarded his advice sufficiently alleges personal involvement against defendant McGinnis (and by extension, defendant Sheahan, who plaintiff alleges acted in concert with McGinnis) to allow plaintiff's fourth claim against McGinnis and Sheahan to go forward.

The Court further finds, however, that plaintiff's fourth claim must be dismissed with respect to defendants Goord, Nuttal, Cieslak and Eagan. Plaintiff's allegations against these defendants with respect to his fourth claim are based upon the fact that they refused to reverse the denial of several grievances filed by plaintiff with respect to his claims of religious discrimination and denial of due process. As explained by the Court in addressing plaintiff's third claim, *supra,* the mere fact that a prison official in the prison

"chain of command" has occasion to pass upon a prisoner's grievance is not sufficient to establish requisite personal involvement in an alleged denial of a plaintiff's constitutional rights. *See, e.g., Joyner v. Greiner,* 195 F.Supp. at 506. Similarly, the fact that plaintiff also sent letters to defendant Goord "pleading for him to take corrective actions," but that Commissioner Goord and Deputy Commissioner Nuttall took no corrective action in response to his missives is not sufficient to hold Goord or Nuttal liable under § 1983. *See Sealey,* 116 F.3d at 51.

Plaintiff also asserts in his fourth claim that he was the victim of malicious prosecution and failure to protect, but the complaint does not allege the predicate facts necessary to support these allegations, and they are accordingly dismissed against all defendants.

*3. Claim of Denial of Access to Court and Right to Petition (Fifth Claim)*

Plaintiff's fifth claim asserts that his rights to petition for redress of grievances and for access to the Courts were interfered with when defendants Ames and Litwilder, in February/March 2004, confiscated all of his writing paper and carbon paper, denied him law library materials, would not allow him to use a stapler, and refused to allow him to have his briefs and affidavits in a state court case to be bound in accordance with the rules of the New York State Supreme Court, Second Judicial Department, causing his papers to be rejected. Plaintiff filed grievances with respect to these alleged interferences with his rights, but his grievances were denied or ignored by defendants Bartlett, Hale, and Cieslak, as were his ensuing appeals to defendants McGinnis, Chapius and Eagan.

Plaintiff's allegations that the denial of his access to materials necessary to prepare or perfect his grievances and lawsuits materially prejudiced his ability to pursue such grievances and legal actions are sufficient to state a claim that his right of access to the courts was unconstitutionally hindered. *Ramsey v. Coughlin,* No. 94-CV-9S( F), 1 F.Supp.2d 198,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

204-205 (W.D.N.Y.1998) (Magistrate's Report and Recommendation). Plaintiff's fifth claim will therefore be allowed to proceed against defendants Ames and Litwilder.

**\*11** However, plaintiff's fifth claim must be dismissed with respect to defendants Bartlett, Hale, Cieslak, McGinnis, Chapius and Eagan. With respect to these defendants, plaintiff's allegations fail to allege the requisite personal involvement. As previously noted, the fact that defendants failed to respond to plaintiff's letters or, as links in the prison system "chain of command," affirmed the denial or dismissal of plaintiff's grievances, is not sufficient to establish their liability under Section 1983. *See, e.g., Page v. Breslin,* 2004 U.S. Dist. LEXIS at \*21-22; *Foreman v. Goord,* 2004 U.S. Dist. LEXIS, at 19-22; *Joyner v. Greiner,* 195 F.Supp.2d at 15.

### CONCLUSION

In accordance with the foregoing, the Court determines that:

Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to the filing fee. Accordingly, plaintiff's request to proceed *in forma pauperis* is granted.

All claims against defendants Goord, Selsky, Eagan, Chappius, Nuttal, Cieslak, Bartlett, and Hale are dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A.

Plaintiff's malicious prosecution claim as set forth in the "first claim" of his complaint is dismissed as to all defendants enumerated therein.

Plaintiff's free exercise of religion, due process, equal protection/discrimination claims set forth in the "third claim" of his complaint are dismissed as to all defendants enumerated therein.

Plaintiff's malicious prosecution and failure to protect claims set forth in the "fourth claim" of his complaint are dismissed as to all defendants enumerated therein.

Plaintiff's due process claim set forth in the "first claim" of his complaint survives as to defendant Ryerson.

Plaintiff's free exercise of religion, right to petition, due process, and equal protection claims set forth in the "fourth claim" of his complaint survive as to defendants Klatt, Clark, Held, Irizarry, McGinnis and Sheahan.

Plaintiff's access to court, right to petition, and due process claims set forth in the "fifth claim" of his complaint survive as to defendants Ames and Litwilder.

The U.S. Marshal is directed to serve the summons, complaint and this Order on defendants Ryerson, Klatt, Clark, Held, Irizarry, McGinnis, Sheahan, Ames and Litwilder regarding the claims against those defendants which survive, as enumerated above.

### ORDER

IT HEREBY IS ORDERED that plaintiff's claims against defendants Selsky, Goord, Eagan, Chappius, Nuttal, Cieslak, Bartlett and Hale are dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to terminate as parties to this action defendants Selsky, Goord, Eagan, Chappius, Nuttal, Cieslak, Bartlett and Hale;

FURTHER, that the Clerk of the Court is directed to file plaintiff's papers, and to cause the United States Marshal to serve copies of the summons, complaint and this Order upon defendants Ryerson, Klatt, Clark,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
**(Cite as: 2005 WL 2000144 (W.D.N.Y.))**

Held, Irizarry, McGinnis, Sheahan, Ames and Litwilder without plaintiff's payment therefore, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor;

**\*12** FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to answer the complaint.

SO ORDERED.

W.D.N.Y.,2005.
Ramsey v. Goord
Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
**(Cite as: 2010 WL 980273 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.

No. 9:07-CV-0432 (LEK/DEP).
March 15, 2010.

Nelson Rodriguez, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

### DECISION AND ORDER
LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on February 25, 2010 by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 54). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including Defendant Donald Selsky's Objections (Dkt. No. 55), which were filed on March 2, 2010 and Plaintiff Nelson Rodriguez's Objections, (Dkt. No. 56), which were filed on March 11, 2010.

It is the duty of this Court to "make a de novo determination of those portions of the report or speci-fied proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the parties' Objections (Dkt.Nos.55, 56) and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 54) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant Selsky's Motion for judgment on the pleadings (Dkt. No. 47) is **DENIED,** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION
DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Nelson Rodriguez, a prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, as amended, Rodriguez alleges that prison officials at the facility in which he was confined at the relevant times issued him a false misbehavior report and denied him procedural due process during the course of the ensuing disciplinary hearing.[FN1] Plaintiff attributes defendants' actions to retaliation for his having filed a civil action against a corrections em-

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
**(Cite as: 2010 WL 980273 (N.D.N.Y.))**

ployee who is not named as a defendant in this action.

> FN1. As originally constituted, plaintiff's complaint recited other allegedly unlawful conduct, including that he was subjected to ongoing harassment, retaliation, and interference with his access to the courts. As a result of a series of court interventions the claims in this action, which was commenced elsewhere but later transferred to this district, have been significantly narrowed.

At this juncture, all that remains in the case is plaintiff's claim against defendant Donald Selsky, the Director of Special Housing and Inmate Disciplinary Programs for the New York State Department of Correctional Services ("DOCS"), alleging violation of plaintiff's due process rights arising out of his disciplinary hearing and defendant Selsky's review of plaintiff's appeal of the disciplinary determination and affirmance of the finding of guilt, though with modification of the sentence imposed. Now that discovery in the action has closed, defendant Selsky has moved for judgment on the pleadings seeking dismissal of plaintiff's claims against him.

Defendant's motion presents an issue that has divided the courts of this circuit-that is, whether by reviewing a disciplinary determination allegedly infected by procedural due process violations defendant Selsky becomes sufficiently involved in the constitutional deprivation to support a finding of liability. After having carefully considered plaintiff's allegations in light of the arguments now raised, I have concluded that those district court decisions finding the requisite personal involvement under the circumstances presented are better-reasoned. Accordingly, I find that plaintiff has set forth a plausible cause of action for a due process violation against defendant Selsky and therefore recommend that his motion for judgment on the pleadings be denied.

*I. BACKGROUND*[FN2]

> FN2. In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

**\*2** Plaintiff is a prison inmate entrusted to the custody of the DOCS; at the times relevant to his due process claim it appears that Rodriguez was housed in the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. *See generally* Amended Complaint (Dkt. No. 7); *see also* Complaint (Dkt. No. 1).[FN3]

> FN3. Defendant Selsky's motion is addressed to plaintiff's amended complaint, which was filed on June 26, 2007, and is the operative pleading currently before the court. Dkt. No. 7. Despite the fact that it has been superceded as a result of the filing of an amended complaint, *Harris v. City of New York,* 186 F.3d 243, 249 (2d Cir.1999), I have also referred to plaintiff's original complaint to assist in fleshing out the relevant background facts as it more clearly identifies the location of some of the relevant events. Plaintiff's amended complaint, for example, does not clearly allege where he was incarcerated when the wrongdoing now at issue occurred, whereas a review of his original complaint indicates that the relevant events occurred while plaintiff was incarcerated at Shawangunk.

Plaintiff alleges that on December 30, 2003, he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
**(Cite as: 2010 WL 980273 (N.D.N.Y.))**

was issued a false misbehavior report accusing him of disciplinary infractions and that Corrections Captain Connolly was principally responsible for its issuance and the false accusation upon which it was based. *See* Amended Complaint (Dkt. No. 7) ¶ 12. In that disciplinary report, which was not served upon him until January 2, 2004, plaintiff was charged with fighting, engaging in violent conduct, and participating in an action detrimental to the order of facility, all in violation of established prison rules. *Id.* ¶ 14. Shortly after the misbehavior report was issued, at the direction of defendant Connolly corrections officers escorted the plaintiff to the facility's hospital isolation room, purportedly for treatment of injuries that he sustained. *Id.* ¶ 13. The following day, without having yet been officially charged with any misconduct, plaintiff was placed in the facility's special housing unit ("SHU"), again at the direction of defendant Connolly. *Id.*

A disciplinary hearing was conducted, beginning on January 8, 2004, to address the misbehavior report. Amended Complaint (Dkt. No. 7) ¶ 15. During the course of that hearing plaintiff was served with yet another misbehavior report which, he alleges, was also fabricated. *Id.* Although plaintiff objected on the record to the late receipt of the newest misbehavior report, the hearing proceeded and continued until January 27, 2004. *Id.* ¶ 16. Plaintiff maintains that during the course of the hearing he presented "overwhelming evidence" supporting his claim of fabrication and his theory that corrections officials, along with certain inmates, conspired to set him up, allegedly on orders from defendant Connolly. *Id.* According to the plaintiff, in light of that evidence defendant Wright, the author of one of the misbehavior reports, was prepared to drop the charges against him, but the hearing was nonetheless reinstated on order of defendant Connolly. *Id.* ¶ 17.

Plaintiff contends that during the course of the hearing Corrections Counselor Roddy, who was apparently assigned to assist him, exhibited bias, acted unprofessionally, and refused to provide him with requested documents. Amended Complaint (Dkt. No. 7) ¶ 18. According to Rodriguez, defendant Roddy threatened that if he continued to request further assistance from her she would "write him up for harassment". *Id.* Plaintiff's amended complaint alleges that he was denied the right to adequately prepare a meaningful defense to the charges against him and that he was deprived of a fair and impartial hearing by defendant John Ewanciw, the hearing officer, who was biased and involved in the "set up" against him. *Id.* ¶¶ 19-20. Plaintiff maintains that all of the defendants' actions were taken in retaliation for his having commenced a civil action against another DOCS employee, Lieutenant Schneider. *Id.* ¶ 19.

**\*3** Although plaintiff's complaint, as amended, does not provide a great deal of detail regarding the hearing outcome, it appears that following the disciplinary hearing he was found guilty of one or more of the charges lodged against him and sentenced to a term of two years of disciplinary SHU confinement. *See* Amended Complaint (Dkt. No. 7) ¶ 21. Plaintiff appealed his disciplinary conviction to both defendant Michael McGinnis, the superintendent at the Southport Correctional Facility, and defendant Selsky. *Id.* ¶ 21. In those appeals, plaintiff reiterated his argument that the misbehavior reports lodged against him were fabricated, that the subsequent disciplinary hearing was unfair, and that the hearing officer's packet was missing "pertinent documentary evidence that the plaintiff had submitted as evidence" which would have refuted the charges leveled against him. *Id.* Though the finding of guilt on the charges was affirmed, plaintiff's appeal to defendant Selsky resulted in a reduction of the term of SHU confinement from two years to one. *Id.*

## II. *PROCEDURAL HISTORY*

This action was filed on April 11, 2007 in the Southern District of New York, but was subsequently transferred to this district by order issued by Chief District Judge Kimba M. Wood on April 11, 2007 .[FN4] Dkt. Nos. 1, 3. Plaintiff's original complaint chal-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
(Cite as: 2010 WL 980273 (N.D.N.Y.))

lenged not only the misbehavior report and disciplinary action that ensued but also chronicled continued harassment and acts of retaliation that he experienced following his transfer into the Attica Correctional Facility, naming as defendants several DOCS employees including Donald Selsky. *Id.* Upon transfer of the case to this district and the court's initial review of plaintiff's complaint and accompanying request for leave to proceed *in forma pauperis* ("IFP"), by order dated May 17, 2007 Senior District Judge Lawrence E. Kahn granted plaintiff IFP status but directed that he file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* the apparent untimeliness of certain of his claims. Dkt. No. 5.

> FN4. While plaintiff's complaint was not filed in the Southern District until April 11, 2007, the transfer order issued by Chief Judge Wood noted that the complaint was received in that district on February 26, 2007. *See* Dkt. No. 3, n. 1.

In accordance with the court's directive, plaintiff filed an amended complaint on June 26, 2007. Dkt. No. 7. Upon review of that pleading District Judge Kahn issued an order on July 19, 2007 accepting plaintiff's amended complaint for filing, but dismissed his claims against the majority of the defendants as time-barred and further directing dismissal of plaintiff's claims against a newly added defendant, Corrections Sergeant Corcran, without prejudice to plaintiff's right to file a separate action against that defendant in the Western District of New York.[FN5] As a result, Donald Selsky was left as the sole remaining defendant in the action.

> FN5. District Judge Kahn explained that "[s]ince the alleged wrongdoing by Defendant Corcran occurred in the Western District of New York, and Plaintiff's claims against Defendant Corcran are very recent, and thus not in jeopardy of being time-barred

at this time, the Court will dismiss Defendant Corcran from the action, without prejudice to Plaintiff filing his claims against Defendant Corcran in the Western District of New York." Dkt. No. 8 at p. 3.

After filing an answer generally denying plaintiff's allegations against him and asserting various affirmative defenses, Dkt. No. 10, on March 5, 2009 defendant Selsky moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, urging dismissal of plaintiff's amended complaint on the ground that plaintiff has failed to allege that he was personally involved in any wrongdoing.[FN6] Dkt. No. 47. Plaintiff has since opposed the motion, Dkt. No. 50, prompting submission by the defendant of a reply to plaintiff's response, Dkt. No. 51, and a surreply by the plaintiff. Dkt. No. 53. Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN6. At defendant's request the dispositive motion filing deadline in this case has been held in abeyance, and the court has granted defendant's request for leave to file a summary judgment motion in the event that his motion for judgment on the pleadings is denied. *See* Dkt. No. 48 and Text Entry Dated March 9, 2009.

III. *DISCUSSION*

A. *Standard of Review*

**\*4** Defendant's motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which governs the entry of judgment on the pleadings. [FN7] When analyzing a Rule 12(c) motion, I must apply

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
**(Cite as: 2010 WL 980273 (N.D.N.Y.))**

the same standard as that applicable to a motion under Rule 12(b)(6). *See, e.g., Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994); *Wynn v. Uhler,* 941 F.Supp. 28, 29 (N.D.N.Y.1996)* (Pooler, J.).

> FN7. Rule 12(c) provides that "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). Rule 12(d) further mandates that:

>> [i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

> Fed.R.Civ.P. 12(d).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion "is not whether [the] plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has

failed to provide some basis for the allegations that support the elements of his or her claim. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563, 570, 127 S.Ct. 1955, 1969, 1974 (2007); *see also Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976)) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (internal quotations omitted); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a pro se plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave [to amend] when justice so requires.").

B. *Personal Involvement*

**\*5** In his motion defendant Selsky maintains that plaintiff's amended complaint fails to allege facts showing that he was personally involved in the alleged due process violation, and does not support a finding

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
**(Cite as: 2010 WL 980273 (N.D.N.Y.))**

of liability against him. Defendant Selsky argues that the mere fact that he reviewed and affirmed the hearing officer's findings, without more, is insufficient to demonstrate his personal involvement in any alleged due process violations that may have occurred during the course of the disciplinary hearing.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

Defendant Selsky's participation in the relevant events, including his review on appeal of the disci-

plinary hearing and determination, would seem to bring him squarely within the second of the five above-stated potential grounds for establishing personal involvement on the part of a supervisory employee. Despite this, some courts have found that the mere allegation that Selsky has reviewed and affirmed a hearing officer's disciplinary determination is insufficient to show the requisite personal involvement in the alleged underlying constitutional violation. *See, e.g., Abdur-Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05-CV-47A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part .");[FN8] *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

> FN8. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like defendant Selsy. *See, e.g., Baez v. Harris,* No. 9:01-CV-807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involve-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
**(Cite as: 2010 WL 980273 (N.D.N.Y.))**

ment); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to withstand this motion."); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02-CV-0915, Report-Recommendation, 2005 WL 3531464, at *16 (N.D.N.Y. Mar. 14, 2004) (Peebles, M.J.) (recommending that Selsky's motion for summary judgment for lack of personal involvement be denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations."), *adopted,* 2005 WL 3531464, at *1-2 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.).

Those cases concluding that a plaintiff's allegations that defendant Selsky reviewed and upheld an alleged constitutionally suspect disciplinary determination are enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement). While it may be true

that the due process violations cited by Rodriguez occurred and were no longer ongoing when his appeal was taken to defendant Selsky, because it appears that the sentence imposed was still being served at the time of his review the liberty interest deprivation alleged to have effectuated without due process was therefore ongoing, and defendant Selsky was in a position to remedy the violation, at least in part, at a time when his intervention would still have been meaningful.[FN9]

> FN9. It should be noted that in this case plaintiff goes beyond merely alleging defendant Selsky's failure to rectify a past due process violation. In his complaint plaintiff also alleges that defendant Selsky participated in or furthered the violation by failing to conduct an appropriate review. Amended Complaint (Dkt. No. 7) ¶ 21. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

**\*7** In sum, having reviewed plaintiff's allegations and accepted them as true, I find that plaintiff has alleged sufficient facts to demonstrate a plausible due process claim and the requisite personal involvement in the violation by defendant Selsky.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint alleges that on his appeal of a disciplinary determination that was infected by procedural due process violations defendant Selsky failed to perform a proper investigation of plaintiff's claims and remedy the unconstitutional conduct that had occurred. Taken as true, these facts could establish that Selsky was aware of and failed to remedy a constitutional violation. At this juncture, plaintiff has therefore sufficiently set forth facts demonstrating defendant Selsky's personal involvement in an alleged Fourteenth Amendment violation. Accordingly, it is hereby respectfully

RECOMMENDED that defendant Selsky's mo-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980273 (N.D.N.Y.)
**(Cite as: 2010 WL 980273 (N.D.N.Y.))**

tion for judgment on the pleadings (Dkt. No. 47) be
DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the
parties may lodge written objections to the foregoing
report. Such objections shall be filed with the Clerk of
the Court within FOURTEEN days. FAILURE TO SO
OBJECT TO THIS REPORT WILL PRECLUDE
APPELLATE REVIEW. 28 U.S.C. § 636(b)(1);
Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984
F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court
serve a copy of this report and recommendation upon
the parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Rodriguez v. Selsky
Not Reported in F.Supp.2d, 2010 WL 980273
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.